# EXHIBIT A

David Azar (State Bar No. 218319)
dazar@milberg.com
**MILBERG PHILLIPS GROSSMAN LLP**
16755 Von Karman Avenue, Suite 200
Irvine, California 92606
Telephone:  212-594-5300
Facsimile:  212-868-1229

Peggy J. Wedgworth (*pro hac vice forthcoming*)
pwedgworth@milberg.com
Robert A. Wallner (*pro hac vice forthcoming*)
rwallner@milberg.com
Elizabeth McKenna (*pro hac vice forthcoming*)
emckenna@milberg.com
Blake Yagman (*pro hac vice forthcoming*)
byagman@milberg.com
Michael Acciavatti (*pro hac forthcoming*)*
macciavatti@milberg.com
*admitted only in Pennsylvania
**MILBERG PHILLIPS GROSSMAN LLP**
One Penn Plaza, Suite 1920
New York, New York 10119
Telephone: 212-594-5300
Facsimile: 212-868-1229

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>                Plaintiff,<br><br>    v.<br><br>GOOGLE LLC; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LIMITED; and GOOGLE PAYMENT CORP.,<br><br>                Defendants. | CASE NO. 3:20-cv-05671-JD<br><br>**ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED PURSUANT TO CIVIL L.R. 3-12** |

Pursuant to Civil Local Rule 3-12, Plaintiffs Dianne Bentley, Jennifer Grace, Adan Moya, Coresa Trimble, and Robert Wing (collectively, "Plaintiffs") respectfully move this Court to consider whether their recently filed case, *Bentley et al. v. Google LLC et al.*, No. 5:20-cv-07079 (filed Oct. 9, 2020) ("*Bentley*"), should be related to *Epic Games, Inc. v. Google LLC et al.*, No. 3:20-cv-05671-JD ("*Epic*"), the lowest-numbered, related case. *See also* Related Case Orders, ECF Nos. 42 and 46.

## I. Relevant Background

On August 13, 2020, app distributor, Epic Games, Inc., filed an antitrust action against Google, alleging that Google's unlawful monopolization of and exclusionary conduct in the market in which Android apps are distributed enables Google to impose a supra-competitive 30% tax on apps purchased from the Google Play Store. Class actions on behalf of app developers and consumers were filed on August 16 and 17, 2020, respectively: *Carr v. Google LLC et al.*, No. 20-cv-05761-JD (Aug. 16, 2020) ("*Carr*"), and *Pure Sweat Basketball, Inc. v. Google LLC et al.*, No. 20-cv-05792-JD (Aug. 17, 2020) ("*Pure Sweat Basketball*"). This Court ordered the *Carr* consumer class action and the *Pure Sweat Basketball* app developer class action related to the *Epic* case on September 9 and 10, 2020, respectively. *See* Related Case Orders ECF No. 42 (Sept. 9, 2020) and 46 (Sept. 10, 2020). The app developer class action, *Peekya Services Inc., v. Google LLC et al.*, No. 3:20-cv-06772-JD ("*Peekya Services*"), was filed against Google on September 29, 2020, containing substantially the same allegations. At the Initial Case Management Conference held on October 8, 2020, this Court noted that "[c]onsolidation for all pre-trial and trial purposes is limited to *Carr*, 20-5761, and *Pure Sweat*, 20-5792, as well as *Peekya Services*, 20-6772, which is related without opposition. Plaintiffs in those cases will file a consolidated amended complaint by October 21, 2020." *See* Civil Minutes of Initial Case Management Proceedings, ECF No. 66 (Oct. 9, 2020). This Court ordered the *Peekya Services* class action related to the *Epic* case on October 9, 2020. *See* Related Case Order, ECF No. 67 (Oct. 9, 2020). On October 9, 2020, Plaintiffs filed *Bentley et al. v. Google LLC et al.*, No. 5:20-cv-07079, a second consumer class action.

ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED
PURSUANT TO CIVIL L.R. 3-12

## II.     Legal Standard for Relating Cases

"Whenever a party knows or learns that an action, filed in or removed to this district is (or the party believes that the action may be) related to an action which is or was pending in this District as defined in Civil L.R. 3-12(a), the party must promptly file in the lowest-numbered case an Administrative Motion to Consider Whether Cases Should be Related, pursuant to Civil L.R. 7-11." Civil L.R. 3-12(b). Under Civil Local Rule 3-12(a), "[a]n action is related to another when: (1) The actions concern substantially the same parties, property, transaction or event; and (2) It appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges." Civil L.R. 3-12(a).

## III.    The Actions Should be Related

The *Bentley* action involves substantially the same subject matter and defendants as the *Epic*, *Carr*, *Pure Sweat Basketball*, and *Peekya Services* cases. Each complaint names as defendants Google LLC, Google Ireland Limited, Google Commerce Limited, and Google Asia Pacific PTE. Ltd.; challenges Google's conduct with regard to the Google Play Store; and alleges that Google engaged in unlawful monopolization and restraints of trade, in violation of federal antitrust law. Plaintiffs in each of the cases likely will seek the same or similar discovery from the Google entities and non-parties, and Google likely will proffer common factual and legal defenses and expert witnesses in each of the cases, thus rendering separate actions before different courts unduly duplicative, burdensome, and likely to result in conflicting results.

## IV.    Conclusion

For the reasons set forth above, Plaintiffs respectfully request that the Court order the *Bentley* case related to *Epic Games, Inc. v. Google LLC et al.*, No. 3:20-cv-05671, the lowest-numbered case.

ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED
PURSUANT TO CIVIL L.R. 3-12

Dated:  October 13, 2020

Respectfully submitted,

**MILBERG PHILLIPS GROSSMAN LLP**

*/s/ David Azar*
David Azar (State Bar No. 218319)
dazar@milberg.com
16755 Von Karman Avenue, Suite 200
Irvine, California 92606
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

Peggy J. Wedgworth (*pro hac vice forthcoming*)
pwedgworth@milberg.com
Robert A. Wallner (*pro hac vice forthcoming*)
rwallner@milberg.com
Elizabeth McKenna (*pro hac vice forthcoming*)
emckenna@milberg.com
Blake Yagman (*pro hac vice forthcoming*)
byagman@milberg.com
Michael Acciavatti (*pro hac vice forthcoming*)*
macciavatti@milberg.com
*admitted only in Pennsylvania
**MILBERG PHILLIPS GROSSMAN LLP**
One Penn Plaza, Suite 1920
New York, New York 10119
Telephone: 212-594-5300
Facsimile: 212-868-1229

*Attorneys for Plaintiffs and the Proposed Class*

ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED
PURSUANT TO CIVIL L.R. 3-12

David Azar (State Bar No. 218319)
dazar@milberg.com
**MILBERG PHILLIPS GROSSMAN LLP**
16755 Von Karman Avenue, Suite 200
Irvine, California 92606
Telephone: 212-594-5300
Facsimile: 212-868-1229

Peggy J. Wedgworth (*pro hac vice forthcoming*)
pwedgworth@milberg.com
Robert A. Wallner (*pro hac vice forthcoming*)
rwallner@milberg.com
Elizabeth McKenna (*pro hac vice forthcoming*)
emckenna@milberg.com
Blake Yagman (*pro hac vice forthcoming*)
byagman@milberg.com
Michael Acciavatti (*pro hac forthcoming*)*
macciavatti@milberg.com
*admitted only in Pennsylvania
**MILBERG PHILLIPS GROSSMAN LLP**
One Penn Plaza, Suite 1920
New York, New York 10119
Telephone: 212-594-5300
Facsimile: 212-868-1229

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>          Plaintiff,<br><br>    v.<br><br>GOOGLE LLC; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LIMITED; and GOOGLE PAYMENT CORP.,<br><br>          Defendants. | CASE NO. 3:20-cv-05671-JD<br><br>**DECLARATION OF PEGGY J. WEDGWORTH IN SUPPORT OF ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED PURSUANT TO CIVIL L.R. 3-12** |

I, PEGGY J. WEDGWORTH, ESQ., pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am a partner at Milberg Phillips Grossman LLP, and I represent Plaintiffs Dianne Bentley, Jennifer Grace, Adam Moya, Coresa Trimble, and Robert Wing (collectively, "Plaintiffs"). I respectfully submit this declaration in support of Plaintiffs' Administrative Motion to Consider Whether Cases Should Be Related pursuant to Civil L.R. 3-12.

2.      I have personal knowledge of the matters set forth herein and could and would testify competently thereto if called upon to do so.

3.      Attached hereto as Exhibit A is a true and correct copy of the complaint in *Epic Games, Inc. v. Google LLC et al.,* No. 3:20-cv-05671-JD (N.D. Cal., filed Aug. 13, 2020) ("*Epic*").

4.      Attached hereto as Exhibit B is a true and correct copy of the complaint in *Pure Sweat Basketball Inc., v. Google LLC et al.*, No. 3:20-cv-05792-JD (N.D. Cal., filed Aug. 17, 2020).

5.      Attached hereto as Exhibit C is a true and correct copy of the complaint in *Carr v. Google LLC et al.,* Case No. 5:20-cv-05761-JD (N.D. Cal., filed Aug. 16, 2020).

6.      Attached hereto as Exhibit D is a true and correct copy of the complaint in *Peekya Services Inc. v. Google LLC et al.*, No. 3:20-cv-06772-JD (N.D. Cal., filed Sept. 29, 2020).

7.      Attached hereto as Exhibit E is a true and correct copy of the complaint in *Bentley et al. v. Google LLC et al.*, No. 5:20-cv-07079 (N.D. Cal., filed Oct. 9, 2020), which Plaintiffs assert should be related to the first-filed related action, *Epic*.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in Birmingham, Alabama, this 13th day of October, 2020.


                                        */s/ Peggy J. Wedgworth*
                                        Peggy J. Wedgworth

1

DECLARATION OF PEGGY J. WEDGWORTH

EXHIBIT A

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

Christine A. Varney (*pro hac vice pending*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice pending*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice pending*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice pending*)
yeven@cravath.com
M. Brent Byars (*pro hac vice pending*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EPIC GAMES, INC., a Maryland Corporation,<br><br>                              Plaintiff,<br><br>            v.<br><br>GOOGLE LLC; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LIMITED; and GOOGLE PAYMENT CORP.,<br><br>                              Defendants. | Case No. _____<br><br><br>**COMPLAINT FOR INJUNCTIVE RELIEF** |

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................ 1

PARTIES ........................................................................................................... 10

JURISDICTION AND VENUE .......................................................................... 11

INTRADISTRICT ASSIGNMENT ..................................................................... 13

RELEVANT FACTS .......................................................................................... 13

I.    Google Dominates the Merchant Market for Mobile Operating Systems. ......... 13

    A.    The Merchant Market for Mobile Operating Systems ............................. 14

        i.    Product Market Definition ................................................. 14

        ii.    Geographic Market Definition .......................................... 16

    B.    Google's Monopoly Power in the Merchant Market for Mobile OSs ...... 16

II.   Google Unlawfully Maintains a Monopoly in the Android Mobile App

Distribution Market. ......................................................................................... 19

    A.    The Android App Distribution Market ..................................................... 20

        i.    Product Market Definition ................................................. 20

        ii.    Geographic Market Definition .......................................... 22

    B.    Google's Monopoly Power in the Android App Distribution Market ...... 22

    C.    Google's Anti-Competitive Conduct Concerning the Android App

        Distribution Market ................................................................................. 26

        i.    Google's Conduct Toward OEMs .................................... 26

        ii.    Google's Conduct Toward App Distributors and Developers ........ 28

        iii.    Google's Conduct Toward Consumers ............................ 30

    D.    Anti-Competitive Effects in the Android App Distribution Market ......... 35

III.  Google Unlawfully Acquired and Maintains a Monopoly in the Android In-

App Payment Processing Market. ...................................................................... 36

    A.    The Android In-App Payment Processing Market .................................... 37

        i.    Product Market Definition ................................................. 37

        ii.    Geographic Market Definition .......................................... 39

B.    Google's Monopoly Power in the Android In-App Payment Processing Market ..................................................... 39

C.    Google's Anti-Competitive Conduct Concerning the Android In-App Payment Processing Market ..................................................... 40

D.    Anti-Competitive Effects in the Android In-App Payment Processing Market .................................................................. 41

COUNT 1:  Sherman Act § 2 (Unlawful Monopoly Maintenance in the Android App Distribution Market) ...................................................... 43

COUNT 2:  Sherman Act § 1 (Unreasonable restraints of trade concerning Android App Distribution Market: OEMs) ..................................... 44

COUNT 3:  Sherman Act § 1 (Unreasonable restraints of trade concerning Android App Distribution Market: DDA) ...................................... 45

COUNT 4:  Sherman Act § 2 (Unlawful Monopolization and Monopoly Maintenance in the Android In-App Payment Processing Market) ................. 46

COUNT 5:  Sherman Act § 1 (Unreasonable restraints of trade concerning Android In-App Payment Processing Market) ................................... 47

COUNT 6:  Sherman Act § 1 (Tying Google Play Store to Google Play Billing) ....... 49

COUNT 7:  California Cartwright Act (Unreasonable restraints of trade in Android App Distribution Market) .................................................... 50

COUNT 8:  California Cartwright Act (Unreasonable restraints of trade in Android App Distribution Market) .................................................... 51

COUNT 9:  California Cartwright Act (Unreasonable restraints of trade in Android In-App Payment Processing Market) ................................... 53

COUNT 10:  California Cartwright Act (Tying Google Play Store to Google Play Billing) .................................................................. 55

COUNT 11:  California Unfair Competition Law ....................................... 58

PRAYER FOR RELIEF ................................................................ 59

Plaintiff Epic Games, Inc. ("Epic"), by its undersigned counsel, alleges, with knowledge with respect to its own acts and on information and belief as to other matters, as follows:

## PRELIMINARY STATEMENT

1.      In 1998, Google was founded as an exciting young company with a unique motto: "Don't Be Evil". Google's Code of Conduct explained that this admonishment was about "how we serve our users" and "much more than that . . . it's also about doing the right thing more generally".[1] Twenty-two years later, Google has relegated its motto to nearly an afterthought, and is using its size to do evil upon competitors, innovators, customers, and users in a slew of markets it has grown to monopolize. This case is about doing the right thing in one important area, the Android mobile ecosystem, where Google unlawfully maintains monopolies in multiple related markets, denying consumers the freedom to enjoy their mobile devices—freedom that Google always promised Android users would have.

2.      Google acquired the Android mobile operating system more than a decade ago, promising repeatedly over time that Android would be the basis for an "open" ecosystem in which industry participants could freely innovate and compete without unnecessary restrictions.[2] Google's CEO, Sundar Pichai, represented in 2014

---

[1] Kate Conger, *Google Removes 'Don't Be Evil' Clause from Its Code of Conduct*, Gizmodo (May 18, 2018), https://gizmodo.com/google-removes-nearly-all-mentions-of-dont-be-evil-from-1826153393.

[2] Google Blog, News and notes from Android team, *The Benefits & Importance of Compatibility*, (Sept. 14, 2012), https://android.googleblog.com/2012/09/the-benefits-importance-of-compatibility.html ("We built Android to be an open source mobile platform freely available to anyone wishing to use it . . . . This openness allows device manufacturers to customize Android and enable new user experiences, driving innovation and consumer choice."); Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The Guardian (Mar. 9, 2014), https://www.theguardian.com/technology/2014/mar/09/google-sundar-pichai-android-chrome-sxsw ("Android is one of the most open systems that I've ever seen"); Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013), *available at* https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog ("At its core, Android has always been about openness").

that Android "is one of the most open systems that I've ever seen".[3]  And Andy Rubin, an Android founder who is described by some as the "Father of Android", said when he departed Google in 2013 that "at its core, Android has always been about openness".[4] Since then, Google has deliberately and systematically closed the Android ecosystem to competition, breaking the promises it made.  Google's anti-competitive conduct has now been condemned by regulators the world over.

3.       Epic brings claims under Sections 1 and 2 of the Sherman Act and under California law to end Google's unlawful monopolization and anti-competitive restraints in two separate markets:  (1) the market for the distribution of mobile apps to Android users and (2) the market for processing payments for digital content within Android mobile apps.  Epic seeks to end Google's unfair, monopolistic and anti-competitive actions in each of these markets, which harm device makers, app developers, app distributors, payment processors, and consumers.

4.       **Epic does not seek monetary compensation from this Court for the injuries it has suffered**.  Epic likewise does not seek a side deal or favorable treatment from Google for itself.  Instead, Epic seeks injunctive relief that would deliver Google's broken promise:  an open, competitive Android ecosystem for all users and industry participants.  Such injunctive relief is sorely needed.

5.       Google has eliminated competition in the distribution of Android apps using myriad contractual and technical barriers.  Google's actions force app developers and consumers into Google's own monopolized "app store"—the Google Play Store.  Google has thus installed itself as an unavoidable middleman for app developers who wish to reach Android users and vice versa.  Google uses this monopoly power to impose a tax that siphons monopoly profits for itself every time an app

---

[3] Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The Guardian (Mar. 9, 2014), https://www.theguardian.com/technology/2014/mar/09/google-sundar-pichai-android-chrome-sxsw.

[4] Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013), *available at* https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog.

developer transacts with a consumer for the sale of an app or in-app digital content. And Google further siphons off all user data exchanged in such transactions, to benefit its own app designs and advertising business.

6. If not for Google's anti-competitive behavior, the Android ecosystem could live up to Google's promise of open competition, providing Android users and developers with competing app stores that offer more innovation, significantly lower prices and a choice of payment processors. Such an open system is not hard to imagine. Two decades ago, through the actions of courts and regulators, Microsoft was forced to open up the Windows for PC ecosystem. As a result, PC users have multiple options for downloading software unto their computers, either directly from developers' websites or from several competing stores. No single entity controls the ecosystem or imposes a tax on all transactions. And Google, as the developer of software such as the Chrome browser, is a direct beneficiary of this competitive landscape. Android users and developers likewise deserve free and fair competition.

*       *       *

7. In today's world, virtually all consumers and businesses stay connected, informed, and entertained through smart mobile computing devices such as smartphones and tablets. Mobile applications ("apps") are innovative software products that greatly contribute to those devices' value. Consumers the world over use smart mobile devices and mobile apps to video chat with friends, pay bills, stay current with the news, listen to music, watch videos, play games, and more.

8. Epic develops and distributes entertainment apps for personal computers, gaming consoles, and smart mobile devices. The most popular game Epic currently makes is *Fortnite*, which has connected hundreds of millions of people in a colorful virtual world where they meet, play, talk, compete, dance, and even attend concerts and other cultural events.



9.      *Fortnite* is free for everyone to download and play.  To generate revenue, Epic offers users various in-app purchases of content for use within the app, such as digital avatars, costumes, dances, or other cosmetic enhancements.



10.     In the first year after *Fortnite* was released in 2017, the game attracted over 125 million players; in the years since, *Fortnite* has topped 350 million players and has become a global cultural phenomenon.

Complaint for Injunctive Relief                    4

11.     Similar to a PC or a Mac personal computer, smart mobile devices use an "operating system" or "OS" to provide core device functionality and to enable the operation of compatible programs.  As with PCs, the commercial viability of an OS for mobile devices (a "mobile OS") depends on the availability of a large number of compatible apps that cater to the preferences and needs of users.

12.     Google controls the most ubiquitous OS used in mobile devices, the Android OS.  Android OS is used by billions of users the world over, and boasts nearly 3 million compatible apps.

13.     Android is the only commercially viable OS that is widely available to license by companies that design and sell smart mobile devices, known as original equipment manufacturers ("OEMs").  Accordingly, when OEMs select a mobile OS to install on their devices, they have only one option:  Google's Android OS.  Google therefore has monopoly power in the market for mobile operating systems that are available for license by OEMs (the Merchant Market for Mobile Operating Systems (*infra* Part I)).

14.     Google has not been satisfied with its control of the Android OS.  Notwithstanding its promises to make Android devices open to competition, Google has erected contractual and technological barriers that foreclose competing ways of distributing apps to Android users, ensuring that the Google Play Store accounts for nearly all the downloads of apps from app stores on Android devices.  Google thus maintains a monopoly over the market for distributing mobile apps to Android users, referred to herein as the "Android App Distribution Market" (*infra* Part II).

15.     For example, Google bundles the Google Play Store with a set of other Google services that Android OEMs must have on their devices (such as Gmail, Google Search, Google Maps, and YouTube) and conditions the licensing of those services on an OEM's agreement to pre-install the Google Play Store and to prominently display it.  Google then interferes with OEMs' ability to make third-party app stores or apps available on the devices they make.  These restrictions effectively

foreclose competing app stores—and even single apps—from what could be a primary distribution channel.

16.  Epic's experience with one OEM, OnePlus, is illustrative.  Epic struck a deal with OnePlus to make Epic games available on its phones through an Epic Games app.  The Epic Games app would have allowed users to seamlessly install and update Epic games, including *Fortnite*, without obstacles imposed by Google's Android OS.  But Google forced OnePlus to renege on the deal, citing Google's "particular[] concern" about Epic having the ability to install and update mobile games while "bypassing the Google Play Store".

17.  Another OEM, LG, told Epic that its contract with Google did not allow it to enable the direct distribution of apps, and that the OEM could not offer any functionality that would install and update Epic games except through the Google Play Store.

18.  Google also enforces anti-competitive restrictions against app developers.  Specifically, Google contractually prohibits app developers from offering on the Google Play Store any app that could be used to download other apps, *i.e.*, any app that could compete with the Google Play Store in app distribution.  And Google further requires app developers to distribute their apps through the Google Play Store if they wish to advertise their apps through valuable advertising channels controlled by Google, such as ad placements on Google Search or on YouTube that are specially optimized to advertise mobile apps.

19.  Finally, Google stifles or blocks consumers' ability to download app stores and apps directly from developers' websites.  As anyone who has tried to download directly on an Android device knows, it is significantly different than the simple process available on a personal computer:  directly downloading *Fortnite* on an Android device can involve a dozen steps, requiring the user to change default settings and bravely click through multiple dire warnings.  And even if a persistent user manages to install a competing app store, Google prevents such stores from competing on equal

footing with the Google Play Store by blocking them from offering basic functions, such as automatic updating of apps in the background, which is available for apps downloaded from the Google Play Store.

20.     Google engages in these anticompetitive acts to eliminate consumer choice and competition in mobile app distribution.  Google has no legitimate justification for these restrictions.  Google therefore has broken its promises that Android would be an "open" ecosystem in which other participants could participate fairly.

21.     But Google does not stop at app distribution.  Google also imposes anti-competitive restrictions in the separate Market for Android In-app Payment Processing (*infra* Part III).

22.     App developers who sell digital content for consumption within the app itself require seamless payment processing tools to execute purchases.  App developers, including Epic, may develop such payment processing tools internally or use a host of payment processing tools offered by multiple competing third parties.

23.     Google, however, ties distribution through its Google Play Store with  developers' exclusive use of Google's own payment processing tool, called Google Play Billing, to process in-app purchases of digital content.  Indeed, app developers that distribute through the Google Play Store are even prohibited from offering Android users the *choice* of additional payment processing options alongside Google's for digital content.  And because Google has a monopoly in the Android App Distribution Market, app developers cannot practically avoid this anti-competitive tie by electing app distribution through an alternative channel.

24.     The result is that in every in-app transaction for digital content, it is Google, not the app developer, that collects the payment in the first instance.  Google then taxes the transaction at an exorbitant 30% rate, remitting the remaining 70% to the developer who actually made the sale.  This 30% commission is often ***ten times*** higher than the price typically paid for the use of other electronic payment solutions.

25.     Moreover, through this tie, Google inserts itself as an intermediary between each seller and each buyer for every purchase of digital content within the Android ecosystem, collecting for itself the personal information of users, which Google then uses to give an anti-competitive edge to its own advertising services and mobile app development business.

26.     But for Google's monopolistic conduct, competing stores could offer consumers and developers choice in distribution and payment processing.  Indeed, Epic, which distributes gaming apps through its own store to users of personal computers, would open a store to compete with Google's and offer developers more innovation and more choice, including in payment processing.  App developers would not have to pay Google's supra-competitive tax of 30%, as the price of distribution and payment processing alike would be set by market forces rather than by Google's fiat.  Developers could address any payment-related issues (such as refunds) directly with their own customers rather than through Google.  And users and developers, jointly, would get to decide whether users' data should be utilized for other purposes.

27.     Google's anti-competitive conduct has injured Epic, both as an app developer and as a potential competitor in app distribution and payment processing. Epic has repeatedly approached Google and asked to negotiate relief that would stop Google's unlawful and anti-competitive restrictions on app developers and consumers. But Google would not budge.

28.     Because of Google's refusal to stop its ongoing anti-competitive and unlawful conduct, on August 13, 2020, Epic began providing *Fortnite* players the choice of using Epic's own direct payment tool as an alternative to Google's overpriced Billing tool, sharing with players who chose to use Epic's payment tool the resulting savings.



29.     In retribution, Google removed *Fortnite* from Google Play Store listings, preventing new players from obtaining the game.  Google also prevented Android users who acquired *Fortnite* from the Google Play Store from obtaining app updates they will need to continue playing with their friends and family.

30.     Epic has publicly advocated for years that Google cease the anti-competitive conduct addressed in this Complaint.  Google refused to change its industry-impacting conduct.  Instead, Google offered to placate Epic by offering it preferential terms on side deals, such as YouTube sponsorships and cloud services, if Epic agreed to distribute *Fortnite* in the Google Play Store and acceded to Google's 30% tax.  Google has reached at least one preferential deal with another mobile game developer, Activision Blizzard, and Epic believes that Google is using similar deals with other companies to allow Google to keep its monopolistic behavior publicly unchallenged.  But Epic is not interested in any side deals that might benefit Epic alone while leaving Google's anti-competitive restraints intact; instead, Epic is focused on opening up the Android ecosystem for the benefit of ***all*** developers and consumers.

31.     Accordingly, Epic seeks injunctive relief in court.  Google's conduct has caused and continues to cause Epic financial harm, but Epic is *not* bringing this case to recover these damages; Epic is not seeking any monetary relief, but rather only an order enjoining Google from continuing to impose its anti-competitive conduct on the Android ecosystem.

### **PARTIES**

32.     Plaintiff Epic Games, Inc. is a Maryland corporation with its principal place of business in Cary, North Carolina.  Epic's mission is "to create fun games we want to play and to build the art and tools needed to bring those games to life".  Epic was founded in 1991 by a college student named Tim Sweeney.  Mr. Sweeney ran Epic out of his parents' basement and distributed, by mail, Epic's first commercial personal computer software, a game named *ZZT*.  Since then, Epic has developed several popular entertainment software products that can be played on an array of platforms—such as personal computers, gaming consoles, and smart mobile devices.  Epic also creates and distributes the *Unreal Engine*, a powerful software suite that allows competing game developers and others to create realistic three-dimensional content, including video games, architectural recreations, television shows, and movies.  An Epic subsidiary also develops and distributes the popular *Houseparty* app, which enables video chatting and social gaming on smart mobile devices and personal computers.  Worldwide, approximately 400 million users have signed up to play Epic games, and each day 30 to 40 million individuals log into an Epic game.

33.     Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California.  Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc.  The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California.  Google LLC contracts with all app developers that distribute their apps through the Google Play Store and is

therefore a party to the anti-competitive contractual restrictions at issue in this Complaint.

34.     Defendant Google Ireland Limited ("Google Ireland") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and a subsidiary of Google LLC.  Google Ireland contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anti-competitive contractual restrictions at issue in this Complaint.

35.     Defendant Google Commerce Limited ("Google Commerce") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and a subsidiary of Google LLC.  Google Commerce contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anti-competitive contractual restrictions at issue in this Complaint.

36.     Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific") is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and a subsidiary of Google LLC.  Google Asia Pacific contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anti-competitive contractual restrictions at issue in this Complaint.

37.     Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its principal place of business in Mountain View, California, and a subsidiary of Google LLC.  Google Payment provides in-app payment processing services to Android app developers and Android users and collects a 30% commission on many types of processed payments, including payments for apps sold through the Google Play Store and in-app purchases made within such apps.

## JURISDICTION AND VENUE

38.     This Court has subject-matter jurisdiction over Epic's federal antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C.

§§ 1331 and 1337.  The Court has supplemental jurisdiction over Epic's state law claims pursuant to 28 U.S.C. § 1367.  The Court also has subject-matter jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1332 based on the diversity of citizenships of Plaintiff, on the one hand, and of Defendants, on the other, and the amount in controversy exceeding $75,000.

39.    This Court has personal jurisdiction over the Defendants.  Google LLC and Google Payment are headquartered in this District.  All Defendants have engaged in sufficient minimum contacts with the United States and have purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise of jurisdiction over them would comport with due process requirements.  Further, the Defendants have consented to the exercise of personal jurisdiction by this Court.

40.    Each of the Defendants except Google Payment is party to a Google Play Developer Distribution Agreement (the "DDA") with Epic.  Section 16.8 of the DDA provides that the parties "agree to submit to the exclusive jurisdiction of the federal or state courts located within the county of Santa Clara, California, to resolve any legal matter arising from or relating to this Agreement".  Section 16.8 further provides that "[a]ll claims arising out of or relating to this Agreement or Your relationship with Google under this Agreement will be governed by the laws of the State of California, excluding California's conflict of laws provisions."  The claims addressed in this Complaint relate to the DDA or to Epic's relationship with Google under the DDA, or in the alternative such claims arise out of the same nucleus of operative facts as other claims as to which the Court may exercise personal jurisdiction over each Defendant, so that the exercise of pendent personal jurisdiction would be proper.

41.    Google Payment is party to a Google Payments—Terms of Service—Seller Agreement with Epic.  Section 11.3 of that Agreement provides that "[t]he exclusive venue for any dispute related to this Agreement will be the state or federal courts located in Santa Clara County, California, and each party consents to

personal jurisdiction in these courts." Section 11.3 further provides that "The laws of California, excluding California's choice of law rules, and applicable federal United States laws will govern this Agreement." The dispute between Google Payment and Epic relates to the parties' Agreement, or in the alternative Epic's claims arise out of the same nucleus of operative facts as other claims as to which the Court may exercise personal jurisdiction over Google Payment, so that the exercise of pendent personal jurisdiction would be proper.

42. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google LLC and Google Payment maintain their principal places of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to Epic's claims occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue. In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Defendants may be found in or transact business in this District.

## INTRADISTRICT ASSIGNMENT

43. Pursuant to Civil Local Rule 3-2(c), this antitrust case shall not be assigned to a particular Division of this District, but shall be assigned on a District-wide basis.

## RELEVANT FACTS

**I.     Google Dominates the Merchant Market for Mobile Operating Systems.**

44. To understand how Google effectively monopolizes the Android App Distribution and Android In-App Payment Processing Markets, as described below in Parts II and III, it is helpful to understand the background of smart mobile devices and how Google effectively dominates the related Merchant Market for Mobile Operating Systems through its control over the Android operating system.

### A.   The Merchant Market for Mobile Operating Systems

#### i.   Product Market Definition

45.   Smart mobile devices are handheld, portable electronic devices that can connect wirelessly to the internet and are capable of multi-purpose computing functions, including, among other things, Internet browsing, using social media, streaming video, listening to music, or playing games.  Smart mobile devices include smartphones and tablet computers.  Many consumers may *only* have a smart mobile device and no other computer.  Such consumers are particularly hard-hit by Google's unlawful conduct in mobile-related markets.

46.   Like laptop and desktop personal computers, mobile devices require an operating system or "OS" that enables multi-purpose computing functionality.  A mobile OS, just like the OS of any computer, is a piece of software that provides basic functionality to users of mobile devices such as button controls, touch commands, motion commands, and the basic "graphical user interface", which includes "icons" and other visual elements representing actions that the user can take.  A mobile OS also manages the basic operations of a smart mobile device, such as cellular or WiFi connectivity, GPS positioning, camera and video recording, speech recognition, and other features.  In addition, a mobile OS permits the installation and operation of mobile apps that are compatible with the particular OS and facilitates their use of the device's OS-managed core functionality.

47.   To ensure that every user can access the basic functions of a mobile device "out of the box", that is at the time he/she purchases the device, an OEM must pre-install an OS on each device prior to its sale.  This is similar to a personal computer that comes pre-installed with Microsoft Windows for PC or Apple's macOS for a Mac computer.  OEMs design mobile devices to ensure the device's compatibility with a particular OS the OEM chooses for a particular model of mobile device, so that the device may utilize the capabilities of that OS.  For OEMs, the process of implementing

a mobile OS requires significant time and investment, making switching to another mobile OS difficult, expensive, and time-consuming.

48.     The vast majority of OEMs do not develop their own OS and must choose an OS that can be licensed for installation on smart mobile devices they design. There is therefore a relevant <u>Merchant Market for Mobile OSs</u> comprising mobile OSs that OEMs can license for installation on the smart mobile devices they manufacture. The market does not include proprietary OSs that are not available for licensing, such as Apple's mobile OS, called iOS.  Historically, the Merchant Market for Mobile OSs has included the Android OS, developed by Google; the Tizen mobile OS, a partially open-source mobile OS that is developed by the Linux Foundation and Samsung; and the Windows Phone OS developed by Microsoft.

49.     Some consumers continue to use cellular phones that do not have multi-purpose, computing functions.  These simple phones resemble older "flip phones", for example; they are not part of the smart mobile device category.  These phones do not support mobile apps such as *Fortnite* and are instead typically limited to basic cellular functionality like voice calls and texting.  The simple operating systems on these phones, to the extent they exist, cannot support the wide array of features supplied by the OSs on smart mobile devices and are not part of the Merchant Market for Mobile OSs defined herein.

50.     To the extent that electronic devices other than smart mobile devices use operating systems, those OSs are not compatible with mobile devices, and therefore are not included in the Merchant Market for Mobile OSs defined herein.  For example, computing devices that are not handheld and portable, that are not capable of multi-purpose computing functions and/or that lack cellular connectivity—such as desktop computers, laptops, or gaming consoles—are not considered to be "smart mobile devices".  Gaming devices like Sony's PlayStation 4 ("PS4") and Microsoft's Xbox are physically difficult to transport, require a stable WiFi or wired connection to operate smoothly, and require an external screen for the user to engage in game play.  Thus,

even if a gamer owns, for example, a dedicated, non-portable gaming console such as a PS4, which connects to and enables gaming via his/her TV, he/she will not consider that PS4 a reasonable substitute for a mobile device like a smartphone, nor would he/she consider the version of any game created for his/her PS4 to substitute for the mobile app version of such a game. That is because the portability (and typically for smartphones the cellular connectivity) of the mobile devices enable the consumer to play mobile games away from home or anywhere in the home. Indeed, for this reason, game developers often distribute multiple versions of a game, each of which is programmed for compatibility with a particular type of device and its operating system.

ii.  <u>Geographic Market Definition</u>

51.    OEMs license mobile OSs for installation on mobile devices globally, excluding China. Google's operations in China are limited, and it does not make available many of its products for mobile devices sold within China. This is based in part on legal and regulatory barriers to the distribution of mobile OS-related software imposed by China. Further, while Google contractually requires OEMs licensing Android outside of China not to sell any devices with competing Android-compatible mobile OSs, it imposes no such restriction on devices sold within China. Because the OEMs that sell Android mobile devices both within and outside China have committed to this contractual restriction, such OEMs must sell, outside of China, devices with Google's Android OS. The geographic scope of the relevant Merchant Market for Mobile OSs is therefore worldwide, excluding China.

**B.    Google's Monopoly Power in the Merchant Market for Mobile OSs**

52.    Google has monopoly power in the Merchant Market for Mobile OSs through its Android OS. As determined by the European Commission during the course of its investigation of Android, the Android OS, licensed to OEMs in relevant respects by Google, is installed on over 95% of all mobile devices sold by OEMs utilizing a merchant mobile OS. Indeed, Android OS is installed on nearly 75% of all smart mobile devices sold by *all* OEMs, including even those OEMs that use a

1  proprietary mobile OS they developed exclusively for their own use (such as Apple's

2  iOS).

3        53.    A mobile ecosystem typically develops around one or more mobile

4  OSs, such as the Android OS.  The "Android ecosystem" is a system of mobile products

5  (such as devices, apps and accessories) designed to be inter-dependent and compatible

6  with each other and the Android OS.  Ecosystem participants include an array of

7  participating stakeholders, such as Google, OEMs that make Android-compatible

8  devices, developers of Android-compatible apps, Android app distribution platforms,

9  including app stores, the makers of ancillary hardware such as headphones or speakers,

10  cellular carriers, and others.

11        54.    Mobile ecosystems benefit from substantial network effects—that is,

12  the more developers that design useful apps for a specific mobile OS, the more

13  consumers will be drawn to use the relevant OS for which those apps are designed; the

14  more consumers that use an OS, the more developers want to develop even more apps

15  for that OS.  As determined in *United States v. Microsoft, Inc.*, No. 98-1232 (D.D.C.),

16  new entrants into an operating system market thus face an "applications barrier to

17  entry".  An applications barrier to entry arises because a new operating system will be

18  desirable to consumers only if a broad array of software applications can run on it, but

19  software developers will find it profitable to create applications that run on an operating

20  system only if there is a large existing base of users.

21        55.    To overcome this challenge and to attract app developers and users,

22  Google has continuously represented that Android is an "open" ecosystem and that any

23  ecosystem participant could create Android-compatible products without unnecessary

24  restrictions.  Indeed, Google LLC's CEO, Sundar Pichai, represented in 2014 that

25  Android "is one of the most open systems that I've ever seen".[5]  And Andy Rubin, an

26

27

28  _____

   [5] Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The
   Guardian (Mar. 9, 2014), https://www.theguardian.com/technology/2014/mar/09/google-sundar-
   pichai-android-chrome-sxsw.

Android founder who is described by some as the "Father of Android", said when he departed Google in 2013 that "at its core, Android has always been about openness".[6]

56.     But the reality is quite different.  Despite these claims of openness, Google has now effectively closed the Android ecosystem through its tight control of the Android OS.  And, as the dominant OS licensor, Google now benefits from these substantial network effects which makes participation on its platform a "must-have" market for developers.

57.     As further described below, Google uses the Android OS to restrict which apps and app stores OEMs are permitted to pre-install on the devices they make and to impose deterrents to the direct distribution of competing app stores and apps to Android users, all at the expense of competition in the Android ecosystem.

58.     Because of Google's monopoly power in the Merchant Market for Mobile OSs, OEMs, developers and users cannot avoid such effects by choosing another mobile OS.  OEMs such as ZTE and Nokia have stated that other non-proprietary OSs are poor substitutes for the Android OS and are not a reasonable alternative to licensing the Android OS.  One important reason is that other mobile OSs presently do not support many high-quality and successful mobile apps, which consumers find essential or valuable when choosing a mobile device.  These circumstances have biased consumers against the purchase of mobile devices with non-proprietary mobile OSs other than Android OS.  OEMs thus have no choice but to agree to Google's demands because it is critical that they be able to offer a popular mobile OS and corresponding ecosystem to consumers who are choosing which mobile device to purchase.

---

[6] Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013), *available at* https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog.

## II. Google Unlawfully Maintains a Monopoly in the Android Mobile App Distribution Market.

59. Mobile apps make mobile devices more useful and valuable because they add functionality to the mobile device that caters to the specific interests of each mobile device user. For example, they facilitate video chats with friends and family, banking online, shopping, job hunting, photo editing, reading digital news sources, editing documents, or playing a game like *Fortnite*. Many workers use their smart mobile device to check work schedules, access company email, or use other employer software while outside the workplace. For many consumers, a smartphone or tablet is the only way to access these functions, because the consumer does not own a personal computer or because the consumer can only access the Internet using a cellular connection. But even when a consumer can perform the same or similar functions on a personal computer, the ability to access apps "on the go" using a handheld, portable device remains valuable and important.

60. Whereas some apps may be pre-installed by OEMs, OEMs cannot anticipate all the various apps a specific consumer may desire to use. Moreover, many consumers have different preferences as to which apps they want, and it would be undesirable for OEMs to load the devices they sell with unwanted apps that take up valuable space on the mobile device. And many apps that consumers may ultimately use on their device will be developed after they buy the device. Accordingly, consumers who seek to add new functionalities to a mobile device and customize the device for their own use need to obtain and install mobile apps themselves after purchasing their device. Currently, on Android devices, this is done most often through the Google Play Store, Google's own "app store". The Google Play Store is a digital portal set up by Google and through which mobile apps can be browsed, searched for, purchased (if necessary), and downloaded by a consumer. App stores such as the Google Play Store, alongside several other ways by which apps can be distributed to the hundreds of millions of consumers using Android-based mobile devices, comprise the Android App Distribution Market, defined below.

61.    Through various anti-competitive acts and unlawful restraints on competition, Google has maintained a monopoly in the Android Mobile App Distribution market, causing ongoing harm to competition and injury to OEMs, app distributors, app developers, and consumers.  Google's restraints of trade belie representations Google currently makes to developers that "as an open platform, Android is about choice" and that app developers "can distribute [their] Android apps to users in any way [they] want, using any distribution approach or combination of approaches that meets [their] needs", including by allowing users to directly download apps "from a website" or even by "emailing them directly to consumers".[7]

**A.    The Android App Distribution Market**

i.    Product Market Definition

62.    There is a relevant market for the distribution of apps compatible with the Android OS to users of mobile devices (the "Android App Distribution Market").  This Market is comprised of all the channels by which mobile apps may be distributed to the hundreds of millions of users of mobile devices running the Android OS.  The Market primarily includes Google's dominant Google Play Store, with smaller stores, such as Samsung's Galaxy Store and Aptoide, trailing far behind.  Nominally only, the direct downloading of apps without using an app store (which Google pejoratively describes as "sideloading") is also within this market.

63.    App stores allow consumers to easily browse, search for, access reviews on, purchase (if necessary), download, and install mobile apps, using the mobile device itself and an Internet connection.  OEMs find it commercially unreasonable to ship a smart mobile device to a consumer without at least one app store installed, as a consumer's ability to obtain new mobile apps is an important part of the value provided by smart mobile devices.

---

[7] Google Play Developers Page, *Alternative distribution options*, https://developer.android.com/distribute/marketing-tools/alternative-distribution (last accessed June 7, 2020).

64.     App stores are OS-specific, meaning they distribute only apps that are compatible with the specific mobile OS on which the app store is used.  A consumer who has a mobile device running the Android OS cannot use apps created for a different mobile operating system.  An owner of an Android OS device will use an Android compatible app store, and such app stores distribute only Android-compatible mobile apps.  That consumer may not substitute an Android app store with, for example, Apple's App Store, as that app store is not available on Android devices, is not compatible with the Android OS, and does not offer apps that are compatible with the Android OS.  Non-Android mobile app distribution platforms—such as the Windows Mobile Store used on Microsoft's Windows Mobile OS or the Apple App Store used on Apple iOS devices—cannot substitute for Android-specific app distribution platforms, and they are therefore not part of the Android App Distribution Market defined herein.

65.     Likewise, stores distributing personal computer or gaming console software are not compatible with the Android OS and do not offer Android-compatible apps:  the Epic Games Store distributes software compatible with personal computers, the Microsoft Store for Xbox distributes software compatible with the Xbox game consoles, and the PlayStation Store distributes software compatible with the PlayStation game consoles.  A user cannot download mobile apps for use on his/her Android device by using such non-Android OS, non-mobile software distribution platforms.  They therefore are not part of the Android App Distribution Market.

66.     The same is true even when an app or game, like *Fortnite*, is available for different types of platforms running different operating systems, because only the OS-compatible version of that software can run on a specific type of device or computer.  Accordingly, as a commercial reality, an app developer that wishes to distribute mobile apps for Android mobile devices must develop an Android-specific version of the app and avail itself of the Android App Distribution Market.

67.     In the alternative only, the Android App Distribution Market is a relevant, economically distinct sub-market of a hypothetical broader antitrust market for

the distribution of mobile apps to users of all mobile devices, whether Android or Apple's iOS.

                ii.   <u>Geographic Market Definition</u>

       68.   The geographic scope of the Android App Distribution Market is worldwide, excluding China. Outside of China, app distribution channels, including app stores, are developed and distributed on a global basis; OEMs, in turn, make app stores, such as the Google Play Store, available on Android devices on a worldwide basis (except in China). China is excluded from the relevant market because legal and regulatory barriers prevent the operation of many global app stores, including the Google Play Store, within China. Additionally, app stores prevalent in China are not available, or have little presence, outside of China.

**B.   Google's Monopoly Power in the Android App Distribution Market**

       69.   Google has monopoly power in the Android App Distribution Market.

       70.   Google's monopoly power can be demonstrated by, among other things, Google's massive market share in terms of apps downloaded. The European Commission determined that, within the Market, more than 90% of app downloads through app stores have been done through the Google Play Store. Indeed, although app stores for merchant mobile OSs other than Android are not included in the Android App Distribution Market, the European Commission found that the only such app store with any appreciable presence was the Windows Mobile Store, which was compatible with the Windows Mobile OS. The Commission determined that even if the Windows Mobile Store share was included in the market, the Google Play Store would still have had a market share greater than 90%.

       71.   Other existing Android mobile app stores do not discipline Google's exercise of monopoly power in the Android App Distribution Market. No other app store is able to reach nearly as many Android users as the Google Play Store. According to the European Commission, the Google Play Store is pre-installed by

1    OEMs on practically all Android mobile devices sold outside of China.  As a result, no

2    other Android app store comes close to that number of pre-installed users.  With the

3    exception of app stores designed for and installed only on mobile devices sold by those

4    respective OEMs, such as Samsung Galaxy Apps and the LG Electronics App Store, no

5    other Android app store is pre-installed on more than 10% of Android devices, and

6    many have no appreciable market penetration at all.  Aptoide, for example, is an

7    Android app store that claims to be the largest "independent" app store outside of China,

8    but it comes pre-installed on no more than 5% of Android mobile devices.

9           72.    Because of Google's success in maintaining its monopoly in Android

10   app distribution, there is no viable substitute to distributing Android apps through the

11   Google Play Store.  As a result, the Google Play Store offers over 3 million apps,

12   including all of the most popular Android apps, compared to just 700,000 apps offered

13   by Aptoide, the Android app store with the next largest listing.  The Google Play Store

14   thereby benefits from ongoing network effects based on the large number of

15   participating app developers and users.  The large number of apps attracts large numbers

16   of users, who value access to a broad range of apps, and the large number of users

17   attract app developers who wish to access more Android users.  Android OEMs too find

18   it commercially unreasonable to make and sell phones without the Google Play Store,

19   and they view other app stores as poor substitutes for the Google Play Store because of

20   the lower number and lesser quality of apps they offer.

21          73.    As further proof of its monopoly power, Google imposes a supra-

22   competitive commission of 30% on the price of apps purchased through the Google Play

23   Store, which is a far higher commission than would exist under competitive conditions.

24          74.    Furthermore, Google's monopoly power in app distribution is not

25   constrained by competition at the smart mobile device level because Android device

26   users face significant switching costs and lock-in to the Android ecosystems that serves

27   to protect Google's monopoly power, and consumers are unable to account for Google's

28   anticompetitive conduct when they purchase a smart mobile device.

75.   *First*, consumers are deterred from leaving the Android ecosystem due to the difficulty and costs of switching.  Consumers choose a smartphone based in part on the OS that comes pre-installed on that device and the ecosystem in which the device participates (in addition to a bundle of other features, such as price, battery life, design, storage space, and the range of available apps and accessories).  Once a consumer has selected a smartphone, the consumer cannot replace the mobile OS that comes pre-installed on it with an alternative mobile OS.  Rather, a consumer who wishes to change the OS must purchase a new smartphone entirely.  In addition, mobile OSs have different designs, controls, and functions that consumers must learn to navigate.  Over time, consumers who use Android devices learn to operate efficiently on the Android OS.  For example, the Android OS layout differs from iOS in a wide range of functions, including key features such as searching and installing "widgets" on the phone, organizing and searching the phone's digital content, configuring control center settings, and organizing photos.  The cost of learning to use a different mobile OS is part of consumers' switching costs.

76.   *Second*, switching from Android devices may also result in a significant loss of personal and financial investment that consumers put into the Android ecosystem.  Because apps, in-app content and many other products are designed for or are only compatible with a particular mobile OS, switching to a new mobile OS may mean losing access to such products or to data.  Even if versions of such apps and products are available within the new ecosystem chosen by the consumer, the consumer would have to go through the process of downloading them again onto the new devices and may have to purchase them anew.  As a result, the consumer may be forced to abandon his or her investment in at least some of those apps, along with any purchased in-app content and consumer-generated data on those apps.

77.   *Third*, consumers are not able to avoid the switching costs and lock-in to the Android OS ecosystem by acquiring more information prior to the purchase of the Android device.  The vast majority of mobile device consumers have no reason to

inquire, and therefore do not know about, Google's anticompetitive contractual restraints and policies. Furthermore, these consumers rationally do not give much weight to Google's anticompetitive conduct and anticompetitive fees when deciding whether to switch from an Android device. Consumers consider many features when deciding which smartphone or tablet to purchase, including design, brand, processing power, battery life, functionality and cellular plan. These features are likely to play a substantially larger role in a consumer's decision as to which smart mobile device to purchase than Google's anticompetitive conduct in the relevant markets, particularly given that a consumer may consider the direct monetary cost of Google's conduct to be small relative to the price of smart mobile devices, if the consumer is even aware of the conduct or assigns it such a cost at all. For example, over time a typical Android user may make multiple small purchases of paid apps and in-app digital content—accumulating to $100 or less annually—but may spend several hundreds of dollars at once to purchase an Android smart mobile device.

78. Consumers are also unable to determine the "lifecycle price" of devices—*i.e.*, to accurately assess at the point of purchase how much they will end up spending in total (including on the device and all apps and in-app purchases) for the duration of their ownership of the device. Consumers cannot know in advance of purchasing a device all of the apps or in-app content that they may want to purchase during the usable lifetime of the device. Consumers' circumstances may change. Consumers may develop new interests. They may learn about new apps or in-app content that becomes available only after purchasing a device. New apps and in-app content will continue to be developed and marketed after a consumer purchases a smartphone or tablet. All of these factors may influence the amount of consumers' app and in-app purchases. Because they cannot know or predict all such factors when purchasing mobile devices, consumers are unable to calculate the lifecycle prices of the devices. This prevents consumers from effectively taking Google's anticompetitive conduct into account when making mobile device purchasing decisions.

79.     Because consumers face substantial switching costs and lock-in to the Android OS, developers can only gain access to these users by also participating in the Android ecosystem.  Thus, developers face an even greater cost in not participating in the Android ecosystem—loss of access to hundreds of millions of Android OS users.

**C.    Google's Anti-Competitive Conduct Concerning the Android App Distribution Market**

80.     Google has willfully and unlawfully maintained its monopoly in the Android App Distribution Market through a series of related anti-competitive acts that have foreclosed competing ways of distributing apps to Android users.

i.    Google's Conduct Toward OEMs

81.     Google imposes anti-competitive constraints on Android OEMs based on their need for access to a viable Android app store and other important services provided by Google.

82.     *First*, Google conditions OEMs' licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on OEMs' agreements to provide the Google Play Store with preferential treatment compared to any other competing app store.  Specifically, to access the Google Play Store, Android OEMs (which, as noted above, comprise virtually all OEMs that obtain an OS on the merchant market) have signed a Mobile Application Distribution Agreement ("MADA") with Google.  A MADA confers a license to a bundle of products comprising proprietary Google apps, Google-supplied services necessary for functioning of mobile apps, and the Android trademark.  Through its MADAs with Android OEMs, Google requires OEMs to locate the Google Play Store on the "home screen"[8] of each mobile device.  Android OEMs must further pre-install up to 30 Google mandatory apps and must locate these apps on the home screen or on the next screen, occupying valuable space on each user's mobile device that otherwise could be occupied by competing app stores and other services.  These requirements ensure that

---

[8] The default "home screen" is the default display, prior to any changes made by users, that appears without scrolling when the device is in active idle mode (*i.e.*, is not turned off or in sleep mode).

the Google Play Store is the most visible app store any user encounters and place any other app store at a significant disadvantage.

83.     Absent this restraint, OEMs could pre-install and prominently display alternative app stores to the purchasers of some or all of their mobile devices, allowing competing app stores the ability to vie for prominent placement on Android devices, increased exposure to consumers and, as a result, increased ability to attract app developers to their store.  As an app distributor, Epic could and would negotiate with OEMs to offer a prominently displayed app store containing *Fortnite* and other games, allowing Epic to reach more mobile users.

84.     *Second*, Google interferes with OEMs' ability to distribute Android app stores and apps directly to consumers outside the Google Play Store.  Some OEMs may choose to compete for buyers by offering mobile devices that provide easy access to additional mobile app stores and apps.  For example, an OEM may pre-install an icon corresponding to an app store or app on the device before it is sold to consumers.  Even when an OEM would want to make mobile apps available to consumers in this way, Google imposes unjustified and pretextual warnings about the security of installing the app, even though the consumer is choosing to install the app in full awareness of its source.

85.     Epic recently reached an agreement with OnePlus, an OEM, to allow users of OnePlus mobile devices to seamlessly install *Fortnite* and other Epic games by touching an Epic Games app on their devices—without encountering any obstacles imposed by the Android OS.  In conjunction with this agreement, Epic designed a version of *Fortnite* for certain OnePlus devices that delivers a state-of-the-art framerate (the frequency at which consecutive images appear on the device's screen), providing an even better gameplay experience for *Fortnite* players.  Although the original agreement between Epic and OnePlus contemplated making this installation method available worldwide, Google demanded that OnePlus not implement its agreement with Epic with the limited exception of mobile devices sold in India.  OnePlus informed Epic that

Google was "particularly concerned that the Epic Games app would have ability to potentially install and update multiple games with a silent install bypassing the Google Play Store".[9]  Further, any waiver of Google's restriction "would be rejected due to the Epic Games app serving as a potential portfolio of games and game updates".  As a result, OnePlus mobile device users in India can install Epic games seamlessly without using the Google Play Store, while users outside India cannot.

86.   Another OEM, LG, also told Epic that it had a contract with Google "to block side downloading off Google Play Store this year", but that the OEM could "surely" make Epic games available to consumers if the Google Play Store were used.  Google prevented LG from pre-installing the Epic Games app on LG devices.

87.   In the absence of this conduct, Epic could and would negotiate with OEMs to make *Fortnite* and other Epic games directly available to consumers, free from Google's anti-competitive restraints.  OEMs could then compete for the sale of mobile devices based in part on the set of apps offered on the OEMs' devices.  But Google forecloses alternative ways of distributing Android apps other than through its own monopolized app store, harming competition among OEMs and among app developers, to the detriment of consumers.

ii.   Google's Conduct Toward App Distributors and Developers

88.   Google imposes anti-competitive restrictions on competing app distributors and developers that further entrench its monopoly in Android App Distribution.

89.   *First*, Google prevents app distributors from providing Android users ready access to competing app stores.  Specifically, even though competitive app stores themselves are mobile apps that could easily be distributed through the Google Play Store, Google prohibits the distribution of any competing app store through the Google Play Store, without any technological or other justification.

---

[9]  A "silent install" is an installation process free of the dire security warnings that Google triggers when apps are directly downloaded, such as the "one touch" process on which Epic and OnePlus had agreed.

90.     Google imposes this restraint through provisions of the Google Play Developer Distribution Agreement ("DDA"), which Google requires all app developers to sign before they can distribute their apps through the Google Play Store.  Each of the Defendants, except Google Payment, is a party to the DDA.

91.     Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  The DDA further reserves to Google the right to remove and disable any Android app that it determines violates this requirement.  The DDA is non-negotiable, and developers that seek access to Android users through the Google Play Store must accept Google's standardized contract of adhesion.

92.     In the absence of these unlawful restraints, competing app distributors could allow users to replace or supplement the Google Play Store on their devices with competing app stores, which users could easily download and install through the Google Play Store.  App stores could compete and benefit consumers by offering lower prices and innovative app store models, such as app stores that are curated to specific consumers' interests—*e.g.*, an app store that specializes in games or an app store that only offers apps that increase productivity.  Without Google's unlawful restraints, additional app stores would provide additional platforms on which more apps could be featured, and thereby, discovered by consumers.  Epic has been damaged through its inability to provide a competing app store (as it does on personal computers) and by the loss of the opportunity to reach more Android users directly in the ways that personal computers allow developers to reach consumers without artificial constraints.

93.     *Second,* Google conditions app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.  Specifically, Google markets an App Campaigns program that, as Google says, allows app developers to "get your app into the hands of more paying users" by "streamlin[ing] the process for you, making it easy to promote your apps across Google's largest

properties".  This includes certain ad placements on Google Search, YouTube, Discover on Google Search, and the Google Display Network, and with Google's "search partners", that are specially optimized for the advertising of mobile apps.  However, in order to access this valuable advertising space through the App Campaigns program, Google requires that app developers list their app in either the Google Play Store (to reach Android users) or in the Apple App Store (to reach Apple iOS users).  This conduct further entrenches Google's monopoly in Android App Distribution by coercing Android app developers to list their apps in the Google Play Store or risk losing access to a great many Android users they could otherwise advertise to but for Google's restrictions.

### iii.   Google's Conduct Toward Consumers

94.     Google directly and anti-competitively restricts the manner in which consumers can discover, download and install mobile apps and app stores.  Although Google nominally allows consumers to directly download and install Android apps and app stores—a process that Google pejoratively describes as "sideloading"—Google has ensured, through a series of technological impediments imposed by the Android OS, that direct downloading remains untenable for most consumers.

95.     But for Google's anticompetitive acts, Android users could freely download apps from developers' websites, rather than through an app store, just as they might do on a personal computer.  There is no reason that downloading and installing an app on a mobile device should differ from downloading and installing software on a personal computer.  Millions of personal computer users download and install software directly every day, such as Google's own Chrome browser or Adobe's Acrobat Reader.  Personal computer users do this easily and safely.

96.     Direct downloading on Android mobile devices, however, differs dramatically.  Google ensures that the Android process is technically complex, confusing and threatening, filled with dire warnings that scare most consumers into abandoning the lengthy process.  For example, depending on the version of Android

running on a mobile device, downloading and installing *Fortnite* on an Android device could take as many as 16 steps or more, including requiring the user to make changes to the device's default settings and manually granting various permissions while being warned that doing so is dangerous.  Below are the myriad steps an average Android user has to go through in order to download and install *Fortnite* directly from Epic's secure servers.



97.     Below are two of the intimidating messages and warnings about the supposed danger of directly downloading and installing apps that consumers encounter during this process.



98.     As if this slog through warnings and threats were not enough to ensure the inferiority of direct downloading as a distribution method for Android apps, Google denies downloaded apps the permissions necessary to be seamlessly updated in the background—instead allows such updates only for apps downloaded via Google Play Store.  The result is that consumers must manually approve every update of a "sideloaded" app.  In addition, depending on the OS version and selected settings, such updates may require users to go through many of the steps in the downloading process repeatedly, again triggering many of the same warnings.  This imposes onerous obstacles on consumers who wish to keep the most current version of an app on their mobile device and further drives consumers away from direct downloading and toward Google's monopolized app store.

99.     Further, under the guise of offering protection from malware, Google further restricts direct downloading.  When Google deems an app "harmful", Google may prevent the installation of, prompt a consumer to uninstall, or forcibly remove the

app from a consumer's device.  And direct downloading has been prevented entirely on the Android devices that are part of Google's so-called Advanced Protection Program ("APP").  Consumers who have enrolled in APP are unable to directly download apps; their Android device can only download apps distributed in the Google Play Store or in another pre-installed app store that Google has pre-approved for an OEM to offer on its devices.  App developers therefore cannot reach APP users unless they first agree to distribute their apps through the Google Play Store or through a separate Google-approved, OEM-offered app store, where available.  Google's invocation of security is an excuse to further strangle an app developer's ability to reach Android users, as shown by a comparison to personal computers, where users can securely purchase and download new software without being limited to a single software store owned or approved by the user's anti-virus software vendor.

100.   Direct downloading is also nominally available to competing app distributors who seek to distribute competing Android app stores directly to consumers.  However, the same restrictions Google imposes on the direct downloading of apps apply to the direct downloading of app stores.  Indeed, Google Play Protect has flagged at least one competing Android app store, Aptoide, as "harmful", further hindering consumers' ability to access a competing app store.

101.   And apps downloaded from "sideloaded" app stores, like apps directly downloaded from a developer's website, may not be automatically uploaded in the background.  Thus, direct downloading is not a viable way for app stores to reach Android users, any more than it is a viable alternative for single apps; the only difference is that the former do not have *any* alternative, ensuring the latter are forced into the Google Play Store.

102.   But for Google's restrictions on direct downloading, Epic and other app distributors and developers could try to directly distribute their stores and apps to those consumers who would be open to a process outside an established app store.  But as explained above, Google makes direct downloading substantially and unnecessarily

difficult, and in some cases prevents it entirely, further narrowing this already narrow alternative distribution channel.

103.    There is no legitimate reason for Google's conduct.  Indeed, for decades the users of personal computers have been able to install software acquired from various sources without being deterred by anything like the obstacles erected by Google.  Now, a user can navigate to the Internet webpage sponsored by the developer of software he/she desires, click once or twice to download and install an application, and be up and running, often in a matter of minutes.  The operating systems used by personal computers efficiently facilitate this download and installation (unlike Android), and security screening is conducted by a neutral security software operating in the background, allowing users to download software from any source they choose (unlike Android).

104.    Google's anti-competitive and unjustified restrictions on distributing apps through any means other than its own app store contradict its own claims that Android app developers can "us[e] any distribution approach or combination of approaches that meets your needs", and that developers can even provide consumers "apps from a website or [by] emailing them directly to users."[10]  In reality, Google specifically prevents app developers from effectively availing themselves of alternative distribution channels that it touts today.

105.    Through these anti-competitive acts, including contractual provisions and exclusionary obstacles, Google has willfully obtained a near-absolute monopoly over Android mobile app distribution.  Google Play Store downloads have accounted for more than 90% of downloads through Android app stores, dwarfing other available distribution channels.

---

[10] Google Play Developers Page, *Alternative distribution options,*
https://developer.android.com/distribute/marketing-tools/alternative-distribution (last accessed June 7, 2020).

### D.  Anti-Competitive Effects in the Android App Distribution Market

106.   Google's anti-competitive conduct forecloses competition in the Android App Distribution Market, affects a substantial volume of commerce in this Market and causes anti-competitive harms to OEMs, competing mobile app distributors, mobile app developers, and consumers.

107.   Google's conduct harms OEMs by forcing them to dedicate to the Google Play Store and other mandatory Google applications valuable space on their devices' "home screen", even if they would rather use that real estate for other purposes, including to offer alternative app stores.  Individually and together, these requirements limit OEMs' ability to innovate and compete with each other by offering innovative and more appealing (in terms of price and quality) distribution platforms for mobile apps. Google's restrictions also interfere with OEMs' ability to compete with each other by offering Android devices with tailored combinations of pre-installed apps that would appeal to particular subsets of mobile device consumers.

108.   Google's conduct harms would-be competitor app distributors, such as Epic, which could otherwise innovate new models of app distribution and provide OEMs, app developers, and consumers choice beyond Google's own app store.

109.   Google's anti-competitive conduct harms app developers, such as Epic, which are forced to agree to Google's anti-competitive terms and conditions if they wish to reach many Android users, such as through advertising on Google's valuable advertising properties.  Google's restrictions prevent developers from experimenting with alternative app distribution models, such as providing apps directly to consumers, selling apps through curated app stores, creating their own competing app stores, or forming business relationships with OEMs who can pre-install apps.  By restricting developers in such a way, Google ensures that the developer's apps will be distributed on the Google Play Store, and that Google is then able to monitor and collect a variety of information on the apps' usage, which it can then use to develop and offer

its own competing apps that are, of course, not subject to Google's supra-competitive taxes.

110.   Both developers and consumers are harmed by Google's supra-competitive taxes of 30% on the purchase price of apps distributed through the Google Play Store, which is a much higher transaction fee than would exist in a competitive market.  Google's supra-competitive taxes raise prices for app developers and consumers and reduce the output of mobile apps and related content by depriving app developers incentive and capital to develop new apps and content.

111.   Consumers are further harmed because Google's control of app distribution reduces developers' ability and incentive to distribute apps to consumers in different and innovative ways—for example, through genre-specific app stores.  Google, by restraining the distribution market and eliminating the ability and incentive for competing app stores, also limits consumers' ability to discover new apps of interest to them.  More competing app stores would permit additional platforms to feature diverse collections of apps.  Instead, consumers are left to sift through millions of apps in one monopolized app store, where Google controls which apps are featured and which apps are identified or prioritized in user searches.

## III.   Google Unlawfully Acquired and Maintains a Monopoly in the Android In-App Payment Processing Market.

112.   By selling digital content within a mobile app rather than (or in addition to) charging a price for the app itself, app developers can make an app widely accessible to all users, then charge users for additional digital content or features, thus still generating revenue from their investment in developing new apps and content.  This is especially true for mobile game developers.  By allowing users to play without up-front costs, developers permit more players try a game "risk free" and only pay for what they want to access.  *Fortnite*, for example, is free to download and play, but makes additional content available for in-app purchasing on an à la carte basis or via a subscription-based Battle Pass.  App developers who sell digital content rely on in-app

payment processing tools to process consumers' purchases in a seamless and efficient manner.

113.   When selling digital content, Android app developers are unable to utilize the multitude of electronic payment processing solutions generally available on the market to process other types of transactions.  Instead, through contractual restrictions and its monopoly in app distribution, Google coerces developers into using its own in-app payment processing by conditioning developers' use of Google's dominant Google Play Store on the use of Google's payment processor, Google Play Billing, for digital content, thereby acquiring and maintaining monopoly power in the Android In-App Payment Processing Market.  Google thus ties its Google Play Store to its own proprietary payment processing tool.

### A. The Android In-App Payment Processing Market

#### i.   Product Market Definition

114.   There is a relevant antitrust market for the processing of payments for the purchase of digital content, including virtual gaming products, that is consumed within Android apps (the "Android In-App Payment Processing Market").  The Android In-App Payment Processing Market is comprised of the payment processing solutions that Android developers could turn to and integrate into their Android apps to process the purchase of such in-app digital content.

115.   Absent Google's unlawful conduct, app developers could integrate compatible payment processor into their apps to facilitate the purchase of in-app digital content.  Developers also would have the capability to develop their own in-app payment processing functionality.  And developers could offer users a choice among multiple payment processors for each purchase, just like a website or brick-and-mortar store can offer a customer the option of using Visa, MasterCard, Amex, Google Pay, and more.

116.   Google offers separate payment solutions for the purchase of digital content than it does for other types of purchases, even within mobile apps.  Google Play

Billing can be used for the purchase of digital content and virtual gaming products, while Google offers a separate tool, Google Pay, to facilitate the purchase of physical products and services within apps.

117. It is particularly important that app developers who sell in-app digital content be able to offer in-app transactions that are seamless, engrossing, quick, and fun. For example, a gamer who encounters a desirable "skin" within *Fortnite*, such as a Marvel superhero, may purchase it nearly instantly for a small price without leaving the app. Although *Fortnite* does not offer content that extends gameplay or gives players competitive advantages, other game developers offer such products—for example, "boosts" and "extra lives"—that extend and enhance gameplay. It is critical that such purchases can be made during gameplay itself, rather than in another manner. If a player were required to purchase game-extending extra lives outside of the app, the player may simply stop playing instead.

118. As another example, if a user of a mobile dating app encounters a particularly desirable potential dating partner, he/she can do more than "swipe right" or "like" that person, but can also purchase a digital item that increases the likelihood that the potential partner will notice his/her profile. If the user could not make that purchase quickly and seamlessly, he/she would likely abandon the purchase and may even stop "swiping" in the app altogether.

119. It is therefore essential that developers who offer digital content be able to seamlessly integrate a payment processing solution into the app, rather than requiring a consumer to go elsewhere, such as to a separate website, to process a transaction. Indeed, if an app user were directed to process a purchase of digital content outside of a mobile app, the user might abandon the purchase or stop interacting with the mobile app altogether.

120. Mobile game developers particularly value the ability to allow users to make purchases that extend or enhance gameplay without disrupting or delaying that gameplay or a gamer's engagement with the mobile app. For these reasons, and in the

alternative, there is a relevant antitrust sub-market for the processing of payments for the purchase of virtual gaming products within mobile Android games (the "Android Games Payment Processing Market").

           ii.    <u>Geographic Market Definition</u>

121.   The geographic scope of the Android In-App Payment Processing Market is worldwide, excluding China. Outside China, in-app payment processing tools, such as Google Play Billing, are available on a worldwide basis. By contrast, in-app payment processing tools available in China are not available outside of China, including because Google prevents the use of non-Google payment processing tools for all apps distributed through the Google Play Store, which as noted above dominates distribution of apps outside of China.

**B.**    **Google's Monopoly Power in the Android In-App Payment Processing Market**

122.   Google has monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

123.   For apps distributed through the Google Play Store, Google requires that the apps use *only* its own in-app payment processor, Google Play Billing, to process in-app purchases of digital content and for all purchases within Android games. And because 90% or more of Android-compatible mobile app downloads conducted through an app stores have been done through the Google Play Store, Google has a monopoly in these Markets. .

124.   Google charges a 30% commission for Google Play Billing. This rate reflects Google's market power, which allows it to charge supra-competitive prices for payment processing within the market. Indeed, the cost of alternative electronic payment processing tools, which Google does not permit to be used for the purchase of in-app digital content or within Android games, can be ***one tenth*** of the 30% cost of Google Play Billing.

| **Electronic Payment Processing Tool** | **Base U.S. Rate** |
|---|---|
| PayPal | 2.9% |
| Stripe | 2.9% |
| Square | 2.6%-3.5% |
| Braintree | 2.9% |

### C. Google's Anti-Competitive Conduct Concerning the Android In-App Payment Processing Market

125.   Through provisions of the DDA that Google imposes on all developers who seek to access Android users, Google unlawfully ties its Google Play Store, through which it has a monopoly in the Android App Distribution Market, to its own in-app payment processing tool, Google Play Billing.  Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and in-app digital content.

126.   Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require in relevant part that:

- Developers offering products within a game downloaded on Google Play or providing access to game content must use Google Play In-app Billing as the method of payment.
- Developers offering products within another category of app downloaded on Google Play must use Google Play In-app Billing as the method of payment, except for the following cases:
    - Payment is solely for physical products,
    - Payment is for digital content that may be consumed outside of the app itself (*e.g.*, songs that can be played on other music players).

127.   Google's unlawful restraints in the DDA prevent app developers from integrating alternative, even multiple, payment processing solutions into their

mobile apps, depriving app developers and consumers alike a choice of competing payment processors. For example, Epic offers its own in-app payment processing tool that it could integrate, alongside Google's and others, into Epic mobile games. Epic consumers could then choose to process their payment using Google's tool, Epic's tool, or another tool altogether.

128. In December of 2019, Epic submitted a build of *Fortnite* to Google Play that enabled users to make in-app purchases through Epic's own payment processor. Upon review of the submission, Google Play rejected the application, citing its violation of Google's Payments policy as well as an unrelated issue raised by Google. In January 2020, Epic again submitted a *Fortnite* build that resolved the unrelated issue but again enabled users to use Epic's own payment processor. Google again rejected Epic's submission.

129. Epic was prevented from offering *Fortnite* on the Google Play Store, and therefore unable to reach many Android users, until it submitted a new version of *Fortnite* that only offered Google Play Billing. Google has damaged Epic by foreclosing it from the Android in-app payment processing market.

130. Google has no legitimate justifications for its tie. If it were concerned, for example, about the security of its users' payment information, then it would not permit alternative payment processing for certain transactions made on Android phones for physical products or digital content consumed outside an app. But Google does allow alternative payment processing tools in that context, with no diminution in security.

**D.    Anti-Competitive Effects in the Android In-App Payment Processing Market**

131. Google's conduct harms competition in the Android In-app Payment Processing Market (and, in the alternative, in the Android Games Payment Processing Market) and injures app developers, consumers, and competing in-app payment processors.

132.   Google's conduct harms would-be competitor in-app payment processors, who would otherwise have the ability to innovate and offer consumers alternative payment processing tools that offer better functionality, lower prices, and better security.  For example, in the absence of Google's Developer Program Policies, Epic could offer consumers a choice of in-app payment processor for each purchase made by the consumer, including a choice of Epic's own payment processor at a lower cost and with better customer service.

133.   Google also harms app developers and consumers by inserting itself as a mandatory middleman in every in-app transaction.  When Google acts as payment processor, Epic is unable to provide users comprehensive customer service relating to in-app payments without Google's involvement.  Google has little incentive to compete through improved customer service because Google faces no competition and consumers often blame Epic for payment-related problems.  In addition, Google is able to obtain information concerning Epic's transactions with its own customers, which it could use to give its ads and Search businesses an anti-competitive edge, even when Epic and its own customers would prefer not to share their information with Google.  In these ways and in others, Google directly harms app developers' relationships with the users of their apps.

134.   Finally, Google raises app developers' costs and consumer prices through its supra-competitive 30% tax on in-app purchases, a price it could not maintain if it had not foreclosed competition for such transactions.  The resulting increase in prices for in-app content likely deters some consumers from making purchases and deprives app developers of resources they could use to develop new apps and content. The supra-competitive tax rate also reduces developers' incentive to invest in and create additional apps and related in-app content.

## COUNT 1:  Sherman Act § 2
## (Unlawful Monopoly Maintenance in the
## Android App Distribution Market)
## (against all Defendants except Google Payment)

135.    Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

136.    Google's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations".  15 U.S.C. § 2.

137.    The Android App Distribution Market is a valid antitrust market.

138.    Google holds monopoly power in the Android App Distribution Market.

139.    Google has unlawfully maintained monopoly power in the Android App Distribution Market through the anti-competitive acts described herein, including conditioning the licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on OEMs' agreement to provide the Google Play Store with preferential treatment, imposing technical restrictions and obstacles on both OEMs and developers, which prevent the distribution of Android apps through means other than the Google Play Store, and conditioning app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.

140.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

141.    Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

142.    As a potential competing app distributor and as an app developer, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered and continues to suffer

damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 2:  Sherman Act § 1
### (Unreasonable restraints of trade concerning
### Android App Distribution Market:  OEMs)
### (against all Defendants except Google Payment)

143.    Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

144.    Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 1.

145.    Google has entered into agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market.  These include MADAs with OEMs that condition their access to the Google Play Store and other "must have" Google services on the OEM offering the Google Play Store as the primary and often the only viable app store on Android mobile devices.

146.    These agreements serve no legitimate or pro-competitive purpose that could justify their anti-competitive effects, and thus unreasonably restrain competition in the Android App Distribution Market.

147.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

148.    Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

149.    As a potential competing app distributor and as an app developer that consumes app distribution services, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered and continues to suffer damages and irreparable injury, and such damages

and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 3:  Sherman Act § 1
### (Unreasonable restraints of trade concerning
### Android App Distribution Market:  DDA)
### (against all Defendants except Google Payment)

150.   Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

151.   Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 1.

152.   Google forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of being distributed through Google's app store, the Google Play Store.  The relevant provisions of these agreements unreasonably restrain competition in the Android App Distribution Market.

153.   Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play".  Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies.  Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play".  The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases.  (§§ 8.3, 10.3.)  These provisions prevent app developers from offering competing app stores through the

Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

154.   These agreements serve no legitimate or pro-competitive purpose that could justify their anti-competitive effects, and thus unreasonably restrain competition in the Android App Distribution Market.

155.   Google's conduct affects a substantial volume of interstate as well as foreign commerce.

156.   Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

157.   As a potential competing app distributor and as an app developer that consumes app distribution services, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 4:  Sherman Act § 2
### (Unlawful Monopolization and Monopoly Maintenance in the Android In-App Payment Processing Market)
### (against all Defendants)

158.   Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

159.   Google's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations".  15 U.S.C. § 2.

160.   The Android In-App Payment Processing Market is a valid antitrust market.  In the alternative, the Android Games Payment Processing Market is a valid antitrust market.

161.   Google holds monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

162.   Google has unlawfully acquired monopoly power in these Markets, including through the anti-competitive acts described herein.  And however Google initially acquired its monopoly, it has unlawfully maintained its monopoly, including through the anti-competitive acts described herein.

163.   Google's conduct affects a substantial volume of interstate as well as foreign commerce.

164.   Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

165.   As an app developer and as the developer of a competing in-app payment processing tool, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 5:  Sherman Act § 1
### (Unreasonable restraints of trade concerning
### Android In-App Payment Processing Market)
### (against all Defendants)

166.   Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

167.   Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations".  15 U.S.C. § 1.

168.   Google, except Google Payment, forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that

Agreement, as a condition of having their apps distributed through Google's monopolized app store, Google Play Store.  The relevant provisions of these agreements unreasonably restrain competition in the Android In-App Payment Processing Market.

169.    Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through the Google Play Store.  This includes payments related to in-app purchases of digital content.  Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for such in-app purchases.  While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself", Google expressly applies its anti-competitive mandate to every "game downloaded on Google Play" and to all purchased "game content", such as purchases made within *Fortnite*.

170.    The challenged provisions serve no sufficient legitimate or pro-competitive purpose and unreasonably restrain competition in the Android In-App Payment Processing Market and, in the alternative, the Android Games Payment Processing Market.

171.    Defendants' conduct affects a substantial volume of interstate as well as foreign commerce.

172.    Defendants' conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

173.    As an app developer and as the developer of a competing in-app payment processing tool, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered

and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 6:  Sherman Act § 1
### (Tying Google Play Store to Google Play Billing)
### (against all Defendants)

174.  Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

175.  Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

176.  Google has unlawfully tied the Google Play Store to its in-app payment processor, Google Play Billing, through its DDAs with app developers and its Developer Program Policies.

177.  Google has sufficient economic power in the tying market, the Android App Distribution Market.  With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive taxes on the sale of apps through the Google Play Store.

178.  The availability of the Google Play Store for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing services.  Google's foreclosure of alternative app distribution channels forces developers like Epic to use Google's in-app payment processing services, which Google has expressly made a condition of reaching Android users through its dominant Google Play Store.

179.  The tying product, Android app distribution, is distinct from the tied product, Android in-app payment processing, because app developers such as Epic have alternative in-app payment processing options and would prefer to choose among them

independently of how an Android app is distributed.  Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

180.   Google's conduct forecloses competition in the Android In-App Payment Processing Market, and, in the alternative, in the Android Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

181.   Google has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anti-competitive effects of Google's conduct or its purported justifications.

182.   In the alternative only, even if Google's conduct does not constitute a *per se* illegal tie, a detailed analysis of Google's tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal.

183.   As an app developer which consumes in-app payment processing services and as the developer of a competing in-app payment processing tool, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 7:  California Cartwright Act
### (Unreasonable restraints of trade in Android App Distribution Market)
### (against all Defendants except Google Payment)

184.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

185.   Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition.  *See* §§ 16720, 16726.

186.   Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

187.   The Android App Distribution Market is a valid antitrust market.

188.   Google has executed agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market.  Namely, Google has entered into MADAs with OEMs that require OEMs to offer the Google Play Store as the primary—and practically the only—app store on Android mobile devices.  These agreements further prevent OEMs from offering alternative app stores on Android mobile devices in any prominent visual positioning.

189.   Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service and lowered output.

190.   Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute its Android applications, including *Fortnite*, and to market a competing app store to the Google Play Store.

191.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anti-competitive scheme took place in California.

192.   Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 8:  California Cartwright Act
### (Unreasonable restraints of trade in Android App Distribution Market) (against all Defendants except Google Payment)

193.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

194.   Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*,  the

combination of resources by two or more persons to restrain trade or commerce or to prevent market competition.  *See* §§ 16720, 16726.

195.    Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

196.    The Android App Distribution Market is a valid antitrust market.

197.    Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein.  Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android App Distribution Market.

198.    Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies.  Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play."  The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases.  (§§ 8.3, 10.3.)  These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

199.    These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android App Distribution Market.

200.   Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service, and lowered output.

201.   Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute its Android applications, including *Fortnite*, and to market a competing app store to the Google Play Store.

202.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anti-competitive scheme took place in California.

203.   Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 9:  California Cartwright Act
### (Unreasonable restraints of trade in Android In-App Payment Processing Market) (against all Defendants)

204.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

205.   Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*,  the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition.  *See* §§ 16720, 16726.

206.   Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

207.   The Android App Distribution Market and Android In-App Payment Processing Market, and, in the alternative, the Android Games Payment Processing Market, are valid antitrust markets.

208.   Google has monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

209.   Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein.  Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android In-App Payment Processing Market.

210.   Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through the Google Play Store.  This includes payments related to in-app purchases.  Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for in-app purchases.  While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself", Google expressly and discriminatorily applies its anti-competitive mandate to every "game downloaded on Google Play" and to all purchased "game content", such as purchases made within *Fortnite*.

211.   These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android In-App Payment Processing Market, and, in the alternative, in the Android Games Payment Processing Market.

212.   Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service and lowered output.

213.   Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute and use its own in-app payment processor.

214.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anti-competitive scheme took place in California.

215.   Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 10:  California Cartwright Act
### (Tying Google Play Store to Google Play Billing)
### (against all Defendants)

216.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

217.   Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*,  the combination of resources by two or more persons to restrain trade or commerce, or to prevent market competition.  *See* §§ 16720, 16726.

218.   Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

219.   The Cartwright Act also makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount

1    from, or rebate upon, such price, on the condition, agreement or understanding that the

2    lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery,

3    supplies, commodities, or services of a competitor or competitors of the lessor or seller,

4    where the effect of such lease, sale, or contract for sale or such condition, agreement or

5    understanding may be to substantially lessen competition or tend to create a monopoly

6    in any line of trade or commerce in any section of the State." § 16727.

7        220.   As detailed above, Google has unlawfully tied its in-app payment

8    processor, Google Play Billing, to the Google Play Store through its DDAs with app

9    developers and its Developer Program Policies.

10       221.   Google has sufficient economic power in the tying market, the

11   Android App Distribution Market, to affect competition in the tied market, the Android

12   In-App Payment Distribution Market.  With Google Play Store installed on nearly all

13   Android OS devices and over 90% of downloads on Android OS devices being

14   performed by the Google Play Store, Google has overwhelming market power.

15   Google's market power is further evidenced by its ability to extract supra-competitive

16   taxes on the sale of apps through the Google Play Store.

17       222.   The availability of the Google Play Store for app distribution is

18   conditioned on the app developer accepting a second product, Google's in-app payment

19   processing services.  Google's foreclosure of alternative app distribution channels forces

20   developers like Epic to use Google's in-app payment processing services, which Google

21   has expressly made a condition of reaching Android users through its dominant Google

22   Play Store.

23       223.   The tying product, Android app distribution, is separate and distinct

24   from the tied product, Android in-app payment processing, because app developers such

25   as Epic have alternative in-app payment processing options and would prefer to choose

26   among them independently of how an Android app is distributed.  Google's unlawful

27   tying arrangement thus ties two separate products that are in separate markets.

28

224.   Google's conduct forecloses competition in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

225.   Google has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anti-competitive effects of Google's conduct or its purported justifications.

226.   Even if Google's conduct does not form a *per se* illegal tie, an assessment of the tying arrangement would demonstrate that it is unreasonable under the Cartwright Act, and therefore, illegal.

227.   Google's acts and practices detailed above unreasonably restrain competition in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

228.   Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, is paying a supra-competitive commission rate on in-app purchases processed through Google's payment processor and has forgone commission revenue it would be able to generate if its own in-app payment processor were not unreasonably restricted from the market.

229.   As an app developer which consumes in-app payment processing services and as the developer of a competing in-app payment processing tool, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.

230.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anti-competitive scheme took place in California.

231.   Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 11:  California Unfair Competition Law
### (against all Defendants)

232.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

233.   Google's conduct, as described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits any unlawful, unfair or fraudulent business act or practice.

234.   Epic has standing to bring this claim because it has suffered injury in fact and lost money as a result of Google's unfair competition.  Specifically, it develops and distributes apps for the Android mobile platform, and has developed and distributes a processor for in-app purchases, and Google's conduct has unreasonably restricted Epic's ability to fairly compete in the relevant markets with these products.

235.   Google's conduct violates the Sherman Act and the Cartwright Act, and thus constitutes unlawful conduct under § 17200.

236.   Google's conduct is also "unfair" within the meaning of the Unfair Competition Law.

237.   Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, is unreasonably prevented from freely distributing mobile apps or its in-app payment processing tool, and forfeits a higher commission rate on the in-app purchases than it would pay absent Google's conduct.

238.   Epic seeks injunctive relief under the Unfair Competition Law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Epic and against Defendants:

A.     Issuing an injunction prohibiting Google's anti-competitive and unfair conduct and mandating that Google take all necessary steps to cease such conduct and to restore competition;

B.     Awarding a declaration that the contractual restraints complained of herein are unlawful and unenforceable;

C.     Awarding any other equitable relief necessary to prevent and remedy Google's anti-competitive conduct; and

D.     Granting such other and further relief as the Court deems just and proper.

Dated:  August 13, 2020

Respectfully submitted,

By:     /s/ Paul J. Riehle

**FAEGRE DRINKER BIDDLE &
REATH LLP**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Christine A. Varney (*pro hac vice pending*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice pending*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice pending*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice pending*)
yeven@cravath.com
M. Brent Byars (*pro hac vice pending*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

JS-CAND 44 (Rev. 07/19)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

1 U.S. Government Plaintiff

2 U.S. Government Defendant

3 Federal Question
*(U.S. Government Not a Party)*

4 Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | | | | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | | 710 Fair Labor Standards Act | 820 Copyrights | 430 Banks and Banking |
| | 340 Marine | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 450 Commerce |
| 151 Medicare Act | 345 Marine Product Liability | | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 350 Motor Vehicle | **PERSONAL PROPERTY** | 751 Family and Medical Leave Act | 840 Trademark | 470 Racketeer Influenced & Corrupt Organizations |
| | 355 Motor Vehicle Product Liability | 370 Other Fraud | 790 Other Labor Litigation | **SOCIAL SECURITY** | 480 Consumer Credit |
| 153 Recovery of Overpayment of Veteran's Benefits | 360 Other Personal Injury | 371 Truth in Lending | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| | 362 Personal Injury -Medical Malpractice | 380 Other Personal Property Damage | | 862 Black Lung (923) | 490 Cable/Sat TV |
| 160 Stockholders' Suits | | 385 Property Damage Product Liability | **IMMIGRATION** | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 190 Other Contract | **CIVIL RIGHTS** | | 462 Naturalization Application | 864 SSID Title XVI | 890 Other Statutory Actions |
| 195 Contract Product Liability | | **PRISONER PETITIONS** | 465 Other Immigration Actions | 865 RSI (405(g)) | 891 Agricultural Acts |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

1 Original Proceeding

2 Removed from State Court

3 Remanded from Appellate Court

4 Reinstated or Reopened

5 Transferred from Another District *(specify)*

6 Multidistrict Litigation–Transfer

8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** Yes No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*

JUDGE

DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

(Place an "X" in One Box Only) **SAN FRANCISCO/OAKLAND** **SAN JOSE** **EUREKA-MCKINLEYVILLE**

DATE

SIGNATURE OF ATTORNEY OF RECORD

**Attachment to Civil Cover Sheet**

I.  PLAINTIFF'S ATTORNEYS

FAEGRE DRINKER BIDDLE & REATH LLP
Paul J. Riehle
Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500

CRAVATH, SWAINE & MOORE LLP
Christine A. Varney*
Katherine B. Forrest*
Gary A. Bornstein*
Yonatan Even*
M. Brent Byars*
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Phone: (212) 474-1000

* *Pro hac vice* application forthcoming

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. a)   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   b)   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   c)   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II.   **Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

   (1)  <u>United States plaintiff</u>. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

   (2)  <u>United States defendant</u>. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

   (3)  <u>Federal question</u>. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

   (4)  <u>Diversity of citizenship</u>. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

III.   **Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.   **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.   **Origin.** Place an "X" in one of the six boxes.

   (1)  <u>Original Proceedings</u>. Cases originating in the United States district courts.

   (2)  <u>Removed from State Court</u>. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

   (3)  <u>Remanded from Appellate Court</u>. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

   (4)  <u>Reinstated or Reopened</u>. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

   (5)  <u>Transferred from Another District</u>. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

   (6)  <u>Multidistrict Litigation Transfer</u>. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

   (8)  <u>Multidistrict Litigation Direct File</u>. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

   <u>Please note that there is no Origin Code 7</u>. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** <u>Example:</u> U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

VII.   **Requested in Complaint.** <u>Class Action</u>. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

   <u>Demand</u>. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

   <u>Jury Demand</u>. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

IX.   **Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# EXHIBIT B

1  Steve W. Berman (*pro hac vice forthcoming*)
   Robert F. Lopez (*pro hac vice forthcoming*)
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   1301 Second Avenue, Suite 2000
3  Seattle, WA  98101
   Telephone:  (206) 623-7292
4  Facsimile:   (206) 623-0594
   steve@hbsslaw.com
5  robl@hbsslaw.com

6  Benjamin J. Siegel (SBN 256260)
   HAGENS BERMAN SOBOL SHAPIRO LLP
7  715 Hearst Avenue, Suite 202
   Berkeley, CA 94710
8  Telephone: (510) 725-3000
   Facsimile:  (510) 725-3001
9  bens@hbsslaw.com

10 Joseph M. Vanek (*pro hac vice forthcoming*)
   Eamon P. Kelly (*pro hac vice forthcoming*)
11 SPERLING & SLATER, P.C.
   55 W. Monroe Street, 32nd Floor
12 Chicago, IL 60603
   Telephone: (312) 676-5845
13 Facsimile: (312) 641-6492
   jvanek@sperling-law.com
14 ekelly@sperling-law.com

15 *Attorneys for Plaintiff and the Proposed Classes*

16                UNITED STATES DISTRICT COURT

17              NORTHERN DISTRICT OF CALIFORNIA

18                      SAN JOSE DIVISION

| | |
|---|---|
| PURE SWEAT BASKETBALL, INC., an Illinois corporation, on behalf of itself and all others similarly situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>GOOGLE LLC, a Delaware limited liability company; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LTD.; and GOOGLE PAYMENT CORP.,<br><br>                              Defendants. | No.<br><br>CLASS ACTION COMPLAINT<br><br>COMPLAINT FOR VIOLATION OF THE SHERMAN ACT AND CALIFORNIA UNFAIR COMPETITION LAW<br><br>**DEMAND FOR JURY TRIAL OF ALL ISSUES SO TRIABLE** |

CLASS ACTION COMPLAINT
Case No.:
010803-11/1334529 V1

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  JURISDICTION ................................................................................................. 9

III. PARTIES ......................................................................................................... 10

   A.   The plaintiff ............................................................................................. 10

   B.   The defendants ........................................................................................ 11

IV.  RELEVANT FACTS ........................................................................................ 12

   A.   The Google Play store is the official Android OS app store. ................... 13

   B.   While the Android OS is superficially open-source, Google maintains
      an iron grip on its commercial aspects. .................................................... 15

   C.   Google is a monopolist in the U.S. market for Android OS app stores,
      and, accordingly, in the markets for app (and in-app) distribution
      services and in-app payment processing. .................................................. 19

   D.   Google is an attempted monopolist in the U.S. market for Android OS
      app stores, and, accordingly, in the markets for app (and in-app)
      distribution services and payment processing services for U.S. Android
      app developers. ........................................................................................ 20

   E.   Apple offers no market constraints via its iOS app store, through which
      it distributes incompatible apps. .............................................................. 21

   F.   Google engages in unlawful behavior in order to restrain trade and to
      maintain and grow its monopoly in the markets at issue. .......................... 22

      1.   Google was recently fined over $5 billion for practices related
         to Google Play. ............................................................................ 22

      2.   Google has used contracts with device manufacturers as means
         to its anticompetitive ends. ........................................................... 24

   G.   Google's practices with respect to Google Play further restrain and
      injure competition in the market for U.S. Android OS app stores,
      where already there are high barriers to entry. ......................................... 26

      1.   There are high barriers to entry into the market for Android OS
         app stores. ................................................................................... 26

      2.   Google manipulates security fears in order to maintain and
         further its market power in U.S. Android OS app stores. ............... 27

      3.   Google's refusal to permit app-store clients into Google Play
         means that only a hardy few will attempt installation of
         alternative stores. ........................................................................ 30

      4.   Even if a consumer succeeds in loading an alternative app-store
         client onto his or her device, Google may try to shut down
         access, which harms competition and developers. ......................... 34

H.   Google's unlawful practices harm developers and competition...................................36

    1.   Google's behavior stifles innovation...............................................36

    2.   Google harms developers by killing competition and diminishing consumer choice. ....................................39

    3.   Google also harms developers and competition by depressing output. .................................................................39

    4.   Google harms developers by causing supracompetitive pricing of distribution services for Android OS apps and in-app add-ons, including subscriptions. ..............................40

V.   INTERSTATE TRADE AND COMMERCE .................................................45

VI.   RELEVANT MARKETS .................................................................45

VII.   CLASS ALLEGATIONS .................................................................49

VIII.   APPLICABILITY OF CALIFORNIA LAW .................................................52

FIRST CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT - MONOPOLIZATION OF MARKET FOR ANDROID DISTRIBUTION SERVICES (15 U.S.C. § 2) .......................................53

SECOND CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION OF MARKET FOR ANDROID DISTRIBUTION SERVICES (15 U.S.C. § 2) .................................54

THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT - MONOPOLIZATION OF MARKET FOR ANDROID IN-APP PAYMENT PROCESSING SERVICES (15 U.S.C. § 2) .................................56

FOURTH CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION OF MARKET FOR ANDROID IN-APP PAYMENT PROCESSING SERVICES (15 U.S.C. § 2)......................57

FIFTH CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – RESTRAINT OF TRADE RE: IN-APP PAYMENT PROCESSING (15 U.S.C. § 1) .................................................................59

SIXTH CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – ALTERNATIVE BASIS FOR TYING AS TO IN-APP PAYMENT-PROCESSING  (15 U.S.C. § 1) .......................................60

SEVENTH CAUSE OF ACTION VIOLATION OF THE UNFAIR COMPETITION ACT (CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*)......................62

PRAYER FOR RELIEF .................................................................63

JURY TRIAL DEMANDED .................................................................64

1       For its suit against defendant Google LLC, Google Ireland Limited, Google Commerce

2   Limited, Google Asia Pacific PTE. Ltd. and Google Payment Corp. (collectively, Google), plaintiff,

3   on its own behalf and that of all similarly situated U.S. Android OS application developers, alleges

4   as follows:

## I.    INTRODUCTION

1.    Native applications—apps of various sorts programmed for and downloaded to a mobile device—bring smartphones and tablets to life.  In turn, add-ons for apps—items such as consumables (for example, extra lives in an adventure game), or subscriptions for full-fledged mobile productivity apps—make apps more fun or useful.  Developers, with their ingenuity, training, investment, and hard work, create these apps and extras.  And certainly there are many device users to buy them.  As of June 2019, for example, 81% of Americans owned smartphones, and 52% owned tablets.[1]  And so the two dominant (albeit not mutually competitive) stores—Google Play for Android Operating System (OS) products, and the App Store for Apple iOS products —generate billions of dollars in annual revenue for their owners, Apple Inc. and Google, respectively.[2]  And what a system it is: because apps for iOS and Android devices are incompatible,[3] with all the barriers and switching costs entailed, these two corporate giants can split the lucrative mobile apps world neatly between them, with enormous ongoing profits for each.

---

[1] http://www.pewinternet.org/fact-sheet/mobile/ (last accessed Aug. 15, 2020).

[2] *See, e.g.*, https://www.statista.com/statistics/296226/annual-apple-app-store-revenue/ ("In the last reported year, customers spent an estimated 54.2 billion U.S. dollars on in-app purchases, subscriptions, and premium apps in the Apple App store. (last accessed Aug. 15, 2020); https://www.statista.com/statistics/444476/google-play-annual-revenue/#:~:text=This%20statistic%20the%20worldwide%20app,spending%20in%20the%20previous%20year. (reporting study indicating that Google Play spending in 2019 was some $29.3 billion, which would translate to roughly $9.76 billion, based on the 30% Google revenue share discussed below) (last accessed Aug. 15, 2020).  Alphabet, Google's parent, reported in its 10-K for 2019 that "other revenue," including that generated from Google Play, Google hardware, and YouTube subscriptions, amounted to $17.014 billion for 2019. (https://abc.xyz/investor/static/pdf/20200204_alphabet_10K.pdf?cache=cdd6dbf (Alphabet 2019 10-K at 32) (last accessed Aug. 15, 2020).)

These are global figures.  Neither Apple nor Google publishes U.S. figures.

[3] https://yourbusiness.azcentral.com/apple-apps-compatible-android-20369.html (last accessed Aug. 15, 2020).

2.  Because each store operates in its own discrete sphere, neither places any competitive pressure on the other, including as to the prices that Google charges developers for app distribution services and in-app services, the latter of which primarily entails the processing of consumers' payments for add-ons, including subscriptions, that they purchase via apps distributed through Google Play.

3.  This suit concerns Google Play, Google's store for Android OS apps, and the in-app add-ons or other digital products, including subscriptions, that developers make available for sale via their apps.[4]  It concerns Google's improper attainment and maintenance of a monopoly in the U.S. market for Android OS app stores and distribution services.  And it concerns Google's improper attainment and maintenance of a monopoly in the U.S. market for in-app product distribution services, which services consist primarily of payment processing for items purchased in-app.  It concerns the harm caused by Google's ongoing abuse of its market power, including the exclusion of competition, the stifling of innovation, the inhibition of consumer choice, and Google's imposition on app developers of a supracompetitive 30% transaction fee.[5]

4.  In fact, the CEO of Google's corporate parent, Alphabet, has admitted that Google's supracompetitive transaction fee is anything but an outcome of competition.  Instead, it has "been the industry standard"—in other words, it is what Google's fellow monopolist Apple imposes in its parallel, closed iOS universe, so Google imposes it its own Android sphere.  And as plaintiff will demonstrate, Google's transaction fees have remained unlawfully high for all these years because Google has willfully—and effectively—excluded competition for developer services in its discrete Android universe.[6]

---

[4] *See, e.g.*, https://play.google.com/store?hl=en (Google Play web page) (last accessed Aug. 15, 2020).

[5] This is the default rate.  *See* n.22 for a description of a variation for certain subscription payments made via Google's in-app purchase mechanism.

[6] Alphabet Inc. (Goog) (Google) Q4 2018 Earnings Conf. Call Transcript, available at: https://www.fool.com/earnings/call-transcripts/2019/02/04/alphabet-inc-goog-googl-q4-2018-earnings-conference.aspx (last accessed Aug. 15, 2020).

**Acquisition of monopoly (or monopsony) power in Android app and in-app markets**

5.    Google's Android OS[7] is one of the two dominant mobile device operating systems.[8] Google Play is the 1,000-pound gorilla of app providers to the many tens of millions of Android OS device consumers.  While Google does not publish its share among app stores for the Android mobile operating system, in the European Economic Area, it's at "more than *90%.*"[9]

6.    But Google has not attained and maintained such dominance because its app store is somehow unique or better than any potential competition.   Rather, as demonstrated below,[10] Google has attained and maintained monopoly status in the U.S. market for Android OS app stores through a series of anticompetitive contracts, strategic abuses of its dominance in other[11] Android software applications, deficits in consumer knowledge and information, and the cultivation and exploitation of device users' fear of malware.

7.    *First*, Google has attained monopoly status in the U.S. market for Android OS app stores in part by bundling the Google Play store with its other must-have apps (themselves made must-have by Google's forced-bundling practices).  If a manufacturer of an Android OS device wanted (or wants) to pre-install the popular YouTube or Google Maps apps on devices sold in the U.S., it has to take the Google Play store as well.  This results in the pre-installation of Google Play on tens of millions of U.S. devices every year.[12]  And of course, the ubiquity of these pre-

---

[7] *See* Alphabet's (Google's parent) 2017 10-K, https://abc.xyz/investor/pdf/20171231_alphabet_10K.pdf, at 3 (referring to Google's acquisition of Android, and referring to Android as one of its "core products")

[8] The other is Apple's iOS.  In July 2020, Android's U.S. market share was at 41.03%, versus 58.78% for iOS.  (http://gs.statcounter.com/os-market-share/mobile/united-states-of-america (last accessed Aug. 15, 2020).)

[9] https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581 (last accessed Aug. 15, 2020).

[10] *See* Secs. IV.F-IV.H, *infra*.

[11] Google Play is itself a software application, known in the instant context as a client.  *See* https://en.wikipedia.org/wiki/Client_(computing)#:~:text=In%20computing%2C%20a%20client%20 is,by%20way%20of%20a%20network. (last accessed Aug. 15, 2020).

[12] For example, one study indicates that at least 27.5 million Android devices were sold in the U.S. in Q3 2017.  (*See* Data 29.5 Million US Smartphone Shipments in Q3, 2017, Android Headlines, available at: https://www.androidheadlines.com/2017/11/data-39-5-million-us-smartphone-shipments-in-q3-2017.html (last accessed Aug. 15, 2020).)  Samsung, LG, ZTE, and Motorola alone sold 23.5 million of these devices.  (*Id.*)  And each of these manufacturers preloads

CLASS ACTION COMPLAINT          - 3 -
Case No.:
010803-11/1334529 V1

installations only reinforces Google Play's status as the perceived official app store for Android apps.

8. *Second*, Google maintains and reinforces its monopoly status in the field by banning the distribution of other Android app-sale clients in Google Play. For example, Amazon runs an app store for Android OS apps, but there is no easy or readily available way for the typical Android OS device owner to buy anything from it. Google's practices require the vast majority of users to sideload[13] the Amazon Appstore by locating the client online; figuring out the sideload process; and changing a security setting on his or her device that allows a practice that Google, as the owner of the standard Android operating system, strongly discourages (enabling the ominous-sounding "Unknown sources" download capability). As Google well knows, hardly any members of its enormous Google Play install base will go to this trouble, if they even know such a process may be available. And still others will heed Google's security warnings and not go through with the installation.[14] No wonder app developers feel bound to sell in Google Play, whatever the cost.

9. *Third*, by so-called anti-fragmentation contractual terms, Google prohibits licensees of apps such as YouTube and Google Play from manufacturing or selling even a single smart device using a so-called forked version, *i.e.*, a non-Google variant, of Android.[15] Amazon is the author and distributor of Fire OS, an Android variant. This Android fork powers Amazon's tablets.[16] Yet because Google's anticompetitive contracts prohibit players large and small from deploying Fire OS, it has not reached its competitive potential; it remains essentially an Amazon-only OS, despite other

---

Google Play on some, if not all or most, of its U.S. devices. According to the European Commission, the Google Play Store is pre-installed by device manufacturers on practically all Android mobile devices sold outside of China.

[13] "Sideloading is the installation of an application on a mobile device without using the device's official application-distribution method." (https://searchmobilecomputing.techtarget.com/definition/sideloading (last accessed Aug. 15, 2020).)

[14] *See, e.g.*, "Download apps to your Android device," available at: https://support.google.com/android/answer/7391672?hl=en&ref_topic=7311596 (last accessed Aug. 15, 2020) (setting forth official safety warnings for those who would venture outside Google Play).

[15] *E.g.*, https://developer.amazon.com/docs/fire-tv/fire-os-overview.html (last accessed Aug. 15, 2020).

[16] It is also the operating system for Amazon's Fire Phone, a now-discontinued device of which Amazon sold very few. *See* https://www.phonearena.com/phones/Amazon-Fire-Phone_id8731 (last accessed Aug. 15, 2020).

manufacturers' reported interest in adopting it.[17]  Because Google regularly prohibits almost all Android device manufacturers from pre-installing Fire OS on their phones and tablets, it's further limited the Amazon Appstore's competitiveness (which otherwise would be pre-installed on those additional Fire OS devices).

10.   Google's abuse of its power regarding Google Play is part of the behavior that led Europe to fine Google a record €4.34 billion, then about $5.1 billion.[18]  In fact—in Europe—due to the E.U.'s action, Google has recently de-coupled Google Play and other popular apps from its Search and Chrome apps, the latter of which were part and parcel of its monopolistic dominance in mobile search.  And Google also will cease its practice of refusing to license its apps to manufacturers who want to build devices with an Android-forked OS—but in Europe, not in the U.S.

11.   *Fourth*, Google makes overblown, self-serving, and unjustifiable claims regarding security in order to dissuade consumers from downloading and trying competitors' app stores.  Not content to rely solely on its huge install base for Google Play, which itself was obtained by anticompetitive means, Google also uses official Android warnings, warnings on devices, and security mechanisms on Android OS devices to convince consumers that it is too risky to try its competitors' stores.  And if all of these security warnings are not enough, then Google will use its security systems to interfere with the ability of users to make purchases from other stores.

12.   For example, its abuse of power on ostensible security grounds has recently led to an injunction issued by a Portuguese court, applicable throughout Europe, barring Google from using purported security measures to dissuade consumers from using an alternative Android OS app store, and from going so far as to disable it on devices on which users had found a way to install it.[19] Google, it appears, will take most any step to protect and bolster its multi-billion dollar Android app-store business.

---

[17] *See* https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581 ((last accessed Aug. 17, 2020).

[18] *See. e.g.*, https://www.nytimes.com/2018/07/18/technology/google-eu-android-fine.html (last accessed Aug. 15, 2020).

[19] *See* https://www.androidpolice.com/2018/10/23/aptoide-gains-injunction-google-latest-antitrust-case-compensation-follow/ (last accessed Aug. 15, 2020).

**Abuse of monopoly (or monopsony) power through Google Play**

**Generally**

13.    Having gained monopoly power by anticompetitive means in the U.S. market for Android OS app stores, Google abuses that power by continuing to stifle innovation and consumer choice.  Its overbearing contracts and practices steal oxygen even from well-resourced competitors such as Amazon, robbing the marketplace of innovative means of distributing apps at lower costs to developers.  And by stifling competition, Google deprives consumers of readily accessible and vibrant choices in the U.S. market for Android OS app stores.  Moreover, as described herein, Google correspondingly has willfully and unlawfully acquired, maintained, and abused monopoly market power, and otherwise acted improperly and unlawfully, in the U.S. Android developer distribution and payment processing markets as alleged herein.

**30% default transaction fee**

14.    Google has abused its unlawfully gained dominance to impose supracompetitive pricing: a default *30%* service fee[20] paid by developers on each sale of non-zero-priced Android OS app purchases[21] made at its Google Play store, and, as the case may be, on sales of in-app digital add-ons, including subscriptions, distributed via apps sold in Google Play.[22]  So if an app or in-app add-

---

[20] Google's current and past 70% (developer) / 30% (Google) revenue split is memorialized at paragraph 3.4 of its Google Play Developer Distribution Agreement by reference to a Service Fee, which in turn is linked to Google's "Service fees" schedule.  (*See* https://play.google.com/about/developer-distribution-agreement.html (Dev. Agr.) (last accessed Aug. 15, 2020), available at: https://support.google.com/googleplay/android-developer/answer/112622?hl=en ("For apps and in-app products offered through Google Play, the service fee is equivalent to 30% of the price. You receive 70% of the payment. The remaining 30% goes to the distribution partner and operating fees.") (last accessed Aug. 15, 2020).)

[21] Google has modified its service-fee structure with respect to subscriptions. (https://support.google.com/googleplay/android-developer/answer/112622?hl=en  ("As of January 1, 2018, the transaction fee for subscription products decreases to 15% for any subscribers you retain after 12 paid months. If a subscriber has been active as of this date, that time will be counted. For example, if a subscriber has been active for 4 months, the transaction fee will be reduced to 15% after 8 more paid months.").)

[22] Google also charges developers a $25 fee to set up a Google Play developer account.  (https://support.google.com/googleplay/android-developer/answer/6112435?hl=en) ("There is a $25 USD one-time registration fee . . . .") (last accessed Aug. 15, 2020).)  This fee helps offset costs that Google may claim as justification for its incredibly high 30% service fee, especially considering the sheer number of developers from whom Google collects it.

on in Google Play costs $1.99, Google takes nearly *$.60*.[23]  As for in-app sales, this charge is essentially for payment-processing services, which could be purchased from other providers at much cheaper rates,[24] and with faster payments to developers, if only Google permitted developers to use them.  Tellingly, Google has succeeded in maintaining this astounding and exploitative 30% take rate (with the exception noted) since it opened its app store in 2008, despite, *e.g.*, accrued economies of scale.

15.  By imposing this unjustified default 30% tax rate on paid Google Play transactions, including as to in-app digital product distributions, and by inserting the requisite terms into its contracts with developers, Google extracts more money from developers than they would otherwise have to pay for the distribution of Android OS apps and add-ons sold via in-app purchase, including subscriptions.  But for Google's exclusionary behavior, including as to in-app payment processing as alleged herein, the Android app distribution market (as well as the tied payment processing market) would have more, and more meaningful and effective, competition.

16.  Even more evidence of Google's supracompetitive pricing has emerged via the developer of Fortnite, a currently popular game.  This developer, Epic Games, decided to forego sales of Fortnite in the Google Play store and to distribute the game on its own—in spite of the need for the difficult sideload process engendered by Google's anticompetitive behavior.  Epic has divulged information, discussed below,[25] further demonstrating that Google's 30% levy on Google Play transactions far exceeds the bounds of even a generous profit.  Epic eventually opted to return to Google Play, due to the effects and obstacles brought about by Google's anticompetitive conduct and policies, including as to the deliberately complicated and fraught way in which Fortnite must be

---

[23] Or, alternatively, a sum calculated on the basis of a still-supracompetitive 15% commission on certain subscriptions, *see* n.22, *supra*, for what amounts to payment processing services that could be purchased much cheaper from other provider, if Google permitted developers to use them.

[24] The cost of alternative electronic payment processing tools, which Google does not permit to be used for the purchase of in-app digital content or within Android games, can be one tenth of the 30% cost of Google Play Billing. For example, the base U.S. rate for electronic payment processing tool PayPay is 2.9%, for Stripe it is also 2.9%, for Square it is 2.6%-3.5%, and for Braintree it is 2.9%. That is particularly so for PayPal's microtransaction rates (for developers whose sales average under $10), the latter of which do not include a separate fee on top of the percentage-of-sale-price charge.

[25] *See* Section IV.H.4, *infra*.

CLASS ACTION COMPLAINT                                    - 7 -
Case No.:
010803-11/1334529 V1

loaded onto affected devices. What is more, as explained below, *see* ¶¶ 118-19, *infra*, Google removed Epic from Google Play a few days ago, after Epic dared to offer a cheaper way for consumers to purchase virtual currency for use in Fortnite, via Epic's own payment processing system. Use of that system meant that Epic could avoid payment Google's supracompetitive fee for the forced use of its own payment processing system.

17.     Other compelling evidence of supracompetitive pricing comes from Google's own Chrome Web Store, in which it charges developers not 30%, but 5% transaction fees.[26]

18.     Furthermore, Google's behavior depresses output. But for Google's abusive behavior, developers would have more pricing flexibility in the hugely dominant Google Play store—and pricing flexibility is, of course, useful.[27] There would be more distribution transactions but for Google's anticompetitive behavior. Therefore, Google's abusive behavior depresses output of transactions in the U.S. market for Android OS app stores. App developers would create and sell more product but for Google's supracompetitive default 30% tax.

### **$.99 minimum-price agreement**

19.     Google also abuses its unlawfully obtained monopoly power by way of minimum price fixing. Through its adhesive contracts with developers, it requires that regularly priced paid apps, in-app purchases, and subscriptions for U.S. consumers be priced no lower than $.99. So, for example, there can be no regularly priced $.69 apps or in-app products sold in Google Play.

20.     There is no pro-competitive justification for this minimum-price requirement. Minimum price fixing in Google Play has no salutary effects on inter-brand competition, a typical purported justification for such requirements. Rather, this mandatory pricing term was designed for the purpose of enabling Google to earn at least 30 cents on every dollar spent in the Google Play store.

21.     Google's minimum-price mandate also depresses output. In light of consumers' demonstrably strong preference for low-priced apps and related products, developers would sell more apps and app-related products but for this requirement.

---

[26] *See* Section IV.H.4, *infra*.

[27] *See, e.g.*, discussion in Sections IV.G and IV.H.

CLASS ACTION COMPLAINT                                                    - 8 -
Case No.:
010803-11/1334529 V1

22. In sum, Google's willful acquisition and maintenance of monopoly power in the markets identified, and its abuse of that power, *inter alia*, to impose its supracompetitive distribution and in-app payment processing fees on U.S. Android OS developers such as the plaintiff, are harmful to competition and harmful to developers specifically. Alternatively, if Google is determined to be the purchaser of digital products from Android OS developers that in turn sells these products to end-users, via Google Play or otherwise, then Google (also) acts as a monopsonist, or attempted monopsonist. (A monopsonist is a buy-side monopolist.) The circumstances, effects, and allegations are essentially the same for monopoly or attempted monopoly: By Google's behavior as alleged herein, Google uses its monopsony power to underpay Android OS developers below the price they would obtain in a competitive market for their apps and in-app products. Therefore, plaintiff's allegations herein should be understood to also plead in the alternative claims based on monopsony, both for plaintiff and the putative classes. In either alternative—and as otherwise pled herein— Google's behavior violates antitrust and consumer protection law. Plaintiff seeks monetary relief to redress the injuries caused by Google's past and ongoing conduct, and it seeks injunctive relief to stop Google's ongoing improper, unlawful, and harmful behavior in the relevant markets.

## II. JURISDICTION

23. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff alleges violations of federal law, namely, the federal Sherman Act. The Court has supplemental jurisdiction over the plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

24. This Court has personal jurisdiction over the Defendants. Google LLC and Google Payment are headquartered in this District. All Defendants have engaged in sufficient minimum contacts with the United States and have purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise of jurisdiction over them would comport with due process requirements. Further, the Defendants have consented to the exercise of personal jurisdiction by this Court.

25. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google LLC and Google Payment maintain their principal places of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to Epic's claims occurred in

this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue. In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Defendants may be found in or transact business in this District. Furthermore, the Google Play Terms of Service incorporates the Google Terms of Service by reference, and the latter designates this judicial district as the federal venue for this action.[28]

26.     <u>Intradistrict Assignment</u>: Assignment to the San Jose division of this Court is appropriate because Defendants Google LLC and Google Payment have their headquarters and/or principal place of business in Mountain View, Santa Clara County, California, which is located in this division of the Northern District of California.  Also, it is believed and therefore alleged that many members of the proposed class reside or do business in the San Jose division of the Northern District of California.

### III.     PARTIES

### A.     The plaintiff

27.     Plaintiff Pure Sweat Basketball is an Illinois corporation with its principal place of business in Crystal Lake, Illinois.  It is the developer of the Pure Sweat Basketball Workout App. Pure Sweat Basketball is a party to the developer contracts referenced in this complaint.  These agreements specify the commission rate and pricing and other mandates described herein.  Also, in order to be permitted to make its app available in Google Play, and to sell non-zero priced subscriptions through its app, Pure Sweat Basketball has paid Google's $25 developer fee.  To the best of its knowledge, Pure Sweat Basketball's last distributions of its app through Google Play, and sales of subscriptions at non-zero prices through the app, have occurred this year.  Pure Sweat

---

[28] *See* Google Play Terms of Service, available at: https://play.google.com/about/play-terms/index.html, which incorporates the Google Terms of Service, the latter of which is available at: https://policies.google.com/terms ("California law will govern all disputes arising out of or relating to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules.  These disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts.") (last accessed Aug. 15, 2020).

CLASS ACTION COMPLAINT                           - 10 -
Case No.:
010803-11/1334529 V1

Basketball charges $4.99 monthly for its digital subscription product, or $49.99 annually, and it has paid Google's supracompetitive 30% commission on each sale.

28.     Alternatively, Google paid Pure Sweat Basketball what amounts to an artificially low wholesale price for digital products sold via Google Play.

29.     Furthermore, Pure Sweat Basketball's in-app subscription sales (like the app, if sold at above-zero prices) have always been subject to Google's requirement that app transactions be priced at a minimum of $.99, as well as other pricing mandates.  Google has denied Pure Sweat Basketball the ability to choose to sell digital products at price points below $.99, in efforts to achieve maximum sales and effect business plans as it would elect, to plaintiff's detriment.

**B.      The defendants**

30.     Defendant Google LLC is a Delaware limited liability company with its headquarters and principal place of business in Mountain View, California.  It is the owner of Google Play, from and by which developers of Android apps sell paid applications, music, movies, books and in-app products to Android device owners.  Its parent, Alphabet Inc., was number 15 on last year's U.S. Fortune 500,[29] with 2019 revenues of nearly $137 billion and net income of $30.736 billion.[30]

31.     Defendant Google Ireland Limited is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and a subsidiary of Google LLC. Google Ireland contracts with all app developers that distribute their apps through Google Play and is therefore a party to the anticompetitive contractual restrictions at issue in this complaint.

32.     Defendant Google Commerce Limited is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and a subsidiary of Google LLC. Google Commerce contracts with all app developers that distribute their apps through Google Play and is therefore a party to the anticompetitive contractual restrictions at issue in this complaint.

33.     Defendant Google Asia Pacific Pte. Ltd. is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and a subsidiary of Google LLC.  Google Asia Pacific contracts with all app developers that distribute

---

[29] https://fortune.com/fortune500/2019/alphabet/ (last accessed Aug. 15, 2020).

[30] *Id.*

CLASS ACTION COMPLAINT                           - 11 -
Case No.:
010803-11/1334529 V1

their apps through Google Play and is therefore a party to the anticompetitive contractual restrictions at issue in this complaint.

34.     Defendant Google Payment Corp. is a Delaware corporation with its principal place of business in Mountain View, California, and a subsidiary of Google LLC.  Google Payment provides in-app payment processing services to Android app developers and Android users and collects a 30% commission on many types of processed payments, including payments for apps sold through Google Play and in-app purchases made within such apps.

## IV.     RELEVANT FACTS

35.     Google has injured plaintiff, the putative class of U.S. developers it seeks to represents, and competition in the relevant markets define herein, *see* Part VI, by way of its unlawful behavior in the U.S. sale of paid Android OS apps from its Google Play store and in-app sales of in-app add-ons, including but not limited to subscriptions.  As the holder of an unlawfully obtained monopoly in the U.S. market for Android OS app stores, Google's behavior has resulted in developer overcharges in these transactions due to its imposition of a supracompetitive 30% fee on each paid sale from its store.  Also, Google's aggressive and improper monopolization (or attempted monopolization) of the U.S. Android OS app[31] store market has stifled competition by strongly inhibiting the emergence of vibrant, and viable, competitors, which reinforces and strengthens its pernicious and overbearing market power.

36.     Additionally, Google requires app developers to sell at minimum prices.  There is no pro-competitive justification for this practice, and certainly none in an environment where Google Play already is overwhelmingly dominant in the U.S. space for Android OS app stores.

---

[31] Throughout this complaint, references to Android OS apps also refer to in-app purchases and paid subscriptions.

CLASS ACTION COMPLAINT                      - 12 -
Case No.:
010803-11/1334529 V1

**A.  The Google Play store is the official Android OS app store.**

**History**

37.  Google introduced its app store, then known as Android Market, in or about August 2008.[32]  On or about October 22, 2008, Google, HTC, and T-Mobile released the first Android OS smartphone, the T-Mobile G-1.[33]  This very first released-to-consumer Android OS smartphone came pre-loaded with the Android Market client.  As T-Mobile's September 2008 press release explained:

> **Android Market:**
>
> The T-Mobile G1 is the first phone to offer access to Android Market, which hosts unique applications and mash ups of existing and new services from developers around the world. With just a couple of short clicks, customers can find and download a wide range of innovative software applications — from games to social networking and on-the-go shopping — to personalize their phone and enhance their mobile lifestyle. When the phone launches next month, dozens of unique, first-of-a-kind Android applications will be available for download on Android Market . . . .[34]

38.  Next, on or about March 6, 2012,[35] Google introduced its Google Play store.  Google Play both succeeded and subsumed its predecessor, Android Market, adding digitized music and books to the store's offerings.[36]  It now carries movies and television programs as well.[37]

**How Google Play works**

39.  For their products to be sold in the Google Play store, application developers[38] enter into the Google Play Developer Distribution Agreement.[39]  The developer then uploads its product to

---

[32] Google launched Android Market, Google Play's predecessor for Android OS Apps, on or about August 28, 2008.  (*See, e.g.*, https://www.cnet.com/news/google-announces-android-market-for-phone-apps/ (dated Aug. 28, 2008) (last accessed Aug. 15, 2020).)

[33] "T-Mobile Unveils the T-Mobile G1—the First Phone Powered by Android," dated September 22 (and 23), 2008, available at: https://www.t-mobile.com/news/t-mobile-unveils-the-t-mobile-g1-the-first-phone-powered-by (last accessed Aug. 15, 2020).

[34] *Id.*

[35] https://googleblog.blogspot.com/2012/03/introducing-google-play-all-your.html (last accessed Aug. 15, 2020).

[36] *Id.* ("Starting today, Android Market, Google Music and the Google eBookstore will become part of Google Play. On your Android phone or tablet, we'll be upgrading the Android Market app to the Google Play Store app over the coming days.").

[37] https://play.google.com/store/apps/details?id=com.google.android.videos&hl=en_US (last accessed Aug. 15, 2020).

[38] Except presumably Google, which also offers its own products—including paid products—in the Google Play store.  (*See* https://play.google.com/store/apps/details?id=com.google.android.apps.youtube.music&hl=en

Google servers for review, testing (if any), limited release (if any), and production-release for sale to consumers in the store.[40]  As part of the process, the developer "grant[s] to Google a nonexclusive and royalty-free license to distribute [the developer's] Products in the manner indicated in the Play Console."[41]

40.     Developers ostensibly set prices for products sold in the Google Play store.  But, as described above, Google's developer contract (more specifically, its incorporated terms or policies) requires that paid products be sold to U.S. consumers at a regular price of no lower than $.99 (and a $400 maximum).[42]  Therefore, developers cannot sell regularly priced apps at $.69, for example.  The contract has, however, allowed for lower minimum prices for 18 other countries' purchasers since November 2015 (or earlier in 2015 for India).[43]  For example, an app that must be priced for U.S. consumers no lower than $.99 can be priced at approximately $.13 for Indian purchasers, as of the exchange rate on Aug. 15, 2020.[44]  There is no evidence that Google is somehow losing money by way of this contractual practice.  But even if one posits hypothetically that it is, then U.S.

(offering YouTube Music app in Google Play, and referring to the paid Music Premium version that is also available) (last accessed Aug. 15, 2020).

[39] Dev. Agr. (current agreement, effective as of Feb. 26, 2018) (Dev. Agr.) (last accessed Aug. 15, 2020).  For the pre-Feb. 26, 2018 version, *see* https://play.google.com/about/developer-distribution-agreement/archive.html (last accessed Aug. 15, 2020).

[40] *Id.*, ¶ 4.2 ("You are responsible for uploading Your Products to Google Play, providing required Product information and support to users, and accurately disclosing the permissions necessary for the Product to function on user Devices.") (last accessed Aug. 15, 2020); https://support.google.com/googleplay/android-developer/answer/113469?hl=en ("Upload an app") (last accessed Aug. 15, 2020); https://support.google.com/googleplay/android-developer/answer/7159011? ("Prepare & roll out releases") (last accessed Aug. 15, 2020).

[41] Dev. Agr., ¶ 5.1.

[42] Dev. Agr., ¶ 5.2 (referring to sales to be made "in the manner indicated in the Play Console").  The Play Console, and Play Console help sections, set forth the minimum pricing requirements: *see* https://support.google.com/googleplay/android-developer/answer/6334373?hl=en ("Set up prices & app distribution") (last accessed Aug. 15, 2020); https://support.google.com/googleplay/android-developer/table/3541286? ("Supported locations for distribution to Google Play users") (last accessed Aug. 15, 2020).

[43] *See, e.g.*, "Google slashes minimum app prices to way below $0.99 in 17 countries," *Mashable*, Nov. 18, 2015, available at: https://mashable.com/2015/11/18/google-minimum-app-prices/#JIuQdT6ebEqd (last accessed Aug. 15, 2020).

[44] https://support.google.com/googleplay/android-developer/table/3541286 (apps for Indian consumers may be priced from between 10.00 INR to 26,000.00 INR, or approximately $.13 to $347.11, as of Aug. 15, 2020—*see* https://transferwise.com/us/currency-converter/inr-to-usd-rate?amount=10 (last accessed Aug. 15, 2020)).

CLASS ACTION COMPLAINT                                     - 14 -
Case No.:
010803-11/1334529 V1

developers (and consumers) are subsidizing consumers from other countries by way of the higher U.S. minimum prices and the sums that Google collects thereby, such that U.S. developers (and consumers) are paying more than they ought to be paying as a result of this restraint of trade.

41.     Developers sell their apps, in-app products,[45] and subscriptions[46] directly through the Google Play store. Consumers select apps from the displays that Google organizes and sets up; tender their payments to Google; and download the apps from Google to their devices.[47]

42.     Developers, in turn, pay Google 30% of each paid sale of an app or in-app product.

43.     In other words, developers are direct purchasers of Google's distribution services, and they are damaged directly by the overcharge on each sale between Google's supracompetitive fee vehicles. A fee subject to competition but for Google's restraints and abusive behavior.

**B.      While the Android OS is superficially open-source, Google maintains an iron grip on its commercial aspects.**

44.     Google owns and controls the Android OS. Ostensibly, the code for the operating system itself is open-source. According to Google, anyone can download, use, and modify the Android OS source code, as long as Google allows it. Google calls this aspect of its OS the Android Open Source Project (AOSP). As Google[48] puts it:

> Android is an open source operating system for mobile devices and a corresponding open source project led by Google. This site and the Android Open Source Project (AOSP) repository offer the information and source code needed to

---

[45] *See, e.g.*, https://support.google.com/googleplay/answer/1061913?hl=en&ref_topic=7049688# ("Make in-app purchases in Android apps") ("With some apps, you can buy additional content or services within the app. We call these 'in-app purchases.' Here are some examples of in-app purchases: A sword that gives you more power in a game . . . .") (last accessed Aug. 15, 2020).

[46] https://support.google.com/googleplay/answer/2476088?hl=en&ref_topic=1689236 ("Subscribe to services or content") (referring to subscriptions to magazines, newspapers, and other material, and explaining how to subscribe) (last accessed Aug. 15, 2020).

[47] *See, e.g.*, https://support.google.com/googleplay/answer/4355207?hl=en&ref_topic=3364260&co=GENIE.Platform%3DAndroid&oco=1 ("Get started with Google Play"-Android) (last accessed Feb. 1, 2019); https://support.google.com/googleplay/answer/113409?hl=en&ref_topic=3365058 ("Get Android apps and digital content from the Google Play Store") ("1. Open the Google Play Store app. 2. Search or browse for content. 3. Select an item. 4. Tap Install (for free items) or the item's price. 5. Follow the onscreen instructions to complete the transaction and get the content.") (last accessed Aug. 15, 2020).

[48] "Android was originated by a group of companies known as the Open Handset Alliance, led by Google. . . .  The Android Open Source Project is led by Google, who maintains and further develops Android."  (https://source.android.com/setup/ (last accessed Aug. 15, 2020).)

CLASS ACTION COMPLAINT                              - 15 -
Case No.:
010803-11/1334529 V1

create custom variants of the Android OS, port devices and accessories to the Android platform, and ensure devices meet the compatibility requirements that keep the Android ecosystem a healthy and stable environment for millions of users. . . .[49]

45.     But the open-source code only enables a device's most basic functions.  As Google explains: "The Android Open-Source Project (AOSP) is the core software stack behind the Android OS and consists of the operating system, middleware, and open-source apps like a phone dialer, email, and messaging.  Mobile operators, device makers, and developers can use this to build devices and apps."[50]

46.     What makes a mobile device marketable and attractive to modern consumers are its apps.  Google has developed several popular apps, including YouTube, Google Maps, Gmail as well as the Google Play client, among others.  These are proprietary apps, and they are decidedly not open-source.  Manufacturers must sign agreements to pre-install them on their Android OS devices, and in the U.S., they come bundled together as a suite—manufacturers who want to pre-install any one of them must pre-install all of them.[51]  Google refers to this program as Google Mobile Services. As Google touts it:

The best of Google, right on your devices

Google Mobile Services brings Google's most popular apps and APIs to your Android devices.

Google's most popular apps, all in one place

Google Mobile Services (GMS) is a collection of Google applications and APIs that help support functionality across devices. These apps work together seamlessly to ensure your device provides a great user experience right out of the box.[52]

47.     GMS is an element of how Google dominates the entire Android ecosystem. Over time, it has moved more and more apps into its proprietary, non-open-source universe of apps, as

_____

[49] https://source.android.com/ (last accessed Aug. 15, 2020).

[50] "Understanding Android," available at: https://www.android.com/everyone/facts/ (last accessed Aug. 15, 2020).

[51] "After building an Android compatible device, consider licensing Google Mobile Services (GMS), Google's proprietary suite of apps (Google Play, YouTube, Google Maps, Gmail, and more) that run on top of Android. GMS is not part of the Android Open Source Project and is available only through a license with Google."  (https://source.android.com/compatibility/overview (last accessed Aug. 15, 2020).)

[52] https://www.android.com/gms/ (last accessed Aug. 15, 2020).

CLASS ACTION COMPLAINT                      - 16 -
Case No.:
010803-11/1334529 V1

well as services that make third-party apps work effectively, in ways that users have come to expect (*e.g.*, by calling up map services, now through the proprietary Google Maps).  As one analyst describes Google's machinations:

> Over time, Google began migrating applications – like Search, Music, and the Calendar – out of AOSP and into GMS. Any OEM wanting to use AOSP to build its own Android fork would now have to build their own versions of these apps, on top of email, maps, and so on. (*Ars Technica* has a good rundown of the application migration here[53].) On top of that, the device would lack the Google services APIs that lots of third-party apps need. And Google didn't stop there. Google Mobile Services mutated into Google Play Services[54] in September 2012.

> A fork in the road: Why Google Play Services is key to understanding the 'forking' question

> Back in May 2013 at the Google I/O Keynote there was no mention of an Android upgrade. Instead, Google announced a bunch of new features to be rolled out to Android devices via Google Play Services. Google had started to move away from Android-as-platform to Play Services-as-platform. As Ron Amadeo writes: 'Play Services has system-level powers, but it's updatable. It's part of the Google apps package, so it's not open source. OEMs are not allowed to modify it, making it completely under Google's control… If you ever question the power of Google Play Services, try disabling it. Nearly every Google App on your device will break.' It is 'a single place that brings in all of Google's APIs on Android 2.2 and above.' Things like Play Game services, Google Cloud Messaging and fused location services are all handled by Play Services, and not the OS.

48.     One important condition for access to GMS is that manufacturers agree to comply with so-called compatibility requirements.  As Google puts it:

---

[53] https://arstechnica.com/gadgets/2018/07/googles-iron-grip-on-android-controlling-open-source-by-any-means-necessary/ (last visited Dec. 10, 2018).

[54] Google Play services is different from the Google Play store.  In fact, one method of distribution is via Google Play.  (*See, e.g.*, https://play.google.com/store/apps/details?id=com.google.android.gms&hl=en_US ("Google Play services is used to update Google apps and apps from Google Play.  This component provides core functionality like authentication to your Google services, synchronized contacts, access to all the latest user privacy settings, and higher quality, lower-powered location based services.") (last accessed Aug. 15, 2020).)  In its Overview of Google Play Services, Google writes:

> With Google Play services, your app can take advantage of the latest, Google-powered features such as Maps, Google+, and more, with automatic platform updates distributed as an APK through the Google Play store. This makes it faster for your users to receive updates and easier for you to integrate the newest that Google has to offer.

> * * *

> The client library contains the interfaces to the individual Google services and allows you to obtain authorization from users to gain access to these services with their credentials.

https://developers.google.com/android/guides/overview (last accessed Aug. 15, 2020).

1    We ask GMS partners to pass a simple compatibility test and adhere to our
2    compatibility requirements for their Android devices. In turn, your users enjoy greater
     app reliability and continuity.[55]

3    49.    Ostensibly, Google seeks compatibility in order to help assure that software works

4    across a variety of devices.  But Google has gone further than merely requiring compatibility testing

5    for devices on which manufacturers wish to install the GMS suite.  As part of its strategy to maintain

6    as much dominance over the Android ecosystem as possible, Google refuses to license GMS to

7    manufacturers who develop so-called Android forks—variants of the official Android OS published

8    by Google.  As the European Commission put it with respect to the record antitrust fine it imposed

9    on Google last summer (discussed *infra*[56]):

10    Google has prevented device manufacturers from using any alternative version
      of Android that was not approved by Google (Android forks). In order to be able to
11    pre-install on their devices Google's proprietary apps, including the Play Store and
      Google Search, manufacturers had to commit not to develop or sell even a single
12    device running on an Android fork. The Commission found that this conduct was
      abusive as of 2011, which is the date Google became dominant in the market for app
13    stores for the Android mobile operating system.[57]

14    According to the European Commission, this has thwarted even as powerful a potential competitor as

15    Amazon.  Manufacturers who want access to GMS are prohibited by way of their anti-fragmentation

16    contractual terms with Google from building even a single device based on Amazon's Android OS

17    fork, known as Fire OS.  As discussed below, this means that Amazon is denied another way to

18    distribute its own Android OS app store.[58]

19

20    [55] *Id.*

21    [56] *See* Section IV.F.1, *infra*.

22    [57] *See* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android
      mobile devices to strengthen dominance of Google's search engine," July 18, 2018, available at:
      http://europa.eu/rapid/press-release_IP-18-4581_en.htm (last accessed Aug. 15, 2020).

23    [58] Per the European Commission:

24    This practice reduced the opportunity for devices running on Android forks to be
      developed and sold. For example, the Commission has found evidence that Google's
25    conduct prevented a number of large manufacturers from developing and selling
      devices based on Amazon's Android fork called "Fire OS".

26    *In doing so, Google has also closed off an important channel for competitors to
      introduce apps and services*, in particular general search services, *which could be pre-*
27    *installed on Android forks*.

28    http://europa.eu/rapid/press-release_IP-18-4581_en.htm (emphasis added).

CLASS ACTION COMPLAINT                          - 18 -
Case No.:
010803-11/1334529 V1

50.     There is no justifiable basis for Google's restraints with regard to Android forks.  As the European antitrust authorities found, Google's stated aim—to help ensure that software works across various Android OS devices—does not require or justify the restraints on competition that Google forces upon device manufacturers:

> The Commission also assessed in detail Google's arguments that these restrictions were necessary to prevent a "fragmentation" of the Android ecosystem, and concluded that these were not well founded. First, Google could have ensured that Android devices using Google proprietary apps and services were compliant with Google's technical requirements, without preventing the emergence of Android forks. Second, Google did not provide any credible evidence that Android forks would be affected by technical failures or fail to support apps.[59]

**C.     Google is a monopolist in the U.S. market for Android OS app stores, and, accordingly, in the markets for app (and in-app) distribution services and in-app payment processing.**

51.     Google's anticompetitive strategies around Android have worked.  Via Google Play, Google is, and long has been, a monopolist in the U.S. market for app stores selling Android OS apps and in-app purchases (and subscriptions as well), as explained herein.  And, accordingly, it is a monopolist in the markets for Android app (and in-app) distribution and in-app payment processing services for U.S. Android app developers as well.

52.     While Google keeps a tight hold on information regarding its Android OS app store market power in the U.S., its high percentage of market share can be inferred from the tens of millions of Android devices deemed "Android compatible,"[60] such that Google Play can be (and usually is) pre-installed[61]—inferentially, far more than any other app store.[62]

53.     Google was first to market in 2008 with its app store, Android Market (which morphed into Google Play).  The Amazon Appstore, for example, would not open until March 22,

---

[59] *Id.*

[60] *See, e.g.*, https://source.android.com/setup/start/faqs (frequently asked questions, providing details re: Android compatibility certification) (Devices that are 'Android compatible' may participate in the Android ecosystem, including Google Play . . . .") (last accessed Aug. 15, 2020).

[61] *See, e.g.*, https://support.google.com/googleplay/answer/1727131?hl=en (Google Play Help screen, providing 852-page list of supported devices, including devices manufactured by Samsung, HTC, LG, and Motorola, among many others) (last accessed Aug. 15, 2020).

[62] According to the European Commission, the Google Play Store is pre-installed by device manufacturers on practically all Android mobile devices sold outside of China.

2011.[63]  But Google was not content to build on its earlier start fairly; instead, it unlawfully and abusively acted to procure and attain monopoly status as alleged herein.

54.  According to the European Commission:

Google is dominant in the *worldwide* market (excluding China) for app stores for the Android mobile operating system.  *Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices.*  This market is also characterized by high barriers to entry . . . .[64]

These facts powerfully support the conclusion that Google is a monopolist in its home (U.S.) market for Android OS app stores—and a monopolist in the markets for Android app (and in-app) distribution and in-app payment processing services for U.S. Android app developers, as explained herein.

55.  Further, the technical barriers that strongly inhibit the sideloading of other app stores, along with Google's "security" measures and cautions, also support the proposition that Google has attained and wields monopoly power in the markets for Android app (and in-app) distribution and in-app payment processing services for U.S. Android app developers.

**D.**  **Google is an attempted monopolist in the U.S. market for Android OS app stores, and, accordingly, in the markets for app (and in-app) distribution services and payment processing services for U.S. Android app developers.**

56.  Alternatively, for the foregoing reasons, Google is an attempted monopolist in the U.S. market for app stores selling Android OS apps and in-app purchases (and subscriptions as well). While the facts alleged amply support a finding that Google already has attained monopoly status in this U.S. market, at the least, they support a finding that Google is attempting to monopolize this market by improper means.

---

[63] "Amazon's Appstore for Android is well-executed and poised for success," *Forbes*, March 22, 2011, available at: fortune.com/2011/03/22/amazons-appstore-for-android-is-well-executed-and-poised-for-success/ (last accessed Aug. 15, 2020).

[64] "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," July 18, 2018, available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm (last accessed Aug. 15, 2020) (emphasis added).

**E.     Apple offers no market constraints via its iOS app store, through which it distributes incompatible apps.**

57.     Nor does Apple, via its iOS mobile operating system, or its iOS apps or iOS App Store, provide any constraints to Google's market power. The apps are incompatible. Therefore, Android SO developers cannot sell their Android apps to Android device wieners via Apple's iOS app store.

58.     Furthermore, the switching costs between Android and iOS are high. Device owners have great sunk costs in their individual spheres: the cost of their phones or tablets; the learning curve inherent in each; and the money and time invested in apps and in-app purchases which, due to technical incompatibilities, they cannot take to iOS devices, to name some. Also, many owners of Android OS devices will not be able to afford Apple hardware, which is sold at premium prices, or they will not find the potential switch economically sensible, so they decline to make it.

59.     Europe is in accord. Per the European Commission:

> As a licensable operating system, Android is different from operating systems exclusively used by vertically integrated developers (like Apple iOS or Blackberry). Those are not part of the same market because they are not available for licence by third party device manufacturers.

> Nevertheless, the Commission investigated to what extent competition for end users (downstream), in particular between Apple and Android devices, could indirectly constrain Google's market power for the licensing of Android to device manufacturers (upstream). The Commission found that this competition does not sufficiently constrain Google upstream for a number of reasons, including:

> end user purchasing decisions are influenced by a variety of factors (such as hardware features or device brand), which are independent from the mobile operating system;

> Apple devices are typically priced higher than Android devices and may therefore not be accessible to a large part of the Android device user base;

> Android device users face switching costs when switching to Apple devices, such as losing their apps, data and contacts, and having to learn how to use a new operating system; and

> even if end users were to switch from Android to Apple devices, this would have limited impact on Google's core business. That's because Google Search is set as the default search engine on Apple devices and Apple users are therefore likely to continue using Google Search for their queries.[65]

---

[65] *See* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm. (last accessed Aug. 15, 2020).

CLASS ACTION COMPLAINT                    - 21 -
Case No.:
010803-11/1334529 V1

60.     Regarding app stores specifically, the European Commission has stated:

> Google is dominant in the worldwide market (excluding China) for app stores for the Android mobile operating system. Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices. This market is also characterised by high barriers to entry. *For similar reasons to those already listed above, Google's app store dominance is not constrained by Apple's App Store, which is only available on iOS devices.*[66]

**F.     Google engages in unlawful behavior in order to restrain trade and to maintain and grow its monopoly in the markets at issue.**

61.     Google maintains monopoly status in the U.S. Android OS app store market, which ensures that the vast majority of Android OS mobile and tablet owners will purchase paid apps and in-app items from Google Play.

62.     Cornering the market for Android OS app stores translates to colossal profits, as alleged herein.

**1.     Google was recently fined over $5 billion for practices related to Google Play.**

63.     As previewed above, Google's anticompetitive behavior, grounded in its voracious appetite for profit derived from its Android ecosystem, recently led to a €4.34 billion, or $5.1 billion, fine from the European Commission.[67]

64.     As the Commission explained, Google bought "the original developer of the Android operating system [in 2005] and has continued to develop Android ever since."[68]  "When Google develops a new version of Android it publishes the source code online."  But

> [t]he openly accessible Android source code covers basic features of a smart mobile operating system . . . not Google's proprietary Android apps and services. Device manufacturers who wish to obtain Google's proprietary Android apps and services need to enter into contracts with Google, as part of which Google imposes a number of restrictions.  Google also entered into contracts and applied some of these restrictions to certain large mobile network operators, who can also determine which apps and services are installed on devices sold to end users.[69]

---

[66] *Id.* (emphasis added).

[67] *See* http://europa.eu/rapid/press-release_IP-18-4581_en.htm (last accessed Aug. 15, 2020).

[68] *See* n. 65, *supra*.

[69] *Id.*

65.    Thus, a manufacturer of an Android OS smartphone or tablet must obtain a license from Google to pre-load popular Google apps including YouTube,[70] Google Maps, Gmail, and Google Play, among others, all of which come bundled in a take-one/take-all suite.[71]  Google knows that buyers of Android OS devices expect to see popular Google apps such as YouTube and Google Maps pre-loaded onto their phones and tablets.  This bundling practice, which is not grounded on any technical need, ensures an enormous and growing base of Google Play installations and users.  It also reinforces the notion that Google Play is the official Android store, even though competing app stores could serve their needs equally well—if Google didn't unfairly shut them out of the market.

66.    As the European Commission's findings illustrate, Google's aggressive use of GMS, including Google Play; its refusal to distribute competing app store clients via Google Play; and its anti-fragmentation terms, which have the effect of depressing forked Android OS system distribution, thereby further inhibiting the distribution of competing app stores (such as Amazon's Fire OS and Appstore), have led to its 90%+ share of the market for Android OS app stores.[72]  As none of Google's management is either technically or economically necessary, it is plain that Google has maintained monopoly power in the market through anticompetitive means, which has enabled it to maintain the supracompetitive 30% transaction fee that it charges developers on Google Play app and in-app product sales.

---

[70] Consumers want and expect the YouTube app on their Android OS devices.  In fact, a 2013 study confirmed that smartphone users prefer to view video with apps such as the YouTube app versus viewing via their browsers (*i.e.*, by browsing to the YouTube website and viewing video there).  ("Do Smartphone Users View Video with YouTube App or Browsers?" dated March 29, 2013, available at: https://jmango360.com/wiki-pages-trends/mobile-app-vs-mobile-website-statistics/ (last accessed Aug. 17, 2020).)

[71] *See, e.g.*, "The best of Google, right on your devices—Google Mobile Services brings Google's most popular apps and APIs to your Android devices," available at: https://www.android.com/gms/ (last access date cited above).

[72] *See id.*

**2.     Google has used contracts with device manufacturers as means to its anticompetitive ends.**

67.     Previously, leaked copies of Google's contracts with device manufacturers, called MADAs, provided details of Google's abusive market manipulation.  Upon information and belief, the same or similar contracts, or those with the same intent or restrictions, remain in play today.[73]

68.     If a smartphone or tablet manufacturer such as Samsung or HTC wishes, for example, to pre-load Google's popular and exclusive YouTube app on a given Android OS phone or tablet, then Google requires that the manufacturer agree via its MADA to pre-load Google Play on the device as well.  This results in a tremendous advantage for Google in that yet more devices will carry its store client.[74]

69.     Additionally, such a manufacturer must agree via this contract that it will pass a so-called Android Compatibility Test as to that device, which Google administers and controls in its sole discretion.[75]  This ties to Google's restraint on the production of devices using Android forks as

---

[73] *See* https://www.einfochips.com/blog/how-to-obtain-googles-gms-license-for-android-devices/# (current website of company providing Android compatibility services to entities who want to deploy Google's GMS suite and have already obtained a prospective MADA from Google) (last accessed Aug. 15, 2020).

[74] But Google is still not satisfied.  In fact, Google Play competitors have faced other anticompetitive behavior by Google.  In 2014, for example, a Portuguese firm operating a much smaller app store than Google Play filed an antitrust complaint with the European Commission regarding Google's anticompetitive practices in the app store field.  (*See, e.g.*, http://online.wsj.com/articles/google-faces-fresh-antitrust-complaint-in-europe-1402941192 (last accessed Aug. 15, 2020).)  According to *The Wall Street Journal*, "Aptoide claim[ed] that Google creates obstacles for users to install third-party app stores onto its Android platform, bundles services that are essential to its operating system with Google, and blocks access to Aptoide websites in its Chrome Web browser." (*Id.*)

Aptoide won an antitrust injunction against Google, as detailed below.  (*See* ¶ 92, *infra*.)

[75] *See* Complaint for Violation of the Sherman Act, Clayton Antitrust Act, California Cartwright Act, and California Unfair Competition Law, *Feitelson v. Google Inc.*, Case No. 14-cv-02007, May 5, 2014 (N.D. Cal.) Ex. A (MADA between Google and Samsung), ¶¶ 2.1 ("Devices may only be distributed if all Google Applications  (excluding any Optional Google Applications) authorized for distribution in the applicable Territory are pre-installed on the device, unless otherwise approved by Google in writing."), 2.7 ("The license to distribute Google Applications in Section 2.1 is contingent upon the Device becoming an Android Compatible Device."), 3.4 (providing that "Google Phone-top Search must be set as *the default search provider for all search access points on the Device* providing for the prime placement of Google Applications" (emphasis added) and also providing for the prime placement of "Google Applications"), 3.8(c) ("Company shall configure Network Location Provider to be the default network-based location provider on all Android Compatible Devices."); Ex. B (MADA between Google and HTC), ¶¶ 2.1 (same as ¶ 2.1 in Google-Samsung agreement), 2.7

their operating systems, which in turn restricts avenues for distribution of competing app-store clients, as discussed herein.[76]

70.     Plaintiff does not yet have sufficient information to identify all other manufacturers beyond Samsung and HTC that have, or have had, MADAs with Google containing these specific (or functionally equivalent) terms.  But the Joint Submission of Corrected Exhibit List submitted in a matter called *Oracle v. Google* lists MADAs between Google and a who's who of Android OS device manufacturers, including LG and Sony.[77]  Unfortunately, these MADAs are not available for public inspection because they were not entered into evidence in the case.  It appears likely, however, that Google has insisted on similar arrangements with some or all of these other manufacturers, in violation of federal and state law, and to the detriment of competition and consumers.

71.     Furthermore, Google also currently provides a long list of brands whose devices are equipped with the GMS suite (including, of course, Google Play).[78]  As alleged herein, Google requires entry into a MADA or MADA-like contract to license GMS.

72.     Because of Google's secrecy, plaintiff is unaware as to whether MADAs as such, or updated versions, continue to be the specific operative documents between Google and manufacturers.  But plainly Google continues to bundle its apps, including Google Play, into a suite (the GMS suite) for U.S. distribution, and plainly they can only be licensed by contract.[79]

---

(same as ¶ 2.7 in Google-Samsung agreement), 3.4 (same as ¶ 3.4 in Google-Samsung agreement), 3.8(c) (same as ¶ 3.8(c) in Google-Samsung agreement).

[76] *See* ¶¶ 47-50, 66.

[77] *See Oracle America, Inc. v. Google Inc.* (N.D. Cal. No. 3:10-cv-03561), ECF No. 923 at entries 83-85, 286, 2742-56, and 2772-93.

[78] *See* https://www.android.com/certified/partners/ (last accessed Aug. 15, 2020).

[79] *See* https://www.android.com/gms/ (referring to Google Mobile Services (GMS)—"a collection of Google applications and APIs that help support functionality across devices.") (last accessed Aug. 15, 2020).  As Google puts it, "While the Android Open Source Project (AOSP) provides common, device-level functionalities such as email and calling, GMS is not part of AOSP. GMS is only available through a license with Google and delivers a holistic set of popular apps and cloud-based services. . . ." (*Id.*)  Further, Google "ask[s] GMS partners to pass a simple compatibility test and adhere to [its] compatibility requirements for their Android devices. . . ." (*Id.*)

73.     Google is willing to run afoul of antitrust and unfair competition law because of the importance of its Google Play client.  Google uses its MADAs or similar contracts to restrain and quash competition in the Android OS app store market. There is no lawful reason to compel manufacturers wishing to pre-load the YouTube or Google Maps app onto a device, to pre-load Google Play as well.  These restraints give Google a *de facto* monopoly because most users won't know how to, or will not, sideload an alternative app store onto a phone (if they even know that is a possibility). Google's practice is a pure power play designed to maintain and extend its monopoly in the Android OS app store market.  Its aim, of course, is to impose its super-high 30% transaction fee on developers who have no choice but to pay it.

**G.     Google's practices with respect to Google Play further restrain and injure competition in the market for U.S. Android OS app stores, where already there are high barriers to entry.**

**1.     There are high barriers to entry into the market for Android OS app stores.**

74.     Google's unlawful practices in aid of its monopoly restrain and injure competition in the Android app store market, where already there are high barriers to entry.[80]  A market-participant hopeful must have the resources: to build and maintain the app store client, to program and maintain the requisite software and algorithms going forward, to advertise the client and the steps needed to install it, to keep the marketplace safe, and to process payments at a high volume.

75.     Google keeps the barriers high by refusing to permit distribution of alternative clients via Google Play, which is pre-installed on most Android OS devices by default thanks to Google's GMS bundling practices.  It also keeps them from gaining users by distribution with Android forks, by way of its exclusionary Android anti-fragment terms.

76.     The European Commission also has concluded that there are high barriers to entering the market for Android OS app stores.[81]  The same factors it cited as high barriers to entry in "the

---

[80] *See also* ¶¶ 54-55, 60, *supra*.

[81] *See* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm.  (*Id.* ("Google is dominant in the worldwide market (excluding China) for app stores for the Android mobile operating system. Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices. This market is also characterised by high barriers to entry. . . .").)  Further, while plaintiff's complaint is

worldwide market (excluding China) for licensable smart operating system," where Google's

Android OS was estimated in 2018 to have "a market share of more than 95%," apply as well with

respect to entry into the U.S. market for Android OS app stores:

> There are high barriers to entry in part due to network effects: the more users use a
> smart mobile operating system, the more developers write apps for that system –
> which in turn attracts more users. Furthermore, significant resources are required to
> develop a successful licensable smart mobile operating system.[82]

**2. Google manipulates security fears in order to maintain and further its market power in U.S. Android OS app stores.**

77.     But Google does not depend solely on high barriers to entry in the app-store

marketplace.  Instead, Google actively manipulates security fears in order to maintain and further its

monopoly in U.S. Android OS stores.

**a. Google steers consumers to Google Play by scaring them away from alternative sources for Android OS apps.**

It isn't enough for Google that Google Play is pre-installed on hundreds of millions of

devices, such that it offers ready access to millions of apps[83]—Google also steers consumers away

from all alternative websites by issuing security warnings from the official Android website.[84]  The

message is that Google Play is safe and protects users; other app stores are very risky, and to be

avoided.  In its "Download apps to your Android device guidance," Google writes:

- You can download free and paid apps from Google Play on your Android Phone. We
  recommend that you get apps from Google Play. You can also get them from other
  sources.

- Your phone has a security setting (*Google Play* Protect) that checks for potentially
  harmful apps, warns you, and removes apps if necessary. Learn how to help protect
  against harmful apps.

- Download apps from other sources

---

not based on Google search dominance, nonetheless, Google search is germane because Google Play
is bundled with Google search products, which has aided in achieving Google Play's monopoly
status in the U.S.

[82] *Id.*

[83] https://www.statista.com/statistics/266210/number-of-available-applications-in-the-google-play-store/ ("The number of available apps in the Google Play Store was most recently placed at 2.96 million apps in June 2020, after surpassing 1 million apps in July 2013.") (last accessed Aug. 15, 2020).

[84] https://support.google.com/android/answer/7391672?hl=en&ref_topic=7311596 (last accessed Aug. 15, 2020).

**Important**: If you download apps from unknown sources, your device and personal information can be at risk.

- Your phone could get damaged or lose data.

- Your personal information could be harmed or hacked.

- Help Google protect against bad apps from other sources

If you install apps from outside of Google Play, your phone can send Google information about those apps.

This information helps Google better protect everyone from harmful apps. The information can include log information, URLs related to the app, device ID, Android version, and IP address.[85]

78. Google issues these warnings indiscriminately. Like Google Play, the Amazon Appstore is monitored and curated.[86] But no matter. According to Google, it's really too risky to use (assuming the consumer even knows about it). These warnings ring hollow, however, for Google Play itself has proven vulnerable to malware that could harm consumers,[87] in spite of Google's high revenues and profits from which it could draw to better protect its users.

>    **b.** **Google will not permit distribution of alternative app-store clients via Google Play on the false premise that it is too risky for consumers.**

79. In order to become a viable app store, a market hopeful must find a way to persuade Android device owners to sideload the client onto their phones or tablets—after first making a sizeable number aware of its existence. This is no easy task. Users must take obscure and unnecessary steps to access other app stores because Google has decreed it so in order to protect its monopoly power in Android OS app sales. Google will not permit distribution of alternative app-store clients via the *de facto* Google Play acquisition and installation method because it falsely claims that it would be too risky for consumers if it did.

---

[85] *Id*. (emphasis added).

[86] *See, e.g.*, "Amazon Appstore Content Policy," available at: https://developer.amazon.com/docs/policy-center/understanding-content-policy.html (last accessed Aug. 15, 2020).

[87] *See, e.g.*, "Android security: Malicious apps sneak back into Google Play after tweaks," May 9, 2018, available at: https://www.zdnet.com/article/android-security-malicious-apps-sneak-back-into-google-play-after-tweaks/ (last accessed Aug. 15, 2020).

CLASS ACTION COMPLAINT - 28 -
Case No.:
010803-11/1334529 V1

80.     In its "Understanding Android" piece, Google states as "Android Fact #12"[88]: "Because third-party stores don't always adhere to the strict Google Play Store security checks for apps, Google Play doesn't allow other app stores to be downloaded directly through the Play Store. . . ."  But this self-serving justification does not withstand scrutiny.

81.     First, Google offers no explanation for shutting out *all* app-store clients from Google Play, including those run by well-resourced companies such as Amazon or Samsung.  Further, Google could scrutinize each app-store client as it does other apps before allowing it into Google Play.

82.     And second, Google itself touts initiatives to safety-check and even quarantine or delete *all* apps on Android OS devices, wherever they are obtained.  For example, in its February 2016 white paper titled, "How we keep harmful apps out of Google Play and keep your Android device safe,"[89] Google states:

> Even though we do a lot of work to make Google Play apps safe before they reach you, Google works hard to protect you—no matter where your app comes from. We sandbox each application to constrain bad behavior and if an app wants new permissions, we ask you to confirm at runtime.
>
> In addition to multiple layers of security built into the platform, Android also includes a feature called Verify Apps. Verify Apps continually scans for potentially harmful apps. If an app is discovered later to be potentially harmful, Verify Apps will disable the app and request for you to remove it.
>
> Verify Apps also checks apps you install from outside of Google Play.  If we see an app that looks malicious, we warn you before the installation proceeds. Verify Apps is available on every Android device (2.3+) that has Google Play installed.[90]

83.     As for its more security regime, Google Play Protect, the defendant assures:

> Google Play Protect helps you keep your device safe and secure.
>
> -   It runs a safety check on apps from the Google Play Store before you download them.
>
> -   It checks your device for potentially harmful apps from other sources. These harmful apps are sometimes called malware.

---

[88] https://www.android.com/everyone/facts/ (last accessed Aug. 15, 2020).

[89] This white paper was linked from the Understanding Android piece cited in paragraph 80 of this complaint.

[90] https://docplayer.net/15116445-How-we-keep-harmful-apps-out-of-google-play-and-keep-your-android-device-safe.html at 4 (last accessed Aug. 15, 2020).

- It warns you about any detected potentially harmful apps found, and removes known harmful apps from your device.

- It warns you about detected apps that violate our Unwanted Software Policy by hiding or misrepresenting important information.

- It sends you privacy alerts about apps that can get user permissions to access your personal information, violating our Developer Policy.[91]

84.  If these assurances are to be believed, then Google already monitors the security of all apps that would be obtained from any competing app store.  These assurances, therefore, alone or coupled with the vetting that Google already performs before releasing any app in Google Play, undercut Google's stated reason for keeping all competing app-store clients out of Google Play.

**3.      Google's refusal to permit app-store clients into Google Play means that only a hardy few will attempt installation of alternative stores.**

85.  By keeping other app-store clients out of Google Play, and by scaring potential users, Google assures that only a hardy few will ever attempt to load another app store front onto their Android OS devices.

86.  The following is an example of the steps Android device consumers must take if they wish to do so—assuming they ever learn of the alternative store's existence, and assuming they consider themselves technically savvy enough to try.  To access the Amazon Appstore, consumers must first obtain a link from an Amazon website.  Then the consumer must do the following:



Step 1
# Download Amazon Appstore

---

[91]
https://support.google.com/android/answer/2812853?p=playprotect_download&hl=en&visit_id=636801711322579028-4051903200&rd=1 (last accessed Aug. 15, 2020).

1. Use link sent to you in email to navigate to the Amazon Appstore download page
2. Tap on "Get Amazon Appstore" button
3. Follow instructions



Step 2

# Enable Unknown Sources

1. In your phone Settings page, tap on "Security" or "Applications" (varies with device)
2. Enable "Unknown Sources" permission
3. Confirm with "OK"



Step 3

# Install and Launch Amazon Appstore

1. In your device's "Download" folder, find and tap on the "Amazon_app.apk" file
2. Tap "Install" on the Android Installer screen
3. Launch the Amazon Appstore[92]

87. Because of Google's refusal to allow competitors to distribute app-store clients via Google Play, and because of Android's security features—whose configuration Google controlled as

---

[92] https://www.amazon.com/gp/feature.html/ref=sxts_snpl_1_1_b122686d-95c7-451e-a41b-8f08ca46cdcb?pf_rd_p=b122686d-95c7-451e-a41b-8f08ca46cdcb&docId=1000626391&pf_rd_r=ZSYBJ5ZEY4SCVPB0YXB5&pd_rd_wg=Ou2nJ&pd_rd_w=l6Ci1&qid=1597568508&pd_rd_r=1f985501-51cf-4e11-8fdc-4d076ac56dbb (last accessed Aug. 15, 2020).

the leader of the AOSP—consumers wishing to install an alternative app store had to be willing to

turn on the "Unknown Sources" permission referenced in Amazon's Step 2 above. In Android

versions released before the Oreo variant, the user first had to find a screen looking like this:



88.     Then, if she opted to turn the switch to the right, she would be greeted with this

ominous warning:

If she dared to leave the "Unknown sources" toggle to the on position, she would then have opened her device to all sorts of vulnerabilities—all because she wanted to use another app store to buy apps that might be cheaper than the purchase price in Google Play.

89.    As of Android 8.0, code-named Oreo, Google has changed the permissions structure so that users can authorize downloads from only one source at a time.[93]  It is believed, and therefore alleged, that many Android OS devices in operation today still run on pre-Oreo Android versions, with their scary app permission toggle and warning.  But even with the change brought with Oreo, Google knows and intends that most device users will not know how to access stores and apps

---

[93] (https://www.android.com/versions/oreo-8-0/ ("Hostile downloader apps can't operate without permission; users now permit the installation of APKs per-source.") (last accessed Aug. 15, 2020).) Oreo was not released to the public until August 21, 2017.  (https://android-developers.googleblog.com/2017/08/introducing-android-8-oreo.html (last accessed Dec. 10, 2018).) As of October 26, 2018, well over a year later, Oreo's worldwide install base was at a mere 21.5%, not counting China.  (https://developer.android.com/about/dashboards/ (last accessed Dec. 10, 2018).)

CLASS ACTION COMPLAINT                    - 33 -
Case No.:
010803-11/1334529 V1

outside of Google Play, and it knows and intends that they still will be frightened away by having to change a permission switch, given its continued warnings in various guises. For example, users who wish to sideload might see this warning (after first receiving a pre-warning): "Your phone and personal data are more vulnerable to attack by unknown apps. By installing apps from this source, you agree that you are responsible for any damage to your phone or loss of data that may result from their use."[94] Such is the case no matter how reputable the store operator (or other developer). The message Google is plain: you should not risk it; better to stay with Google Play.

**4.   Even if a consumer succeeds in loading an alternative app-store client onto his or her device, Google may try to shut down access, which harms competition and developers.**

90.    If all else fails—if a consumer learns of another app store, figures out how to acquire the client, educates herself on how to install it, and steels himself against Google's dire security warnings, Google may attempt to shut down the consumer's access.

91.    Aptoide is a competing Android OS app provider.[95] As such, Google has denied it distribution via Google Play.

92.    Google forced Aptoide to go to court to seek an antitrust injunction for sweeping up its distribution app in its Google Play Protect sweeps. And Aptoide won. According to Aptoide's press release:

**EU National Court rules against Google in Anti-Trust process**

*Lisbon, October 19th, 2018*

The Portuguese Courts issued today a decision against Google in relation to the injunction filed by Aptoide. It is applicable on 82 countries including UK, Germany, USA, India, among others. Google will have to stop Google Play Protect from removing the competitor Aptoide's app store from users' phone without users' knowledge which has caused losses of over 2.2 million users in the last 60 days.

The acceptance of the injunction is totally aligned with Aptoide's claim for Google to stop hiding the app store in the Android devices and showing warning messages to the users. Aptoide is now working alongside its legal team to next week fill in courts the main action, demanding from Google indemnity for all the damages caused.

---

[94] "Android Q currently disables 'Install uknown apps' permission after every use," available at https://9to5google.com/2019/04/04/android-q-install-unknown-apps/ (last accessed Aug. 17, 2020).

[95] http://www.aptoide.com/.

CLASS ACTION COMPLAINT                              - 34 -
Case No.:
010803-11/1334529 V1

This action is part of a complaint against foul play by Google, directed to Android's antivirus software, Google Play Protect. Google's anti-malware system was wrongly identifying Aptoide as a potentially malicious app, hiding and uninstalling it from Android smartphones without user consent.

Aptoide, with over 250 million users, 6 billion downloads and one of the top stores globally, also presented last July, a formal complaint to the European Union's anti-trust departments against Google.

Paulo Trezentos, Aptoide's CEO, says that "For us, this is a decisive victory. Google has been a fierce competitor, abusing his dominant position in Android to eliminate App Store competitors. Innovation is the reason for our 200 million users base. This court's decision is a signal for startups worldwide: if you have the reason on your side don't fear to challenge Google."

According to Carlos Nestal, head of the legal team that worked in the case:

"This case, to our knowledge, is the first of an EU national Court that enforces a clear separation of Android layer and the Services layer. Court is clearly stating that Google's control of the Operating System cannot be used as a competitive advantage in the Services market. We believe this may apply to other situations where Google has competition."[96]

93.     Reports indicate that Samsung's small app store also was caught up in Google's dubious security net.  As androidsage.com reported on June 18, 2018, "[S]ince today, a bunch of Samsung users have reported of Google Play Store flagging the official Samsung Galaxy App Store as potentially dangerous and fake at the extent of even blocking it."[97]  This action no doubt resulted in some number consumers fleeing the store rather than risking continued access to it.  But for those who wanted to keep it, androidsage.com offered a "temporary fix" for those inclined to disregard Google's warnings.[98]

94.     There is no good reason that a company as technologically sophisticated as Google could not whitelist or otherwise continue to permit unimpeded access to competitors' app stores on Android OS devices, including those run by well-known operators such as Amazon and Samsung. Again, Google is bound and determined to maintain its ill-gotten monopoly market power which allows it to impose its default 30% transaction fee on developer approved in-app product sales.

---

[96] Press release available at, *inter alia*: https://www.androidpolice.com/2018/10/23/aptoide-gains-injunction-google-latest-antitrust-case-compensation-follow/ (last accessed Aug. 15, 2020).

[97] https://www.androidsage.com/2018/06/18/google-play-protect-blocking-galaxy-app-store-how-to-fix/ (last accessed Aug. 15, 2020).

[98] *See id.*

CLASS ACTION COMPLAINT
Case No.:
010803-11/1334529 V1

- 35 -

**H.    Google's unlawful practices harm developers and competition.**

95.    Google's practices in aid of maintaining or attempting a monopoly in the Android OS app store market harm developers and competition by depressing output of transactions in the U.S. market for Android OS app stores.  They also directly harm developers by requiring them to pay supracompetitive distribution fees.

**1.    Google's behavior stifles innovation.**

96.    Google's abusive behavior also stifles innovation in the U.S. market for Android OS app stores.[99]

97.    For example, Amazon devised an alternative way of distributing Android OS apps, Amazon Underground, which makes apps and in-app purchases "actually free" to consumers.[100] Amazon pays developers according to how much time consumers spend interacting with the apps.[101] Yet Google's developer terms will not allow Amazon to distribute the client for this app via Google Play (even as Amazon distributes several other apps through the store).[102]

98.    In fact, shortly after Amazon introduced Amazon Underground by integrating it into its larger shopping app, Google changed its developer terms to prohibit distribution of an app store in that manner.[103]  This forced Amazon to remove its Appstore from its shopping app—and to lose that promising avenue of distribution.

---

[99] *E.g.*, Stephen D. Houck, *Injury to Competition/Consumers in High Tech Cases*, St. Johns L. Rev. Vol. 5, Iss. 4, 593, 598 (2001) ("Any assessment of a restraint's anticompetitive impact, however, will be incomplete if limited to price and output effects. The restraint's impact on consumer choice and innovation must also be considered.").

[100] *See, e.g.*, "Amazon Underground innovates with free apps but faces challenges," available at https://technology.informa.com/550085/amazon-underground-innovates-with-free-apps-but-faces-challenges (last accessed Oct. 7, 2015).

[101] *Id.*

[102] *See id.*

[103] *See, e.g.*, "[Update: Confirmed] Google Forced Amazon To Remove Its Main Shopping App From The Play Store Because Of Its Appstore Integration," Dec. 11, 2014, available at: https://www.androidpolice.com/2014/12/11/google-may-have-forced-amazon-to-remove-its-main-shopping-app-from-the-play-store-because-of-its-appstore-integration/ (last accessed Dec. 10, 2018).

99.     Surely Google's aggressive, anticompetitive behavior is one reason why Amazon shuttered Amazon Underground in 2019.[104]  Industry analysts perceived Amazon's extreme uphill battle from the outset.  One put it this way:

> The first issue is scale. For a system like this you need critical mass and scale in terms of audience and content. Amazon's hands were tied because they weren't able to make Underground readily available on iOS (obviously) or Google devices.
>
> That means they were always going to be limited to those people with Fire devices or who were motivated enough to use more than one app store. . . .[105]

100.     Another analyst put it thus:

**User acquisition is still the biggest challenge**

> Amazon's revamped plans offer app publishers an innovative new model for monetising certain apps but it may not be enough to address its major challenge: how to persuade Android users to download an alternative store to Google Play. . . .

**Strong app store competition**

> The app store competition is extremely strong. The Google Play Store offers a catalogue of than more one million apps (far greater than Amazon) and comes preinstalled on almost all Android smartphones outside China. The Google Play store is more than sufficient for most users' needs and Google reported more than 1.4bn active devices in September 2015.
>
> Beyond Amazon's own Fire branded smartphone (now discontinued) and tablets, Amazon's store does not come preinstalled on any devices[106] and so app publishers correctly focus first on providing content for Google's store rather than Amazon's.
>
> To download the Amazon Underground app, as with its previous Appstore for Android, users have to change their Android permissions to enable non-Google Play downloads which is a step too far for most customers. Amazon needs to have its store pre-installed on Android smartphones if it is to drive increased adoption. Smartphone brands that wish to reduce their dependency on Google should be open to such a relationship.

**Other stores are unlikely to follow suit, for now**

---

[104] *See, e.g.*, "Why is Amazon shutting down its Underground Initiative?" May 9, 2017, available at: https://www.pocketgamer.biz/mobile-mavens/65694/why-is-amazon-shutting-down-its-underground-initiative/ ("It was part of a long-term strategy with bold ambitions to change the way mobile developers made games, but two years on Amazon has announced that Underground will no longer feature on the Amazon Appstore as of Summer 2017, with the program officially ending in 2019.") (last accessed Aug. 15, 2020).

[105] *Id.* (quoting Oscar Clark, "Author, Consultant and Independent Developer Rocket Lolly Games").

[106] This was as of October 2015, when the referenced article was published.

Amazon's Underground app program is a response challenging market position. As a challenger store with limited market share, Amazon has to innovate to attract users. It also needs to give developers a reason to provide content for its store. Amazon can offset the costs of running the Underground program by tying its users more closely into its ecosystem and driving retail transactions and other content revenues; Amazon Prime Video and its retail store are available alongside mobile apps in Underground. Market leaders Apple and Google do not struggle to attract users or app publishers and the share they take from app transactions have become significant revenue streams, so there is no incentive for them to adopt a similar program.[107]

101.    And as Google has done what it can to shut out even a well-resourced potential competitor such as Amazon, Amazon itself continues to soldier on by way of its Amazon Coins program, which allows consumers to buy apps at a discount in the Amazon Appstore.[108] For example, on Aug. 15, 2020, the popular game Minecraft for Android OS is priced at the same nominal sum of $6.99 in both Google Play and the Amazon Appstore.[109]  But by using Amazon Coins, a purchaser could save 20%, bringing her price to approximately $5.59:

# Minecraft

by Mojang
Rated: Guidance Suggested
*4.4 out of 5 stars* 83,176 customer ratings

Price: **$6.99**

*Save up to 20%* on this app and its in-app items when you purchase **Amazon Coins**. Learn More

---

[107] *See* "Amazon Underground innovates with free apps but faces challenges," Oct. 7, 2015, available at: https://technology.ihs.com/550085/amazon-underground-innovates-with-free-apps-but-faces-challenges (last accessed Aug. 15, 2020).

[108] Amazon's presumptive revenue split in its own Appstore is also 70% developer / 30% store operator, as with Google and Apple.  On the other hand, its Amazon Coins program allows consumers to save money on the purchase price of apps everyday while developers continue to earn their 70% developer share.  (*See* https://www.amazon.com/dp/B018HB6E80/ref=twister_B009CDKIA8?_encoding=UTF8&psc=1#where (explaining Amazon Coins programs and noting: "The More You Buy, the More You Save. Amazon Coins come in denominations from 300 to 50,000 Amazon Coins. Bigger denominations always have bigger discounts. The savings on an order of 50,000 Coins is always larger than on an order of 300 Coins."); https://www.amazon.com/Amazon-Coins-Apps-Games/b?ie=UTF8&node=13927674011 (more on Coins program) (last accessed Aug. 17, 2020).

[109] *Compare* https://play.google.com/store/apps/details?id=com.mojang.minecraftpe (last accessed Aug. 15, 2020) *with*, https://www.amazon.com/Mojang-Minecraft/dp/B00992CF6W/ref=sr_1_1?s=mobile-apps&ie=UTF8&qid=1549260798&sr=1-1&keywords=minecraft (last accessed Aug. 15, 2020).

CLASS ACTION COMPLAINT                         - 38 -
Case No.:
010803-11/1334529 V1

1  Sold by: Amazon.com Services LLC.[110]

2      102.    Unfortunately, there is no evidence that any of these innovative programs has dented

3  Google's market share to any serious degree, which is not surprising considering Google's abusive

4  behavior, including its refusal to permit access via Google Play.

5      103.    Google's hogging of the U.S. app-store market also stifles innovation in apps—

6  another way it hurts competition generally.  Other vibrant app stores would mean more places for

7  featuring apps.  With so many apps available on the market, product can and does get lost in Google

8  Play.  Developers and competition generally, not to mention individual end-users, would benefit

9  from other venues that would surface good, new product and encourage the development of yet more

10  and better apps—all of which would engender more output in the market here at issue.

### 2. Google harms developers by killing competition and diminishing consumer choice.

13      104.    Google's aggressive, anticompetitive behavior diminishes the choice offered by

14  endeavors such as Amazon Underground, which lowered prices (even to zero, with its Actually Free

15  component), while also offering developers another way to earn from their work.  If even another

16  corporate giant could not make the model work given Google's policies and the Google Play

17  behemoth, there is little hope for other prospective competitors to gain significant market share

18  unless Google is required to change its contracts and practices.

### 3. Google also harms developers and competition by depressing output.

20      105.    Evidence shows that consumers of app-store products are quite price sensitive.[111]

21  Google's high transaction fees, therefore, inhibit sales of products sold via Google Play, which has

---

[110] https://www.amazon.com/Mojang-Minecraft/dp/B00992CF6W/ref=sr_1_2?dchild=1&keywords=minecraft&qid=1597603583&s=mobile-apps&sr=1-2 (last accessed Aug. 16, 2020).

[111] *See, e.g.*, "The History of App Pricing, And Why Most Apps Are Free," July 18, 2013, available at: https://flurrymobile.tumblr.com/post/115189750715/the-history-of-app-pricing-and-why-most-apps-are ("Conventional wisdom (backed by a variety of non-Flurry surveys) is that Android users tend to be less affluent and less willing to pay for things than iOS users. Does the app pricing data support that theory? Resoundingly.  As of April 2013, the average price paid for Android apps (including those where the price was free) was significantly less than for iPhone and iPad apps . . . .") (last accessed Aug. 15, 2020); "Only 33% of US Mobile Users Will Pay for Apps This Year," Feb. 5, 2015, available at: https://www.emarketer.com/Article/Only-33-of-US-Mobile-Users-Will-Pay-Apps-This-Year/1011965 ("Put a dollar sign in front of an app, and the number of

the lion's share of the U.S. market for Android OS app stores.[112] In other words, they depress output. Developers understand that paying Google's high distribution fees denies them the ability to lower prices as they choose, which deters many from investing in app development and distribution. Thus, output is depressed.

106. Furthermore, Google crams too many apps into what is the monopoly Google Play store. With so many apps in one store, consumers cannot discover the vast majority of them. They are lost in the forest. Google's monopoly practices render it impossible to maintain viable alternative stores at any scale; therefore, there are no reasonable alternatives for surfacing good apps elsewhere. Again, because of the way in which Google willfully makes sideloading a non-alternative for the vast majority of consumers, output is depressed by way of the hiding of apps through overcrowding in Google Play.

107. Google's $.99 minimum price for U.S. app sales also depresses output. Google itself recognizes this by way of contractual terms that permit lower minimum prices in 18 other countries[113]: lower prices move more apps. Again, developers lose volume and real money as a result. There is no good or pro-competitive reason to deny them pricing flexibility for minimum-priced apps.

### 4. Google harms developers by causing supracompetitive pricing of distribution services for Android OS apps and in-app add-ons, including subscriptions.

108. There is no good, pro-competitive, or otherwise justified reason for the 30% fee that Google charges to U.S. app developers for app and in-app product distribution services, the rate of which it has maintained since the opening of its Android OS app store.[114] Nor is there justification

---

people who are willing to download and install it drops dramatically. According to a new forecast from eMarketer, 80.1 million US consumers will pay for mobile apps at least once this year, representing only 33.3% of all mobile users.") (last accessed Aug. 15, 2020).

[112] *See* ¶¶ 54-55, 60, *supra.*

[113] *See, e.g.*, ¶ 40, *supra.*

[114] *See, e.g.*, "A decade on, Apple and Google's 30% app store cut looks pretty cheesy," Aug. 29, 2018, available at: https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/ ("Apple unveiled the App Store in July 2008, and Android Market the following month, opening with the first Android device that October. Apple set the 30 per cent rate, Google simply followed suit.") (last accessed Aug. 15, 2020); *see also* https://support.google.com/googleplay/android-developer/answer/112622?hl=en ((last accessed Aug. 15, 2020).

for its 15% distribution-services fee as to certain subscriptions in place for over a year, the rate of which Google began to offer sometime in 2018. In fact, that Google offers the 15% rate for certain subscriptions only underscores the supracompetitive nature of Google's default 30% commission rate. This unnatural price stability, under the circumstances alleged herein, including what surely is the accrual of economies of scale and pertinent lower costs for various inputs as time has progressed, is a sure sign of Google's unlawful acquisition of monopoly power and the abuse of that market power. Google immediately imposes this charge on developers by way of its contracts of adhesion.

109. Nor do the circumstances give rise to any pro-competitive justification for Google's contractual terms requiring $.99 minimum pricing for paid apps and in-app add-ons. This pricing mandate, too, is an abuse of Google's monopoly power.

### 30% default transaction fee

110. In spite of not having to carry physical inventory (as distinct from a mere bit of digital storage for uploaded content); having such a large and growing pre-install base for the Google Play store, which has multiplied not by building more physical stores but simply by replicating an app; and economies of scale that have grown over time, Google has continued to take from developers nearly a third of every dollar spent as a fee for all covered Google Play transactions. Given how large the market is, there is plainly enough revenue to support app-store functions while providing a healthy profit in the event the 30% transaction fee were lowered to a reasonable rate—one the market could generate on its own but for Google's improperly acquired monopoly in the U.S. market for Android OS app stores and the historic and ongoing abuses of its market power.

### Epic Games

111. In its August 29, 2018 article entitled, "A decade on, Apple and Google's 30% app store cut looks pretty cheesy," *The Register* raised several important points and asked as many hard questions with regard to Google's long-standing fee structure. The impetus for the article was the developer Epic Games' decision to distribute its popular Fortnite game to Android device owners outside of Google Play.[115]

---

[115] https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/ (last accessed Aug. 15, 2020). The article's subtitle and URL refer to a "duopoly." There is no duopoly in a legal

112.    As reported in the article, Epic's CEO, Tim Sweeney, told *Forbes*[116] that "[a]voiding the 30 percent [Google Play] 'store tax' is a part of Epic's motivation."[117] "It's a high cost in a world where game developers' 70 per cent must cover all the cost of developing, operating, and supporting their games.  And it's disproportionate to the cost of the services these stores perform, such as payment processing, download bandwidth, and customer service."[118]  In a previous *Register* article, Mr. Sweeney put it this way: "[F]rom the [developer's] 70 percent, the developer pays all the costs, of developing the game, operating it, marketing it, acquiring users and everything else.  For most developers that eats up the majority of their revenue."[119]

113.    After noting that one reader of a previous *Register* article had written: "I learned something.  Google take[s] 30%.  That is some serious gouging," the later article stated: "More pertinently, after a decade, is the question why Apple and Google *still* take a 30 per cent cut.  In a competitive marketplace, wouldn't that rate have been whittled down over the years?"[120]  Indeed.

114.    While the scale of Epic's own endeavor—not only the sale of Fortnite outside of Google Play, but [121]a new game store for Android OS device owners—will be small compared to

---

sense, given the incompatibility between Android OS apps on the one hand and Apple iOS apps on the other.

[116] *See* "From 'Fortnite' To 'Fallout 76,' Publishers Are Sick Of Google, Apple and Steam's Store Cuts, Aug.13, 2018, available at: https://www.forbes.com/sites/insertcoin/2018/08/13/from-fortnite-to-fallout-76-publishers-are-sick-of-google-apple-and-steams-store-cuts/#1c118ff2578c (last accessed Aug. 15, 2020) ("Epic announced that Fortnite would indeed be coming to Android, but it would not be sold through the Google Play store. Players would have to (somewhat clunkily) download it from Epic's website on their phones, and the game would then update itself independently of the Play store going forward.").

[117] https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/.

[118] *Id.*

[119] "Game over for Google: Fortnite snubs Play Store, keeps its 30%, sparks security fears, Aug. 3, 2018," Aug. 3, 2018, available at: https://www.theregister.co.uk/2018/08/03/fortnite_security_fears/ (last accessed Aug. 15, 2020). The security fears of which the article also speaks could be avoided if Google Play permitted the distribution of alternative game-store clients through Google Play.

[120] https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/.

[121] *Id.*  The piece goes on to note that Amazon's Appstore might be considered "fairly shabby" today, but points out that it might not remain so "if it could provide incentives to app developers to submit apps[.]"  (Citation omitted).  "Submitting to more than one app store has a very low marginal cost to the developer, so this would make a good proof point for any remedy."  (Citation omitted.)

Google Play, its owners have provided information illustrating the supracompetitive nature of Google's 30% transaction fee. For their own store, Epic will employ a *12%* transaction fee.

115.    This is plenty to achieve a reasonable profit, as explained by Epic's CEO. Per an *MCV* article entitled, "New Epic Games Store takes on Steam with just 12% revenue share – Tim Sweeney answers our questions"[122]:

> "While running Fortnite we [Epic] learned a lot about the cost of running a digital store on PC. The math is quite simple: we pay around 2.5 per cent to 3.5 per cent for payment processing for major payment methods, less than 1.5 per cent for CDN costs (assuming all games are updated as often as Fortnite), and between 1 and 2 per cent for variable operating and customer support costs." Sweeney told us.
>
> "Fixed costs of developing and supporting the platform become negligible at a large scale. In our analysis, stores charging 30 per cent are marking up their costs by 300 to 400 per cent," he reveals. "But with developers receiving 88 per cent of revenue and Epic receiving 12 per cent, this store will still be a profitable business for us," he explains.[123]

116.    That a newcomer like Epic can run a store profitably with a 12% fee demonstrates how supracompetitive Google's 30% transaction fee truly is. Given Google's experience, huge pre-installation base for Google Play, and its other economies of scale, it's likely that Google could earn a healthy profit by charging even less than 12% per covered transaction.

117.    Notably, Epic's CEO indicates above that the rates are "around 2.5 percent to 3.5 percent . . . for major payment methods." Yet Google charges 30% as its Google Play default rate for in-app purchases (with some subscription rates at 15%, as referenced herein). And this matters deeply to Android developers. The ability for consumers to pay in-app is critical to app developers, who may otherwise forego purchasing app add-ons if they cannot readily do it with the developer's app.[124]

118.    Epic has repeatedly tried to do something about this rate, imposed by Google the monopolist, to no avail. In fact, only last week, Epic tried to offer a lower rate to consumers for

---

[122] https://www.mcvuk.com/business/new-epic-games-store-takes-on-steam-with-just-12-revenue-share-tim-sweeney-answers-our-questions (dated Dec. 4, 2018) (last accessed Aug. 15, 2020).

[123] *Id.*

[124] Complaint for Injunctive Relief, *Epic Games, Inc. v. Google, et al.*, No. 20-cv-05671 (N.D. Cal.), filed Aug. 13, 2020, ECF No. 1, ¶ 134.

virtual currency in its popular Fortnite app for Android, which is distributed via Google Play.[125]
Epic offered consumers a choice: pay through Google's payment processing system, or pay 20% less
through Epic's.[126]  Within hours, Google, in an exercise of its enormous market power, responded by
kicking Fortnite out of Google Play.[127]

119.    Epic responded by filing suit against Google later that day.  Epic's complaint includes
Sherman Act monopolization claims and state claims as well.  It seeks injunctive relief against
Google.[128]

### Chrome Web Store

120.    Another comparator comes from Google itself.  Google has for years operated the
Chrome Web Store, whereby it sells certain apps for use on computers, such as Windows laptops and
desktops.[129]  Google's transaction fee for purchases of paid apps or in-app products is only 5%,[130]
not Google Play's 30%.  There is no indication that the Chrome Web Store is an eleemosynary
venture, or that Google is losing money by way of transaction fees set at 5%.

121.    Tellingly, however, when so-called ARC apps are concerned, the fee goes up to 30%
for in-app (and one-time[131]) payments.  ARC stands for App Runtime for Chrome, which is a Google
project introduced in 2014 to bring Android apps to devices running Google's Chrome OS.[132]
According to Google:

---

[125] *Id.* ¶ 28.

[126] *Id.*

[127] *Id.* ¶ 29.

[128] *Id.* ¶¶ 135-238.

[129] *See* https://chrome.google.com/webstore/category/extensions (last accessed Aug. 15, 2020).

[130] https://developer.chrome.com/webstore/pricing#seller ("Each time someone buys your app using Chrome Web Store Payments, Google charges you a 5% transaction fee.  For example, if you charge $1.99, you'll receive $1.89; if you charge $9.99, you'll receive $9.49.") (last accessed Aug. 15, 2020); https://developer.chrome.com/webstore/money (same transaction fee for in-app payments when using the Chrome Web Store API) (last accessed Aug. 15, 2020).

[131] This is evidently equivalent to charging some amount for the app itself.  (*See* n. 135, *infra*.)

[132] "First set of Android apps coming to a Chromebook near you," Sep. 11, 2014, available at: https://chrome.googleblog.com/2014/09/first-set-of-android-apps-coming-to.html (last accessed Aug. 15, 2020).

> **Note:** In-app payments for ARC apps are subject to a 30% transaction fee. For example, if you charge $1.99 for an item offered in an ARC app, you'll receive $1.39. *This is to ensure a consistent pricing structure with in-app payments made in apps available on Google Play.* ARC does not currently support other purchase models including up-front payments, subscriptions and in-app version upgrades; as these types of purchases require provisioning from Google Play which is not currently enabled. . . .[133]

In other words, Google *could* charge much less, but it is all-important for it to maintain the 30% Google Play fee.

**Minimum pricing**

122.    The minimum price fixing that Google requires via its adhesive developer contract likewise is unlawful. Low-price apps sell especially well, but the developer contract will not allow regular pricing in the U.S. to fall below $.99, to the detriment of developers who must forego volumes of lower-price sales.

## V.    INTERSTATE TRADE AND COMMERCE

123.    The activities of Google as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Google Play sells distribution and payment-processing services across, and without regard to, state lines.

## VI.    RELEVANT MARKETS

**First relevant market**

124.    The antitrust injuries alleged herein, including harm to developers and competition, have occurred in the U.S. market for distribution of Android OS apps, *i.e.*, for distribution services provided to U.S. Android App Developers.[134] This market is heavily dominated, to the point of monopoly status, by Google, including by way of its Google Play store, thanks to Google's willful and anticompetitive behavior as described in this complaint. As the European Commission has found, Google and Google Play, via various anticompetitive practices, have acquired some 90

---

[133] https://developer.chrome.com/webstore/money (last accessed Aug. 15, 2020).

[134] *Cf.* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," July 18, 2018, available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm ("Google is dominant in the worldwide market (excluding China) for app stores for the Android mobile operating system. Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices.").

percent of the market worldwide in Android app stores.[135]  There is no reason to believe that Google's share is less than that in the U.S.  Accordingly, Google's share of the relevant market for Android app and in-app distribution services is believed, and therefore alleged, to have reached a similar level of dominance.

125.    Competitors in the relevant market exist, such as Amazon, Aptoide, and Samsung, but they are weak in terms of their own market power.  Each is and has been starved of competitive oxygen by Google's unlawful contracts, policies, and actions.  None has made a serious dent in Google's market share.

126.    Furthermore, due to the incompatibility of Apple's iOS with Google's Android OS, and the resultant incompatibility of iOS and Android OS apps; due to Google's status as a bottleneck retailer; and due, *inter alia*, to the high switching costs among end users, as well as plaintiff and putative class members, Apple's App Store and corresponding distribution services for iOS apps offers no competition to, and is not a substitute for, Google's distribution services for Android OS apps.  Developers, industry, and governments understand that the Android market alleged herein is a discrete one, which Google monopolizes.

127.    For the reasons alleged herein, including the foregoing, the relevant market is a single-brand market or, alternatively, a submarket of a larger market that includes, *inter alia*, Apple's iOS app distribution services.

128.    Google's restraints on competition directly impact the U.S. market for Android OS distribution services as alleged herein.  Google permits and encourages U.S. app developers to sell their apps via Google Play to non-U.S. nationals, and U.S. developers, including the plaintiff, do so.  Upon information and belief, these developers' business relationship and dealings are primarily with Google LLC and Google Payment Corp., which are U.S. entities.  Therefore, the Foreign Trade Antitrust Improvement Act does not apply.  Alternatively, its exceptions apply, including because the

---

[135] *See* European Commission, *Google Android*, Case AT 40099, Commission Decision of 18 July 2018, at 92-97, available at https://ec.europa.eu/competition/antitrust/cases/dec_docs/40099/40099_9993_3.pdf (last accessed Aug. 17, 2020).

conduct alleged has a direct, substantial, and reasonably foreseeable effect on trade

or commerce which is not trade or commerce with foreign nations.

129.     Google is a direct seller of distribution services to Android developers for the sale of apps in or via the Google Play store and for add-ons and other products sold in those apps.[136]

130.     Plaintiff seeks relief on behalf of themselves and other developers.  Insofar as Google Play may be or is a two-sided platform, lower prices would not lead to any discernible negative indirect network effects under the circumstances described herein.  For example, unlike on credit-card transaction platforms, lower fees or prices would not mean less money available to pay rebates or rewards to consumers.  To the contrary, Google does not share its transaction fees with consumers.  Here, Google's restraints do not help to establish or enhance participation *inter se* developers and consumers, nor do they help to prevent erosion in participation.  In fact, Google can point to no considerations that countervail the propriety of the monetary and injunctive relief that Plaintiff seeks.

**Second relevant market**

131.     The antitrust injuries alleged herein, including harm to developers and competition, have occurred in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.[137]  Google has enormous power in this market, thanks to its willful and anticompetitive behavior as described in this complaint.  As the European Commission has found, Google and Google Play, via various anticompetitive practices, have acquired some 90 percent of the market worldwide in Android app stores.[138]  And with few exceptions, Google requires the use of its in-app payment system for in-app product distributions.

---

[136] *See, e.g.*, https://play.google.com/store (offering various digital products to consumers for purchase, including apps, at various price points) (last accessed Aug. 15, 2020). The Google Play mobile client is installed on hundreds of millions of Android OS devices, as alleged herein, and similarly offers various products, including apps, for purchase and sale.

[137] *Cf.* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," July 18, 2018, available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm ("Google is dominant in the worldwide market (excluding China) for app stores for the Android mobile operating system. Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices.").

[138] *See* n.135, *supra*.

CLASS ACTION COMPLAINT                         - 47 -
Case No.:
010803-11/1334529 V1

1    There, Google's share of the relevant market for Android in-app payment processing is believed, and

2    therefore alleged, to have reached monopoly status.

3         132.    Competitors in the relevant market exist, but their share is exceedingly small given

4    Google's insistence that Android app developers use its own payment processing system for digital

5    products sold in apps acquired from Google Play.  These competitors, such as PayPal, Stripe, and

6    Square, charge many magnitudes less than Google,[139] and they provide better service, including

7    quicker access to funds.[140]  Each is and has been starved of competitive oxygen in the market for

8    Android in-app payment processing by Google's abusive contracts, policies, and actions.  And given

9    the high sales and monetary value of in-app products,[141] certainly the effect on commerce in the

10   market for these services is substantial.

11        133.    For again, due to Google's exclusivist contracts and policies, these competitors offer

12   no substitute for, Google's payment processing services.  Developers, industry, and governments

13   understand that the Android market alleged herein is a discrete one, which Google monopolizes.

14        134.    Based on the reasons alleged herein, including the foregoing, the relevant market is a

15   single-brand market.

16        135.    Google's restraints on competition directly impact the U.S. market for Android in-app

17   payment processing as alleged herein.  Google permits and encourages U.S. app developers to sell

18   their in-app products (in apps purchased in or via Google Play) to non-U.S. nationals, and U.S.

19   developers, including the plaintiff, do so.  Upon information and belief, these developers' business

20   relationship and dealings are primarily with Google LLC and Google Payment Corp., which are U.S.

21   ─────────────────

22   [139] In fact, PayPal has a microtransactions program for sellers whose transactions average less
     than $10.  Its rate is __, without additional per-transaction charges.  Where funds come from a
     PayPal account in the U.S., Paypal charges a fee of 5.0% of the transaction plus a fixed fee based on
23   currency.  *See* "Micropayment Fees," https://www.paypal.com/us/webapps/mpp/merchant-fees (last
     accessed Aug. 17, 2020).

24   [140] *Cf.* "Receiving Payout," available at: https://stripe.com/docs/payouts#payoutschedule
     (referring to two-business-day and seven-calendar-day payout schedule for U.S. accounts, depending
25   on assessed risk level, for the payment processor Stripe) (last accessed Sept. 27, 2019).

26   [141] *See, e.g.*, *Consumer Spending in Mobile Apps Grew 17% in 2019 to Exceed $83 Billion
     Globally*, SensorTower (Jan. 6, 2020), https://sensortower.com/blog/app-revenue-and-downloads-
     2019 ("An estimated $61.7 billion was spent in mobile games across both stores last year, 12.8
27   percent more than 2018's total of $54.7 billion. This was 74 percent of all in-app spending for
     2019[.]") (last accessed Aug. 17, 2020).

28

entities.  Therefore, the Foreign Trade Antitrust Improvement Act does not apply.  Alternatively, its exceptions apply, including because the conduct alleged has a direct, substantial, and reasonably foreseeable effect on trade or commerce which is not trade or commerce with foreign nations.

136.     Google is a direct seller of Android in-app payment processing services to Android developers for the sale of apps in or via the Google Play store and for add-ons and other products sold in those apps.[142]

137.     Plaintiff seeks relief on behalf of themselves and other developers.  Insofar as Google Play may be or is a two-sided platform, lower prices would not lead to any discernible negative indirect network effects under the circumstances described herein.  For example, unlike on credit-card transaction platforms, lower fees or prices would not mean less money available to pay rebates or rewards to consumers.  To the contrary, Google does not share its transaction fees with consumers.  Here, Google's restraints do not help to establish or enhance participation *inter se* developers and consumers, nor do they help to prevent erosion in participation.  In fact, Google can point to no considerations that countervail the propriety of the monetary and injunctive relief that plaintiff seeks.

## VII.    CLASS ALLEGATIONS

138.     Plaintiff brings this proposed class action pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

139.     Plaintiff brings this action on its own behalf and the following nationwide class, for monetary and injunctive relief based on violations of the federal Sherman Act:

> All U.S. developers of: (a) any paid Android OS app sold in or via the Google Play store, or (b) any paid in-app product (including subscriptions) sold in the Google Play store or via apps distributed in or via the Google Play store.

Excluded from this proposed class are the defendants; defendants' affiliates and subsidiaries; defendants' current or former employees, officers, directors, agents, and representatives; and the

---

[142] *See, e.g.*, https://play.google.com/store (offering various digital products to consumers for purchase, including apps, at various price points) (last accessed Aug. 15, 2020).  The Google Play mobile client is installed on hundreds of millions of Android OS devices, as alleged herein, and similarly offers various products, including apps, for purchase and sale.

district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate

family members.

140.    Plaintiff also brings this action on its own behalf and the following nationwide class,

for monetary and injunctive relief based on violations of California's Unfair Competition Law:

> All U.S. developers of: (a) any paid Android OS app sold in or via the Google
> Play store, or (b) any paid in-app product (including subscriptions) sold in the
> Google Play store or via apps distributed in or via the Google Play store.

Excluded from this proposed class are the defendants; defendants' affiliates and subsidiaries;

defendants' current or former employees, officers, directors, agents, and representatives; and the

district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate

family members.

141.    **Numerosity:**  The exact number of the members of the proposed classes is unknown

and is not available to the plaintiff at this time, but upon information and belief, the classes will

consist of many thousands of members such that individual joinder in this case is impracticable.

142.    **Commonality:**  Numerous questions of law and fact are common to the claims of the

plaintiff and members of the proposed classes.  These include, but are not limited to:

a.    Whether Google unlawfully has conditioned the contractual right of any

manufacturer of any Android OS mobile telephone or tablet to pre-install desired Google

applications such as the YouTube or Google Maps apps on the manufacturer's agreement also to

install the Google Play client, with the object of acquiring or maintaining monopoly status in the

U.S. market for Android OS app stores (and correspondingly high market shares in the markets for

Android OS distribution services and in-app payment processing services);

b.    Whether there is a U.S. antitrust market (or submarket) for Android OS app

distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers;

c.    Whether there is a U.S. market for Android in-app payment processing, *i.e.*, for

payment processing provided to U.S. Android App Developers;

d.    Whether Google has unlawfully monopolized, or attempted to monopolize, the

foregoing markets or submarket;

CLASS ACTION COMPLAINT                    - 50 -
Case No.:
010803-11/1334529 V1

e.    Whether competition in the U.S. market for Android OS distribution services, or payment processing, has been restrained and harmed by Google's monopolization, or attempted monopolization, of such market(s);

f.    Whether Google has imposed contracts on developers that restrain trade as alleged herein;

g.    Whether developers have been harmed, including by way of having paid more for app transaction or distribution fees, or in-app product payment processing fees, than they would have but for Google's unlawful conduct, as a result of Google's unlawful practices;

h.    Whether plaintiff and members of the proposed classes are entitled to declaratory or injunctive relief to halt Google's unlawful practices, and to their attorney fees, costs, and expenses;

i.    Whether plaintiff and members of the proposed classes are entitled to any damages or restitution incidental to the declaratory or injunctive relief they seek, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief; and

j.    Whether plaintiff and members of the proposed classes are otherwise entitled to any damages or restitution, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

143.    **Typicality:** Plaintiff's claims are typical of the claims of the members of the proposed classes. The factual and legal bases of Google's liability are the same and resulted in injury to plaintiff and all of the other members of the proposed classes.

144.    **Adequate representation:** Plaintiff will represent and protect the interests of the proposed classes both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiff has no interests that are antagonistic to those of the proposed classes, and its interests do not conflict with the interests of the proposed class members it seeks to represent.

145.    **Prevention of inconsistent or varying adjudications:** If prosecution of myriad individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for

the defendant. Certification of plaintiff's proposed classes would prevent these undesirable outcomes.

146. **Injunctive and declaratory relief:** By way of its conduct described in this complaint, the defendants have acted on grounds that apply generally to the proposed classes. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

147. **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## VIII. APPLICABILITY OF CALIFORNIA LAW

148. There is a California law provision incorporated by reference in the Google Play Terms of Service.[143] Accordingly, plaintiff alleges that California law applies to the state law claims they assert on their own behalf, and on behalf of the proposed nationwide classes.

149. Furthermore, upon information and belief, the unlawful conduct alleged in this complaint, including the drafting, dissemination, and consummation of anticompetitive contracts and policies, as well as the levying and collection of Google's supracompetitive 30% transaction fee on Google Play purchases, and the enforcement of minimum-price terms, was effected, implemented, adopted, and ratified in the state of California, where Google LLC and Google Payment Corp.

---

[143] *See* Google Play Terms of Service, available at: https://play.google.com/about/play-terms/index.html, which incorporates the Google Terms of Service, the latter of which is available at: https://policies.google.com/terms ("California law will govern all disputes arising out of or relating to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules. These disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts.").

CLASS ACTION COMPLAINT                                                     - 52 -
Case No.:
010803-11/1334529 V1

maintain their U.S. headquarters. Therefore, a substantial part of the anticompetitive conduct took place in California. For these reasons, too, plaintiff alleges that they and the proposed nationwide classes are entitled to monetary and injunctive relief pursuant to California law.

## FIRST CAUSE OF ACTION
## VIOLATION OF THE SHERMAN ACT - MONOPOLIZATION OF MARKET FOR ANDROID DISTRIBUTION SERVICES
### (15 U.S.C. § 2)

150. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

151. Plaintiff brings this federal law claim on its own behalf and on behalf of each member of the proposed nationwide class described above.

152. For this count, the relevant market is the U.S. market for Android OS app ~~and in-app product~~ distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers,

153. Google possesses monopoly power in the relevant market.

154. For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant markets.

155. Google has the power to exclude competition in the relevant market, and it has willfully used that power, including by way of its unlawful practices in restraint of trade as described herein, in order to achieve, maintain, and expand its monopoly power in that market.

156. Furthermore, in an exercise of its monopoly market power, and in order to willfully obtain, maintain, and enhance that power, Google has tied in-app payment processing via its Google Pay Billing product to Android OS app distribution via Google Play. Google has done so via policy, practice, and contract as alleged herein. In-app payments to U.S. developers run to millions of dollars each year, on millions of transactions. Therefore, the effect on the tied market for in-app payment processing, as on the tying market for distribution services, is substantial. Accordingly, Google's tying conduct is *per se* unlawful. And alternatively, it is unlawful under a rule of reason analysis given the facts and circumstances described herein.

157. Given this tie, Google's immense market power in the tying market for distribution services, and the substantial effect on commerce in the tied market for Android in-app payment processing, is *per se* unlawful.

158.     Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for Android OS app and in-app product distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers.

159.     Google has behaved as alleged herein to achieve, maintain, and grow its monopoly in the U.S. market for Android OS app and in-app product distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers, with the effect being that competition is foreclosed and that developer choice is gravely diminished.  So is innovation.  Additionally, Google has abused its market power by imposing supracompetitive 30% developer transaction fees[144] and minimum price fixing.  Further, Google's actions have depressed output as alleged herein.

160.     There is no business necessity or other pro-competitive justification for Google's conduct.  Instead, Google's actions are designed to destroy competition as alleged herein.

161.     Plaintiff and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying for distribution services.

162.     Finally, developers, including the plaintiff, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem.  Plaintiff and the federal law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing to their businesses.

### SECOND CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION OF MARKET FOR ANDROID DISTRIBUTION SERVICES
### (15 U.S.C. § 2)

163.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

164.     Plaintiff brings this claim on its own behalf and on behalf of each member of the proposed nationwide federal law class described above.

---

[144] Or, alternatively, a still supracompetitive 15% commission on certain subscriptions, for what amounts to payment processing services that could be purchased much cheaper from other provider, if Google permitted developers to use them.

CLASS ACTION COMPLAINT                                                      - 54 -
Case No.:
010803-11/1334529 V1

165.    Google has attempted to monopolize the U.S. market for Android OS app distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers.

166.    Google's anticompetitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market for Android OS app distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers.

167.    Google has a specific intent to achieve monopoly power in the U.S. market for Android OS app distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers.

168.    Google has the power to exclude competition in the U.S. market for Android OS app distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

169.    Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for Android OS app distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers.

170.    Google has behaved as alleged herein in a willful attempt to obtain a monopoly in the U.S. market for Android OS app distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers, with the effect being that competition is foreclosed and that consumer choice is gravely diminished.  So is innovation.  Additionally, Google has abused its market power by insisting on 30% transaction fees[145] and minimum price fixing.  Further, Google's actions have depressed output as alleged herein.

171.    There is no business necessity or other pro-competitive justification for Google's conduct.

---

[145] Or, alternatively, a still supracompetitive 15% commission on certain subscriptions, for what amounts to payment processing services that could be purchased much cheaper from other provider, if Google permitted developers to use them.

172.    Plaintiff and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying for distribution services.

173.    Finally, developers, including the plaintiff, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem.  Plaintiff and the federal law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing to their businesses.

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT - MONOPOLIZATION OF MARKET FOR ANDROID IN-APP PAYMENT PROCESSING SERVICES**
**(15 U.S.C. § 2)**

174.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

175.    Plaintiff brings this federal law claim on its own behalf and on behalf of each member of the proposed nationwide class described above.

176.    For this count, the relevant market is the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

177.    Google possesses monopoly power in the relevant market.

178.    For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant markets.

179.    Google has the power to exclude competition in the relevant market, and it has willfully used that power, including by way of its unlawful practices in restraint of trade as described herein, in order to achieve, maintain, and expand its monopoly power in that market.

180.    Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the relevant market is the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

181.    Google has behaved as alleged herein to achieve, maintain, and grow its monopoly in the relevant market is the U.S. market for Android in-app payment processing, *i.e.*, for payment

processing provided to U.S. Android App Developers., with the effect being that competition is foreclosed and that developer choice is gravely diminished. So is innovation. Additionally, Google has abused its market power by imposing supracompetitive 30% developer transaction fees[146] and minimum price fixing. Further, Google's actions have depressed output as alleged herein.

182. There is no business necessity or other pro-competitive justification for Google's conduct. Instead, Google's actions are designed to destroy competition as alleged herein.

183. Plaintiff and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying for payment processing services.

184. Finally, developers, including the plaintiff, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem. Plaintiff and the federal law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing to their businesses.

### FOURTH CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION OF MARKET FOR ANDROID IN-APP PAYMENT PROCESSING SERVICES
### (15 U.S.C. § 2)

185. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

186. Plaintiff brings this claim on its own behalf and on behalf of each member of the proposed nationwide federal law class described above.

187. Google has attempted to monopolize the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

188. Google's anticompetitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

---

[146] Or, alternatively, a still supracompetitive 15% commission on certain subscriptions, for what amounts to payment processing services that could be purchased much cheaper from other provider, if Google permitted developers to use them.

CLASS ACTION COMPLAINT     - 57 -
Case No.:
010803-11/1334529 V1

189.    Google has a specific intent to achieve monopoly power in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

190.    Google has the power to exclude competition in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

191.    Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

192.    Google has behaved as alleged herein in a willful attempt to obtain a monopoly in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers, with the effect being that competition is foreclosed and that consumer choice is gravely diminished.  So is innovation.  Additionally, Google has abused its market power by insisting on 30% transaction fees[147] and minimum price fixing.  Further, Google's actions have depressed output as alleged herein.

193.    There is no business necessity or other pro-competitive justification for Google's conduct.

194.    Plaintiff and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying for payment processing services.

195.    Finally, developers, including the plaintiff, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem.  Plaintiff and the federal law class are entitled to an

---

[147] Or, alternatively, a still supracompetitive 15% commission on certain subscriptions, for what amounts to payment processing services that could be purchased much cheaper from other provider, if Google permitted developers to use them.

CLASS ACTION COMPLAINT                     - 58 -
Case No.:
010803-11/1334529 V1

injunction to prevent Google from persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing to their businesses.

## FIFTH CAUSE OF ACTION
## VIOLATION OF THE SHERMAN ACT – RESTRAINT OF TRADE RE: IN-APP PAYMENT PROCESSING
## (15 U.S.C. § 1)

196.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

197.    Google's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

198.    Google requires app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of having their apps distributed through Google's monopolized app store, Google Play. The relevant provisions of these agreements unreasonably restrain competition in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

199.    Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through Google Play. This includes payments related to in-app purchases of digital content. Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through Google Play "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for such in-app purchases. While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself," Google expressly applies its anticompetitive mandate to every "game downloaded on Google Play" and to all purchased "game content."

200.    The challenged provisions serve no sufficient legitimate or pro-competitive purpose and unreasonably restrain competition in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

201.    Google's conduct affects a substantial volume of interstate commerce.

CLASS ACTION COMPLAINT                    - 59 -
Case No.:
010803-11/1334529 V1

202. Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output

203. Plaintiff and putative class members have been harmed by Google's anticompetitive conduct in a manner that the antitrust laws were intended to prevent. They have suffered and continue to suffer damages and irreparable injury, including harm to their businesses, and such damages and injury will not abate unless an injunction issues that will stop Google's anticompetitive conduct.

204. Developers, including the plaintiff, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem. Plaintiff and the federal law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

### SIXTH CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT – ALTERNATIVE BASIS FOR TYING AS TO IN-APP PAYMENT-PROCESSING
### (15 U.S.C. § 1)

205. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

206. Google's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

207. Google has unlawfully tied distribution services for Google Play to its in-app payment processor, Google Play Billing, through its DDAs with app developers and its Developer Program Policies.

208. As demonstrated herein, Google has immense, monopoly power in the tying market—the U.S. market for Android OS app and in-app product distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers. Put another way, with Google Play installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed via Google Play, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supracompetitive taxes on the sale of apps via Google Play.

209. The availability of Google Play for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing . Google's foreclosure of alternative app distribution channels thus forces developers, including the plaintiff and putative class members, to use Google's in-app payment processing services. Indeed, Google has expressly its use a condition of reaching Android users through its dominant Google Play store.

210. The tying product, Android app distribution, is distinct from the tied product, Android in-app payment processing, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of how an Android app is distributed. Google's unlawful tying arrangement thus ties two separate products that are in separate markets. Google's contract and written policies underscore their separate nature.[148]

211. Google's conduct forecloses competition in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers. Given the volume of transactions and the money at issue, Google's conduct thus affects a substantial volume of commerce in that market.

212. Google has thus engaged in a *per se* illegal tying arrangement. *See* ¶¶ 155-157, *supra*.

213. In the alternative only, even if Google's tying conduct does not constitute a *per se* violation of the law, a rule-of-reason analysis of Google's tying arrangement also would demonstrate that it violates the law.

214. As an app developer that consumes in-app payment processing services for its in-app subscription product, plaintiff has been harmed by Google's anticompetitive conduct. Plaintiffs and members of the putative class have suffered and continue to suffer damages and irreparable injury, including ongoing harm to their businesses, and such damages and injury will not abate until the Court issues an injunction ending Google's anticompetitive conduct issues

215. Developers, including the plaintiff, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is

---

[148] *See* supra ¶¶ 155-57.

CLASS ACTION COMPLAINT          - 61 -
Case No.:
010803-11/1334529 V1

incompatible with Apple's iOS ecosystem. Plaintiff and the federal law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

### SEVENTH CAUSE OF ACTION
### VIOLATION OF THE UNFAIR COMPETITION ACT
### (CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*)

216. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

217. Plaintiff brings this claim on its own behalf and on behalf of each member of the proposed nationwide California law class described above. Alternatively, if the Court does not apply California law on a nationwide basis, Plaintiff brings this claim on their own behalf and on behalf of each member of a California resident class.

218. California's Unfair Competition Law (UCL) defines "unfair competition" to include any "unlawful, unfair, or fraudulent" business act or practice. CAL. BUS. & PROF. CODE §§ 17200 *et seq.* As these are stated in the disjunctive, the UCL sets up three prongs—the unlawful, unfair, and fraudulent prongs—the violation of any of which constitutes a violation of the UCL

219. Google has engaged in, and continues to engage in, acts of unfair competition as defined in California's UCL. More specifically, Google, based upon the conduct alleged herein, has violated the unlawful and unfair prongs of the UCL.

**Unlawful prong**

220. Google's acts of unfair competition include its violations of the Sherman Act as alleged herein. Therefore, Google has violated the unlawful prong of the UCL.

221. Google's conduct has harmed developers, and developers have overpaid for distribution and in-app payment processing fees, due to Google's unlawful behavior as alleged herein. Google's willfully obtained market power has allowed it to impose its supracompetitive fees on developers. But for Google's exclusionary and anticompetitive behavior, developer charges would have been much lower than what they were.

**Unfair prong**

222. Google's acts of unfair competition include its violations of the Sherman Act and the policies underlying it, as alleged herein. Additionally, Google has behaved unfairly and in violation of public policy as alleged herein. Therefore, Google has violated the unfair prong of the UCL.

223.    Google's conduct has harmed developers, and developers have overpaid for distribution and in-app payment processing fees, due to Google's unfair behavior as alleged herein. Google's willfully obtained market power has allowed it to impose its supracompetitive fees on developers. But for Google's exclusionary and anticompetitive behavior, developer payments would have been much lower than what they were.

224.    Finally, developers, including the plaintiff, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem. Plaintiff and the state law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests the following relief:

A.    That the Court certify this case as a class action; that it certify the proposed federal law class on a nationwide basis; the proposed California law class on a nationwide basis; or, alternatively with respect to plaintiff's California law claim, and at a minimum, a California resident class based on California law; and that it appoint them as class representatives and their counsel as class counsel;

B.    That the Court award it and the proposed classes all appropriate relief, to include, but not be limited to, injunctive relief requiring that Google cease the abusive, unlawful, and anticompetitive practices described herein (including pursuant to federal antitrust law, *see, e.g.*, 15 U.S.C. § 26, and state law, *see, e.g.*, Cal. Bus. & Prof. Code § 17203, as requested herein); declaratory relief, adjudging such practices unlawful; as well as monetary relief, whether by way of restitution (*see, e.g.*, Cal. Bus. & Prof. Code § 17203) or damages, including treble damages (*see, e.g.*, 15 U.S.C. § 15(a)), or other multiple or punitive damages, or restitution, where mandated by law (including federal antitrust law, *see, e.g.*, 15 U.S.C. § 15(a)) or equity or as otherwise available; together with recovery of their costs of suit, to include their reasonable attorneys' fees, costs, and expenses (including pursuant to federal antitrust law, *see, e.g.*, 15 U.S.C. § 15(a) and/or 15 U.S.C. §

26; *see also* Cal. Code Civ. Pro. § 1021.5)), together with pre- and post-judgment interest to the maximum levels permitted by law or equity;

      C.     That the Court grant such additional orders or judgments as may be necessary to prevent the unlawful practices complained of herein; and

      D.     That the Court award it and proposed classes such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all issues so triable.

DATED:  August 17, 2020                    Respectfully submitted,

                                           HAGENS BERMAN SOBOL SHAPIRO LLP


                                           By ___*/s/ Benjamin J. Siegel*_____
                                           Benjamin J. Siegel (SBN 256260)
                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                           715 Hearst Avenue, Suite 202
                                           Berkeley, CA 94710
                                           Telephone: (510) 725-3000
                                           Facsimile:  (510) 725-3001
                                           bens@hbsslaw.com

                                           Steve W. Berman (*pro hac vice forthcoming*)
                                           Robert F. Lopez (*pro hac vice forthcoming*)
                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                           1301 Second Avenue, Suite 2000
                                           Seattle, WA  98101
                                           Telephone:  (206) 623-7292
                                           Facsimile:  (206) 623-0594
                                           steve@hbsslaw.com
                                           robl@hbsslaw.com

                                           Joseph M. Vanek (*pro hac vice forthcoming*)
                                           Eamon P. Kelly (*pro hac vice forthcoming*)
                                           SPERLING & SLATER, P.C.
                                           55 W. Monroe Street, 32nd Floor
                                           Chicago, IL 60603
                                           Telephone: (312) 676-5845
                                           Facsimile: (312) 641-6492
                                           jvanek@sperling-law.com
                                           ekelly@sperling-law.com


                                           *Attorneys for Plaintiff and the Proposed Classes*

CLASS ACTION COMPLAINT                     - 65 -
Case No.:
010803-11/1334529 V1

# EXHIBIT C

George A. Zelcs (*pro hac vice forthcoming*)
  gzelcs@koreintillery.com
Robert E. Litan (*pro hac vice forthcoming*)
Randall P. Ewing, Jr. (*pro hac vice forthcoming*)
  rewing@koreintillery.com
Jonathon D. Byrer (*pro hac vice forthcoming*)
  jbyrer@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery (*pro hac vice forthcoming*)
  stillery@koreintillery.com
Jamie Boyer (*pro hac vice forthcoming*)
  jboyer@koreintillery.com
Michael E. Klenov, CA Bar #277028
  mklenov@koreintillery.com
Carol O'Keefe (*pro hac vice forthcoming*)
  cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Karma M. Giulianelli, CA Bar #184175
  karma.giulianelli@bartlitbeck.com
Glen E. Summers
  glen.summers@bartlitbeck.com
**BARTLIT BECK LLP**
1801 Wewetta St. Suite 1200,
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

Ann Ravel
  aravel@mcmanisfaulkner.com
**MCMANIS FAULKNER**
Fairmont Plaza, 10th Floor, 50 West San
Fernando Street
San Jose, CA 95113
Telephone: (408) 279-8700
Facsimile: (408) 279-3244

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| MARY CARR, individually and on behalf of all others similarly situated;<br><br>        Plaintiffs,<br><br>        vs.<br><br>GOOGLE LLC; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LIMITED; and GOOGLE PAYMENT CORP.;<br><br>        Defendants. | CASE NO. 5:20-CV-5761<br><br>**COMPLAINT<br>(CLASS ACTION)**<br><br>**JURY TRIAL DEMANDED** |

1  Plaintiff Mary Carr, on behalf of herself and all others similarly situated, brings this class

2  action against Defendants Google LLC; Google Ireland Ltd.; Google Commerce Ltd.; Google

3  Asia Pacific Pte. Ltd; and Google Payment Corp. (collectively, "Google"), and alleges as follows:

4  **INTRODUCTION**

5  1.  Consumers and businesses worldwide rely on smart mobile devices such as

6  smartphones and tablets for work, news, entertainment and communication.  These devices are

7  enhanced through software products known as mobile applications or "apps."  Apps allow a user to

8  personalize their device to meet their specific needs and interests.  Consequently, a mobile device

9  that provides seamless access to and use of a wide variety of apps is valuable to consumers across

10 the globe.

11 2.  Like personal computers, smart mobile devices use an operating system or "OS" to

12 provide core device functionality and enable the operation of compatible apps. The commercial

13 viability of an OS for mobile devices (a "mobile OS") depends in large part on the availability,

14 number, and variety of compatible apps that cater to the preferences and needs of users.

15 3.  Google controls the most pervasive mobile OS: the Android OS. Android OS is used

16 by billions of users around the world, and boasts nearly 3 million compatible apps.  For companies

17 that design and sell smart mobile devices, known as original equipment manufacturers ("OEMs"),

18 Android is the only commercially viable OS that is widely available to license. Stated simply, OEMs

19 have a single mobile OS option: Google's Android OS. Consequently, Google enjoys monopoly

20 power over the market for mobile OS that are available for license by OEMs.

21 4.  Google is not, however, satisfied with its control of the market for Android OS. To

22 further strengthen its monopoly power, Google erected contractual and technological barriers that

23 foreclose Android users' ability to utilize app distribution platforms other than Google Play Store.

24 This ensures that the Google Play Store accounts for nearly all the app downloads from app stores

1    on Android devices. Google thus maintains a monopoly over the market for distributing mobile apps

2    to Android users (hereafter, the "Android App Distribution Market").

3           5.      For example, Google bundles the Google Play Store with other Google services that

4    Android OEMs must provide on their devices (such as Gmail, Google Search, Google Maps, and

5    YouTube).  Then, as a condition to license those services, Google requires an OEM to pre-install

6    the Google Play Store and prominently display it, while at the same time interfering with an OEM's

7    ability to make third-party app stores or apps available on their devices. These restrictions

8    effectively foreclose competing app stores—and even single apps—from a primary distribution

9    channel.

10          6.      But the OEMs are not Google's only avenue of implementing its anticompetitive

11    scheme. Google also enforces anticompetitive restrictions against app developers. Specifically,

12    Google contractually prohibits app developers from offering an app through the Google Play Store

13    that is, in turn, used to download other apps. Additionally, Google forces app developers to distribute

14    their apps through the Google Play Store to take advantage of advertising channels controlled by

15    Google, such as ad placements on Google Search or YouTube that are specially optimized to

16    advertise mobile apps.  Because Google also has a monopoly in internet searches, app developers

17    have no choice but to acquiesce to Google's anticompetitive restrictions on Google Play.

18          7.      Finally, Google stifles or blocks consumers' ability to download alternative app

19    stores and apps directly from developers' websites. Downloading apps on an Android device outside

20    of Google Play requires multiple steps that require the user to, among other things, change default

21    settings and click through multiple warnings. Even if a user runs this gauntlet and manages to install

22    a competing app store, Google protects the Play Store's competitive advantage by blocking the

23    alternative store from offering basic functions, such as automatic "background" updates of the kind

24    seamlessly available for apps downloaded from the Google Play Store.

8.      Through its behavior, Google intends to eliminate consumer choice, foreclosing competition in mobile app distribution. There is no legitimate procompetitive justification for Google's conduct and restrictions.

9.      Google also imposes anticompetitive restrictions in the separate market for Android In-app Payment Processing. App developers frequently sell digital content for consumption within an app itself (also known as an "in-app purchase").  These in-app purchases require seamless payment processing tools.  An app developer may create its own payment mechanism or utilize a payment processing tool offered by third parties.

10.      Google, however, conditions the right to distribute an app through Google Play Store on a developer's agreement to exclusively use Google's own payment processing tool, Google Play Billing, to process in-app purchases. App developers cannot even offer users other payment processing options alongside Google Play Billing. This essentially forces app developers to use both Google Play Store and Google Play Billing because Google's monopoly over the Android App Distribution Market means developers cannot circumvent this anticompetitive tie by distributing their content through a channel other than the Google Play Store.

11.      Google's decision to tie app distribution to in-app purchase billing means that for every in-app purchase, just as for the initial app purchase, it is Google, not the app developer, that first collects payment. Google then taxes the transaction at an exorbitant 30% supra-competitive rate, remitting the remaining 70% to the developer. This 30% commission is up to ten times higher than the toll charged by other electronic payment options.

12.      Further, by interposing itself as an intermediary in every digital content purchase conducted within an Android-distributed app, Google is able to collect user's personal information, which Google then uses to give an anticompetitive edge to its own advertising services and mobile app development business.

1    13.    But for Google's monopolistic conduct, competitors could offer consumers and

2    developers choice in distribution and payment processing. Entities wishing to distribute apps

3    through a competing store could offer developers greater innovation and enhanced choices,

4    including in-app payment processing. With other viable options, app developers would not have to

5    pay Google's supra-competitive tax of 30%.  Rather, the price of distribution and payment

6    processing alike would be set by market forces.  Further, users and developers—not Google—would

7    decide how (or even whether) user data was used for other purposes.

8                                            **PARTIES**

9    14.    Plaintiff Mary Carr is a natural person who resides in the State of Illinois

10   ("Plaintiff").  Plaintiff purchased an app through the Google Play store and also purchased in-app

11   digital content through an app purchased from the Google Play store within the last four years.

12   15.    Defendant Google LLC is a Delaware limited liability company with its principal

13   place of business in Mountain View, California. Google LLC is the primary operating subsidiary of

14   the publicly traded holding company Alphabet Inc. The sole member of Google LLC is XXVI

15   Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View,

16   California. Google LLC contracts with all app developers that distribute their apps through the

17   Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in

18   this suit.

19   16.    Defendant Google Ireland Limited ("Google Ireland") is a limited company

20   organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a

21   subsidiary of Google LLC. Google Ireland contracts with all app developers that distribute their

22   apps through the Google Play Store and is therefore a party to the anticompetitive contractual

23   restrictions at issue in this suit.

17.     Defendant Google Commerce Limited ("Google Commerce") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC. Google Commerce contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

18.     Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific") is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and is a subsidiary of Google LLC. Google Asia Pacific contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

19.     Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its principal place of business in Mountain View, California, and is a subsidiary of Google LLC. Google Payment provides in-app payment processing services to Android app developers and Android users and collects a 30% commission on many types of processed payments, including payments for apps sold through the Google Play Store and in-app purchases made within such apps.

## JURISDICTION & VENUE

20.     This Court has subject-matter jurisdiction over Plaintiff's federal antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over the Defendants. Google LLC and Google Payment are headquartered in this District. All Defendants have engaged in sufficient minimum contacts with the United States and have purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise of jurisdiction over them

1   would comport with due process requirements. Further, the Defendants have consented to the

2   exercise of personal jurisdiction by this Court.

3        22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google LLC

4   and Google Payment maintain their principal places of business in the State of California and in this

5   District, because a substantial part of the events or omissions giving rise to Plaintiff's claims

6   occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not

7   resident in the United States may be sued in any judicial district and their joinder with others shall

8   be disregarded in determining proper venue. In the alternative, personal jurisdiction and venue also

9   may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because

10  Defendants may be found in or transact business in this District.

11  **FACTUAL ALLEGATIONS**

12  **I.    GOOGLE DOMINATES THE MERCHANT MARKET FOR MOBILE**
13  **    OPERATING SYSTEMS.**

14      **A.    The Merchant Market For Mobile Operating Systems.**

15      23.    Smart mobile devices such as smartphones and tablets are handheld, portable

16  electronic devices that can connect wirelessly to the internet and perform multi-purpose computing

17  functions, including, among other things, Internet browsing, using social media, streaming video,

18  listening to music, or playing games. Many consumers own only a smart mobile device and no other

19  computer. Such consumers are particularly hard-hit by Google's unlawful conduct in mobile-related

20  markets.

21      24.    Mobile devices require an OS that enables multi-purpose computing functionality,

22  including, but not limited to: (1) button, touch, and motion commands; (2) a "graphical user

23  interface" made up of icons indicating actions a user may take; (3) basic operations such as cellular

24  or WiFi connectivity, GPS positioning, camera and video recording, and speech recognition; and

25  (4) the installation and operation of compatible mobile apps.

25.     An OEM must pre-install an OS on each device prior to its sale so that purchasers immediately have access to basic functions like the ones described above. OEMs design mobile devices to ensure compatibility with whatever OS was selected for that device. For OEMs, the process of implementing a mobile OS requires significant time and investment, making switching to another mobile OS difficult, expensive, and time-consuming.

26.     The vast majority of OEMs do not develop their own OS, so they must choose and license an OS for their devices. There is therefore a relevant Merchant Market for Mobile OS that is comprised of mobile OS that OEMs can license for their smart mobile devices.[1] Historically, the Merchant Market for Mobile OS included the Android OS, developed by Google, the Tizen mobile OS, a partially open-source mobile OS that was developed by the Linux Foundation and Samsung, and the Windows Phone OS developed by Microsoft.

27.     OEMs license mobile OSs for installation on mobile devices globally, excluding China.[2]  The geographic scope of the relevant Merchant Market for Mobile OSs is therefore worldwide, excluding China.  Notably, OEMs outside of China must all contractually consent that if their device licenses the Android OS that they will not sell devices preloaded with a competing, Android-compatible mobile OS.

28.     The geographic scope of the Merchant Market for Mobile OSs includes a separate market within the United States.  The U.S. Merchant Market for Mobile OSs operates as described throughout this Complaint.

---

[1] The market does not include: (1) proprietary OSs that are not available for licensing, such as Apple's mobile OS, called iOS; (2) mobile devices that lack the multi-computing functions of smart mobile devices and tablets (*i.e.,* "flip phones"); or (3) electronic devices whose OS are not compatible with mobile device OS (*i.e.,* desktop computers or gaming systems like Xbox).

[2] Google's operations in China are limited for legal and regulatory reasons, and Google does not make available many of its products for mobile devices sold within China.  Further, while Google contractually requires OEMs licensing Android outside of China not to sell devices with competing Android-compatible mobile OSs, it imposes no such restriction on devices sold within China.

**B.      Google's Monopoly Power In The Merchant Market For Mobile Operating Systems.**

29.      Google enjoys monopoly power in the Merchant Market for Mobile OS through its Android OS. For instance, the European Commission determined the Android OS, licensed to OEMs in relevant respects by Google, is installed on over 95% of all mobile devices sold by OEMs utilizing a merchant mobile OS. Indeed, Android OS is installed on nearly 75% of all smart mobile devices sold by OEMs, including OEMs that use a proprietary mobile OS developed exclusively for their own use (such as Apple's iOS).

30.      A mobile ecosystem of products like apps, devices, and accessories typically develops around one or more mobile OSs, such as the Android OS. The "Android ecosystem" is, therefore, a system of mobile products that are inter-dependent and compatible with each other and the Android OS. Ecosystem participants include Google, OEMs of Android-compatible devices, developers of Android-compatible apps, Android app distribution platforms, the makers of ancillary hardware such as headphones or speakers, cellular carriers, and others.

31.      Mobile ecosystems benefit from substantial network effects—as more developers design useful, compatible apps for a specific mobile OS, the more consumers will be drawn to use that OS, and the more consumers using an OS, the more developers want to develop apps for it. As a result, new entrants to the OS market face significant barriers to entry. A new OS is only as desirable as the number of software applications running on it, and software developers are not incentivized to create apps for an OS that lacks a large existing base of users.

32.      To attract app developers and users, Google represents that Android is an "open" ecosystem where any participant may create Android-compatible products without unnecessary restrictions.

33.      In fact, Google uses its Android OS to keep its ecosystem closed to any competition. As the dominant OS licensor, Google recognizes that participation on its platform is a "must-have"

1   market for developers.  Google only unlocks the door to its ecosystem for participants willing to

2   play by Google's rules.

3       34.    Moreover, Google uses the Android OS to restrict which apps and app stores OEMs

4   pre-install on their devices and to deter the direct distribution of competing app stores and apps to

5   Android users, all at the expense of competition in the Android ecosystem.

6       35.    Because of Google's monopoly power in the Merchant Market for Mobile OS,

7   OEMs, developers and users cannot choose another mobile OS. OEMs such as ZTE and Nokia

8   acknowledge that other, non-proprietary OS are poor substitutes for and not a reasonable alternative

9   to the Android OS, not least because other mobile OS do not presently support many high-quality

10  and successful mobile apps deemed essential and/or valuable by consumers. Google, therefore, has

11  constructed a market that biases consumers against devices with non-proprietary mobile OS other

12  than Android OS, while putting OEMs at Google's mercy because their devices must offer a popular

13  mobile OS and corresponding ecosystem to consumers.

14
15  **II.    GOOGLE UNLAWFULLY MAINTAINS A MONOPOLY IN THE ANDROID MOBILE APP DISTRIBUTION MARKET.**

16      36.    Mobile apps make mobile devices more useful and valuable because they add user-

17  specific functionality like working, video chatting, banking, shopping, job hunting, photo editing,

18  reading digital news sources, editing documents, or playing a game like Hearthstone or Pokémon

19  Go.  Many consumers do not even own a traditional computer. But even when a consumer can

20  perform the same or similar functions on a personal computer, the ability to access apps "on the go"

21  using a handheld, portable device remains valuable and important.

22      37.    Some apps are pre-installed by OEMs.  However, OEMs cannot anticipate the

23  various apps a specific consumer may want, nor should they try since that may result in a device

1    overloaded with pre-installed apps of no interest to a given consumer. Moreover, apps developed

2    after a user buys his or her mobile device cannot, as a practical matter, be pre-installed.

3         38.    Consequently, mobile devices must provide a way for users to download and/or buy

4    apps post-purchase. On Android devices, this is primarily done through the Google Play Store, a

5    digital portal set up by Google. Through this Store, mobile apps can be browsed, purchased (if

6    necessary), and downloaded by a consumer. App stores such as the Google Play Store, alongside

7    other distribution platforms available to the hundreds of millions of consumers using Android-based

8    mobile devices, comprise the Android App Distribution Market, defined below.

9         39.    Through various anticompetitive acts and unlawful restraints on competition, Google

10   maintains a monopoly in the Android Mobile App Distribution market, causing ongoing harm to

11   competition and injury to OEMs, app distributors, app developers, and consumers. Google's

12   restraints of trade undermine representations that "as an open platform, Android is about choice,"

13   and that app developers "can distribute [their] Android apps to users in any way [they] want, using

14   any distribution approach or combination of approaches that meets [their] needs," including by

15   allowing users to directly download apps "from a website" or even by "emailing them directly to

16   consumers." None of this is true, and Google has used anticompetitive means to ensure that this is

17   the case.

18        **A. The Android App Distribution Market.**

19        40.    There is a relevant market for the distribution of apps compatible with the Android

20   OS to mobile device users (the "Android App Distribution Market"). This Market is comprised of

21   all the channels by which mobile apps may be distributed to the hundreds of millions of mobile

22   Android OS users. The Market primarily includes Google's dominant Google Play Store, with

23   smaller stores, such as Samsung's Galaxy Store and Aptoide, trailing far behind. Nominally only,

the direct downloading of apps without using an app store (which Google pejoratively describes as "sideloading") is also part of this market.

41.    App stores allow consumers to use their mobile device to browse, search for, access reviews on, purchase (if necessary), download, and install mobile apps. It would be commercially unreasonable for an OEM to sell a smart mobile device without an app store since the ability to find, purchase and/or download apps is one of the primary benefits of such devices.

42.    App stores are OS-specific and therefore only distribute apps compatible with a specific mobile OS. An Android OS owner will use an Android-compatible app store that distributes only Android-compatible mobile apps. That consumer may not, for example, substitute Apple's App Store because it is not available on Android devices, not compatible with the Android OS, and does not offer Android-compatible apps. Consequently, non-Android mobile app distribution platforms are not part of the Android App Distribution Market.[3]

43.    Notably, even if an app or game is available for different types of platforms running different operating systems, only the OS-compatible version of that software can run on a specific device, console, or computer. Accordingly, as a commercial reality, any app developer that wishes to distribute apps for Android mobile devices must develop an Android-specific version of the app that is distributed through the Android App Distribution Market.

44.    In the alternative only, the Android App Distribution Market is a relevant, economically distinct sub-market of a hypothetical broader antitrust market for the distribution of mobile apps to users of all mobile devices, whether Android or Apple's iOS.

---

[3] These non-Android platforms would include, for example, the Windows Mobile Store used on Microsoft's Windows Mobile OS, the Apple App Store used on Apple iOS devices, and gaming stores for specific consoles like the Sony PlayStation and/or Nintendo.

45.     The geographic scope of the Android App Distribution Market is worldwide, excluding China.[4] Outside of China, app distribution channels like app stores, are globally developed and distributed, and OEMs, in turn, make app stores like the Google Play Store globally available on Android devices.

46.     The geographic scope of the Android App Distribution Market includes a separate market within the United States.  The U.S. Android App Distribution Market operates as described throughout this Complaint.

**B.  Google's Monopoly Power In The Android App Distribution Market.**

47.     Google has monopoly power in the Android App Distribution Market.

48.     Google's monopoly power is demonstrated by its massive market share in terms of apps downloaded. The European Commission determined that, within the Market, more than 90% of app store downloads were processed through the Google Play Store. The European Commission found the only other app store with any appreciable presence was the Windows Mobile Store, which is compatible with the Windows Mobile OS (and therefore excluded from the Android App Distribution Market). The Commission determined that even if the Windows Mobile Store share was included in the market, the Google Play Store would still possess a market share greater than 90%.

49.     Other existing Android mobile app stores cannot thwart Google's monopoly power in the Android App Distribution Market because no other app store reaches nearly as many Android users as the Google Play Store. The European Commission found the Google Play Store is pre-installed by OEMs on practically all Android mobile devices sold outside of China. No other

---

[4] China is excluded from the relevant market because legal and regulatory barriers prevent the operation of many global app stores, including the Google Play Store, within China. Additionally, app stores prevalent in China are not available, or have little presence, outside of China.

1    Android app store comes close to that number of pre-installed users. With the exception of app

2    stores designed for and installed only on mobile devices sold by particular OEMs (for example,

3    Samsung Galaxy Apps and the LG Electronics App Store), no other Android app store is pre-

4    installed on more than 10% of Android devices, and many have no appreciable market penetration

5    at all. Aptoide, for example, is an Android app store that claims to be the largest "independent" app

6    store outside of China, but it comes pre-installed on no more than 5% of Android mobile devices.

7         50.     Because of Google's monopoly over Android app distribution, there is no viable

8    substitute to distribution through the Google Play Store. As a result, the Google Play Store offers

9    over 3 million apps, including all of the most popular Android apps, compared to just 700,000 apps

10   offered by Aptoide, the Android app store with the next largest listing. The Google Play Store

11   benefits from the large number of participating app developers and users. The ever-growing variety

12   of apps attracts more and more users, and, in turn, the audience attracts app developers who wish to

13   access Android users.  The system feeds itself. Consequently, Android OEMs find it commercially

14   unreasonable to make and sell phones without the Google Play Store, and they view other app stores

15   as poor substitutes because they offer fewer and less impressive apps.

16        51.     As further proof of its monopoly power, Google imposes a supra-competitive

17   commission of 30% on the price of apps purchased through the Google Play Store, which is a far

18   higher commission than would exist under competitive conditions.

19        52.     Google's monopoly power in app distribution is not constrained by competition at

20   the smart mobile device level, whether the relevant market is defined as the Android App

21   Distribution Market or, in the alternative, as the App Distribution Market in general.

22        53.     First, consumers are deterred from leaving the Android ecosystem due to the

23   difficulty and costs of switching. Consumers choose a smartphone based in part on the pre-installed

24   OS and its ecosystem. Once a consumer selects a smartphone, the consumer cannot replace the pre-

installed mobile OS with an alternative.  If they want to switch OS, that consumer must purchase a new mobile device. In addition, mobile OSs have different designs, controls, and functions that consumers learn to navigate over time.  The cost of learning to use a different mobile OS is part of consumers' switching costs.

54.     Second, switching from Android devices may result in a significant loss of personal and financial investment that consumers put into the Android ecosystem. Because apps, in-app content and many other products are designed for or are only compatible with a particular mobile OS, switching to a new mobile OS may mean losing access to such products or to data, even if such apps and products are available within the new ecosystem.  A consumer switching OS would, consequently, lose their investment in the Android-specifics apps previously purchased and/or used.

55.     Third, consumers have no reason to inquire, and therefore do not know about, Google's anticompetitive contractual restraints and policies.  Mobile device purchasers are focused on design, brand, processing power, battery life, functionality and cellular plan. These features are likely to play a substantially larger role in a consumer's decision as to which smart mobile device to purchase than Google's anticompetitive conduct in the relevant markets.

56.     Consumers are also unable to determine the "lifecycle price" of devices—*i.e.,* to accurately assess at the point of purchase how much they will ultimately spend (including on the device and all apps and in-app purchases) for the duration of their device ownership. Consumers cannot predict all of the apps or in-app content they may eventually purchase.  Because they cannot know or predict all such factors when purchasing mobile devices, consumers are unable to calculate the lifecycle prices of the devices. This prevents consumers from effectively taking Google's anticompetitive conduct into account when making mobile device purchasing decisions.

57.     Given consumers' essentially unavoidable "lock-in" to the Android OS, developers must participate in the Android ecosystem. The alternative is losing access to millions of Android users.

**C. Google's Anticompetitive Conduct Concerning The Android App Distribution Market.**

58.     Google has willfully and unlawfully maintained its monopoly in the Android App Distribution Market through a series of related anticompetitive acts designed to foreclose alternative and competing Android app distribution channels.

59.     Google imposes anticompetitive restrictions on OEMs.

60.     First, Google conditions OEM licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on an OEM's agreement to provide the Google Play Store with preferential treatment compared to any other competing app store.

61.     Specifically, Android OEMs (which, as noted above, comprise virtually all OEMs that obtain an OS on the merchant market) must sign a Mobile Application Distribution Agreement ("MADA") with Google. A MADA confers a license to a product bundle comprised of proprietary Google apps, Google-supplied services necessary for mobile app functionality, and the Android trademark. The MADA requires OEMs to locate the Google Play Store on the "home screen" of each mobile device. Android OEMs must further pre-install up to 30 Google mandatory apps and locate these apps on the home screen or on the next screen, occupying valuable space on each user's mobile device that otherwise could be occupied by competing app stores and other services. These requirements ensure that the Google Play Store is the most visible app store any user encounters. All other app stores are, therefore, at a significant disadvantage.

62.     Absent this restraint, OEMs could pre-install and prominently display alternative app stores.  This would allow competing app stores to vie for prominent placement on Android devices,

increase exposure to consumers and, as a result, increase their ability to attract app developers to their store. An app distributor could and would negotiate with OEMs to offer a prominently displayed app store containing its apps, allowing it to reach more mobile users.

63. Second, Google interferes with OEMs' ability to distribute Android app stores and apps directly to consumers outside the Google Play Store. Some OEMs might compete for buyers by offering mobile devices with easy access to additional mobile app stores and apps through, for instance, pre-installed and/or prominently placed icons. Even when an OEM wants to make mobile apps available to consumers in this way, Google imposes unjustified and pretextual warnings about the security of installing the app, even though the consumer is choosing to install the app in full awareness of its source. This conduct dissuades users from downloading apps outside of the Google Play Store.

64. Google also imposes anticompetitive restrictions on competing app distributors and developers to further entrench its monopoly in Android App Distribution.

65. First, Google prevents app distributors from providing Android users ready access to competing app stores. In other words, Google prevents developers from providing an app that, when downloaded from the Google Play Store, would operate as a competing mobile storefront for other app purchases. Google prohibits the distribution of any competing app store through the Google Play Store, without any technological or other justification.

66. Google imposes this restraint through provisions of the Google Play Developer Distribution Agreement ("DDA"), which Google requires all app developers to sign before they can distribute their apps through the Google Play Store. Each of the Defendants, except Google Payment, is a party to the DDA.

67. Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of

1    software applications and games for use on Android devices outside of Google Play." The DDA

2    further reserves to Google the right to remove and disable any Android app that it determines

3    violates this requirement. The DDA is non-negotiable, so developers seeking access to Android

4    users through the Google Play Store must accept Google's standardized contract of adhesion.

5         68.    In the absence of these unlawful restraints, competing app distributors could allow

6    users to replace or supplement the Google Play Store on their devices with competing app stores,

7    easily downloaded and installed through the Google Play Store. App stores could compete and

8    benefit consumers by offering lower prices and innovative app store models, such as app stores that

9    are curated to specific consumers' interests—*e.g.,* an app store that specializes in games. Without

10    Google's unlawful restraints, these app stores would provide additional platforms on which more

11    apps could be featured, and thereby, discovered by consumers.

12         69.    Second, Google conditions app developers' ability to effectively advertise their apps

13    to Android users on being listed in the Google Play Store. Specifically, Google markets an App

14    Campaigns program that, as Google says, allows app developers to "get your app into the hands of

15    more paying users" by "streamlin[ing] the process for you, making it easy to promote your apps

16    across Google's largest properties." This includes certain ad placements on Google Search,

17    YouTube, Discover on Google Search, and the Google Display Network, and with Google's "search

18    partners," that are specially optimized for the advertising of mobile apps. However, to access the

19    App Campaigns program, Google requires that app developers list their app in either the Google

20    Play Store (to reach Android users) or in the Apple App Store (to reach Apple iOS users). This

21    conduct further entrenches Google's monopoly in Android App Distribution by coercing Android

22    app developers to list their apps in the Google Play Store or risk losing access to a great many

23    Android users they could otherwise advertise to, including through Google's monopoly search

24    engine, but for Google's restrictions.

70.     Google directly and anticompetitively restricts how consumers discover, download and install mobile apps and app stores. Although Google nominally allows consumers to directly download and install Android apps and app stores—a process that Google pejoratively describes as "sideloading"—Google uses the Android OS to impose a series of technological impediments designed to dissuade users from direct downloads.

71.     But for Google's anticompetitive acts, Android users could freely download apps from developers' websites, rather than through an app store, just as they might do on a personal computer. There is no reason that downloading and installing an app on a mobile device should be different. Millions of personal computer users easily and safely download and install software directly every day, such as Google's own Chrome browser or Adobe's Acrobat Reader.

72.     Direct downloading on Android mobile devices, however, differs dramatically. Google ensures that the Android process is technically complex, confusing and threatening, filled with dire warnings that scare most consumers into abandoning the lengthy process.

73.     Even after a user runs the gauntlet of warnings and threats, Google denies directly downloaded apps the permissions necessary to be seamlessly updated in the background—a benefit reserved solely for apps downloaded via the Google Play Store.  Instead, users must manually trigger these updates, which may even require revisiting the original download process, complete with its hurdles and warnings. This imposes onerous obstacles on consumers who wish to keep the most current version of an app on their mobile device and further drives consumers away from direct downloading and toward Google's monopolized app store.

74.     Google further restricts direct downloading under the guise of offering protection from malware. When Google deems an app "harmful," Google may prevent the installation of, prompt a consumer to uninstall, or forcibly remove the app from a consumer's device. Direct downloading is entirely prevented on Android devices that are part of Google's so-called Advanced

1    Protection Program ("APP"). Consumers who enroll in APP cannot directly download apps; their

2    Android device can only download apps distributed in the Google Play Store or in another pre-

3    installed app store that Google pre-approved an OEM to offer on its devices. App developers

4    therefore cannot reach APP users unless they first agree to distribute their apps through the Google

5    Play Store or through a separate Google-approved, OEM-offered app store, where available.

6    Google's invocation of security is an excuse to further strangle an app developer's ability to reach

7    Android users, as shown by a comparison to personal computers, where users can securely purchase

8    and download new software without being limited to a single software store owned or approved by

9    the user's anti-virus software vendor. This comparison shows that Google's multiple technical

10   barriers to direct downloading from alternative sources go far beyond what is necessary to achieve

11   any legitimate security objections. Put differently, Google has not adopted the least restrictive means

12   necessary for achieving any legitimate security objectives.

13        75.    Direct downloading is also nominally available to competing app distributors who

14   seek to distribute competing Android app stores directly to consumers. However, the same

15   restrictions Google imposes on the direct downloading of apps apply to the direct downloading of

16   app stores. Indeed, Google Play Protect has flagged at least one competing Android app store,

17   Aptoide, as "harmful," further hindering consumers' ability to access a competing app store.

18        76.    Additionally, apps downloaded from "sideloaded" app stores, like apps directly

19   downloaded from a developer's website, may not be automatically uploaded in the background.

20   Thus, direct downloading is not a viable way for app stores to reach Android users, any more than

21   it is a viable alternative for single apps. The only difference is that the former do not have any

22   alternative, ensuring the latter are forced into the Google Play Store. Google's barriers erected

23   against competing app distributors also are not the least restrictive means necessary to achieve any

24   legitimate security objectives.

77.     But for Google's restrictions on direct downloading, app distributors and developers could try to directly distribute their stores and apps to consumers. As explained above, Google makes direct downloading substantially and unnecessarily difficult, and in some cases prevents it entirely, further narrowing this already narrow alternative distribution channel.

78.     There is no legitimate reason for Google's conduct, and even if there were, Google has not adopted the least restrictive means for achieving it.  For decades, PC users have installed software acquired from various sources without being deterred by anything like the obstacles erected by Google. A PC user can navigate to an internet webpage, click to download and install an application, and be up and running, often in a matter of minutes. Security screening is conducted by a neutral security software operating in the background, allowing users to download software from any source they choose (unlike Android).

79.     Through these anticompetitive acts, including contractual provisions and exclusionary obstacles, Google has willfully obtained a near-absolute monopoly over Android mobile app distribution. Google Play Store downloads have accounted for more than 90% of downloads through Android app stores, dwarfing other available distribution channels.

**D.     Anticompetitive Effects In The Android App Distribution Market.**

80.     Google's anticompetitive conduct forecloses competition in the Android App Distribution Market, affects a substantial volume of commerce in this Market and causes anticompetitive harms to OEMs, competing mobile app distributors, mobile app developers, and consumers.

81.     As described above, Google's anticompetitive conduct harms OEMs by forcing them to dedicate valuable "home screen" real estate to the Google Play Store and other mandatory Google applications, regardless of the OEM's preferences, which might include allowing other app stores or developers to place an icon there. Individually and together, these requirements limit OEMs'

ability to differentiate themselves and compete with each other by offering innovative and more appealing (in terms of price and quality) distribution platforms for mobile apps. Google's restrictions also interfere with OEMs' ability to compete with each other by offering Android devices with tailored combinations of pre-installed apps that would appeal to particular subsets of mobile device consumers.

82.     Google's anticompetitive conduct harms would-be competitor app distributors, which could otherwise innovate new models of app distribution and provide OEMs, app developers, and consumers choice beyond Google's own app store.

83.     Google's anticompetitive conduct harms app developers, who must agree to Google's anticompetitive terms and conditions to reach many Android users, through downloads or Google's advertising platforms. Google's restrictions prevent developers from experimenting with alternative app distribution models, such as providing apps directly to consumers, selling apps through curated app stores, creating their own competing app stores, or forming business relationships with OEMs who can pre-install apps. By restricting developers, Google ensures that the developer's apps will be distributed on the Google Play Store, which empowers Google to monitor the apps' usage.  This information can, in turn, be used by Google to develop and offer its own competing apps that are, of course, not subject to Google's supra-competitive taxes.

84.     Both developers and consumers are harmed by Google's supra- competitive taxes of 30% on the purchase price of apps distributed through the Google Play Store, which is a much higher transaction fee than would exist in a competitive market unimpaired by Google's anticompetitive conduct. Google's supra-competitive taxes raise prices for app developers and consumers and reduce the output of mobile apps and related content by depriving app developers of incentive and capital to develop new apps and content.

85.     Consumers are further harmed because Google's control of app distribution reduces developers' ability and incentive to distribute apps in different and innovative ways—for example, through genre-specific app stores. Google, by restraining the distribution market and eliminating the ability and incentive for competing app stores, also limits consumers' ability to discover new apps of interest to them. More competing app stores would permit additional platforms to feature diverse collections of apps. Instead, consumers are left to sift through millions of apps in one monopolized app store, where Google controls which apps are featured, identified or prioritized in user searches.

## III.     GOOGLE UNLAWFULLY MAINTAINS A MONOPOLY IN THE ANDROID IN-APP PAYMENT PROCESSING MARKET

86.     By selling digital content within a mobile app rather than charging for the app itself, app developers can make an app widely accessible to all users, then generate revenue to use in developing new games. This is especially true for mobile game developers. By allowing users to play without up-front costs, developers permit more players try a game "risk free" and only pay for what they want to access. Many games are free to download and play, but make additional content available for in-app purchasing on an à la carte basis or via a subscription-based service. App developers who sell digital content rely on in-app payment processing tools to process consumers' purchases in a seamless and efficient manner.

87.     Google has pursued a strategy of anticompetitive conduct, however, to ensure that Android app developers are not free to utilize any one of the multitude of electronic payment processing solutions available to process in-app purchases and other transactions. Instead, Google conditions developers' access to the dominant Google Play Store on an agreement to use Google Play Billing to process in-app purchases of digital content. Google thus ties its Google Play Store to its own proprietary payment processing tool and uses that tie to maintain its monopoly over the Android In-App Payment Processing Market, as defined below.

88.     Absent Google's unlawful conduct, app developers could integrate compatible payment processors into their apps to facilitate in-app digital content purchases or develop such functionality themselves.  Developers could even offer users a choice among multiple payment processors for each purchase, just like a website or brick-and-mortar store can offer a customer the option of using Visa, MasterCard, Amex, Google Pay, and more. This would, in turn, result in lower prices for consumers.

**A.  Google's Monopoly Power In The Android In-App Payment Processing Market**

89.     There is a relevant antitrust market for processing payment for digital content, including virtual gaming products, within Android apps (the "Android In-App Payment Processing Market"). The Android In-App Payment Processing Market is comprised of the payment processing solutions that Android developers could integrate into their Android apps to process the purchase of in-app digital content.

90.     App developers selling in-app digital content must offer transactions that are seamless, engrossing, quick, and fun. It is critical that such purchases can be made during gameplay itself.

91.     Mobile game developers particularly value seamless in-app purchases that extend or enhance gameplay without disrupting or delaying that gameplay or a gamer's engagement with the mobile app. For these reasons, and in the alternative, there is a relevant antitrust sub-market for the processing of payments for the purchase of virtual gaming products within mobile Android games (the "Android Games Payment Processing Market").

92.     The geographic scope of the Android In-App Payment Processing Market is worldwide, excluding China. Outside China, in-app payment processing tools, such as Google Play Billing, are available on a worldwide basis. By contrast, in-app payment processing tools available in China are not available outside of China, including because Google prevents the use of non-

1   Google payment processing tools for all apps distributed through the Google Play Store, which as

2   noted above dominates distribution of apps outside of China.

3       93.    The geographic scope of the Android In-App Payment Processing Market includes a

4   separate market within the United States.  The U.S. Android In-App Payment Processing Market

5   operates as described throughout this Complaint.

6       94.    Google has monopoly power in the Android In-App Payment Processing Market and,

7   in the alternative, in the Android Games Payment Processing Market.

8
9   **B. Google's Anticompetitive Conduct in the Android In-App Payment Processing Market**

10       95.    For apps distributed through the Google Play Store, Google requires use of Google

11   Play Billing to process in-app purchases of digital content and for all purchases within Android

12   games. Because 90% or more of Android-compatible mobile app downloads through an app store

13   are conducted in the Google Play Store, Google has a monopoly in these Markets.

14       96.    Google charges a 30% commission for Google Play Billing. This rate reflects

15   Google's market power, which allows it to charge supra-competitive prices for payment processing

16   within the market. Indeed, the cost of alternative electronic payment processing tools, which are

17   prohibited by Google for apps purchased through the Google Play Store, can be one tenth of the

18   30% cost of Google Play Billing.

19       97.    Through provisions of Google's DDA imposed on all developers seeking access to

20   Android users, Google unlawfully ties its Google Play Store, through which it has a monopoly in

21   the Android App Distribution Market, to its own in-app payment processing tool, Google Play

22   Billing.  Section 3.2 of the DDA requires that Android app developers enter into a separate

23   agreement with Google's payment processor, Google Payment, to receive payment for and from

24   apps and in-app digital content.

98.     Further, § 4.1 of the DDA makes compliance with Google's Developer Program Policies mandatory and those Policies require in relevant part that (1) Developers offering products within a game downloaded on Google Play or providing access to game content must use Google Play In-app Billing as the method of payment and (2) Developers offering products within another category of app downloaded on Google Play must use Google Play In-app Billing as the method of payment, except when the payment is solely for physical products or is for digital content that may be consumed outside of the app itself *(e.g.,* songs that can be played on other music players).

99.     Google's unlawful restraints in the DDA prevent app developers from integrating alternative, even multiple, payment processing solutions into their mobile apps, depriving app developers and consumers alike a choice of competing payment processors.

100.     Google has no legitimate justifications for its tie. If it were concerned, for example, about the security of its users' payment information, then it would not permit alternative payment processing for certain transactions made on Android phones for physical products or digital content consumed outside an app. But Google does allow alternative payment processing tools in that context, with no diminution in security.

**C. Anticompetitive Effects In The Android In-App Payment Processing.**

101.     Google's conduct harms competition in the Android In-app Payment Processing Market (and, in the alternative, in the Android Games Payment Processing Market) and injures app developers, consumers, and competing in-app payment processors.

102.     Google's conduct harms would-be competitor in-app payment processors who would otherwise be free to innovate and offer Android consumers alternative payment processing tools with better functionality, lower prices, and tighter security.  Absent Google's Developer Program Policies, for example, app designers could offer consumers a choice of in-app payment processors

1   for each purchase made by the consumer, including payment processers at a lower cost and with

2   better customer service.

3        103.   Google also harms app developers and consumers by inserting itself as a mandatory

4   middleman in every in-app transaction. This prevents app developers from providing users

5   comprehensive customer service relating to in-app payments without Google's involvement.

6   Google has little incentive to compete through improved customer service because it faces no

7   competition. Google *does*, however, have an incentive to obtain information concerning developers'

8   transactions with their customers, which Google could use to give its ads and search businesses an

9   anticompetitive edge. This is true regardless of whether the developer and or the app's users would

10  prefer not to share their information with Google. In these ways and others, Google directly harms

11  app developers' relationships with the users of their apps.

12       104.   Finally, Google raises app developers' costs and consumer prices through its supra-

13  competitive 30% tax on in-app purchases, a price it could not maintain in a competitive payment

14  processing market. The resulting increase in prices for in-app content likely deters some consumers

15  from making purchases and deprives app developers of resources they could use to develop new

16  apps and content. The supra-competitive tax rate also reduces developers' incentive to invest in and

17  create additional apps and related in-app content.

18  **IV.   ANTITRUST INJURY**

19       105.   Plaintiff and class members have suffered antitrust injury as a direct result of

20  Google's unlawful conduct.

21       106.   By impairing competition in the Android App Distribution Market, Google's

22  unlawful conduct has enabled it to charge supra-competitive prices for Android Apps.

107.     By impairing competition in the Android In-App Payment Processing Market, Google's unlawful conduct has enabled it to charge supra-competitive prices for in-app digital content.

108.     Plaintiff and the Class are the direct purchasers of Android Apps and in-game digital content. When Plaintiff and the Class purchased Android apps, they did so directly on Google Play and paid Google directly, using their credit card or other payment sources. When Plaintiff and the Class purchased in-game digital content, they did so through Google Play, using the pre-established payment streams set up when purchasing that app or other apps on Google Play. When Plaintiff and the Class purchased the in-game digital content, they paid Google directly.

## V.     CLASS ALLEGATIONS

109.     Plaintiff brings this action for herself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons in the United States who paid for an app on Google Play, subscribed to an app obtained on Google Play, or paid for in-app digital content on an app obtained on Google Play within the relevant statute of limitations (the "Class Period").

110.     Specifically excluded from the Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant and any person acting on their behalf. Also excluded from the Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

111.     The Class is readily ascertainable and the records for the Class should exist, including, specifically, within Defendants' own records and transaction data.

112.     Due to the nature of the trade and commerce involved, there are tens of millions of geographically dispersed members in the Class, the exact number and their identities being known to Defendants.

113.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of the laws alleged herein.  The damages and injuries of each member of the Class were directly caused by Defendants' wrongful conduct.

114.     There are questions of law and fact common to the Class, and those questions predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, but are not limited to:

- whether Google has monopoly power in the Android App Distribution Market;

- whether Google has market power in the alternatively defined App Distribution Market;

- whether Google has monopoly power in the Android In-App Payment Processing Market;

- whether Google's contractual restrictions for Google Play further Google's attempt to monopolize the Android App Distribution Market;

- whether Google's restriction on side-loading apps is an attempt to, and does in fact further, Google's monopoly over the Android App Distribution Market;

- whether Google's tie of its Google Play and Google Billing products furthers Google's attempt to monopolize the Android In-App Payment Processing Market;

- whether Google's conduct with respect to the Android In-App Payment Processing Market has attempted to monopolize that market;

- whether Google's conduct results in supra-competitive prices for Android Apps and for in-game purchases of Android Apps;

- whether Google's conduct has harmed or at least not benefited consumers; and

- the appropriate Class-wide measures of damages.

115. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the Class members to seek redress for the violations of law alleged herein.

## CAUSES OF ACTION

### COUNT 1: Sherman Act § 2 Unlawful Monopoly Maintenance in the Android App Distribution Market
### (Against all Defendants except Google Payment)

116. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

117. Google's conduct violates §2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

118. The Android App Distribution Market is a valid antitrust market.

119. Google holds monopoly power in the Android App Distribution Market.

120.     Google has unlawfully maintained monopoly power in the Android App Distribution Market through the anticompetitive acts described herein, including, but not limited to: (1) conditioning licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on OEMs' agreement give the Google Play Store preferential placement and treatment; (2) imposing technical restrictions and obstacles on both OEMs and developers that prevent the distribution of Android apps through means other than the Google Play Store; and (3) conditioning app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.

121.     Google's conduct affects a substantial volume of interstate as well as foreign commerce.

122.     Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

123.     Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Additionally, Plaintiff was injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 2: Sherman Act § 1 Unreasonable Restraints of Trade Concerning The Android App Distribution Market: OEMs
(Against all Defendants except Google Payment)**

124. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

125. Defendants' conduct violates §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

126. Google entered into agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market. These include MADA with OEMs that condition their access to the Google Play Store and other "must have" Google services on the OEM offering the Google Play Store as the primary (and often the only) viable app store on Android mobile devices.

127. These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the Android App Distribution Market.

128. Google's conduct affects a substantial volume of interstate as well as foreign commerce.

129. Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

130. Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was

1    further injured because Google's establishment and maintenance of monopoly pricing has caused a

2    reduction in the output and supply of Android apps and in-app purchases, which would have been

3    more abundantly available in a competitive market. Plaintiff has suffered and will continue to suffer

4    damages and irreparable injury, and such damages and injury will not abate until an injunction

5    ending Google's anticompetitive conduct issues.

6    **COUNT 3: Sherman Act § 1 Unreasonable Restraints of Trade Concerning The Android**
7    **App Distribution Market: DDA**
8    **(Against all Defendants except Google Payment)**
9

10   131.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

11   forth in the rest of this Complaint as if fully set forth herein.

12   132.    Defendants' conduct violates §1 of the Sherman Act, which prohibits "[e]very

13   contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or

14   commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

15   133.    Google forces app developers to enter its standardized DDA, including Developer

16   Program Policies integrated into that Agreement, as a condition of their apps being distributed

17   through the Google Play Store. The relevant provisions of these agreements unreasonably restrain

18   competition in the Android App Distribution Market.

19   134.    Section 4.5 of the DDA provides that developers "may not use Google Play to

20   distribute or make available any Product that has a purpose that facilitates the distribution of

21   software applications and games for use on Android devices outside of Google Play." Section 4.1

22   of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under

23   the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from

24   distributing apps that "download executable code [*i.e.*, code that would execute an app] from a

25   source other than Google Play." The DDA further reserves to Google the right to remove and disable

26   any Android app that it determines violates either the DDA or its Developer Program Policies and

1    to terminate the app on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from

2    offering competing app stores through the Google Play Store, even though there is no legitimate

3    technological or other impediment to distributing a competing app store through the Google Play

4    Store.

5        135.    These agreements serve no legitimate or pro-competitive purpose that could justify

6    their anticompetitive effects, and thus unreasonably restrain competition in the Android App

7    Distribution Market.

8        136.    Google's conduct affects a substantial volume of interstate as well as foreign

9    commerce.

10       137.    Google's conduct has substantial anticompetitive effects, including increased prices

11   and costs, reduced innovation and quality of service, and lowered output.

12       138.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the

13   antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app

14   purchases than she would have paid in a competitive market. Plaintiff was also injured because

15   Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has

16   extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market

17   alternatives that would have been available had Google not monopolized the market. Plaintiff was

18   further injured because Google's establishment and maintenance of monopoly pricing has caused a

19   reduction in the output and supply of Android apps and in-app purchases, which would have been

20   more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer

21   damages and irreparable injury, and such damages and injury will not abate until an injunction

22   ending Google's anticompetitive conduct issues.

23
24

**COUNT 4: Sherman Act § 2 Unlawful Monopolization and Monopoly Maintenance in the
Android In-App Payment Processing Market
(Against all Defendants)**

139.   Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

140.   Google's conduct violates §2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

141.   The Android In-App Payment Processing Market is a valid antitrust market. In the alternative, the Android Games Payment Processing Market is a valid antitrust market.

142.   Google holds monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

143.   Google has unlawfully acquired monopoly power in these Markets, including through the anticompetitive acts described herein. However Google initially acquired its monopoly, it has unlawfully maintained its monopoly through the anticompetitive acts described herein.

144.   Google's conduct affects a substantial volume of interstate as well as foreign commerce.

145.   Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

146.   Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was

1　further injured because Google's establishment and maintenance of monopoly pricing has caused a

2　reduction in the output and supply of Android apps and in-app purchases, which would have been

3　more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer

4　damages and irreparable injury, and such damages and injury will not abate until an injunction

5　ending Google's anticompetitive conduct issues.

6　**COUNT 5: Sherman Act § 1 Unreasonable Restraints of Trade Concerning Android In-App**
7　**Payment Processing Market**
8　**(Against all Defendants)**
9

10　147.　Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

11　forth in the rest of this Complaint as if fully set forth herein.

12　148.　Defendants' conduct violates §1 of the Sherman Act, which prohibits "[e]very

13　contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or

14　commerce among the several States, or with foreign nations."

15　149.　Google, except Google Payment, forces app developers to enter its standardized

16　DDA, including Developer Program Policies integrated into that Agreement, as a condition of

17　having their apps distributed through Google's monopolized app store, Google Play Store. The

18　relevant provisions of these agreements unreasonably restrain competition in the Android In-App

19　Payment Processing Market.

20　150.　Section 3.2 of the DDA requires that Android app developers enter into a separate

21　agreement with Google's payment processor, Defendant Google Payment, in order to receive

22　payment for apps and content distributed through the Google Play Store. This includes payments

23　related to in-app purchases of digital content. Further, compliance with Google's Developer

24　Program Policies, which § 4.1 of the DDA makes obligatory, requires that apps distributed through

25　the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the

26　method of payment" for such in-app purchases. While Google's Policies exclude certain types of

1    transactions from this requirement, such as the purchase of "solely physical products" or of "digital

2    content that may be consumed outside of the app itself," Google expressly applies its anticompetitive

3    mandate to every "game downloaded on Google Play" and to all purchased "game content."

4        151.    The challenged provisions serve no sufficient legitimate or pro-competitive purpose

5    and unreasonably restrain competition in the Android In-App Payment Processing Market and, in

6    the alternative, the Android Games Payment Processing Market.

7        152.    Defendants' conduct affects a substantial volume of interstate as well as foreign

8    commerce.

9        153.    Defendants' conduct has substantial anticompetitive effects, including increased

10   prices and costs, reduced innovation and quality of service, and lowered output.

11       154.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the

12   antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app

13   purchases than she would have paid in a competitive market. Plaintiff was also injured because

14   Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has

15   extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market

16   alternatives that would have been available had Google not monopolized the market. Plaintiff was

17   further injured because Google's establishment and maintenance of monopoly pricing has caused a

18   reduction in the output and supply of Android apps and in-app purchases, which would have been

19   more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer

20   damages and irreparable injury, and such damages and injury will not abate until an injunction

21   ending Google's anticompetitive conduct issues.

22

23

## COUNT 6: Sherman Act § 1 Tying Google Play Store to Google Play Billing
### (Against all Defendants)

155.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

156.     Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

157.     Google has unlawfully tied the Google Play Store to its in-app payment processor, Google Play Billing, through its DDAs with app developers and its Developer Program Policies.

158.     Google wields significant economic power in the tying market, the Android App Distribution Market. With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive taxes on the sale of apps through the Google Play Store.

159.     Google only makes the Google Play Store available to those app developers who agree to exclusively process all app-related payments (including in-app purchases) through Google Billing. This tie is especially powerful and effective because Google simultaneously forecloses a developer's ability to use alternative app distribution channels, as described above. Taken together, Google's conduct effectively forces developers to use Google Billing.

160.     The tying product, Android app distribution, is distinct from the tied product, Android in-app payment processing, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of distribution. Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

161.     Google's conduct forecloses competition in the Android In-App Payment Processing Market, and, in the alternative, in the Android Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

162.     Google has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anticompetitive effects of Google's conduct or its purported justifications.

163.     In the alternative only, even if Google's conduct does not constitute a *per se* illegal tie, a detailed analysis of Google's tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal.

164.     Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 7: California Cartwright Act Unreasonable Restraints of Trade in Android App Distribution Market**
**(Against all Defendants except Google Payment)**

165.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

166.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition.  *See id.* §§ 16720, 16726.

167.    Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

168.    The Android App Distribution Market is a valid antitrust market.

169.    Google has executed agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market. Namely, Google entered into MADAs with OEMs that require OEMs to offer the Google Play Store as the primary—and practically the only—app store on Android mobile devices. These agreements further prevent OEMs from offering alternative app stores on Android mobile devices in any prominent visual positioning.

170.    Google's conduct and practices have substantial anticompetitive effects, including increased prices and costs, reduced innovation, poorer customer service and lowered output.

171.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

172.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was

1    also injured because Google's establishment and maintenance of monopoly pricing has caused a

2    reduction in the output and supply of Android apps and in-app purchases, which would have been

3    more abundantly available in a competitive market. Plaintiff has suffered and continue to suffer

4    damages and irreparable injury, and such damages and injury will not abate until an injunction

5    ending Google's anticompetitive conduct issues.

6    **COUNT 8: California Cartwright Act Unreasonable Restraints of Trade in Android App**
7    **Distribution Market**
8    **(Against all Defendants except Google Payment)**
9

10   173.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

11   forth in the rest of this Complaint as if fully set forth herein.

12   174.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. &

13   Prof. Code § 16700 *et seq*., which prohibits, *inter alia*, the combination of resources by two or more

14   persons to restrain trade or commerce or to prevent market competition. *See id.* §§ 16720, 16726.

15   175.    Under the Cartwright Act, a "combination" is formed when the anti- competitive

16   conduct of a single firm coerces other market participants to involuntarily adhere to the

17   anticompetitive scheme.

18   176.    The Android App Distribution Market is a valid antitrust market.

19   177.    Google conditions distribution through the Google Play Store on entering into the

20   standardized DDA described above, including the Developer Program Policies integrated therein.

21   Through certain provisions in these agreements, Google forces app developers to submit to

22   conditions that unreasonably restrain competition in the Android App Distribution Market.

23   178.    Section 4.5 of the DDA provides that developers "may not use Google Play to

24   distribute or make available any Product that has a purpose that facilitates the distribution of

25   software applications and games for use on Android devices outside of Google Play." Section 4.1

26   of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under

the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

179.    These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android App Distribution Market.

180.    Google's conduct and practices have substantial anticompetitive effects, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

181.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anticompetitive scheme took place in California.

182.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been

1     more abundantly available in a competitive market. Plaintiff has suffered and continue to suffer

2     damages and irreparable injury, and such damages and injury will not abate until an injunction

3     ending Google's anticompetitive conduct issues.

4
5     **COUNT 9: California Cartwright Act Unreasonable Restraints of Trade in Android In-App Payment Processing Market**
6     **(Against all Defendants)**
7

8     183.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

9     forth in the rest of this Complaint as if fully set forth herein.

10     184.     Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. &

11     Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more

12     persons to restrain trade or commerce or to prevent market competition. *See id.* §§ 16720, 16726.

13     185.     Under the Cartwright Act, a "combination" is formed when the anticompetitive

14     conduct of a single firm coerces other market participants to involuntarily adhere to the

15     anticompetitive scheme.

16     186.     The Android App Distribution Market and Android In-App Payment Processing

17     Market, and, in the alternative, the Android Games Payment Processing Market, are valid antitrust

18     markets.

19     187.     Google has monopoly power in the Android In-App Payment Processing Market and,

20     in the alternative, in the Android Games Payment Processing Market.

21     188.     Google conditions distribution through the Google Play Store on entering into the

22     standardized DDA described above, including the Developer Program Policies integrated therein.

23     Through certain provisions in these agreements, Google forces app developers to submit to

24     conditions that unreasonably restrain competition in the Android In-App Payment Processing

25     Market.

189.     Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, to receive payment for apps and content distributed through the Google Play Store. This includes payments related to in-app purchases. Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for in-app purchases. While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself," Google expressly and discriminatorily applies its anticompetitive mandate to every "game downloaded on Google Play" and to all purchased "game content."

190.     These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android In-App Payment Processing Market, and, in the alternative, in the Android Games Payment Processing Market.

191.     Google's conduct and practices have substantial anticompetitive effects, including increased prices and costs, reduced innovation, poorer customer service and lowered output.

192.     It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

193.     Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market

1    alternatives that would have been available had Google not monopolized the market. Plaintiff has

2    also been injured because Google's establishment and maintenance of monopoly pricing has caused

3    a reduction in the output and supply of Android apps and in-app purchases, which would have been

4    more abundantly available in a competitive market.  Plaintiff has suffered and continue to suffer

5    damages and irreparable injury, and such damages and injury will not abate until an injunction

6    ending Google's anticompetitive conduct issues.

7    **COUNT 10: California Cartwright Act Tying Google Play Store to Google Play Billing**
8    **(Against all Defendants)**

9    194.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

10   forth in the rest of this Complaint as if fully set forth herein.

11   195.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. &

12   Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more

13   persons to restrain trade or commerce, or to prevent market competition. *See id.* §§ 16720, 16726.

14   196.    Under the Cartwright Act, a "combination" is formed when the anticompetitive

15   conduct of a single firm coerces other market participants to involuntarily adhere to the

16   anticompetitive scheme.

17   197.    The Cartwright Act also makes it "unlawful for any person to lease or make a sale or

18   contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the

19   State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the

20   condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in

21   the goods, merchandise, machinery, supplies, commodities, or services of a competitor or

22   competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such

23   condition, agreement or understanding may be to substantially lessen competition or tend to create

24   a monopoly in any line of trade or commerce in any section of the State." *Id.* § 16727.

198.    As detailed above, Google has unlawfully tied its in-app payment processor, Google Play Billing, to the Google Play Store through its DDAs with app developers and its Developer Program Policies.

199.    Google has sufficient economic power in the tying market, the Android App Distribution Market, to affect competition in the tied market, the Android In-App Payment Distribution Market. With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive taxes on the sale of apps through the Google Play Store.

200.    The availability of the Google Play Store for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing services. Google's foreclosure of alternative app distribution channels forces developers to use Google's in-app payment processing services, which Google has expressly made a condition of reaching Android users through its dominant Google Play Store.

201.    The tying product, Android app distribution, is separate and distinct from the tied product, Android in-app payment processing, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of how an Android app is distributed. Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

202.    Google's conduct forecloses competition in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

203.    Google has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anticompetitive effects of Google's conduct or its purported justifications.

204.    Even if Google's conduct does not form a *per se* illegal tie, an assessment of the tying arrangement would demonstrate that it is unreasonable under the Cartwright Act, and therefore, illegal.

205.    Google's acts and practices detailed above unreasonably restrained competition in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

206.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anticompetitive scheme took place in California.

207.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 11: Arizona Uniform State Antitrust Act (Against all Defendants)**

208.   Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

209.   Google's acts and practices detailed above violate the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 44-1402, and monopolization or attempted monopolization of trade or commerce for the purpose of excluding competition or controlling, fixing or maintaining prices, *id.* § 44-1403.

210.   Google's conduct and practices have substantial anticompetitive effects in Arizona, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

211.   Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Arizona Uniform State Antitrust Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 12: District of Columbia Antitrust Act (Against all Defendants)**

212.   Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

213.   Google's acts and practices detailed above violate the District of Columbia Antitrust Act, D.C. Code § 28-4501, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 28-4502, and monopolization or attempted monopolization over any part of trade or commerce for the purpose of excluding competition or controlling, fixing or maintaining prices, *id.* § 28-4503.

214.   Google's conduct and practices have substantial anticompetitive effects in the District of Columbia, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

215.   Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the District of Columbia Antitrust Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

1

**COUNT 13: Hawaii Antitrust Laws (Against all Defendants)**

2      216.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

3    forth in the rest of this Complaint as if fully set forth herein.

4      217.    Google's acts and practices detailed above violate Hawaii's antitrust laws, Haw. Rev.

5    Stat. § 480-1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.*

6    § 480-4, and monopolization or attempted monopolization of any part of trade or commerce, *id.* §

7    480-9.

8      218.    Google's conduct and practices have substantial anticompetitive effects in Hawaii,

9    including increased prices and costs, reduced innovation, poorer customer service, and lowered

10   output.

11     219.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that

12   Hawaii's antitrust laws were intended to prevent. For example, she paid more for Android apps

13   and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been

14   injured because Google's unlawful monopolization of the Android apps and in-app purchases

15   aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower

16   cost market alternatives that would have been available had Google not monopolized the market.

17   Plaintiff has also been injured because Google's establishment and maintenance of monopoly

18   pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which

19   would have been more abundantly available in a competitive market.  Plaintiff has suffered and

20   continues to suffer damages and irreparable injury, and such damages and injury will not abate until

21   an injunction ending Google's anticompetitive conduct issues.

22

**COUNT 14: Iowa Competition Law (Against all Defendants)**

23     220.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

24   forth in the rest of this Complaint as if fully set forth herein.

221.     Google's acts and practices detailed above violate the Iowa Competition Law, Iowa Code § 553.1, *et seq.*, which prohibits, *inter alia*, combinations to restrain or monopolize trade or commerce, *id.* § 553.4, and the monopolization or attempted monopolization of a market for the purpose of excluding competition or of controlling, fixing, or maintaining prices, *id.* § 553.5.

222.     Google's conduct and practices have substantial anticompetitive effects in Iowa, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

223.     Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Iowa Competition Law was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### COUNT 15: Kansas Restraint of Trade Act (Against all Defendants)

224.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

225.     Google's acts and practices detailed above violate the Kansas Restraint of Trade Act, Kan. Stat. § 50-101, *et seq.*, which prohibits, *inter alia*, combinations to create or carry out

1    restrictions in trade or commerce, increase the price of merchandise, or prevent competition in the

2    sale of merchandise, *id.*

3        226.    Google's conduct and practices have substantial anticompetitive effects in Kansas,

4    including increased prices and costs, reduced innovation, poorer customer service, and lowered

5    output.

6        227.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that

7    the Kansas Restraint of Trade Act was intended to prevent. For example, she paid more for Android

8    apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also

9    been injured because Google's unlawful monopolization of the Android apps and in-app purchases

10   aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower

11   cost market alternatives that would have been available had Google not monopolized the market.

12   Plaintiff has also been injured because Google's establishment and maintenance of monopoly

13   pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which

14   would have been more abundantly available in a competitive market.  Plaintiff has suffered and

15   continues to suffer damages and irreparable injury, and such damages and injury will not abate until

16   an injunction ending Google's anticompetitive conduct issues.

17       **COUNT 16: Maine Monopoly & Profiteering Laws (Against all Defendants)**

18       228.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

19   forth in the rest of this Complaint as if fully set forth herein.

20       229.    Google's acts and practices detailed above violate Maine's monopoly and

21   profiteering laws, Me. Rev. Stat. tit. 10, § 1101, *et seq.*, which prohibit, *inter alia*, combinations in

22   restraint of trade or commerce, *id.*, and the monopolization or attempted monopolization of any part

23   of trade or commerce, *id.* § 1102.

230. Google's conduct and practices have substantial anticompetitive effects in Maine, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

231. Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that Maine's monopoly and profiteering laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 17: Maryland Antitrust Laws (Against all Defendants)**

232. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

233. Google's acts and practices detailed above violate Maryland's antitrust laws, Md. Code, Com. Law § 11-201, *et seq.*, which prohibit, *inter alia*, combinations that unreasonably restrain trade or commerce, *id.* § 11-204, and the monopolization or attempted monopolization of any part of the trade or commerce for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce, *id.*

234.     Google's conduct and practices have substantial anticompetitive effects in Maryland, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

235.     Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Maryland antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### COUNT 18: Massachusetts consumer protection laws (Against all Defendants)

236.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

237.     Google's acts and practices detailed above violate Massachusetts' consumer protection laws, Mass. Gen. Laws ch. 93A, § 1, *et seq.*, which prohibit, *inter alia*, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, *id.* § 2.

238.     Google's conduct and practices have substantial anticompetitive effects in Massachusetts, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

239.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Massachusetts consumer protection laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 19: Michigan Antitrust Reform Act (Against all Defendants)**

240.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

241.    Google's acts and practices detailed above violate the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 445.772, and the establishment or attempted establishment of a monopoly of trade or commerce for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, *id.* § 445.773.

242.    Google's conduct and practices have substantial anticompetitive effects in Michigan, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

243.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that Michigan Antitrust Reform Act was intended to prevent. For example, she paid more for Android

1    apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also

2    been injured because Google's unlawful monopolization of the Android apps and in-app purchases

3    aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower

4    cost market alternatives that would have been available had Google not monopolized the market.

5    Plaintiff has also been injured because Google's establishment and maintenance of monopoly

6    pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which

7    would have been more abundantly available in a competitive market.  Plaintiff has suffered and

8    continues to suffer damages and irreparable injury, and such damages and injury will not abate until

9    an injunction ending Google's anticompetitive conduct issues.

10    **COUNT 20: Minnesota Antitrust Law of 1971 (Against all Defendants)**

11    244.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

12    forth in the rest of this Complaint as if fully set forth herein.

13    245.    Google's acts and practices detailed above violate the Minnesota Antitrust Law of

14    1971, Minn. Stat. § 325D.49, *et seq.*, which prohibits, *inter alia*, combinations in unreasonable

15    restraint of trade or commerce, *id.* § 325D.51, and the establishment or attempted establishment of

16    a monopoly over any part of trade or commerce for the purpose of affecting competition or

17    controlling, fixing, or maintaining prices, *id.* § 325D.52.

18    246.    Google's conduct and practices have substantial anticompetitive effects in

19    Minnesota, including increased prices and costs, reduced innovation, poorer customer service, and

20    lowered output.

21    247.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that

22    Minnesota Antitrust Law of 1971 was intended to prevent. For example, she paid more for Android

23    apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also

24    been injured because Google's unlawful monopolization of the Android apps and in-app purchases

aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### COUNT 21: Mississippi Antitrust Laws (Against all Defendants)

248.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

249.     Google's acts and practices detailed above violate Mississippi's antitrust laws, Miss. Code. § 75-21-1, *et seq.*, which prohibit, *inter alia*, combinations inimical to the public welfare that restrain trade, increase the price of a commodity, or reduce the production of a commodity, *id.*

250.     Google's conduct and practices have substantial anticompetitive effects in Mississippi, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

251.     Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that Mississippi's antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which

would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### COUNT 22: Nebraska Junkin Act (Against all Defendants)

252. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

253. Google's acts and practices detailed above violate the Junkin Act, Neb. Rev. Stat. § 59-802, *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce, *id.* § 59-802, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 16726.

254. Google's conduct and practices have substantial anticompetitive effects in Nebraska, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

255. Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that Nebraska's Junkin Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 23: Nevada Unfair Trade Practices Act (Against all Defendants)**

256.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

257.     Google's acts and practices detailed above violate the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, et seq., which prohibits, *inter alia*, the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 598A.060, and tying arrangements, consisting of contracts in which the seller or lessor conditions the sale or lease of commodities or services on the purchase or leasing of another commodity or service, *id.*

258.     Google's conduct and practices have substantial anticompetitive effects in Nevada, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

259.     Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that Nevada's Unfair Trade Practices Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 24: New Hampshire Consumer Protection Act (Against all Defendants)**

260.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

261.    Google's acts and practices detailed above violate the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*, which prohibits, *inter alia*, the pricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition, *id.* § 358-A:2.

262.    Google's conduct and practices have substantial anticompetitive effects in New Hampshire, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

263.    Plaintiff has been harmed by Defendants' anti-competitive conduct in a manner that the New Hampshire Consumer Protection Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

**COUNT 25: New Mexico Antitrust Act (Against all Defendants)**

264.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

265. Google's acts and practices detailed above violate the New Mexico Antitrust Act, N.M. Stat. § 57-1-1, *et seq.*, which prohibits, *inter alia*, the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 57-1-2, and combinations in restraint of trade or commerce, *id.* § 57-1-1.

266. Google's conduct and practices have substantial anticompetitive effects in New Mexico, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

267. Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the New Mexico Antitrust Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### COUNT 26: New York Donnelly Act (Against all Defendants)

268. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

269. Google's acts and practices detailed above violate New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq*., which prohibits, *inter alia*, monopoly in the conduct of any business, trade or commerce or in the furnishing of any service, *id.* § 340.

270.     Google's conduct and practices have substantial anticompetitive effects in New York, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

271.     Plaintiff has been harmed by Defendants' anti-competitive conduct in a manner that New York's Donnelly Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### **COUNT 27: North Carolina Antitrust Laws (Against all Defendants)**

272.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

273.     Google's acts and practices detailed above violate North Carolina's antitrust laws, N.C. Gen. Stat. § 75-1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 75-1, and the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 75-2.1

274. Google's conduct and practices have substantial anticompetitive effects in North Carolina, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

275. Plaintiffs have been harmed by Defendants' anti-competitive conduct in a manner that the North Carolina antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiffs have also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiffs' freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiffs have also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiffs have suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 28: North Dakota Uniform State Antitrust Act (Against all Defendants)

276. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

277. Google's acts and practices detailed above violate the North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-01, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 51-08.1-02, and the establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, *id.* § 51-08.1-03.

278.    Google's conduct and practices have substantial anticompetitive effects in North Dakota, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

279.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the North Dakota Uniform State Antitrust Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### COUNT 29: Oregon Antitrust Law (Against all Defendants)

280.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

281.    Google's acts and practices detailed above violate the Oregon Antitrust Law, Or. Rev. Stat. § 646.705, *et seq.*, which prohibits, *inter alia*, combinations in restraint of trade or commerce, *id.* § 646.725, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 646.730.

282.    Google's conduct and practices have substantial anticompetitive effects in Oregon, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

283. Plaintiff has been harmed by Defendants' anti-competitive conduct in a manner that the Oregon Antitrust Law was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 30: South Dakota Antitrust Laws (Against all Defendants)

284. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

285. Google's acts and practices detailed above violate South Dakota's antitrust laws, .S.D. Codified Laws § 37-1-3.1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.*, and monopolization or attempted monopolization of trade or commerce, *id.* § 37-1-3.2.

286. Google's conduct and practices have substantial anticompetitive effects in South Dakota, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

287. Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that South Dakota's antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also

1   been injured because Google's unlawful monopolization of the Android apps and in-app purchases

2   aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower

3   cost market alternatives that would have been available had Google not monopolized the market.

4   Plaintiff has also been injured because Google's establishment and maintenance of monopoly

5   pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which

6   would have been more abundantly available in a competitive market.  Plaintiff has suffered and

7   continues to suffer damages and irreparable injury, and such damages and injury will not abate until

8   an injunction ending Google's anticompetitive conduct issues.

9   **COUNT 31: Tennessee Trade Practices Act (Against all Defendants)**

10   288.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

11   forth in the rest of this Complaint as if fully set forth herein.

12   289.    Google's acts and practices detailed above violate the Tennessee Trade Practices Act,

13   Tenn. Code § 47-25-101, *et seq.*, which prohibits, *inter alia*, combinations designed, or which tend,

14   to advance, reduce, or control the price or the cost to the producer or the consumer of any such

15   product or article, *id.*

16   290.    Google's conduct and practices have substantial anticompetitive effect in Tennessee,

17   including increased prices and costs, reduced innovation, poorer customer service, and lowered

18   output.

19   291.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that

20   the Tennessee Trade Practices Act was intended to prevent. For example, she paid more for Android

21   apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also

22   been injured because Google's unlawful monopolization of the Android apps and in-app purchases

23   aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower

24   cost market alternatives that would have been available had Google not monopolized the market.

1   Plaintiff has also been injured because Google's establishment and maintenance of monopoly

2   pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which

3   would have been more abundantly available in a competitive market. Plaintiff has suffered and

4   continues to suffer damages and irreparable injury, and such damages and injury will not abate until

5   an injunction ending Google's anticompetitive conduct issues.

6   **<u>COUNT 32: Utah Antitrust Act (Against all Defendants)</u>**

7   292.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

8   forth in the rest of this Complaint as if fully set forth herein.

9   293.    Google's acts and practices detailed above violate the Utah Antitrust Act, Utah Code

10  § 76-10-3101, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.*

11  § 76-10-3104, and monopolization or attempted monopolization of any part of trade or commerce,

12  *id.*

13  294.    Google's conduct and practices have substantial anticompetitive effect in Utah,

14  including increased prices and costs, reduced innovation, poorer customer service, and lowered

15  output.

16  295.    Plaintiff has been harmed by Defendants' anti-competitive conduct in a manner that

17  the Utah Antitrust Act was intended to prevent. For example, she paid more for Android apps and/or

18  in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured

19  because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket

20  has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market

21  alternatives that would have been available had Google not monopolized the market. Plaintiff has

22  also been injured because Google's establishment and maintenance of monopoly pricing has caused

23  a reduction in the output and supply of Android apps and in-app purchases, which would have been

24  more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer

1  damages and irreparable injury, and such damages and injury will not abate until an injunction

2  ending Google's anti-competitive conduct issues.

3  **COUNT 33: Vermont Consumer Protection Laws (Against all Defendants)**

4  296.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

5  forth in the rest of this Complaint as if fully set forth herein.

6  297.    Google's acts and practices detailed above violate Vermont's consumer protection

7  laws, Vt. Stat. tit. 9, § 2451, *et seq.*, which prohibit, *inter alia*, all unfair methods of competition in

8  commerce, *id.* § 2453.

9  298.    Google's conduct and practices have substantial anticompetitive effects in Vermont,

10  including increased prices and costs, reduced innovation, poorer customer service, and lowered

11  output.

12  299.    Plaintiff has been harmed by Defendants' anti-competitive conduct in a manner that

13  the Vermont consumer protection laws were intended to prevent. For example, she paid more for

14  Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff

15  has also been injured because Google's unlawful monopolization of the Android apps and in-app

16  purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store

17  and lower cost market alternatives that would have been available had Google not monopolized the

18  market. Plaintiff has also been injured because Google's establishment and maintenance of

19  monopoly pricing has caused a reduction in the output and supply of Android apps and in-app

20  purchases, which would have been more abundantly available in a competitive market. Plaintiff has

21  suffered and continues to suffer damages and irreparable injury, and such damages and injury will

22  not abate until an injunction ending Google's anti-competitive conduct issues.

23

**COUNT 34: Wisconsin Trade Regulations (Against all Defendants)**

1

2      300.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

3   forth in the rest of this Complaint as if fully set forth herein.

4      301.    Google's acts and practices detailed above violate Wisconsin's trade regulations,

5   Wis. Stat. Ann. § 133.01, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or

6   commerce, *id.* § 133.03, and monopolization or attempted monopolization of any part of trade or

7   commerce, *id.*

8      302.    Google's conduct and practices have substantial effects in Wisconsin, including

9   increased prices and costs, reduced innovation, poorer customer service, and lowered output.

10      303.    Plaintiffs have been harmed by Defendants' anti-competitive conduct in a manner

11   that Wisconsin's trade regulations were intended to prevent. For example, she paid more for Android

12   apps and/or in-app purchases than she would have paid in a competitive market. Plaintiffs have also

13   been injured because Google's unlawful monopolization of the Android apps and in-app purchases

14   aftermarket has extinguished Plaintiffs' freedom to choose between the Google Play Store and lower

15   cost market alternatives that would have been available had Google not monopolized the market.

16   Plaintiffs have also been injured because Google's establishment and maintenance of monopoly

17   pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which

18   would have been more abundantly available in a competitive market.  Plaintiffs have suffered and

19   continues to suffer damages and irreparable injury, and such damages and injury will not abate until

20   an injunction ending Google's anti-competitive conduct issues.

21

22

23

24

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendants:

A.      Permanently enjoining Defendants from monopolizing or attempting to monopolize the Android applications aftermarket;

B.      Awarding Plaintiffs and the Class treble damages for injuries caused by Defendants' violations of the federal antitrust laws, California's Cartwright Act, the Arizona Uniform State Antitrust Act, the District of Columbia Antitrust Act, the Hawaii antitrust laws, the Iowa Competition Law, the Kansas Restraint of Trade Act, Maine's monopoly and profiteering laws, Maryland's antitrust laws, Massachusetts' consumer protection laws, the Michigan Antitrust Reform Act, the Minnesota Antitrust Law of 1971, the Mississippi antitrust laws, Nebraska's Junkin Act, the Nevada Unfair Trade Practices Act, the New Hampshire Consumer Protection Act, the New Mexico Antitrust Act, New York's Donnelly Act, North Carolina's antitrust laws, the North Dakota Uniform State Antitrust Act, the Oregon Antitrust Law, South Dakota's antitrust laws, the Tennessee Trade Practices Act, the Utah Antitrust Act, Vermont's consumer protection laws, and Wisconsin's trade regulations;

C.      Awarding Plaintiff and the Class reasonable attorneys' fees and costs; and

D.      Granting such other and further relief as the Court may deem just and proper.

# Jury Trial Demand

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demand a jury trial of all issues so triable.

Dated: August 16, 2020                              s/ Michael E. Klenov

George A. Zelcs *(pro hac vice forthcoming)*
Robert E. Litan *(pro hac vice forthcoming)*
Randall P. Ewing *(pro hac vice forthcoming)*
Jonathon D. Byrer *(pro hac vice forthcoming)*
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery *(pro hac vice forthcoming)*
Jamie L. Boyer *(pro hac vice forthcoming)*
Michael E. Klenov, CA Bar #277028
Carol L. O'Keefe *(pro hac vice forthcoming)*
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Karma M. Giulianelli, CA Bar #184175
Glen E. Summers
BARTLIT BECK LLP
1801 Wewetta St. Suite 1200,
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

Ann Ravel
MCMANIS FAULKNER
Fairmont Plaza, 10th Floor, 50 West San
Fernando Street
San Jose, CA 95113
Telephone: (408) 279-8700
Facsimile: (408) 279-3244

# EXHIBIT D

1  Bonny E. Sweeney (SBN 176174)
   Samantha J. Stein (SBN 302034)
2  HAUSFELD LLP
   600 Montgomery Street, Suite 3200
3  San Francisco, CA 94104
   Telephone: (415) 633-1908
4  Facsimile: (415) 358-4980
   bsweeney@hausfeld.com
5  sstein@hausfeld.com

6  *Counsel for Plaintiff Peekya Services, Inc.*
7  *and the Proposed Class*

8  [Additional Counsel Listed on Signature Page]

9

10               UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12

13  **PEEKYA SERVICES, INC.,** *on behalf of itself*        Case No.
14  *and the proposed class*,

15                              Plaintiff,                  **ANTITRUST CLASS ACTION
                                                            COMPLAINT PURSUANT TO THE
16        v.                                                SHERMAN AND CLAYTON ACTS
                                                            (15 U.S.C. §§ 1, 2, 3, 15, 26),
17  **GOOGLE LLC, GOOGLE IRELAND                            CARTWRIGHT ACT (CAL. BUS. &
    LIMITED; GOOGLE COMMERCE                                PROF. CODE §§ 16700 ET SEQ.) AND
18  LIMITED; AND GOOGLE ASIA PACIFIC                        UNFAIR COMPETITION LAW (CAL.
    PTE. LIMITED,**                                         BUS. & PROF. CODE §§ 17200 ET
19                                                          SEQ.)**

20                              Defendants.                 **DEMAND FOR JURY TRIAL**

21

22

23

24

25

26

27

28

                                                    ANTITRUST CLASS ACTION COMPLAINT

1.     Plaintiff Peekya Services, Inc. ("Peekya" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this Class Action Complaint for damages and injunctive relief against Defendants Google LLC, Google Ireland Limited, Google Commerce Limited, and Google Asia Pacific PTE. Ltd. (collectively, "Google") for violations of Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§1, 2 and 3), California's Cartwright Act, (Cal. Bus. & Prof. Code §§ 16700 et seq). and California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 et seq). All allegations other than those concerning the Plaintiff are based on information and belief.

## I.     INTRODUCTION

2.     Just 12 years after its launch, the Google Play Store — Google's applications store for mobile phones and tablets using the Android operating system — is now home to 2.96 million apps, making it the biggest app store in the world.  While Google developed some of those apps itself, the vast majority were created by independent app developers.

3.     Although Google touts its role in creating a marketplace for software developers, those developers in fact have no choice.  Google has a monopoly in the market for Android app stores, which it has unlawfully maintained through anticompetitive conduct.  As a result of its monopoly power and the anticompetitive restraints it has imposed on device manufacturers, app developers and consumers, Google has been able to extract from developers a supracompetitive 30% tax on paid apps downloaded from the Play Store as well as in-app purchases for products and services.

4.     Google's anticompetitive conduct has harmed competition in the market for Android app stores.  It has reduced competition by deterring entry by would-be competitors, stifled innovation by controlling the manner in which Android apps are distributed, increased prices to app developers and consumers who bear the 30% tax, and reduced output by reducing app developers' capital and incentives for creating new apps.

5.     Google's conduct has also injured Plaintiff and members of the Class, who have paid a supracompetitive 30% tax on every paid download of their apps from the Play Store and in-app purchases.

6. In this action, Plaintiff seeks to recover the damages caused by Google's unlawful anticompetitive conduct and an order enjoining its unlawful practices.

## II. JURISDICTION AND VENUE

7. Plaintiff brings this action on its own behalf as well as that of the Class to recover damages, including treble damages, restitution, costs of suit, and reasonable attorney's fees arising from Defendants' violations of Sections 1, 2 and 3 of the Sherman Act (15 U.S.C. §§ 1, 2, 3), California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 et seq.), and California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 et seq.), as well as any and all equitable relief afforded them under federal and California law.

8. Jurisdiction and venue are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in or emanated from this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and Google's principal place of business is in this District. The anticompetitive conduct alleged in this complaint has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States and its territories, including in this District.

## III. INTRA-DISTRICT ASSIGNMENT

9. Pursuant to N.D. Cal. Civil Local Rule 3.2 and General Order 44, this antitrust class action shall be assigned on a district-wide basis and is not subject to reassignment on the basis of intra-district venue.

## IV. PARTIES

10. Plaintiff Peekya App Services, Inc. ("Peekya" or "Plaintiff") is a Florida corporation with its principal place of business in Sarasota, Florida. Plaintiff is a party to and has complied with the Google-developer contracts that are described in this Complaint. Plaintiff developed and maintains an app called "*Peekya*" that has been and currently is distributed through the Play Store. Within the four years preceding the filing of this Complaint, users of Android

1 mobile device users have purchased and downloaded *Peekya*. For each such download, Google

2 has taken a 30% commission from the payment remitted to Plaintiff.

3       11.     Google LLC is a Delaware limited liability company with its principal place of

4 business in Mountain View, California. It is the primary operating subsidiary of the holding

5 company Alphabet, Inc. Google LLC is a technology company that provides internet-related

6 services and products, including online advertising technologies and a search engine. Google LLC

7 contracts with all app developers that distribute their apps through the Play Store.

8       12.     Defendant Google Ireland Limited ("Google Ireland") is an Irish limited company

9 with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC. Google

10 Ireland contracts with all app developers that distribute their apps through the Play Store and is

11 therefore a party to the anticompetitive contractual restrictions at issue in this Complaint.

12       13.     Defendant Google Commerce Limited ("Google Commerce") is an Irish limited

13 company with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC.

14 Google Commerce contracts with all app developers that distribute their apps through the Play

15 Store and is therefore a party to the anticompetitive contractual restrictions at issue in this

16 Complaint.

17       14.     Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific") is a Singapore

18 private limited company organized with its principal place of business in Mapletree Business City,

19 Singapore, and is a subsidiary of Google LLC. Google Asia Pacific contracts with all app

20 developers that distribute their apps through the Play Store and is therefore a party to the

21 anticompetitive contractual restrictions at issue in this Complaint.

22     Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its

23 principal place of business in Mountain View, California, and is a subsidiary of Google LLC.

24 Google Payment provides in-app payment processing services to Android app developers and

25 Android users and collects a 30% commission on many types of processed payments, including

26 payments for apps sold through the Play Store and in-app purchases made within such apps.

27

28

ANTITRUST CLASS ACTION COMPLAINT

## V.     RELEVANT FACTS

### A.     The Market for Licensable Smart Mobile Operating Systems

15.     Smart mobile devices are handheld, portable electronic devices that enable the user to connect wirelessly to the Internet and perform many of the functions traditionally associated with desktop and laptop computers.  They include smart phones and tablets.  Consumers use smart mobile devices to browse the Internet, shop, access social media, stream music and videos, read books, and play games.

16.     Like desktop and laptop computers, smart mobile devices require an operating system, or OS.  OSs are software products that control the basic functions of a computer.  Without an OS, the user cannot operate the computer or run software on it.  OSs designed for smart mobile devices are "smart mobile OSs."

17.     In addition to the features typically found in a desktop or laptop computer OS, smart mobile OSs include features such as a touchscreen, cellular, Bluetooth, and WiFi capabilities, GPS mobile navigation, cameras, video cameras, speech recognition capability, voice recorders, music players, personal digital assistants and other features.

### 1.     Licensable Smart Mobile OSs Constitute a Relevant Product Market

18.     Licensable smart mobile OSs constitute a distinct product market.  Although desktop and laptop computers, early mobile phones (like flip phones) and game consoles also use OSs, those OSs are not compatible with smart mobile devices and are not included in the relevant market.  From the demand side, makers of smart mobile devices — original equipment manufacturers or "device manufacturers" — cannot use the OSs found in computers, older flip phones or game consoles to power their smart mobile devices.  From the supply side, any OS developer that switched from a computer, flip phone or game console-compatible OS to a smart mobile OS would have to invest substantial time and money in re-designing the OS to account for the specific functionalities of smart mobile devices.

19.     Following a years-long investigation, the European Commission ("EC" or

4

"Commission") concluded in a July 18, 2018 decision that Google abused its dominant power in the Android app store market by tying Google Search to the Play Store, and by tying Google Chrome to the Play Store and Google Search. The Commission ordered Google to pay a $5.1 billion fine and to change its practices. Google is currently appealing the decision but asserts that it has complied with the Commission's conduct remedies by changing its contracts with manufacturers that ship phones and tablets into the European Economic Area.

20.     In the European Commission's Google Android case, Google did not contest the Commission's conclusion that smart mobile OSs constitute a distinct product market.

21.     Smart phone OSs and tablet OSs make up the smart mobile OS product market. From the demand side, the same OS, or similar versions of it, power both smart phones and tablets. From the supply side, all of the principal OS developers use the same OS to power both smartphones and tablets. Apple, for example, which makes both the OS and the hardware for its smartphones and tablets, has confirmed that it uses a single OS for its iPhone and iPad. In the EC Google Android case, Google did not contest the Commission's conclusion that smart phone and tablet OSs belong in the same product market.

22.     Manufacturers of smart mobile devices ("device manufacturers") pre-install smart mobile OSs on devices before selling them to retailers and end users. Most device manufacturers do not develop their own OSs but instead license Google's Android OS. The most widely-used mobile non-Android OS outside of China is Apple's iOS. But because Apple does not license its operating system to device manufacturers, instead manufacturing its own smart phones and tablets, Apple's iOS is not an option for device manufacturers.

23.     Non-licensable smart mobile OSs such as Apple's iOS do not belong to the same product market as licensable smart mobile OSs. From the demand side, device manufacturers cannot obtain a license to pre-install iOS because Apple does not license iOS to competing device manufacturers. As even Google has conceded, device manufacturers cannot switch to non-licensable OSs such as iOS.

24.     From the supply side, even assuming Apple decided to license iOS to competing

ANTITRUST CLASS ACTION COMPLAINT

device manufacturers, it would probably take device manufacturers at least two years to make all the changes necessary to migrate to iOS, according to market participants. And the likelihood that Apple would decide voluntarily to license iOS to competing device manufacturers is pretty much nil. Apple's legendary strategy of remaining vertically integrated within its "walled garden" and selling luxury products to loyal customers has been wildly successful. What other company has exceeded a market capitalization of $2 trillion? As device manufacturer Nokia put it: "Apple has no incentives to enter the market for licensable OS[s] by starting to license iOS to third party device manufacturers. This is because Apple currently holds a monopoly over the supply of iOS compatible devices. Apple makes most of its mobile profits with device sales and opening the system for third party device manufacturer competition would be likely to erode Apple's device profits. […] Apple does not need to expand its ecosystem in order to attract developers".

25.     The European Commission concluded that Apple's iOS "exercises an insufficient indirect constraint on Google's dominant position in the worldwide (excluding China) market for licensable smart mobile OSs," confirming that iOS should not be included in the relevant market for licensable smart mobile OSs.

**2.     The Geographic Scope of the Licensable Smart Mobile OSs Market is Worldwide, Excluding China**

26.     The geographic scope of the licensable smart mobile OS market is worldwide, excluding China. Agreements between device manufacturers and OS developers are typically worldwide in scope, and mobile devices are often sold on a worldwide basis. The competitive conditions in China differ from other regions due to limitations on Google's activities in China and the wide availability and popularity of "forked", *i.e.*, non-Google, Android devices. In the European Commission's Google Android case, Google did not contest the Commission's conclusion that the market for the licensing of smart mobile OSs is worldwide in scope, excluding China.

**3.     Google Monopolizes the Market for Licensable Smart Mobile OSs**

27.     Google possesses monopoly power in the market for licensable smart mobile OSs.

This monopoly power is demonstrated by Google's market share, the existence of high barriers to entry and expansion, the lack of countervailing buyer power, and the lack of constraint posed by non-licensable smart mobile OSs such as Apple's iOS.

28.     The EC found in its 2018 Google Android decision that Android OS is installed on more than 95% of smart mobile devices with licensed mobile OSs worldwide, excluding China. In the United States, that percentage currently appears to be even higher.  As of July 2020, 98.85% of smartphones with licensed mobile OSs were powered by Android, compared to just .15% for other licensed mobile OSs (Samsung's share was .11%; Windows was .02%, and "unknown" was .02%).  For that same period, Windows, Linux and "unknown" licensable mobile OSs collectively powered only .17% of tablets, leaving the remaining 98.83% to Google. There also has been very little competitor entry.  The only other licensable smart mobile OSs that have entered the market since 2011 have not made a dent in Google's market share.  The most prominent competitor — Microsoft — dropped below 2% market share in 2016, and exited the market shortly thereafter. The other providers, including Firefox OS, Tizen and Sailfish, have been unable to gain more than .2% market share.

29.     The market for licensable smart mobile OSs is characterized by high barriers to entry and expansion.  First, development of a smart mobile OS requires an enormous investment of time and money in research and development.  Google claims, for example, that it subsidized the development of Android through advertising revenue derived from Google Search and Chrome.

30.     Equally important, network effects make entry less attractive to would-be competitors.  App developers, who earn revenue through app downloads, in-app purchases, and ads, want to develop apps for mobile OSs that have a large user base.  Google's giant installed base of consumers who download apps creates strong incentives for developers to focus their efforts on developing for Google Android, rather than developing for multiple OSs.  Google itself submitted evidence in its appeal of the Commission's decision which confirmed this network effect:  "As the Google App Store is preinstalled on most android devices, developers reach most

users by publishing their App through the App store, which makes the Google App Store the Store with the highest number of apps. Users prefer the store with the highest number of Apps which makes this a self-enforcing effect."

31.     According to findings by the EC, Google's monopoly power is also supported by the lack of countervailing buyer power.  There are numerous device manufacturers that license Android OS for pre-installation in smart mobile devices.  Of these, only Samsung had more than a 10% market share, demonstrating the diffusion of buyer power.  This lack of buyer power is further evidenced by the apparently limited nature of the negotiations that occur between Google and device manufacturers when device manufacturers enter into licensing agreements with Google.  The agreements are signed online, with the device manufacturer representative merely providing contact information and clicking in the relevant box accepting the terms and conditions of the agreement.

32.     Nor does Apple's non-licensable iOS impose sufficient indirect constraints to undermine Google's monopoly power in the market for licensable smart mobile OSs.  As the EC has concluded, there are several reasons why Apple's iOS does not inhibit Google's monopoly power.  First, there are significant price differences between Google Android and iOS devices.  In the United States, the latest iPhone costs $1099, compared to the latest Samsung Android phone, which costs $899.  This disparate pricing reflects Apple's and Google's different commercial strategies.  Apple's vertically-integrated approach is aimed at keeping its affluent, loyal customers in Apple's ecosystem, and purchasing its hardware and services, which generates the bulk of Apple's revenue. Of Apple's revenue for the third quarter of 2020, 78% was based in hardware such as iPhones, Macbooks, iPads and wearables.   Google, on the other hand, wants to put Google Android devices in as many hands as possible in order to ensure its continued domination of search advertising, which generates the bulk of Google's revenue.  In the first quarter of 2018, for example, 82% of Google's revenue came from advertising.  As the Netherlands Authority for

8

Consumers & Markets put it in a recent study[1]:  "In contrast to Apple and Microsoft, Android was not developed by Google to generate revenues through the sale of software or hardware.  Android, apps, and the Play Store are only means to an end to become embedded everywhere on the internet, and to increase the audience for its services so it can create more advertising space."[2]

33.     Second, Android users would face substantial costs if they switched to iOS devices.  They would need to re-download and re-purchase existing apps for the new device (if they exist for that OS), transfer their data, and learn how to use the new device.  The Netherlands Market Study confirmed that smartphone users are locked into their OS.  The study observed that 88% of Dutch consumers who purchased a new smartphone in 2018 purchased a phone with the same OS as their old phone.  Of those who bought a smartphone with a different OS, five percent did so because their old smartphone's OS was no longer available (BlackBerry's RIM or Windows Phone), meaning that only seven percent of consumers voluntarily switched to a smartphone with a different OS.

**B.     Google Unlawfully Maintains a Monopoly in the Android App Store Market**

34.     A pre-installed app store is a virtual necessity on any smart mobile device.  Consumers locate and download apps that they want to use through the app store, rely on the app store for reviews and rankings, and pay for the app (if necessary) through the app store.  Device manufacturers pre-install app stores on their smart mobile devices because an app store is an important part of value of a smart mobile device.

35.     The device manufacturers that submitted evidence in the EC proceeding confirm that it does not make sense to sell a smart mobile device without first pre-installing at least one app store.  Lenovo, for example, stated: "Devices must have a pre-installed app store with a competitive catalog of apps in order to be relevant. It is not commercially viable to sell a smart phone without an app store."  Microsoft also stated: "We believe that it is impossible to compete

---

[1] The Netherlands Authority for Consumers & Markets, "Market Study into Mobile App Stores" (April 11, 2019) ("Market Study").
[2] Market Study at 28.

without an appstore, and device manufacturers find it very important to include an appstore on their mobile devices."  According to Nokia: "A pre-installed app store is an absolute requirement for any device marketed as a mobile device. While technically there are other ways to get apps on mobile devices, such as via certain websites, most consumers are not aware of this and would likely find the device close to unusable without a pre-loaded app store that offered quick access to their personal favorites (apps)."

### C.  Android App Stores Constitute a Relevant Product Market

36.     The market for Android app stores constitutes a relevant product market.  This market includes the Play Store, other app stores for Google Android devices, such as Samsung's Galaxy Apps store and the Amazon AppStore, and independent app stores, such as Aptoide.  It also includes app stores for non-Google ("forked") Android devices, such as the app store Amazon developed for its own Android OS (Fire OS).  The direct downloading of apps without using an app store is not within the market.  In the European Commission's Google Android case, Google did not contest these conclusions.

37.     The relevant market does not include app stores for non-Android smart mobile OSs such as the (now defunct) Windows Mobile Store (compatible only with Microsoft's Windows Mobile OS) or Apple's App Store (compatible only with iOS), because app stores are OS-specific. A consumer who owns an Android smartphone cannot use an app store developed for a non-Android OS, and a device manufacturer that pre-installs an app store on an Android device cannot install an app store that runs on a non-Android OS.

38.     Apple's App Store is not part of the relevant product market for the same reasons that Apple's iOS operating system is not in the same market as licensable smart mobile OSs.  From a demand perspective, the App Store was developed for iOS (which is not licensable to device manufacturers) and cannot run on Android.  From the supply side, Apple has never announced an intention to develop and license an app store for Android, and its success in and devotion to its vertically integrated business model makes it unlikely to do so.

39.     The relevant geographic market for Android app stores is worldwide, excluding

10

China.

### D. Google Monopolizes the Android App Stores Market

40.     Google possesses monopoly power in the market for Android app stores. This monopoly power is demonstrated by Google's market share, the existence of high barriers to entry and expansion, and the lack of countervailing buyer power. Apple's App Store, which is not in the relevant product market, does not exercise an indirect restraint sufficient to undermine Google's monopoly power.

41.     Google's share of the Android App Stores market exceeds 90%, whether measured by the number of devices sold with the Play Store pre-installed, or the number of apps downloaded from app stores onto Android smart mobile devices. The EC found that the Play Store is pre-installed by device manufacturers on nearly all — more than 90% — of Android mobile devices sold outside of China. No other Android app store comes close to that number of pre-installed users. Samsung's Galaxy Apps Store, which is a distant second to the Play Store, is the only app store that has come pre-installed on more than 10% of smart mobile devices outside of China, according to the EC. And even Samsung pre-installs its own app store alongside the Play Store. According to Samsung, it would "not be commercially feasible for an OEM to ship Android devices without Google Play preinstalled due to the variety and number of apps and contents available to users uniquely through the Google Play Store." The other app stores have even smaller installed user bases.

42.     The Play Store also demonstrates its dominance by the number of apps downloaded from the store, and by the sheer number of apps available. Since 2011, more than 90% of apps on Android devices have been downloaded via the Play Store. In October of 2018, according to the Dutch ACM, the Play Store offered 3.3 million apps, compared to less than one million for Aptoide. As Amazon said in the EC Android case, its own app store "lags behind the Play Store. . . . it has become increasingly difficult over time to obtain and retain a competitive selection of apps because, as the Play Store continues to grow by virtue of being pre-installed on all licensed Android devices, more and more app developers have focused their development efforts on

11

1   developing apps that use [Google Play Services]."

2       43.    Because of their small shares of the user base, other existing Android mobile app

3   stores cannot discipline Google's exercise of monopoly power in the Android App Stores Market.

4       44.    Google's monopoly power is further reinforced by its bundling of the Play Store

5   with Google Play Services.  Google Play Services is a proprietary software layer that runs in the

6   background on Android.  It provides application programming interfaces (APIs) that enable apps

7   to integrate with other apps and with Google services.  Many of these Google services are critical

8   to the functioning of apps.  More than half of the apps in the Play Store, for example, use Google's

9   cloud messaging service; nearly half use AdMob, Google's mobile advertising service.  Apps

10  cannot access these functionalities without Google Play Services.  As the European Commission

11  concluded, without Google Play Services, "many apps would either crash, or lack important

12  functions."

13      45.    Market participants agree that access to Google Play Services is critical.  According

14  to one mobile network operator, "without [Google Play Services] the Android OS would be more

15  like a feature phone OS than a smartphone OS."  Because many Google and third party apps are

16  "intimately tied with Google Play Services," according to one device manufacturer, many apps

17  "do not function" without access to Google Play Services.

18      46.    Google does not license the Play Store and Google Play Services separately.  They

19  can only be licensed together, thus further entrenching the Play Store as the number one pre-

20  installed app store.

21      47.    The most dramatic proof of Google's monopoly power is its ability to impose a

22  supracompetitive 30% commission on every app, and every in-app product or service, sold through

23  the Play Store.  Google justifies this extortionate tax by pointing to Apple's identical commission

24  — essentially using a grownup version of "they did it first."  But pricing by Apple — which also

25  faces monopolization allegations —is not the most relevant comparison.  As David Heinemeir

26  Hansson, CTO and Cofounder of Basecamp, a small internet software company, testified recently

27  before Congress, businesses should not be required to "hand over 30% of their revenue for the

28

ANTITRUST CLASS ACTION COMPLAINT

privilege" of selling software through the Play Store or the App Store. "Most mobsters would not be so brazen as to ask for such an exorbitant cut. . . ." Hansson contrasted Google's 30% cut to the fees it pays to transact in the credit card processing market, where "we basically pay around 2% . . . and there are countless competitors constantly trying to win our business by offering lower rates. . . . Credit card processing is a competitive market, and the rates show. Mobile application stores are not a competitive market, and the rates show."

48. In the absence of Google's entrenched monopoly, rivals could establish app stores which compete, among other dimensions, on price. The CEO of Epic Games, for example, has suggested that "they could run a store with as little as an 8% cut while remaining profitable."

49. The only independent app store with a market share greater than 1-2% is Aptoide, which has historically offered app developers a higher percentage of sales revenue than the Play Store. Currently, the developer/app store split is 25/75%. Despite its more attractive pricing, Aptoide has not been able to attract sufficient numbers of developers to inhibit Google's monopoly power, due to Google's entrenched monopoly.

50. Nor, as discussed above, is Google's monopoly power constrained by competition at the smart mobile device level. Android device users cannot purchase apps from Apple's App Store without switching to an Apple iOS device, because Apple has not developed or licensed an app store for Android, and it does not license its OS. And Android users are unlikely to switch to an Apple phone because of the price differences between Google Android and Apple devices, the significant switching costs they would incur, and loyalty to their existing device. Locked into the Android ecosystem, users are unable to constrain Google's monopoly power.

51. Furthermore, most users of smart mobile devices cannot avoid switching costs and lock-in by acquiring more information prior to the purchase of the Android device. First, most consumers are unaware of Google's anticompetitive contractual restraints and policies. Second, consumers considering whether to switch from an Android to an Apple device are much more likely to consider features such as the price of the device, design, brand, processing power, battery life, functionality and cellular plan than they are to consider the range, quality or price of apps

available on the app Store.  This is especially likely when considering the cost of apps compared to the cost of a smart mobile device.

52.     Users are also unable to determine accurately the "lifecycle price" of devices at the time of purchase — *i.e.*, how much they will spend in total (including on the device and all apps and in-app purchases) during the time they own the device, because new apps will be developed, their tastes may change, and their circumstances may change.  Because users are unable to calculate the lifecycle prices of the devices at the time of purchase, they are unable to take into account Google's anticompetitive conduct when they decide which device to buy.

53.     Because Android mobile smart device users face substantial switching costs and lock-in, developers who want access to that enormous user base must also participate in the Android ecosystem.  The Play Store has by far the largest numbers of developers.  As Samsung stated in the European Commission's Google Android case: "Another important factor for developers is the fact that Google Play is the indisputable market leader for Android apps, in both number of apps and number of users.  Developers of Android apps therefore target distribution through Google Play, and have no reason to exclude Google Play as a distribution channel for their apps."

54.     There are significant barriers to entry and expansion in the market for Android app stores.  First, the cost of developing an app store that is relevant and able to compete with Google is, according to Sony, "prohibitive."  Amazon, whose app store has barely made a dent in Google's market share, has dedicated hundreds of employees and spent tens of millions of dollars annually over several years to develop and commercialize its app store.  In addition, the cost of commercializing the store would be enormous because the app store would need to convince users to try a new Android app store despite the established position of the Play Store.

55.     Other significant barriers to entry and expansion have been erected by Google, which has excluded competition through its restrictive contracts with device manufacturers and app developers and through its warning and threats to end users.

ANTITRUST CLASS ACTION COMPLAINT

**E.** **Google Unlawfully Acquired and Unlawfully Maintains its Monopoly in the Android App Stores Market through Contractual Restrictions and Consumer Warnings that Unreasonably Restrain Competition**

56.     Google unlawfully acquired and has unlawfully maintained its monopoly in the Android App Stores Market through anticompetitive acts that have excluded potential competitors.

**1.     Google's Contracts with Device Manufacturers**

57.     Google unreasonably restricts competition in the App Store Market by including in its contracts with device manufacturers terms and conditions that (1) require device manufacturers to accept a bundle of apps and services that include the Play Store, and (2) disadvantage other app stores by requiring device manufacturers to give preferential location to the Play Store and other Google apps on the device's home screen.

58.     The EC concluded in its Google Android decision that an app store is unlikely to succeed if device manufacturers do not pre-install the store on devices: "[P]re-installation is a key requirement for an app store in order to achieve a sufficient scale. . . ."  As one device manufacturer said: "App stores' owners try as much as possible to have their shop pre-installed in the devices as end users usually use the store which is directly available on the device."  Even Google has admitted that "[p]reloading remains valuable to users, and hence device manufacturers, despite full unbundling because most users just use what comes on the device.  People rarely change defaults."  And while Google does not outright prohibit its licensees from pre-installing app stores that could potentially compete with the Play Store, its contractual restrictions make it extremely unlikely.

59.     First, Google requires a device manufacturer that wants to pre-install Google Search or one of Google's must-have apps — such as You Tube, Google Maps or Gmail — on its devices to pre-install the entire suite of applications and services that comprises Google Mobile Services, including the Play Store.  At the time of the EC's Google Android decision, Google Mobile Services included 30 apps.

60.     Not content with requiring device manufacturers to accept the entire bundle of apps and services included in Google Mobile Services, Google also dictates the location of those apps.

The licensing contracts require device manufacturers to put the Play Store on the home screen of all devices they manufacture, and to put the additional Google apps (up to 30) either on the device's home screen or on the next page. Google thus ensures that the Play Store will be the most visible app store, making it unlikely that a user will continue scrolling until it finds a competing store.

61. In addition, Google will not license Google Play Services separately from the Play Store. As discussed above, the majority of apps on the Play Store do not function at all or cannot perform all of their intended functions without access to the services included in Google Play Services.

62. Absent these contractual restrictions, competing app stores could contract with device manufacturers to have their app store icons pre-installed and prominently displayed on smart mobile devices, increasing their exposure to consumers and app developers.

63. According to allegations by Epic, Inc., the maker of the popular game Fortnite, in its antitrust complaint against Google, Google has gone even further to prevent users from accessing competing app stores on their smart mobile devices. Epic allegedly had entered into agreements with two device manufacturers for the pre-installation of an Epic games app on Google Android devices, but Google caused the device manufacturers to cancel those agreements.

### 2. Google's Contracts with App Developers

64. Google restricts competition in the App Store Market by including terms and conditions in its contracts with app developers that limit consumers' access to competing app stores.

65. *First*, Google prohibits any app developer that wants to distribute its apps through the Play Store from also distributing any competing *app store* through the Store. Although this would be a logical and effective way to distribute app stores — which are themselves mobile apps — Google prohibits this distribution method to maintain its monopoly in the App Store Market.

66. Google imposes this restraint through provisions of the Google Play Developer Distribution Agreement ("DDA"), which Google requires all app developers to sign before they can distribute their apps through the Play Store. Each of the Defendants is a party to the DDA.

ANTITRUST CLASS ACTION COMPLAINT

67.     Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates this requirement. The DDA is non-negotiable, and developers that seek access to Android users through the Play Store must accept Google's standardized contract of adhesion.

68.     As discussed above, Google's anticompetitive restrictions in its contracts with device manufacturers discourage device manufacturers and app developers from pre-installing any competing app stores on Google Android smart mobile devices.  Further, Google discourages mobile device users from installing app stores or even apps through misleading warnings and cumbersome processes (see discussion below).  Thus, by prohibiting app developers from distributing app store apps through the Play Store, Google has effectively foreclosed any alternative.  Without these restrictions, users could download competing app stores, which would lead to increased competition, more choice, and lower prices.

69.     *Second,* Google binds app developers to the Play Store by closing off critical advertising venues to app developers that do not publish their Android apps in the Play Store. Google markets an app advertising program that includes placement on must-have advertising space, including Google Search and YouTube.  But this advertising is accessible only to app developers that publish their app in the Play Store (or, for iOS developers, in Apple's App Store). This limitation restricts competition by discouraging app developers from developing apps that are not distributed through the Play Store.

### 3.     Google's Restraints on Consumers

70.     Google further restricts competition in the App Store Market by restricting consumers' ability to download and install mobile apps and app stores. Because Google does not allow users to download other Android app stores from the Play Store, and (through its contractual restrictions on device manufacturers) makes pre-installation of competing app stores very unlikely, direct downloading by users is the only remaining avenue for app stores to attempt to compete

17

with the Play Store. However, although Google purportedly allows consumers to download and install Android apps and app stores directly, it discourages downloading by making the process difficult and by misleadingly warning users of the dangers of direct downloading, which it calls "sideloading."

71.     Consumers download apps onto their personal computers every day, easily and without incident. But a consumer who wants to download an app or an app store onto her Google Android phone or tablet without using the Play Store faces extraordinary obstacles. Google makes this process technically complex, confusing and threatening. In the EC's Google Android case, Amazon described the process as follows: "[E]ven for consumers who discover and download an alternate store outside of the Play Store, Google has configured Android to block the installation of that store. Consumers are unable to install downloadable app stores unless the consumer first navigates to and changes Android's obscure "Unknown Sources" setting to allow installation of apps from sources other than the Play Store. When consumers attempt to change this setting, Google displays a message warning that "your [tablet or phone] and personal data are more vulnerable to attack by apps from unknown sources. You agree that you are solely responsible for any damage to your tablet or loss of data that may result from using these apps."

72.     Epic's experience demonstrates the challenges faced by app developers who attempt to market their Android apps outside of the Play Store and users who attempt to sideload apps onto their Google Android devices. Before the present dispute that led to litigation before this Court, Epic had tried to stay out of the Play Store, relying instead on sideloading of its apps. Yet despite Epic's well-known brand and the enormous success of its games, Epic could not afford this strategy over the long term. In April 2020, Epic issued this statement: "After 18 months of operating Fortnite on Android outside of the Google Play Store, we've come to a basic realization. Google puts software downloadable outside of Google Play at a disadvantage, through technical and business measures such as scary, repetitive security pop-ups for downloaded and updated software, restrictive manufacturer and carrier agreements and dealings, Google public relations characterizing third party software sources as malware, and new efforts such as Google Play

18

Protect to outright block software obtained outside the google Play Store."

73.     And for the hardy few brave enough to download an app or app store despite Google's dire warnings of loss and damage, direct downloading is inferior to downloading an app from the Play Store, because Google bars downloaded apps from updating in the background.  As a result, the user must manually approve every update of a sideloaded app or app store, thus further discouraging consumers from using alternatives to the Play Store.

74.     Google also discourages users from downloading apps and app stores from other sources by preventing installation of or even removing apps that it deems "harmful."   While Google describes this as a way of protecting users from malware, it has blocked or removed well-known app stores used by millions of consumers, including Aptoide, the largest independent app store in the world.   Currently, Aptoide boasts more than 300 million users, seven billion downloads, one million apps, and "one of the best malware detection systems in the market."  Yet Google repeatedly removed Aptoide from users' mobile phones without their knowledge, forcing Aptoide to obtain a court order enjoining the practice.

75.     In the absence of Google's restrictions on direct downloading, app developers and distributors could at least access those consumers who are aware that Android apps exist outside the Play Store.  (As the European Commission and the Netherlands Authority for Consumers & Markets noted, most consumers are not even aware that these alternatives are available.)  By deliberately and misleadingly discouraging users from downloading apps and app stores, Google has closed off the last remaining alternative access point, cementing its monopoly position.

**F.     Google's Anticompetitive Conduct in the Android App Store Market Harms Competition**

76.     Google's anticompetitive conduct in the Android App Store Market forecloses competition in that Market and harms Android app developers and consumers.

77.     As a result of its anticompetitive conduct, which has foreclosed competition in the Android App Store Market, Google has stifled innovation, limited choice, and extracted a supracompetitive 30% tax on every paid app and many in-app purchases of products and services

purchased through the Play Store. But for Google's anticompetitive restrictions, app developers would be able to distribute their apps through alternative methods, including by providing apps directly to consumers, selling apps through independent app stores, creating their own competing app stores, or forming business relationships with device manufacturers which can pre-install apps.

78. Google's conduct harms both developers and consumers by enabling Google to levy a supracompetitive 30% tax on every app and many in-app purchases of products and services purchased through the Play Store. In a competitive market the transaction fee would be lower and the output would be higher, as app developers would have more incentive and more capital to develop new apps. More competition in the market would benefit consumers through lower prices, more apps, and more innovation in how apps are distributed. Currently, consumers must search for apps in one monopolized store. In the absence of Google's anticompetitive restrictions, consumers could find apps they are interested in through other means, for example, app stores organized by subject matter.

## VI. CLASS ALLEGATIONS

79. Plaintiff brings this action for damages and injunctive relief on its own behalf and, pursuant to Federal Rules of Civil Procedure Rules 23(a), (b)(2) and (b)(3), on behalf of all U.S. developers of any Android OS app distributed through the Play Store.

80. This definition excludes the defendants; defendants' affiliates and subsidiaries; defendants' current or former officers, directors, employees, agents, and representatives; the district judge or magistrate judge to whom this case is assigned, as well as those judges' chambers staff and immediate family members; and all governmental entities.

81. Plaintiff does not know the exact number of Class members, because this information is in the exclusive control of Defendants and is not currently available to the Plaintiff. Plaintiff is informed and believes that the Class will consist of many thousands of members such that individual joinder is impracticable.

82. Numerous questions of law and fact are common to the claims of Plaintiff and members of the proposed Class. These include, but are not limited to:

A.   Whether there is a relevant product market comprised of licensable smart mobile OSs and a relevant geographic market of the world, except for China;

B.   Whether there is a relevant product market comprised of Android App Stores and a relevant geographic market of the world, except for China;

C.   Whether Google unlawfully obtained and/or maintained monopoly power in the market for Android App Stores;

D.   Whether Google unlawfully has conditioned the contractual right of any device manufacturer to pre-install desired Google applications such as the YouTube or Google Maps apps on the device manufacturer's agreement also to install the Play Store;

E.   Whether competition in the Android App Store Market has been restrained and harmed by Google's monopolization and anticompetitive restrictions;

F.   Whether Google has imposed contractual restrictions on Plaintiff and Class members that unreasonably restrain trade;

G.   Whether Plaintiff and Class members have been harmed by Google's unlawful practices;

H.   Whether Plaintiff and Class members are entitled to declaratory or injunctive relief;

I.   Whether Plaintiff and Class members are entitled to any damages or restitution; and

J.   Whether Plaintiff and Class members are entitled to their attorney fees, costs, and expenses related to injunctive or monetary relief.

83.   Plaintiff's claims are typical of the claims of the members of the proposed Class. The factual and legal bases of Google's liability are the same and resulted in injury to Plaintiff and all the other members of the proposed classes.

84.   Plaintiff will represent and protect the interests of the proposed Class both fairly and adequately. It has retained counsel competent and experienced in complex antitrust class-action litigation. Plaintiff has no interests that are antagonistic to those of the proposed Class.

85.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

86.   The defendants have acted on grounds that apply generally to the proposed Class, making final injunctive relief appropriate with respect to the Class as a whole.

87.   This class action is superior to other alternatives for the fair and efficient

adjudication of this controversy. Prosecuting the claims as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

### VII.    CLAIMS FOR RELIEF

**COUNT 1:**

**Sherman Act § 2**

**(Unlawful Monopoly Acquisition and/or Maintenance in the Android App Store Market)**

88.    Plaintiff restates, re-alleges, and incorporates by reference each preceding and succeeding allegation as though fully set forth herein.

89.    Google's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 2.

90.    The Android App Store Market is a valid antitrust market.

91.    Google holds monopoly power in the Android App Store Market.

92.    Google has unlawfully acquired and/or maintained monopoly power in the Android App Store Market through the anticompetitive acts described in this Complaint, including conditioning the licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on device manufacturers' agreement to grant preferential treatment to the Google Play Store; imposing technical restrictions and obstacles for both device manufacturers and app developers, which prevent the distribution of Android apps through means other than the Google Play Store; and conditioning app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.

93.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

94.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

95.    As an app developer, Plaintiff has been harmed by Defendants' anticompetitive

22

conduct in a manner that the antitrust laws were intended to prevent.  Plaintiff has suffered and continues to suffer damages, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 2:**

**Sherman Act §§ 1 and 3**
**(Unreasonable Restraints of Trade in the Android App Store Market: Device Manufacturers)**

96.     Plaintiff restates, re-alleges and incorporates by reference each preceding and succeeding allegation as though fully set forth herein.

97.     Defendants' conduct violates Sections 1 and 3 of the Sherman Act, which prohibit "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce. . . ."  15 U.S.C. §§ 1, 3.

98.     Google has entered into agreements with device manufacturers that unreasonably restrict competition in the Android App Store Market. These include contracts with device manufacturers that condition their access to the Google Play Store and other "must have" Google services on the device manufacturer offering the Google Play Store as the primary and often the only viable app store on Android mobile devices.

99.     These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the Android App Store Market.

100.     Google's conduct affects a substantial volume of interstate as well as foreign commerce.

101.     Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

102.     As an app developer that distributes its app through the Google Play Store, Plaintiff has been harmed by Google's anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiff has suffered and continues to suffer damages and such damages and

injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## COUNT 3:

## Sherman Act §§ 1 and 3

## (Unreasonable Restraints of Trade in the Android App Store Market: App Developers)

103.    Plaintiff restates, re-alleges, and incorporates by reference each preceding and succeeding allegation as though fully set forth herein.

104.    Defendants' conduct violates Sections 1 and 3 of the Sherman Act, which prohibit "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce. . . ."  15 U.S.C. §§ 1, 3.

105.    Google forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition to having apps distributed through the Google Play Store.   The relevant provisions of these agreements unreasonably restrain competition in the Android App Store Market.

106.    Section 4.5 of the DDA prohibits developers from using the Play Store to "distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  Section 4.1 of the DDA requires all developers to "adhere" to Google's Developer Program Policies.  Under the ominous heading "Device and Network Abuse," Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

107.    These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the Android App Store

Market.

108.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

109.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

110.    As an app developer that consumes app distribution services, Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiff has suffered and continues to suffer damages, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## COUNT 4:

## California Cartwright Act

## (Unreasonable Restraints of Trade in Android App Store Market)

111.    Plaintiff restates, re-alleges and incorporates by reference each of the preceding and succeeding allegations as though fully set forth herein.

112.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*,  the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

113.    Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

114.    The Android App Store Market is a valid antitrust market.

115.    Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein. Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android App Store Market.

116.    Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of

25

software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

117.    These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android App Store Market.

118.    Google's conduct and practices have substantial anticompetitive effects, including increased prices and costs, reduced innovation, poorer quality customer service, and lowered output.

119.    Google's conduct harms Plaintiff which, as a direct result of Google's anticompetitive conduct, has been unreasonably restricted in its ability to distribute its Android applications, including *Peekya*.

120.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anticompetitive scheme took place in California.

121.    Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 5:**

**California Unfair Competition Law**

122. Plaintiff restates, re-alleges and incorporates by reference each preceding and succeeding allegation as though fully set forth herein.

123. Google's conduct, as described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits any unlawful, unfair or fraudulent business act or practice.

124. Plaintiff has standing to bring this claim because it has suffered injury in fact and lost money as a result of Google's unfair competition. Specifically, it develops and distributes apps for the Android mobile platform, and Google's conduct has unreasonably restricted Plaintiff's ability to fairly compete in the relevant markets with these products.

125. Google's conduct violates the Sherman Act and the Cartwright Act, and thus constitutes unlawful conduct under § 17200.

126. Google's conduct is also "unfair" within the meaning of the Unfair Competition Law.

127. Google's conduct harms Plaintiff which, as a direct result of Google's anticompetitive conduct, is unreasonably prevented from freely distributing mobile apps, and pays a higher commission rate on downloaded apps than it would pay absent Google's conduct.

128. Plaintiff seeks injunctive relief and restitution under the Unfair Competition Law.

129. WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A.  This action may proceed as a class action, with Plaintiff serving as the Class Representative, and with Plaintiff's counsel as Class Counsel;

B.  Google has unlawfully acquired and unlawfully maintained a monopoly in the market for Android app stores in violation of Section 2 of the Sherman Act (15 U.S.C. § 2);

C.  Google has unreasonably restrained trade in violation of Sections 1, 2, and 3 of the

Sherman Act and the Cartwright Act;

D. Google has engaged in unlawful, unfair or fraudulent business acts or practices in violation of California's Unfair Competition Law;

E. Plaintiff and the Class are entitled to recover damages sustained by them, as provided by federal and state law, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act (15 U.S.C. § 15) and Section 16750 of the Cartwright Act (Cal. Bus. & Prof. Code § 16750);

F. Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

G. Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

    i. A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants;

    ii. Restitution of the fees and commissions unlawfully obtained by Defendants; and

    iii. Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from continuing and maintaining the monopolies, agreements and unlawful, unfair or fraudulent business practices alleged herein.

H. Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

1   I.   Plaintiff and the Class recover their costs of this suit, including reasonable

2        attorneys' fees as provided by law; and

3   J.   Plaintiff and the Class receive such other or further relief as may be just and proper.

4        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the

5   claims asserted in this Complaint that are so triable.

6
7   Dated: September 29, 2020                    Respectfully submitted,

8                                               By: */s/ Bonny E. Sweeney*
                                                Bonny E. Sweeney (SBN 176174)
9                                               Samantha J. Stein (SBN 302034)
                                                **HAUSFELD LLP**
10                                              600 Montgomery Street, Suite 3200
                                                San Francisco, CA 94111
11                                              Tel.: (415) 633-1908 (main)
                                                Tel.: (415) 633-1953 (direct)
12                                              Fax: (415) 358-4980
                                                bsweeney@hausfeld.com
13                                              sstein@hausfeld.com

14                                              Melinda R. Coolidge (*pro hac vice forthcoming*)
15                                              **HAUSFELD LLP**
                                                1700 K Street, NW, Suite 650
16                                              Washington, DC 20006
                                                Tel.: (202) 540-7200 (main)
17                                              Tel.: (202) 540-7144 (direct)
                                                Fax: (202) 540-7201
18                                              mcoolidge@hausfeld.com

19                                              Katie R. Beran (*pro hac vice forthcoming*)
                                                **HAUSFELD LLP**
20                                              325 Chestnut Street, Suite 900
                                                Philadelphia, PA 19106
21                                              Tel.: (215) 985-3270 (main)
                                                Tel.: (267) 702-3215 (direct)
22                                              Fax: (215) 985-3271
                                                kberan@hausfeld.com
23
24                                              Scott A. Martin (*pro hac vice forthcoming*)
                                                Irving Scher (*pro hac vice forthcoming*)
25                                              **HAUSFELD LLP**
                                                33 Whitehall Street, 14th Floor
26                                              New York, NY 10004
                                                Tel.: (646) 357-1100 (main)
27
28                                              29

Tel.: (646) 357-1195 (direct)
Fax: (212) 202-4322
smartin@hausfeld.com
ischer@hausfeld.com

Michael Lewis (*pro hac vice pending*)
**The Lewis Firm PLLC**
1300 I Street NW, Suite 400E
Washington, DC 20005
Tel.: (202) 355-8895
Fax: (888) 430-6695
mlewis@lewis-firm.com

*Counsel for Plaintiff Peekya Services, Inc. and
the Proposed Class*

# EXHIBIT E

David Azar (State Bar No. 218319)
dazar@milberg.com
**MILBERG PHILLIPS GROSSMAN LLP**
16755 Von Karman Avenue, Suite 200
Irvine, California 92606
Telephone: 212-594-5300
Facsimile: 212-868-1229

Peggy J. Wedgworth (*pro hac vice forthcoming*)
pwedgworth@milberg.com
Robert A. Wallner (*pro hac vice forthcoming*)
rwallner@milberg.com
Elizabeth McKenna (*pro hac vice forthcoming*)
emckenna@milberg.com
Blake Yagman (*pro hac vice forthcoming*)
byagman@milberg.com
Michael Acciavatti (*pro hac forthcoming*)*
macciavatti@milberg.com
*admitted only in Pennsylvania
**MILBERG PHILLIPS GROSSMAN LLP**
One Penn Plaza, Suite 1920
New York, New York 10119
Telephone: 212-594-5300
Facsimile: 212-868-1229

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIANNE BENTLEY, JENNIFER GRACE, ADAN MOYA, CORESA TRIMBLE, and ROBERT WING, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>GOOGLE LLC, GOOGLE IRELAND LIMITED, GOOGLE COMMERCE LIMITED, GOOGLE ASIA PACIFIC PTE. LIMITED, and GOOGLE PAYMENT CORP.,<br><br>                    Defendants. | CASE NO. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**<u>TABLE OF CONTENTS</u>**

I.     INTRODUCTION .................................................................................................. 1

II.    JURISDICTION AND VENUE ........................................................................... 1

III.   INTRA-DISTRICT ASSIGNMENT .................................................................. 2

IV.    PARTIES .............................................................................................................. 3

V.     RELEVANT FACTUAL ALLEGATIONS ........................................................ 4

    A.  Google's Domination Of The Market For Licensable Smart Mobile Operating Systems .......................................................................................... 4

    B.  Google Unlawfully Maintains A Monopoly In The Android App Store Market ..... 8

       1.  Android App Stores Constitute a Relevant Product Market ..................... 8

       2.  Google Monopolizes the Android App Stores Market ............................ 10

       3.  Google's Anticompetitive Conduct in the Android App Store Market ................. 15

          a.  *Google's Contracts with OEMs* ............................................... 15

          b.  *Google's Contracts with App Developers* ............................... 16

          c.  *Google's Restraints on Consumers* ........................................ 18

          d.  *Anticompetitive Effects in the Android App Store Market* .............. 21

    C.  Google Unlawfully Maintains A Monopoly In The Android In-App Payment Processing Market ................................................................................ 23

       1.  Android In-App Payment Processing Constitutes a Relevant Product Market ....... 23

       2.  Google's Monopoly Power In The Android In-App Payment Processing Market .. 24

       3.  Google's Anticompetitive Conduct in the Android In-App Payment Processing Market ................................................................................ 25

       4.  Anticompetitive Effects in the Android In-App Payment Processing ................. 26

VI.    ANTITRUST INJURY ...................................................................................... 27

VII.   CLASS ALLEGATIONS .................................................................................. 27

VIII.  CAUSES OF ACTION ...................................................................................... 30

IX.    PRAYER FOR RELIEF .................................................................................... 54

X.     JURY TRIAL DEMANDED ............................................................................ 55

CLASS ACTION COMPLAINT

Plaintiffs Dianne Bentley, Jennifer Grace, Adan Moya, Coresa Trimble, and Robert Wing (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action against Defendants Google LLC, Google Ireland Ltd., Google Commerce Ltd., Google Asia Pacific Pte. Ltd., and Google Payment Corp. (collectively, "Google"), and allege the following based upon information and belief, except as to those allegations that are based on Plaintiffs' personal knowledge.

## I.     **INTRODUCTION**

1.     This is an antitrust class action arising out of Google's unlawful conduct concerning the Google Play Store, Google's store for the distribution and sale of billions of applications ("apps") and in-app purchases running on Android smartphones and other mobile devices utilizing the Android operating system. Through its acquisition and maintenance of an unlawful monopoly, and its anticompetitive contractual restrictions imposed on app developers, Google has forced consumers to pay supra-competitive prices for apps and in-app purchases on the Google Play Store. Although Google has publicly acknowledged "that developers should have a choice in how they distribute their apps and that stores should compete for the consumer's and the developer's business,"[1] its unlawful conduct has prevented such choices and foreclosed competition, to the enormous detriment of consumers throughout the United States.  By this action, Plaintiffs, on behalf of themselves and other consumers, seek monetary damages for injuries sustained from Google's unlawful conduct, and injunctive relief enjoining Google from continuing its anticompetitive conduct.

## II.    **JURISDICTION AND VENUE**

2.     This Court has subject-matter jurisdiction over Plaintiffs' federal antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

---

[1]Sameer Samat, *Listening to Developer Feedback to Improve Google Play*, ANDROID DEVELOPERS BLOG (Sept. 28, 2020), https://android-developers.googleblog.com/2020/09/listening-to-developer-feedback-to.html.

3.      This Court also has subject-matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship of the Plaintiffs and of Defendants, and the amount in controversy exceeds $75,000.

4.      Alternatively, this Court has subject-matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount-in-controversy, exclusive of costs and interests, exceeds the sum of $5,000,000, in the aggregate, there are well over 100 members of the proposed Class, and a Plaintiff and a Defendant are citizens of different states. Plaintiff Grace is a citizen of Pennsylvania and Defendants Google LLC and Google Payment are citizens of California, where they maintain their principal places of business.

5.      This Court has personal jurisdiction over the Defendants. Google LLC and Google Payment are headquartered in this District. All Defendants have engaged in sufficient minimum contacts with the United States and have purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise of jurisdiction over them would comport with due process requirements.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google LLC and Google Payment maintain their principal places of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue. In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Defendants may be found in or transact business in this District.

## III.   INTRA-DISTRICT ASSIGNMENT

7.      Pursuant to N.D. Cal. Civil Local Rule 3.2 and General Order 44, this antitrust class action shall not be assigned to a particular Division of this District but shall be assigned on a District-wide basis.

## IV.  **PARTIES**

8.  Plaintiff Dianne Bentley is an individual residing in North Carolina who purchased an application(s) and/or made an in-app purchase(s) through the Google Play Store during the relevant statutory period.

9.  Plaintiff Jennifer Grace is an individual residing in Pennsylvania who purchased an application(s) and/or made an in-app purchase(s) through the Google Play Store during the relevant statutory period.

10.  Plaintiff Adan Moya is an individual residing in Colorado who purchased an application(s) and/or made an in-app purchase(s) through the Google Play Store during the relevant statutory period.

11.  Plaintiff Coresa Trimble is an individual residing in Missouri who purchased an application(s) and/or made an in-app purchase(s) through the Google Play Store during the relevant statutory period.

12.  Plaintiff Robert Wing is an individual residing in Florida who purchased an application(s) and/or made an in-app purchase(s) through the Google Play Store during the relevant statutory period.

13.  Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc. The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California. Google LLC contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

14.  Defendant Google Ireland Limited ("Google Ireland") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC. Google Ireland contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

15.     Defendant Google Commerce Limited ("Google Commerce") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC. Google Commerce contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

16.     Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific") is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and is a subsidiary of Google LLC. Google Asia Pacific contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

17.     Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its principal place of business in Mountain View, California, and is a subsidiary of Google LLC. Google Payment provides in-app payment processing services to Android app developers and Android users and collects a 30% commission on many types of processed payments, including payments for apps sold through the Google Play Store and in-app purchases made within such apps.

## V.    RELEVANT FACTUAL ALLEGATIONS

### A.    Google's Domination Of The Market For Licensable Smart Mobile Operating Systems

18.     Google's monopolization of the markets at issue in this case, the Android App Store Market and the Android In-App Payment Processing Market, as described in Sections V(B) and (C), are better understood through a discussion of smart mobile devices and Google's domination and control of the Android operating system of the related market for licensable smart mobile operating systems ("OSs").

19.     Smart mobile devices, including smartphones and tablets, are handheld, portable electronic devices that enable the user to connect wirelessly to the Internet and perform multi-purpose computing functions, including, but not limited to, internet browsing, shopping, accessing social media,

CLASS ACTION COMPLAINT

streaming videos and music, and playing games. Many consumers now rely solely on their smart mobile device and have no other personal computer system.

20.    Mobile devices require an operating system ("OS") to provide basic multi-purpose computing functionality, including the installation and operation of compatible mobile apps; button, touch, and motion commands; and a graphical user interface consisting of icons. A mobile operating system ("mobile OS") is an OS that is built exclusively for a mobile device, such as a smart phone or tablet.

21.    Companies that design and sell smart mobile devices are referred to as original equipment manufacturers ("OEMs"). Android is the only commercially viable OS that is widely available to license; thus, OEMs have a single mobile OS option: Google's Android OS. Accordingly, Google has monopoly power over the market for mobile OSs that are available for license by OEMs.

22.    Prior to sale, an OEM must pre-install an OS on each mobile device in order to provide purchasers with access to basic functions, including those described above. OEMs design mobile devices to ensure compatibility with whatever OS is selected for that device. Implementation of a mobile OS requires significant time and investment from OEMs, and switching to another mobile OS, as discussed in Section V(B)(2), is disruptive, expensive, and time-consuming.

23.    The vast majority of OEMs do not develop their own OS, so they must choose and license an OS for their devices. There is therefore a relevant market for licensable smart mobile OSs consisting of mobile OSs that OEMs can license for their smart mobile devices. The market does not include: (1) proprietary OSs that are unavailable for licensing, such as Apple's mobile OS, called iOS which is used on Apple's iPhone and iPad products; (2) mobile devices that lack the multi-computing functions of smart mobile devices and tablets (*e.g.*, "flip phones"); or (3) electronic devices whose OS are not compatible with mobile device OS (*e.g.*, desktop computers or gaming systems like Xbox). Historically, the market for smart mobile OSs included the Android OS, developed by Google, the Tizen mobile OS, a partially open-source mobile OS that was developed by the Linux Foundation and Samsung, and the Windows Phone OS developed by Microsoft.

CLASS ACTION COMPLAINT

24.     The geographic scope of the market for licensable smart mobile OSs is worldwide, excluding China. Google's operations in China are limited for legal and regulatory reasons, Google does not make available many of its products for mobile devices sold within China, and non-Google, Android devices are widely available and popular there. Lastly, while Google contractually requires OEMs licensing Android not to sell devices with competing Android-compatible mobile OSs outside of China, it does not impose such restrictions on devices sold within China. Outside of China, OEMs must all contractually consent that if their device licenses the Android OS, they will not sell devices preloaded with a competing, Android-compatible mobile OS.

25.     The geographic scope of the market for licensable smart mobile operating systems includes a separate sub-market within the United States which operates as described throughout this Complaint.

26.     Google possesses monopoly power in the market for licensable smart mobile OSs through its Android OS.

27.     A mobile ecosystem of products like apps, devices, and accessories typically develops around one or more mobile OSs, such as the Android OS. The "Android ecosystem" is a system of mobile products that are inter-dependent and compatible with each other and the Android OS. Ecosystem participants include Google, OEMs of Android-compatible devices, developers of Android-compatible apps, Android app distribution platforms, the makers of ancillary hardware such as headphones or speakers, cellular carriers, and others.[2] The Android ecosystem is akin to the iOS ecosystem created by Apple, "[w]hen you combine all of Google's services with Google's hardware and its frequently updated software, recreating the same type of ecosystem that Apple claims is only possible with Apple, is, indeed, possible outside of Apple . . . . Google's ecosystem is a capable one."[3]

---

[2] Jason Cipriani, *Is there an alternative to Apple's ecosystem? Yes, but you'll have to Google it*, ZD NET (May 1, 2019), https://www.zdnet.com/article/alternatives-to-apples-ecosystem-yes-there-is-a-way-out/.

[3] *Id.*

28.     As more developers design useful, compatible apps for a specific mobile OS, the more consumers will want to use that OS. The more consumers using an OS, the more developers want to develop apps for it. Thus, significant barriers to entry arise for new entrants to the OS market. A new OS appeals to consumers only if there is a broad array of software applications running on it, and software developers are not incentivized to create applications for an OS unless there is a large existing user base.

29.     In order to attract app developers and users, Google misleadingly represents that Android is an "open" ecosystem where any participant may create Android-compatible products without unnecessary restrictions. Instead, however, Google uses its Android OS to keep its ecosystem closed to any competition. As the dominant OS licensor, Google recognizes that participation on its platform is a "must-have" market for developers. Google only unlocks the door to its ecosystem for participants willing to play by Google's rules.

30.     Moreover, Google uses the Android OS to restrict which apps and app stores OEMs pre-install on their devices and to deter the direct distribution of competing app stores and apps to Android users, all at the expense of competition in the Android ecosystem.

31.     As a result of Google's monopoly power in the market for licensable smart mobile OSs, OEMs, developers and users cannot choose another mobile OS. OEMs such as ZTE and Nokia acknowledge that other, non-proprietary OSs are inadequate substitutes for and not a reasonable alternative to licensing the Android OS.[4] Other mobile OSs do not currently support many popular mobile apps that are valued by consumers. Google, therefore, has constructed a market that biases consumers against mobile device purchases from non-proprietary mobile OS other than Android OS. OEMs are forced to concede to Google's demands because it is essential that they offer a popular mobile OS and corresponding ecosystem to consumers.

---

[4] *Google Android*, No. AT.40099, European Commission Decision (July 18, 2018) ("EC Google Android Decision") at ¶ 292,
https://ec.europa.eu/competition/antitrust/cases/dec_docs/40099/40099_9993_3.pdf.

CLASS ACTION COMPLAINT

**B.    Google Unlawfully Maintains A Monopoly In The Android App Store Market**

32.    A pre-installed app store is a necessity for mobile device users. An app store is an online portal through which software programs are made available for procurement and download. Mobile apps make mobile devices valuable to users because they add user-specific functionality for activities such as banking, shopping, making travel arrangements, streaming music and videos, reading news sources and books, and game playing.

33.    While some apps are pre-installed by OEMs, due to each consumer's specific preferences, OEMs cannot anticipate the various apps a specific consumer may utilize. Furthermore, apps developed after a user purchases his or her mobile device cannot, as a practical matter, be pre-installed. Thus, mobile devices must provide a way for users to download and/or buy apps post-purchase.

**1.    <u>Android App Stores Constitute a Relevant Product Market</u>**

34.    The market for Android App Stores constitutes a relevant product market. On Android mobile devices, Google maintains its heavily dominant Google Play Store, a pre-loaded digital portal set up by Google. On the Google Play Store, mobile apps can be reviewed, purchased (if necessary), and downloaded by a consumer.

35.    The European Commission has determined there is a "relevant product market" for Android app stores. Google did not contest that determination.[5]

36.    Google has offered an app store for Google Android since 2008. An early version of Google's app store was known as "Android Market", which in March 2012, was integrated into Google Play and became the Google Play Store.

37.    The Play Store is part of Google Mobile Services, the bundle of Google apps and services Google licenses together.

---

[5] EC Google Android Decision at ¶¶ 217(2), 273. "From a supply-side perspective, the development of an app store requires significant time and resources, regardless of whether the developer in question has already developed other apps. In particular, developers of other apps have stated that the time and resources to develop an app store are significant. Microsoft, for example, stated: 'Using [R&D data] for fiscal years 2007 to 2014, we roughly estimate that we spent [millions of dollars] over this time period to develop appstores for Windows Phone 7, 8, and 8.1.'" *Id.* at ¶ 272 (emphasis omitted).

38.     Unlike other Google apps, the Play Store is not downloadable and therefore needs to be pre-installed by OEMs so that users have access to it. App developers cannot distribute alternative apps via the Play Store.

39.     In order to download an app (which is either free or available for purchase), an Android user must download that application through the Google Play Store. As described by Google, "With some apps, you can buy additional content or services within the app. We call these 'in-app purchases.' …. [S]ome examples of in-app purchases [include]:

   • A sword that gives you more power in a game.

   • A key that unlocks more features of a free app.

   • Virtual currency that can be used for purchases."[6]

40.     The Android App Store Market also includes other app stores for Android devices, such as Samsung's Galaxy Apps store and the Amazon AppStore, and independent app stores, such as GetJar.

41.     The Android App Store Market does not include app stores for non-Android smart mobile OSs, such as the (now defunct) Windows Mobile Store (which is compatible only with Microsoft's Windows Mobile OS) or Apple's App Store (compatible only with iOS), because app stores are OS-specific. A consumer who owns an Android smartphone cannot use an app store developed for a non-Android OS, and an OEM that pre-installs an app store on an Android device cannot install an app store that runs on a non-Android OS. The Google Play Store does not offer apps for download onto Apple devices, and the Apple Store does not offer apps for download onto Android devices.

---

[6]Google Play Help, *Make in-app purchases in Android apps*, GOOGLE, https://support.google.com/googleplay/answer/1061913?hl=en (last visited Oct. 2, 2020). Examples of "products supported by Google Play In-app billing include: Virtual game products . . . . App functionality or content . . . . subscription services . . . . [and] Cloud software products." Examples of "products not currently supported by Google Play In-app billing [include]: [r]etail merchandise . . . . Service fees . . . . One-time membership fees or recurring dues . . . . One-time payments, including peer-to-peer payments . . . . [and] Electronic bill payment . . . ." Classic Play Console Help, *Payments*, GOOGLE, https://support.google.com/googleplay/android-developer/answer/9858738?hl=en. (last visited Oct. 6, 2020).

CLASS ACTION COMPLAINT

42.     The relevant geographic market for the Android App Store Market is worldwide, excluding China.[7] China is excluded from the relevant market because legal and regulatory barriers prevent the operation of many global app stores, including the Google Play Store, within China. Additionally, app stores prevalent in China are not available, or have little presence, outside of China. Outside of China, app distribution channels like app stores, are globally developed and distributed, and OEMs, in turn, make app stores like the Google Play Store globally available on Android devices.

43.     The geographic scope of the Android App Store Market includes a separate sub-market within the United States which operates as described throughout this Complaint.

### 2.     Google Monopolizes the Android App Stores Market

44.     Through various anticompetitive acts and unlawful restraints on competition, Google possesses and maintains monopoly power in the Android App Stores Market, causing ongoing harm to competition and injury to consumers. Google's monopoly power is evidenced by its market share, the absence of countervailing buyer power, and the existence of high barriers to entry and expansion. Apple's App Store (which is not part of the relevant product market), does not exercise an indirect restraint sufficient to undermine Google's monopoly power.

45.     In the Google Android case, the European Commission concluded that Google holds a dominant position in the worldwide market (excluding China) for Android App Stores since 2011.[8]

46.     The existence of iPhone mobile devices applications and in-app products and services are not reasonably interchangeable substitutes for Android apps.

47.     In a July 18, 2018 decision, the European Commission concluded that Google abused its dominant power in the Android App Store Market. The European Commission fined Google €4.34 billion for breaching EU antitrust rules, concluding that, since 2011, Google has imposed illegal restrictions on Android device manufacturers and mobile network operators to cement its dominant position in general

---

[7] *See* EC Google Android Decision at ¶ 402: "The Commission concludes that the [Android App Stores Market] for the purpose of these proceedings are: . . . the worldwide market (excluding China) for Android app stores".

[8] *Id.* at ¶ 439(2).

CLASS ACTION COMPLAINT

internet searches. The European Commission determined that, "Google is dominant in the worldwide market (excluding China) for app stores for the Android mobile operating system. Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices. This market is also characterized by high barriers to entry . . . . Google's app store dominance is not constrained by Apple's App Store, which is only available on iOS devices."[9]

48.     As determined by the Majority Staff of the Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary: "Apps are not interoperable between operating systems – native apps developed for [Apple's] iOS only work on iOS devices, and native apps developed for Android only work on Android devices. The [Apple] App Store and the Play Store do not compete against one another. Android users cannot access the Apple App Store and iOS users cannot access the Google Play Store, so the dominance of the Play Store is not constrained by the App Store and vice versa." "[10]   Additionally, "app developers and industry observers agree that Apple and Google control the app distribution market on mobile devices."[11]

49.     In the United States, iOS and Android represent approximately 99% of the market share for mobile OS as of September 2020.[12] Because iOS is not licensable, it is not part of the market that is in consideration with respect to this case, which is the market for licensable OS for mobile devices. With respect to the OS which are licensable, including Samsung and Windows, neither of them has been able to penetrate the market share held by Google's Android OS.[13]

---

[9] Press Release, Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine, EUROPEAN COMMISSION (July 18, 2018), https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581.

[10] *Investigation of Competition in Digital Markets*, Majority Staff Report and Recommendations, Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary, at 95 (Oct. 6, 2020), available at
https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.

[11] *Id*. at 96.

[12] *Mobile Operating System Market Share United States of America*, STATCOUNTER GLOBALSTATS, (Sept. 2020) https://gs.statcounter.com/os-market-share/mobile/united-states-of-america/#monthly-202009-202009-bar.

[13] *Id*.

CLASS ACTION COMPLAINT

50. Currently, Google's dominance of the Android App Stores market exceeds 90%. The European Commission found that the Google Play Store is pre-installed on 90% of Android devices sold outside of China.[14] Additionally, the number of apps downloadable from the various app stores shows the disparity caused by Google's monopolistic grip: in 2019, Google Play had 2.7 million available apps for download, whereas the next four closest competitors number of apps do not even add up to the total the amount of available apps on Google Play (GetJar has 850,000 apps, Aptoide has 1,000,000 apps, Amazon AppStore has 480,000 apps, and Opera Mobile Store has 300,000 apps).[15]

51. Google's Play Store's dominance is also shown by, among other things, the number of apps downloaded from the Store, and the enormous number of apps available on the Store. The European Commission determined that more than 90% of app store downloads were processed through the Google Play Store.[16]

52. As further evidence of its monopoly power, Google imposes a supra-competitive commission of 30% on the price of apps, and in-app products or services, purchased through the Google Play Store: "For apps and in-app products offered through Google Play, the service fee is equivalent to 30% of the price."[17] This is a far higher fee than would exist absent Google's misconduct as described herein.

53. Google bundles the Google Play Store with Google Play Services, further reinforcing its monopoly. Google Play Services is a proprietary software layer that runs in the background on Android;

---

[14] EC Google Android Decision at ¶ 1451. The Commission concluded that even if the Windows Mobile Store share was included in the market, the Google Play Store would still possess a market share greater than 90%. *Id.*

[15] *About Us*, APTOIDE, https://en.aptoide.com/company/about-us. (last visited Oct. 5, 2020); Artyom Dogtiev, *App Stores List (2019)*, BUSINESSOFAPPS, https://www.businessofapps.com/guide/app-stores-list/.

[16] EC Google Android Decision at ¶ 1451.

[17] Play Console Help, *Service fees*, GOOGLE, https://support.google.com/googleplay/android-developer/answer/112622?hl=en#:~:text=As%20of%20January%201%2C%202018,that%20time%20will%20be%20counted. (last visited Oct. 2. 2020). As of January 1, 2018, under certain circumstances, "the service fee for subscription products decreases to 15% for any subscribers you [app developers] retain after 12 paid months." *Id.*

Google Play provides application programming interfaces (APIs) that enable apps to integrate with other apps and with Google services.[18] These Google services are necessary to the functionality of many apps. For example, the majority of apps in the Play Store use Google's cloud messaging service; and more than a million use AdMob, Google's mobile advertising service.[19] Apps cannot access these functionalities without Google Play Services. As the European Commission concluded, without Google Play Services, "many apps would either crash, or lack important functions."[20] Google does not license the Play Store and Google Play Services separately; they can only be licensed together,[21] thus further solidifying the Play Store as the number one pre-installed app store.

54. Substantial switching costs ensure that Google's monopoly power is not constrained by any competition in the smart mobile device arena. For example, consumers who own an Android device cannot purchase apps from Apple's App Store without moving to an Apple iOS device (*e.g.*, the iPhone) because Apple does not license its OS, nor has it developed or licensed an app store for Android. Thus, any consumers who switch from a Google Android device to an Apple device would lose the financial investment made in previously-purchased apps.

55. Additionally, once a consumer selects a smartphone, the consumer cannot replace the pre-installed mobile OS with an alternative OS -- if a consumer wants to switch OSs, that consumer has no choice but to purchase a new mobile device. Moreover, mobile OSs have different designs, controls, and functions that consumers learn to navigate and are familiar with over time. The learning curve to navigate a different mobile OS is part of consumers' switching costs.

---

[18] *Google Play Developer API*, GOOGLE DEVELOPERS, https://developers.google.com/android-publisher. (last visited Oct. 4, 2020).

[19] EC Google Android Decision at ¶ 142; Google Play, *Get paid to show relevant ads from over a million advertisers with Google AdMob*, GOOGLE DEVELOPERS, https://developer.android.com/distribute/best-practices/earn/show-ads-admob. (last visited Oct. 4, 2020).

[20] *Id.*

[21] *Id.* at ¶ 144.

CLASS ACTION COMPLAINT

56. Android OEMs find it commercially unreasonable to make and sell phones without the Google Play Store, and they view other app stores as poor substitutes because they offer fewer and less impressive apps.[22]

57. Switching from Android devices may result in a significant loss of personal and financial investment that consumers put into the Android ecosystem. Because apps, in-app content and many other products are designed for or are only compatible with a particular mobile OS, switching to a new mobile OS may mean losing access to such products or to data, even if such apps and  products are available within the new ecosystem.

58. When purchasing a mobile device, consumers have no reason to inquire about Google's anticompetitive contractual restraints and policies. Mobile device purchasers are focused on design, brand, processing power, battery life, and cellular plan. These features play a decisive role in a consumer's decision as to which smart mobile device to purchase.

59. Consumers are also unable to determine the "lifecycle price" of devices -- *i.e.*, to accurately assess at the point of purchase how much they will ultimately spend (including on the device and all apps and in-app purchases) for the duration of their device ownership. Consumers do not and cannot predict all of the apps or in-app content they may eventually purchase. Because they cannot know or predict all such factors when purchasing mobile devices, consumers are unable to accurately predict the lifecycle prices of the devices. This prevents consumers from effectively taking Google's anticompetitive conduct into account when making mobile device purchasing decisions.

60. Consumers who purchase Android devices are thus "locked-in" to the Android OS and Android app stores.

---

[22] Federico Etro & Cristina Caffarra, *On the economics of the Android case*, EUROPEAN COMPETITION JOURNAL Vol. 13, Nos. 2-3, 282-313 at 286-87 (Sept. 28, 2017), https://www.tandfonline.com/doi/pdf/10.1080/17441056.2017.1386957?needAccess=true (last visited Oct. 8, 2020).

CLASS ACTION COMPLAINT

**3.    Google's Anticompetitive Conduct in the Android App Store Market**

61.    Google has willfully and unlawfully maintained its monopoly in the Android App Store Market through a series of related anticompetitive acts.

*a.    Google's Contracts with OEMs*

62.    Google imposes anticompetitive restrictions in the Android App Store Market on OEMs by (1) crippling other app stores by requiring OEMs to give preferential location to the Play Store and other Google apps on the device's home screen; and (2) requiring OEMs to accept a bundle of apps and services that include the Google Play Store.

63.    Google conditions OEM licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on an OEM's agreement to provide the Google Play Store with preferential treatment compared to any other competing app store.

64.    Android OEMs (which comprise virtually all OEMs) must sign a Mobile Application Distribution Agreement ("MADA") with Google.[23] A MADA confers a license to a product bundle comprised of proprietary Google apps, Google-supplied services necessary for mobile app functionality, and the Android trademark.[24] The MADA requires OEMs to locate the Google Play Store on the home screen of each mobile device.[25] Android OEMs must further pre-install up to 30 Google mandatory apps and locate these apps on the home screen or on the next screen, occupying valuable space on each user's mobile device that otherwise could be used for competing app stores and other services.[26] These requirements ensure that the Google Play Store is the most prominent app store viewed by users; accordingly, other app stores are at a significant disadvantage.

65.    As discussed, Google will not license Google Play Services separately from the Play Store. The majority of the apps on the Play Store do not function at all or cannot perform all of their intended functions without access to the services included in Google Play Services.

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

66.     Through Google's anticompetitive restrictions in its contracts with OEMs, it is able to obstruct OEMs from pre-installing competing app stores on Google's Android mobile devices. Google also insulates itself from competition by issuing misleading warnings to Android users about the efficacy of other app stores, as well as time-consuming, multi-step processes (discussed below) to those that do choose to download, in an effort to dissuade consumers from downloading said stores. By wrongfully and unjustifiably convincing OEMs not to pre-download competing app stores, and intimidating consumers that competitors' stores are unsafe to be download, Google has foreclosed the mechanisms by which it would face competition. And, because of the absence of competition, consumers pay supra-competitive prices for apps and in-app purchases.

67.     Google interferes with OEMs' ability to distribute Android app stores and apps directly to consumers outside the Google Play Store. Even in circumstances when an OEM offers mobile devices with easy access to additional mobile app stores and apps through, for example, pre-installed and/or prominently placed icons, Google imposes unjustified and pretextual warnings about the security of installing the app in order to discourage its download from alternative sources other than the Google Play Store, even though the consumer is choosing to install the app fully aware of its source. This conduct dissuades users from downloading apps outside of the Google Play Store.

*b.*     ***Google's Contracts with App Developers***

68.     Google also imposes anticompetitive restrictions on competing app developers to further solidify its monopoly in the Android App Store Market.

69.     First, in order to maintain its monopoly in the App Store Market, Google prohibits any app developer that wants to distribute its apps through the Google Play Store from also distributing any competing app store through the Play Store.

70.     Google enforces this restraint through Google Play's Developer Distribution Agreement ("DDA"), which Google requires all app developers to sign before they are permitted to distribute their

CLASS ACTION COMPLAINT

apps via the Google Play Store.[27] All of the Defendants, other than Google Payment, are a party to the DDA.[28]

71.     Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."[29] The DDA further reserves to Google the right to remove and disable any Android app that it determines violates this requirement.[30] The DDA is non-negotiable, so developers seeking access to Android users through the Google Play Store must accept Google's standardized contract of adhesion.

72.     In the absence of these unlawful restraints, competing app distributors could allow users to replace or supplement the Google Play Store on their devices with competing app stores, easily downloaded and installed through the Google Play Store. App stores could compete and benefit consumers by offering lower prices and innovative app store models, such as app stores that cater to specific consumers' interests. Without Google's unlawful restraints, these app stores would provide additional platforms on which more apps could be featured, and thereby, discovered by consumers.

73.     Google also restricts competition in the Android App Store Market by closing off critical advertising opportunities to app developers who do not list their Android apps in the Google Play Store. Google markets an App Campaigns program that, allows app developers to "get your app into the hands of more paying users" by "streamlin[ing] the process for you, making it easy to promote your apps across Google's largest properties."[31] This program includes ad placements on Google Search, YouTube, Discover on Google Search, and the Google Display Network, and with Google's "search partners," that

---

[27] *See* Google Play, *Google Play Developer Distribution Agreement*, GOOGLE, https://play.google.com/about/developer-distribution-agreement/archive.html. (last accessed Oct. 8, 2020).

[28] *Id*.

[29] *Id*.

[30] *Id*.

[31] Google Ads Help, *About App campaigns*, GOOGLE, https://support.google.com/google-ads/answer/6247380?hl=en. (last accessed Oct. 4, 2020).

are specially optimized for the advertising of mobile apps.[32] But to access the App Campaigns program, Google requires that app developers list their app in either the Google Play Store to reach Android users, or in the Apple App Store to reach Apple iOS users. This conduct further solidifies Google's monopoly in Android App Distribution by forcing Android app developers to list their apps in the Google Play Store or risk losing access to many Android users they could otherwise reach through advertising, including through Google's monopoly search engine, but for Google's restrictions.

### c.   *Google's Restraints on Consumers*

74.   Google directly and anticompetitively restricts how consumers discover, download and install mobile apps and app stores. Although Google claims to permit consumers to directly download and install Android apps and app stores, Google uses its monopoly power to impose a series of technological obstacles designed to prevent users from direct downloads. Google misleadingly claims users face dangers of these direct downloads, referred to by Google as "sideloading."

75.   A consumer who wants to download an app or an app store onto her Google Android phone or tablet without using the Play Store faces extreme and unwarranted obstacles. Google makes this process technically complex, and confusing. In the European Commission's Google Android case, Amazon described the process as follows: "[E]ven for consumers who discover and download an alternate store outside of the Play Store, Google has configured Android to block the installation of that store. Consumers are unable to install downloadable app stores unless the consumer first navigates to and changes Android's obscure 'Unknown Sources' setting to allow installation of apps from sources other than the Play Store. When consumers attempt to change this setting, Google displays a message warning that 'your [tablet or phone] and personal data are more vulnerable to attack by apps from unknown sources. You agree that you are solely responsible for any damage to your tablet or loss of data that may result from using these apps.'"[33]

---

[32] *Id.*

[33] EC Google Android Decision at ¶ 635 citing to n.677 in Decision: "See Amazon's non-confidential response to Question 15 of the request for information of 21 October 2015 on app stores (Doc ID 4067)."

76.     According to the Majority Staff of the Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary: "Google has created significant friction for sideloading apps to Android devices. One developer explained to Subcommittee staff that sideloading entails a complicated twenty-step process, and users encounter multiple security warnings designed to discourage sideloading. Additionally, software developers that have left the Play Store to distribute software to Android users via sideloading have experienced precipitous declines in downloads and revenue and report problems updating their apps. Thus, the option for sideloading apps on mobile devices does not discipline the market power of dominant app stores."[34]

77.     Even if a user proceeds past Google's unjustified threats and warnings, direct downloading is inferior to downloading an app from the Play Store because Google prevents downloaded apps from updating in the background -- a benefit reserved solely for apps downloaded via the Google Play Store. Instead, users must *manually* approve every update of a sideloaded app or app store, which further discourages consumers from using alternatives to the Play Store.

78.     Google also unjustifiably discourages users from downloading apps and app stores from other sources by preventing installation of or even removing apps that it claims are "harmful."[35]

79.     Google has the capacity to make it nearly impossible to be able to directly download (or "sideload")[36] applications; in an interview, one app developer informed the United States Congress "sideloading entails a complicated twenty-step process, and users encounter multiple security warnings designed to discourage sideloading."[37] Downloading apps directly – bypassing the Google Play Store –

---

[34] *Investigation of Competition in Digital Markets*, *supra* n.10 at 98 (footnotes omitted). *See id*. ("There are no competitive constraints on the power Apple and Google have over the software distribution marketplace on their mobile ecosystems.").

[35] Google Play Help, Help Center, *Help protect against harmful apps with Google Play Protect*, GOOGLE, https://support.google.com/googleplay/answer/2812853?hl=en (last accessed Oct. 8, 2020); *See also Unwanted Software Policy*, GOOGLE, https://www.google.com/about/unwanted-software-policy.html (last accessed Oct. 8, 2020).

[36] With respect to mobile applications, "sideloading" is the process of "downloading apps manually from the internet (through a browser [window]" from a source other than an official application store (*i.e.*, not from Apple's App Store or Google's Play Store). EC Google Android Decision at ¶ 634 citing to n.675 in Decision.

[37] *Investigation of Competition in Digital Markets*, *supra* n.10 at 98 (footnotes omitted).

is prevented on Android devices that are part of Google's Advanced Protection Program ("APP").[38] Consumers who enroll in APP cannot directly download apps; their Android device can only download apps distributed in the Google Play Store or in another pre-installed app store that Google pre-approved an OEM to offer on its devices.[39]

80.     According to the Majority Staff of the Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary, other app stores and the sideloading of apps "do not provide meaningful alternatives to the Google Play Store," and "[t]he dual dominance of the Play Store and the Android ecosystem enable Google to exert control and engage in conduct that harms competition by exploiting, excluding, and discriminating against rivals."[40]

81.     Thus, app developers cannot reach APP users unless they agree to distribute their apps through the Google Play Store or through a separate Google-approved, OEM-offered app store. Google's security pretext is an excuse to further restrict an app developer's ability to reach Android users, in contrast to personal computers, where users can securely purchase and download new software without being limited to a single source owned by the PC's manufacturer.

82.     Additionally, apps downloaded or "sideloaded" from competing app stores, or apps directly downloaded from a developer's website, may not be automatically uploaded in the background. Thus, direct downloading is not a viable way for competing app stores to reach Android users, any more than it is a viable alternative for single apps. The only difference is that app stores do not have any alternative, ensuring that Android users have no choice but to use Google Play Store. Google's barriers erected against competing app distributors also are not the least restrictive means necessary to achieve any legitimate security objectives.

83.     But for Google's anticompetitive acts, as on a personal computer, Android users could download apps from developers' websites, rather than through an app store. There is no justification that

---

[38] Google Advanced Protection Program, GOOGLE, https://landing.google.com/advancedprotection/. (last accessed Oct. 4, 2020).

[39] *Id.*

[40] *Investigation of Competition in Digital Markets*, *supra* n.10 at 221.

CLASS ACTION COMPLAINT

downloading and installing an app on a mobile device is different. Millions of personal computer users safely download and install software directly, such as through Google's own Chrome browser or Mozilla Firefox.

84.     But for Google's restrictions on direct downloading, app distributors and developers would directly distribute their stores and apps to consumers. As explained above, Google makes direct downloading substantially and unnecessarily difficult, and in some cases prevents it entirely, further restricting any distribution channel.

85.     There is no legitimate justification for Google's conduct challenged herein, and even if there were, Google has not adopted the least restrictive means for achieving it. For decades, PC users have installed software acquired from various sources without being deterred by anything like the obstacles set up by Google. A PC user can access an internet webpage, download and install an application, and be up and running, often in a matter of minutes. Security screening is conducted by security software operating in the background, allowing users to download software from any source they choose, unlike Android.

86.     Through these anticompetitive acts,  including contractual provisions and exclusionary obstacles, Google has willfully obtained a virtual monopoly over Android mobile app distribution and in the Android App Store Market. Google Play Store downloads have accounted for more than 90% of downloads through Android app stores, dwarfing other available distribution channels.

### d.     *Anticompetitive Effects in the Android App Store Market*

87.     Google's anticompetitive conduct forecloses competition in the Android App Store Market, affecting interstate commerce with respect to this Market, causing anticompetitive harm and antitrust injury to consumers.

88.     Google's anticompetitive conduct forces OEMs to commit valuable home screen space to the Google Play Store (and other required Google applications), with no regard for the OEM's preferences, including having other app stores/developers' icons on the home page. These requirements limit OEMs' ability to compete with each other on price and quality of distribution platforms for mobile

apps. Google's restrictions additionally interfere with OEMs' ability to compete with each other in being able to offer consumers Android devices with customized pre-installed apps curated to specific categories of mobile device consumers.

89.     Google's anticompetitive conduct harms consumers by, among other things, impeding competition among app distributors, who would otherwise innovate new models of app distribution and provide consumers choices that extend beyond Google's app store.

90.     Consumers are harmed, damaged and injured by Google's supra-competitive charges of 30% on the purchase price of apps and in-app purchases sold through the Google Play Store, which is a much higher transaction fee than would exist in a competitive market unimpaired by Google's anticompetitive conduct. Google's supra-competitive prices reduce the output of mobile apps and related content by reducing app developers' incentives and capital to develop new apps and content.

91.     As explained by the Majority Staff of the Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary:  "Developers have . . .said that the 30% commissions charged by app stores have led them to increase prices for consumers and diminished innovation by software developers."[41]

92.     Google's restraint of the Android App Store Market hinders the ability and incentive for competing app stores, limiting consumers' ability to discover new apps of interest to them. If there were more competing app stores, this would permit additional platforms to feature more and more diverse collections of apps. Instead, consumers are left to search for millions of apps in one monopolized app store, where Google controls which apps are featured, identified or prioritized in user searches.

---

[41] *Investigation of Competition in Digital Markets*, *supra* n.10 at 100.

**C.      Google Unlawfully Maintains A Monopoly In The Android In-App Payment Processing Market**

   **1.      Android In-App Payment Processing Constitutes a Relevant Product Market**

93.      The relevant antitrust market for processing payment for digital content, including virtual gaming products, within Android apps is the "Android In-App Payment Processing Market". The Android In-App Payment Processing Market consists of the payment processing solutions that Android developers could integrate into their Android apps to process the purchase of in-app digital content.

94.      For applications purchased through the Google Play Store, Google requires use of Google Play Billing to process in-app purchases of digital content and for all purchases within Android games[42] Because 90% or more of Android-compatible mobile app downloads through an app store occur in the Google Play Store,[43] Google has a monopoly in this the Android In-App Payment Processing Market.

95.      By selling digital content within a mobile app rather than directly charging for the app itself, app developers can make an app widely accessible to all users, then generate revenue to fund development of new apps. For example, by allowing users of gaming apps to play games without up-front costs, developers permit more players try a game "risk free" and only pay for what they want to access. Many games are free to download and play but make additional content available for in-app purchases on an à la carte basis or via a subscription-based service.

96.      Google offers separate payment solutions for the purchase of digital content than it does for other types of purchases, even within mobile apps. Google Play Billing can be used for the purchase of digital content and virtual gaming products.

97.      Google's anticompetitive conduct ensures that Android app developers cannot integrate compatible payment processors into their apps to facilitate the purchase of in-app digital content. Nor

---

[42] Play Console Help, Policy Center, Monetization and Ads, *Payments*, GOOGLE, https://support.google.com/googleplay/android-developer/answer/9858738, (last accessed Oct. 8, 2020).

[43] Press Release, Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine, *supra* n.9.

CLASS ACTION COMPLAINT

can app developers utilize any one of the many electronic payment processing options available to process in-app purchases and other transactions. Instead, Google conditions developers' access to the dominant Google Play Store on an agreement to use Google Play Billing[44] to process in-app purchases of digital content. This directly affects consumers.

98.     Absent Google's anticompetitive conduct, app developers would integrate payment processors into their apps to facilitate in-app purchases or develop such functionality themselves. App developers would be able to offer consumers a choice among multiple payment processors for each purchase, comparable to options of using different credit cards, Apple pay, etcetera at brick-and-mortar stores or on websites. This would result in lower prices for consumers.

### 2.     Google's Monopoly Power In The Android In-App Payment Processing Market

99.     Google has monopoly power in the Android In-App Payment Processing Market, including the relevant antitrust sub-market for the processing of payments for the purchase of virtual products within mobile apps games (the "Android Games Payment Processing Market").

100.     The geographic scope of the Android In-App Payment Processing Market is worldwide, excluding China. Outside China, in-app payment processing tools, such as Google Play Billing, are available on a worldwide basis. By contrast, in-app payment processing tools available in China are not available outside of China, including because Google prevents the use of non-Google payment processing tools for all apps distributed through the Google Play Store, which dominates distribution of apps outside of China.

101.     The geographic scope of the Android In-App Payment Processing Market includes a separate sub-market within the United States which operates as described throughout this Complaint.

102.     Google charges a 30% commission for Google Play Billing. This rate reflects Google's market power, which allows it to charge consumers supra-competitive prices for payment processing within the Android In-App Payment Processing Market. The cost of alternative electronic payment

---

[44] *Payments*, *supra* n.42.

processing tools, which are prohibited by Google for apps and in-app purchases through the Google Play Store, are as little as one tenth of the 30% cost of Google Play Billing.

103.    For example, the electronic processing payment rate for online payment processing company PayPal is 2.9%,[45] for Stripe it is 2.9%,[46] and for Square it ranges from 2.6%-3.5%,[47] all of which are substantially less than the supra-competitive rate that Google charges.

### 3.    Google's Anticompetitive Conduct in the Android In-App Payment Processing Market

104.    Through provisions of Google's DDA imposed on all app developers seeking access to Android users, Google unlawfully ties its Google Play Store, through which it has a monopoly in the Android App Store Market, to its own in-app payment processing tool, Google Play Billing. Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Google Payment, to receive payment for and from apps and in-app digital content.[48]

105.    Section 4.1 of the DDA makes compliance with Google's Developer Program Policies mandatory and those Policies require in relevant part that (1) app developers offering products within a game downloaded on Google Play or providing access to game content must use Google Play In-app Billing as the method of payment; and (2) app developers offering products within another category of app downloaded on Google Play must use Google Play In-app Billing as the method of payment, except when the payment is solely for physical products or is for digital content that may be consumed outside of the app itself (*e.g.*, songs that can be played on other music players).[49]

---

[45] PayPal Editorial Staff, *Credit card processing fees: What business owners need to know*, PAYPAL, (May 15, 2020), https://www.paypal.com/us/brc/article/understanding-merchant-credit-card-processing-fees.

[46] Pricing, *Pricing built for businesses of all sizes. Always know what you'll pay.*, STRIPE, https://stripe.com/pricing. (last accessed Oct. 4, 2020).

[47] *How much does Square cost?*, SQUARE, INC., https://squareup.com/us/en/pricing?solution=pricing-in-person-payments. (last accessed Oct. 4, 2020).

[48] *See Google Play Developer Distribution Agreement*, supra n.28.

[49] *Id.*

CLASS ACTION COMPLAINT

106. Google's unlawful restraints in the DDA prevent app developers from integrating alternative, and multiple, payment processing solutions into their mobile apps, depriving consumers the availability of competing payment processors with lower fees.

107. Google has no legitimate justification for this conduct. If, for example Google was concerned about the security of its users' payment information, then it would not permit alternative payment processing for certain transactions made on Android phones for physical products or digital content consumed outside an app.[50] But Google *does* allow alternative payment processing tools in that context, with no compromise to security.[51]

### 4. <u>Anticompetitive Effects in the Android In-App Payment Processing</u>

108. Google's conduct harms competition in the Android In-App Payment Processing Market (including the Android Games Payment Processing Market) and injures consumers, app developers, and competing in-app payment processors.

109. Google's conduct harms would-be competitor in-app payment processors who would otherwise be free to offer consumers alternative payment processing tools with lower prices and improved functionality.

110. Google also harms consumers by requiring that in-app purchases are transacted through Google Play Billing, preventing app developers from providing customer service to consumers without Google's involvement. Google has minimal incentive to compete through improved customer service because it faces no competition. In obtaining information concerning app developers' transactions with their customers, Google has an anticompetitive edge in its advertising, whether or not app developers and consumers want to share their information with Google. In these ways as well as others, Google directly harms app developers' relationships with consumer who use their apps and make in-app purchases.

111. Google raises consumer prices through its supra-competitive 30% tax on app and in-app purchases, a fee that consumers would not be paying in a competitive payment processing market. These

---

[50] *Id.*

[51] *Id.*

CLASS ACTION COMPLAINT

prices reduce app developers' incentives to invest in and create additional apps and in-app content for consumers.

## VI.   ANTITRUST INJURY

112.   Plaintiffs and Class members have suffered antitrust injury as a direct result of Google's unlawful conduct.

113.   By unlawfully restricting competition in the Android App Store Market, Google's unlawful conduct has enabled it to charge supra-competitive prices to consumers.

114.   By unlawfully impairing competition in the Android In-App Payment Processing Market, Google's unlawful conduct has enabled it to charge supra-competitive prices to consumers.

115.   Plaintiffs and Class members are the direct purchasers of Android apps and in-app purchases. When Plaintiffs and Class members purchase Android apps, they do so directly on Google Play and pay Google directly, using their credit card or other payment sources. When Plaintiffs and Class members purchase in-app digital content, they do through Google Play, using the payment source set up when purchasing that app or other apps on Google Play. When Plaintiffs and Class members purchase the in-app digital content, they pay/paid Google directly.

## VII.   CLASS ALLEGATIONS

116.   Plaintiffs bring this action on  behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> **All persons in the United States who purchased an app or in-app**
> **product or service on the Google Play Store.**

117.   Excluded from the Class are Defendants; Defendants' current or former officers, directors, employees, agents and/or representatives; Defendants' affiliates and subsidiaries; any entity in which any Defendant has a controlling interest; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action; and all governmental entities.

118.     The Class is readily ascertainable and the records for the Class should exist, including, specifically, within Defendants' own records and transaction data.

119.     Due to the nature of the trade and commerce involved, there are least one million geographically-dispersed members in the Class, the exact number and their identities being known to Defendants, such that individual joinder in this case is impracticable.

120.     Plaintiffs' claims are typical of the claims of the members of the proposed Class. Plaintiffs and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of the laws alleged herein. The damages and injuries of each member of the Class were directly caused by Defendants' wrongful conduct.

121.     Plaintiffs and their counsel will fairly and adequately protect and represent the interests of the Class. Counsel for Plaintiffs are experienced in complex class action litigation, including antitrust litigation, and will vigorously assert the claims of Class members. Plaintiffs will represent and protect the interests of the proposed Class both fairly and adequately. Plaintiffs have no interests that are antagonistic to those of the proposed Class, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

122.     Numerous questions of law and fact are common to the claims of Plaintiffs and members of the proposed Class, and those questions predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, but are not limited to:

- Whether there is a relevant Android App Store Market;

- Whether there is a relevant worldwide geographic market, excluding China;

- Whether Google unlawfully obtained and/or maintained monopoly power in the market for Android App Stores;

- Whether competition in the Android App Store Market has been restrained and harmed by Google's monopolization and anticompetitive restrictions;

- Whether there is a relevant Android In-App Payment Processing Market;

- Whether Google unlawfully obtained and/or maintained monopoly power in the Android In-App Payment Processing Market;

- Whether competition in the Android In-App Payment Processing Market has been restrained and harmed by Google's monopolization and anticompetitive restrictions;

- Whether Google's contractual restrictions for Google Play further Google's attempt to monopolize the Android App Store Market;

- Whether Google's restrictions on sideloading apps is an attempt to, and does further maintain Google's monopoly over the Android App Store Market;

- Whether Google's conduct results in supra-competitive prices for Android apps, in-app purchases, and/or subscriptions to apps obtained in the Google Play Store;

- Whether Plaintiffs and Class members have been harmed by Google's unlawful practices;

- Whether Plaintiffs and Class members are entitled to injunctive relief; and

- The appropriate Class-wide measures of damages

123.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the Class members to seek redress for the violations of law alleged herein.

**VIII.   CAUSES OF ACTION**

**COUNT 1**
**SHERMAN ACT § 2**
**UNLAWFUL MONOPOLY AND/OR MAINTENANCE OF MONOPOLY**
**For Damages and Injunctive Relief**
**(Against All Defendants)**

124.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

125.    Google's conduct violates § 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

126.    The Android App Store Market and the Android In-App Payment Processing Market (including the Android Games Payment Processing Market) are valid and relevant antitrust markets.

127.    Google holds monopoly power in each of the foregoing markets.

128.    Google has unlawfully maintained monopoly power in foregoing markets through the anticompetitive acts described herein, including, but not limited to: (1) impermissibly and unjustifiably interfering with consumers' ability to purchase apps and in-app purchases outside the Google Play Store; (2) impermissibly and unjustifiably interfering with consumers' ability to use payment processing tools, other than Google Play Billing, for in-app purchases; (3) conditioning licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on OEMs' agreement, giving the Google Play Store preferential placement and treatment; (4) imposing technical restrictions and obstacles on both OEMs and app developers that prevent the distribution of Android apps to consumers through means other than the Google Play Store; and (3) conditioning app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.

129.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

130.    Google's conduct has substantial anticompetitive effects, including increased prices to consumers, reduced innovation and quality of service, and lowered output.

30
CLASS ACTION COMPLAINT

131.    Plaintiffs were injured and damaged by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost alternatives, that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 2**
**SHERMAN ACT § 1**
**UNLAWFUL RESTRAINTS OF TRADE**
**For Damages and Injunctive Relief**
**(Against All Defendants)**

132.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

133.    Defendants' conduct violates §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

134.    Google entered into agreements with third parties that unreasonably restrict competition in the Android App Store Market and the Android In-App Payment Processing Market (including the Android Games Payment Processing Market).

135.    These include (i) MADA with OEMs that condition their access to the Google Play Store and other "must have" Google services on the OEM offering the Google Play Store as the primary (and often the only) viable app store on Android mobile devices; and (ii) agreements with app developers that restrict the use of payment processing systems other than Google Play Billing.

136.    These agreements serve no legitimate or pro-competitive purpose that justify their anticompetitive effects, and they unreasonably restrain competition in the foregoing markets.

137.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

CLASS ACTION COMPLAINT

138.   Google's conduct has substantial anticompetitive effects, including increased prices to consumers, reduced innovation and quality of service, and lowered output.

139.   Plaintiffs were harmed and injured by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 3**
**CALIFORNIA CARTWRIGHT ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

140.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

141.   Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See id.* §§ 16720, 16726.

142.   Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

143.   The Android App Store Market and the Android In-App Payment Processing Market (including the Android Games Payment Processing Market) are relevant antitrust markets.

144.   Google has monopoly power in the foregoing markets.

145.   Google has executed agreements with OEMs that unreasonably restrict competition in the foregoing markets. Google entered into MADAs with OEMs that require OEMs to offer the Google Play Store as the primary—and practically the only—app store on Android mobile devices. These agreements

32

CLASS ACTION COMPLAINT

further prevent OEMs from offering alternative app stores on Android mobile devices in any prominent visual positioning.

146.  Additionally, Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein. Through provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android App Store Market.

147.  Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

148.  Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, to receive payment for apps and content distributed through the Google Play Store. This includes payments related to in-app purchases. Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for in-app purchases. While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself," Google

CLASS ACTION COMPLAINT

expressly and discriminatorily applies its anticompetitive mandate to every "game downloaded on Google Play" and to all purchased "game content."

149.    Google's conduct has no legitimate or pro-competitive purpose or effect, and unreasonably restrains competition in the Android App Store Market and the Android In-App Payment Processing Market (including in the Android Games Payment Processing Market).

150.    Google's conduct and practices have substantial anticompetitive effects, including increased prices to consumers, reduced innovation, poorer customer service and lowered output.

151.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

152.    Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

<u>**COUNT 4**</u>
**ARIZONA UNIFORM STATE ANTITRUST ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

153.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

154.    Google's acts and practices detailed above violate the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 44-1402, and monopolization or attempted monopolization of trade

or commerce for the purpose of excluding competition or controlling, fixing or maintaining prices, *id.* § 44-1403.

155.    Google's conduct and practices have substantial anticompetitive effects in Arizona, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

156.    Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

<u>**COUNT 5**</u>
**DISTRICT OF COLUMBIA ANTITRUST ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

157.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

158.    Google's acts and practices detailed above violate the District of Columbia Antitrust Act, D.C. Code § 28-4501, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 28-4502, and monopolization or attempted monopolization over any part of trade or commerce for the purpose of excluding competition or controlling, fixing or maintaining prices, *id.* § 28-4503.

159.    Google's conduct and practices have substantial anticompetitive effects in the District of Columbia, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

160. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 6**
**HAWAII ANTITRUST LAWS**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

161. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

162. Google's acts and practices detailed above violate Hawaii's antitrust laws, Haw. Rev. Stat. § 480-1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 480-4, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 480-9.

163. Google's conduct and practices have substantial anticompetitive effects in Hawaii, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

164. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 7
### ILLINOIS ANTITRUST ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

165.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in this Complaint as if fully set forth herein.

166.    Google's acts and practices detailed above violate the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq.*, which prohibits, *inter alia*, combinations to restrain or monopolize trade or commerce, and the monopolization or attempted monopolization of a market for the purpose of excluding competition or of controlling, fixing, or maintaining prices, *id.* § 10/3.

167.    Google's conduct and practices have substantial anticompetitive effects in Illinois, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

168.    Plaintiffs have been harmed by Defendants' anticompetitive conduct in a manner that the Illinois Antitrust Act was intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 8
### IOWA COMPETITION LAW
### For Damages and Injunctive Relief
### (Against all Defendants)

169.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

170.    Google's acts and practices detailed above violate the Iowa Competition Law, Iowa Code § 553.1, *et seq.*, which prohibits, *inter alia*, combinations to restrain or monopolize trade or commerce,

*id.* § 553.4, and the monopolization or attempted monopolization of a market for the purpose of excluding competition or of controlling, fixing, or maintaining prices, *id.* § 553.5.

171.    Google's conduct and practices have substantial anticompetitive effects in Iowa, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

172.    Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 9
### KANSAS RESTRAINT OF TRADE ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

173.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

174.    Google's acts and practices detailed above violate the Kansas Restraint of Trade Act, Kan. Stat. § 50-101, *et seq.*, which prohibits, *inter alia*, combinations to create or carry out restrictions in trade or commerce, increase the price of merchandise, or prevent competition in the sale of merchandise, *id.*

175.    Google's conduct and practices have substantial anticompetitive effects in Kansas, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

176.    Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not

engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 10**
**MAINE MONOPOLY & PROFITEERING LAWS**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

177.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

178.   Google's acts and practices detailed above violate Maine's monopoly and profiteering laws, Me. Rev. Stat. tit. 10, § 1101, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.*, and the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 1102.

179.   Google's conduct and practices have substantial anticompetitive effects in Maine, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

180.   Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

CLASS ACTION COMPLAINT

## COUNT 11
**MARYLAND ANTITRUST LAWS**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

181. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

182. Google's acts and practices detailed above violate Maryland's antitrust laws, Md. Code, Com. Law § 11-201, *et seq.*, which prohibit, *inter alia*, combinations that unreasonably restrain trade or commerce, *id.* § 11-204, and the monopolization or attempted monopolization of any part of the trade or commerce for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce, *id.*

183. Google's conduct and practices have substantial anticompetitive effects in Maryland, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

184. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 12
**MASSACHUSETTS CONSUMER PROTECTION LAWS**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

185. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

CLASS ACTION COMPLAINT

186.     Google's acts and practices detailed above violate Massachusetts' consumer protection laws, Mass. Gen. Laws ch. 93A, § 1, *et seq.*, which prohibit, *inter alia*, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, *id.* § 2.

187.     Google's conduct and practices have substantial anticompetitive effects in Massachusetts, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

188.     Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 13**
**MICHIGAN ANTITRUST REFORM ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

189.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

190.     Google's acts and practices detailed above violate the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 445.772, and the establishment or attempted establishment of a monopoly of trade or commerce for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, *id.* § 445.773.

191.     Google's conduct and practices have substantial anticompetitive effects in Michigan, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

192.     Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 14**
**MINNESOTA ANTITRUST LAW OF 1971**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

193.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

194.     Google's acts and practices detailed above violate the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, *et seq.*, which prohibits, *inter alia*, combinations in unreasonable restraint of trade or commerce, *id.* § 325D.51, and the establishment or attempted establishment of a monopoly over any part of trade or commerce for the purpose of affecting competition or controlling, fixing, or maintaining prices, *id.* § 325D.52.

195.     Google's conduct and practices have substantial anticompetitive effects in Minnesota, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

196.     Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages

and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 15
### MISSISSIPPI ANTITRUST LAWS
### For Damages and Injunctive Relief
### (Against all Defendants)

197.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

198.    Google's acts and practices detailed above violate Mississippi's antitrust laws, Miss. Code. § 75-21-1, *et seq.*, which prohibit, *inter alia*, combinations inimical to the public welfare that restrain trade, increase the price of a commodity, or reduce the production of a commodity, *id.*

199.    Google's conduct and practices have substantial anticompetitive effects in Mississippi, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

200.    Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 16
### NEBRASKA JUNKIN ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

201.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

---

43

CLASS ACTION COMPLAINT

202. Google's acts and practices detailed above violate the Junkin Act, Neb. Rev. Stat. § 59-802, *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce, *id.* § 59-802, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 16726.

203. Google's conduct and practices have substantial anticompetitive effects in Nebraska, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

204. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 17
### NEVADA UNFAIR TRADE PRACTICES ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

205. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

206. Google's acts and practices detailed above violate the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, *et seq.*, which prohibits, *inter alia*, the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 598A.060.

207. Google's conduct and practices have substantial anticompetitive effects in Nevada, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

CLASS ACTION COMPLAINT

208. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 18
### NEW HAMPSHIRE CONSUMER PROTECTION ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

209. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

210. Google's acts and practices detailed above violate the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*, which prohibits, *inter alia*, the pricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition, *id.* § 358-A:2.

211. Google's conduct and practices have substantial anticompetitive effects in New Hampshire, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

212. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 19
## NEW MEXICO ANTITRUST ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

213.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

214.    Google's acts and practices detailed above violate the New Mexico Antitrust Act, N.M. Stat. § 57-1-1, *et seq.*, which prohibits, *inter alia*, the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 57-1-2, and combinations in restraint of trade or commerce, *id.* § 57-1-1.

215.    Google's conduct and practices have substantial anticompetitive effects in New Mexico, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

216.    Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 20
## NEW YORK DONNELLY ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

217.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

218.    Google's acts and practices detailed above violate New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*, which prohibits, *inter alia*, monopoly in the conduct of any business, trade or commerce or in the furnishing of any service, *id.* § 340.

219.   Google's conduct and practices have substantial anticompetitive effects in New York, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

220.   Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 21**
**NORTH CAROLINA ANTITRUST LAWS**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

221.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

222.   Google's acts and practices detailed above violate North Carolina's antitrust laws, N.C. Gen. Stat.  § 75-1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 75-1, and the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 75-2.1.

223.   Google's conduct and practices have substantial anticompetitive effects in North Carolina, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

224.   Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not

engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 22**
**NORTH DAKOTA UNIFORM STATE ANTITRUST ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

225.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

226.    Google's acts and practices detailed above violate the North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-01, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 51-08.1-02, and the establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, *id.* § 51-08.1-03.

227.    Google's conduct and practices have substantial anticompetitive effects in North Dakota, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

228.    Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 23
## OREGON ANTITRUST LAW
### For Damages and Injunctive Relief
### (Against all Defendants)

229.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

230.   Google's acts and practices detailed above violate the Oregon Antitrust Law, Or. Rev. Stat. § 646.705, *et seq.*, which prohibits, *inter alia*, combinations in restraint of trade or commerce, *id.* § 646.725, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 646.730.

231.   Google's conduct and practices have substantial anticompetitive effects in Oregon, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

232.   Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 24
## SOUTH DAKOTA ANTITRUST LAWS
### For Damages and Injunctive Relief
### (Against all Defendants)

233.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

49

234.     Google's acts and practices detailed above violate South Dakota's antitrust laws, S.D. Codified Laws § 37-1-3.1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.*, and monopolization or attempted monopolization of trade or commerce, *id.* § 37-1-3.2.

235.     Google's conduct and practices have substantial anticompetitive effects in South Dakota, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

236.     Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 25**
**TENNESSEE TRADE PRACTICES ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

237.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

238.     Google's acts and practices detailed above violate the Tennessee Trade Practices Act, Tenn. Code § 47-25-101, *et seq.*, which prohibits, *inter alia*, combinations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, *id.*

239.     Google's conduct and practices have substantial anticompetitive effect in Tennessee, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

240.     Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 26**
**UTAH ANTITRUST ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

241.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

242.     Google's acts and practices detailed above violate the Utah Antitrust Act, Utah Code § 76-10-3101, *et seq.*, which prohibit, *inter alia,* combinations in restraint of trade or commerce, *id.* § 76-10-3104, and monopolization or attempted monopolization of any part of trade or commerce, *id.*

243.     Google's conduct and practices have substantial anticompetitive effect in Utah, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

244.     Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

CLASS ACTION COMPLAINT

**COUNT 27**
**VERMONT CONSUMER PROTECTION LAWS**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

245.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

246.   Google's acts and practices detailed above violate Vermont's consumer protection laws, Vt. Stat. tit. 9, § 2451, *et seq.*, which prohibit, *inter alia*, all unfair methods of competition in commerce, *id.* § 2453.

247.   Google's conduct and practices have substantial anticompetitive effects in Vermont, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

248.   Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 28**
**WEST VIRGINIA ANTITRUST ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

249.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in this Complaint as if fully set forth herein.

250.   Google's acts and practices detailed above violate West Virginia Antitrust Act, W. Va. Code §§ 47-18-1 – 47-18-23, which prohibits, *inter alia*, combinations in restraint of trade or commerce,

*id.* § 47-18-3, and the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 47-18-4.

251. Google's conduct and practices have substantial anticompetitive effects in West Virginia, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

252. Plaintiffs have been harmed by Defendants' anti-competitive conduct in a manner that the West Virginia Antitrust Act was intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 29**
**WISCONSIN TRADE REGULATIONS**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

253. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

254. Google's acts and practices detailed above violate Wisconsin's trade regulations, Wis. Stat. Ann. § 133.01, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 133.03, and monopolization or attempted monopolization of any part of trade or commerce, *id.* Google's conduct and practices have substantial effects in Wisconsin, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

255. Plaintiffs have been harmed by Defendants' anti-competitive conduct in a manner that Wisconsin's trade regulations were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had

Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## IX.     **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendants and order the following relief:

A.     Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

B.     Preliminarily and permanently enjoining Defendants from engaging in the wrongful conduct alleged herein;

C.     Declaring Defendants' conduct unlawful under the statutes and causes of action alleged herein;

D.     Awarding Plaintiffs and the Class treble damages for injuries caused by Defendants' violations of the federal antitrust laws, California's Cartwright Act, the Arizona Uniform State Antitrust Act, the District of Columbia Antitrust Act, the Hawaii antitrust laws, the Illinois Antitrust Act, the Iowa Competition Law, the Kansas Restraint of Trade Act, Maine's monopoly and profiteering laws, Maryland's antitrust laws, Massachusetts' consumer protection laws, the Michigan Antitrust Reform Act, the Minnesota Antitrust Law of 1971, the Mississippi antitrust laws, Nebraska's Junkin Act, the Nevada Unfair Trade Practices Act, the New Hampshire Consumer Protection Act, the New Mexico Antitrust Act, New York's Donnelly Act, North Carolina's antitrust laws, the North Dakota Uniform State Antitrust Act, the Oregon Antitrust Law, South Dakota's antitrust laws, the Tennessee Trade Practices Act, the Utah Antitrust Act, Vermont's consumer protection laws, the West Virginia Antitrust Act, and Wisconsin's trade regulations; and other monetary relief, including prejudgment and post judgment interest, to the maximum extent permitted by law;

E.     Awarding Plaintiffs and the Class reasonable attorneys' fees and costs; and

F.     Granting such other and further relief as the Court may deem just and proper.

## X.    <u>JURY TRIAL DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial of all issues so triable.

Dated: October 9, 2020          Respectfully submitted,

**MILBERG PHILLIPS GROSSMAN LLP**

*/s/ David Azar*

David Azar (State Bar No. 218319)
dazar@milberg.com
16755 Von Karman Avenue, Suite 200
Irvine, California 92606
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

Peggy J. Wedgworth (*pro hac vice forthcoming*)
pwedgworth@milberg.com
Robert A. Wallner (*pro hac vice forthcoming*)
rwallner@milberg.com
Elizabeth McKenna (*pro hac vice forthcoming*)
emckenna@milberg.com
Blake Yagman (*pro hac vice forthcoming*)
byagman@milberg.com
Michael Acciavatti (*pro hac forthcoming*)*
macciavatti@milberg.com
*admitted only in Pennsylvania
**MILBERG PHILLIPS GROSSMAN LLP**
One Penn Plaza, Suite 1920
New York, New York 10119
Telephone: 212-594-5300
Facsimile: 212-868-1229

*Attorneys for Plaintiffs and the Proposed Class*

JS-CAND 44 (Rev. 10/2020)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Dianne Bentley, Jennifer Grace, Adan Moya, Coresa Trimble, Robert Wing, on behalf of themselves and all others similarly situated,

**(b)** County of Residence of First Listed Plaintiff    Cumberland County, NC
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attachment.

## DEFENDANTS

Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific Pte. Limited, and Google Payment Corp.

County of Residence of First Listed Defendant    Santa Clara
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

---

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

1. U.S. Government Plaintiff

2. U.S. Government Defendant

3. Federal Question
*(U.S. Government Not a Party)*

4. Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

---

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | **LABOR** | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | | 710 Fair Labor Standards Act | 830 Patent | 430 Banks and Banking |
| | 340 Marine | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 151 Medicare Act | 345 Marine Product Liability | **PERSONAL PROPERTY** | 740 Railway Labor Act | 840 Trademark | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 350 Motor Vehicle | 370 Other Fraud | 751 Family and Medical Leave Act | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 790 Other Labor Litigation | **SOCIAL SECURITY** | 480 Consumer Credit |
| of Veteran's Benefits | 360 Other Personal Injury | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| 160 Stockholders' Suits | 362 Personal Injury -Medical Malpractice | 385 Property Damage Product Liability | | 862 Black Lung (923) | 490 Cable/Sat TV |
| 190 Other Contract | | | **IMMIGRATION** | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 462 Naturalization Application | 864 SSID Title XVI | 890 Other Statutory Actions |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | 865 RSI (405(g)) | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

---

## V. ORIGIN *(Place an "X" in One Box Only)*

1. Original Proceeding
2. Removed from State Court
3. Remanded from Appellate Court
4. Reinstated or Reopened
5. Transferred from Another District *(specify)*
6. Multidistrict Litigation–Transfer
8. Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   Yes   No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*

JUDGE        DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

**(Place an "X" in One Box Only)**    SAN FRANCISCO/OAKLAND    SAN JOSE    EUREKA-MCKINLEYVILLE

DATE       SIGNATURE OF ATTORNEY OF RECORD

**Attachment to Civil Cover Sheet**


I.  PLAINTIFF'S ATTORNEYS

      David Azar
      **MILBERG PHILLIPS GROSSMAN LLP**
      16755 Von Karman Avenue, Suite 200
      Irvine, California 92606
      Telephone:  212-594-5300

      Peggy J. Wedgworth*
      Robert A. Wallner *
      Elizabeth McKenna*
      Blake Yagman*
      Michael Acciavatti*
      **MILBERG PHILLIPS GROSSMAN LLP**
      One Penn Plaza, Suite 1920
      New York, New York 10119
      Telephone: 212-594-5300

* *Pro hac vice* application forthcoming

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

(1) United States plaintiff. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

(2) United States defendant. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

(3) Federal question. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

(4) Diversity of citizenship. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the six boxes.

(1) Original Proceedings. Cases originating in the United States district courts.

(2) Removed from State Court. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

(3) Remanded from Appellate Court. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

(4) Reinstated or Reopened. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5) Transferred from Another District. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

(6) Multidistrict Litigation Transfer. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

(8) Multidistrict Litigation Direct File. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

Please note that there is no Origin Code 7. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**IX.** **Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

9

10

EPIC GAMES, INC.,

11

                Plaintiff,

12

      v.

13

GOOGLE LLC; GOOGLE IRELAND

14

LIMITED; GOOGLE COMMERCE LIMITED;
GOOGLE ASIA PACIFIC PTE. LIMITED; and

15

GOOGLE PAYMENT CORP.,

16

                Defendants.

17

CASE NO. 3:20-cv-05671-JD

**[PROPOSED] ORDER RELATING**
**CASES AND GRANTING**
**ADMINISTRATIVE MOTION TO**
**CONSIDER WHETHER CASES**
**SHOULD BE RELATED**

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER RELATING CASES AND GRANTING ADMINISTRATIVE MOTION TO
CONSIDER WHETHER CASES SHOULD BE RELATED

Having considered Plaintiffs Dianne Bentley, Jennifer Grace, Adan Moya, Coresa Trimble, and Robert Wing's Administrative Motion to Consider Whether the Cases Should Be Related, as well as the pleadings on file, the Court GRANTS the Motion and ORDERS the Clerk to relate its later-filed case, *Bentley et al. v. Google LLC et al.*, No. 5:20-cv-07079 (filed Oct. 9, 2020) to the first-filed action, captioned: *In re Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD (N.D. Cal., filed August 13, 2020):

**IT IS SO ORDERED.**

Dated:                    , 2020

_____
UNITED STATES DISTRICT JUDGE
THE HONORABLE JAMES DONATO

[PROPOSED] ORDER RELATING CASES AND GRANTING ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED